**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC
4110 SE Hawthorne Blvd. # 168
Portland, OR 97214
(503) 388-9160
davebeckerlaw@gmail.com

**Talasi B. Brooks (*Pro hac vice***
***application to be filed*)**
Western Watersheds Project
PO Box 2863
Boise, ID 83701
(208) 336-7910
tbrooks@westernwatersheds.org

**Paul D. Ruprecht (OSB # 132762)**
Western Watersheds Project
PO Box 12356
Reno, NV 89510
(208) 421-4637
paul@westernwatersheds.org

Attorneys for Plaintiffs Western Watersheds Project, Center for Biological Diversity, and
WildEarth Guardians

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| **WESTERN WATERSHEDS PROJECT, CENTER FOR BIOLOGICAL DIVERSITY,** and **WILDEARTH GUARDIANS,** | Case No.: 2:19-cv-750 |
| Plaintiffs, | **COMPLAINT FOR VACATUR OF ILLEGAL AGENCY DECISIONS, AND DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| **DAVID BERNHARDT,** Secretary of the Interior, **JEFFREY A. ROSE,** District Manager Burns District Bureau of Land Management, and **BUREAU OF LAND MANAGEMENT,** | **(Environmental Matter)** |
| Defendants. | (Pursuant to the Administrative Procedure Act, Federal Land Policy and Management Act, and National Environmental Policy Act) |

## NATURE OF ACTION

1.      In this action, Plaintiff environmental organizations request that this Court enjoin and vacate former Secretary of the Interior Ryan Zinke's eleventh-hour decision to renew a term grazing permit for Hammond Ranches, Inc. (Hammond), even though Hammond lacked the satisfactory record of performance required by the Federal Land Policy and Management Act (FLPMA) and Department of Interior regulations. Hammond's past violations of the terms and conditions of their livestock grazing permit included arson during extreme fire weather situations that resulted in the destruction of important habitat for greater sage-grouse (*Centrocercus urophasianus*) and the spread of the fire-prone invasive weed cheatgrass. Cheatgrass continues to impair land health on the permitted allotments to this day. Plaintiffs also seek injunctive relief and vacatur of BLM District Manager Jeffrey Rose's reissuance of the permit and determination that the permit reissuance met the requirements for using a categorical exclusion (CX) rather than the Environmental Assessment (EA) or Environmental Impact Statement (EIS) required by the National Environmental Policy Act (NEPA), especially because the Secretary and BLM violated FLPMA by failing to consider including specific management thresholds and defined responses to protect sage-grouse in the permit, as the relevant land use plans require.

2.      BLM grazing permits are 10-year privileges to graze federal public lands. The permits create no right, title, or interest in those lands. To qualify for a grazing permit renewal under FLPMA and the grazing regulations that implement it, the permittee must be in compliance with the regulations, and the authorized federal officer must determine that an applicant has a satisfactory record of performance under its current permit.

3.      Hammond held a permit to graze four BLM grazing allotments on Steens Mountain adjacent to the Malheur National Wildlife Refuge in southeastern Oregon from 2004 to 2014—the Hammond, Mud Creek, Hardie Summer, and Hammond FFR allotments. In 2010,

Hammond's principals, Dwight and Steven Hammond, were indicted on multiple counts of arson for setting fire to public BLM lands to increase forage for their cattle. In 2012, they were convicted, and eventually each was sentenced to serve five years in jail.

4.      In 2014, BLM denied the Hammond grazing permit renewal application. BLM determined that Hammond did not have the mandatory satisfactory record of performance for permit renewal because the intentional and malicious fire-setting by principals of Hammond associated with the 2001 Hardie-Hammond Arson and August 22, 2006 Krumbo Butte Arson violated regulations applicable to the Hammond grazing permit along with the permit terms, and because other conduct by the Hammond principals violated federal regulations. The fires set resulted in destruction of sage-grouse habitats. The fire also increased the spread of the invasive weed cheatgrass, elevating future fire risk.

5.      Hammond appealed BLM's decision and sought a stay to prevent the decision from going into effect. The Office of Hearings and Appeals (OHA) denied the stay on April 28, 2014. When OHA denied the stay, BLM's nonrenewal decision went into effect. The four Hammond allotments were not grazed for the past five years, beginning in spring 2014. The allotments have begun to heal and recover. After OHA denied the stay, Hammond's administrative appeal remained pending.

6.      In January, 2016, armed extremists seized and occupied the Malheur National Wildlife Refuge, demanding the Hammonds' release from prison. Secretary Zinke expressed sympathy for the Hammonds and advocated for them to receive a Presidential pardon. In July 2018, President Trump pardoned Dwight and Steven Hammond.

7.      On December 26, 2018, during the federal government shutdown, Secretary Zinke assumed jurisdiction over Hammond's appeal under 43 C.F.R. § 4.5. On January 2, 2019, his last

day in office as Secretary, he signed a decision reversing BLM's denial of the permit renewal application, renewing the Hammond permit, and directing BLM to reissue the Hammonds' grazing permit under the same terms and conditions within 30 days. Importantly, Secretary Zinke's decision did not disturb BLM's findings of fact or legal conclusions regarding the Hammond principals' conduct and unsatisfactory record of performance and multiple violations of the terms of their permits, on which the agency had based its decision to deny the permit renewal application. The Secretary made no determination that Hammond had a satisfactory record of performance. Instead, the Secretary relied on the pardons as changed circumstances justifying his decision. His decision issued after the government shutdown ended, on January 28, 2019.

8.      In a memo signed by District Manager Jeffrey Rose on February 5, 2019, BLM complied with the Secretary's order. District Manager Rose determined that the permit reissuance was categorically excluded from the requirement to prepare an EA or EIS; that renewal of the Hammond grazing permit conformed with the relevant land use plans; and that, pursuant to the Secretary's decision, the permit would be renewed from February 2, 2019 to February 28, 2024. But grazing permit renewal decisions may not be categorically excluded from NEPA review unless the issued permit or lease continues the current grazing management of the allotment and extraordinary circumstances do not preclude use of a CX. Extraordinary circumstances include impacts on ecologically significant or critical areas, and contribution to spread of noxious weeds or non-native invasive species. District Manager Rose's determination allowed the release of cows onto the allotments, even though the allotments suffer from weed invasions, lie within important greater sage-grouse habitats, include streams important to redband trout (*Oncorhynchus mykiss ssp.*), lie mostly within the Steens Mountain Cooperative

Management and Protection Area (CMPA), and encompass a portion of the Bridge Creek Wilderness Study Area (WSA)—without a full, public environmental analysis.

9.    The Resource Management Plans (RMPs) that govern grazing on the four allotments covered by the challenged permit were amended in September 2015 by the Oregon Greater Sage-Grouse Approved RMP Amendment (ARMPA). The 2015 ARMPA identifies priority sage-grouse habitats that require special protection and consideration in management decisions, including Priority Habitat Management Areas (PHMA)—BLM-administered lands identified as having the highest value to maintaining sustainable sage-grouse populations—and sagebrush focal areas (SFA), which is a subset of PHMA and represent recognized strongholds for sage-grouse. The RMPs, as amended by the ARMPA, require the NEPA analysis for grazing permit renewals that include lands within SFA and PHMA to include specific management thresholds and one or more defined responses that will allow the authorizing officer to make adjustments to livestock grazing to protect sage-grouse. Neither the Secretary nor BLM considered these provisions for the renewed permit, in violation of FLPMA.

10.    Plaintiffs challenge the Secretary's decision, as well as BLM's implementation of that decision by reissuing the grazing permit under a CX, for violating the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06; FLPMA, 43 U.S.C. §§ 1701–84; and NEPA, 42 U.S.C. §§ 4321–61, and their implementing regulations. The Secretary's decision violated FLPMA and its implementing regulations because he renewed the permit even though Hammond lacked the satisfactory record of performance mandated by FLPMA, and NEPA, because he issued the decision without first completing NEPA analysis. BLM violated NEPA by renewing the permit using a CX when the permit did not continue "current" grazing (which was no grazing, following the denial of Hammond's petition for stay before OHA), extraordinary

circumstances precluded use of a CX, and because it incorrectly determined that the action

complied with the RMPs. The Secretary and BLM violated FLPMA by not considering specific

management thresholds and defined responses required by the RMPs in processing the renewed

grazing permit.

11.    If Hammond is allowed to graze livestock under the unlawfully-renewed permit,

Plaintiffs and their members and supporters will suffer irreparable harms. The Hammond grazing

allotments encompass high-value sagebrush habitats essential to greater sage-grouse and stream

segments important to redband trout. They also encompass the Bridge Creek WSA and lands

within the Steens Mountain CMPA where, upon information and belief, the Hammond principals

have set fires and otherwise violated BLM regulations. Resumption of grazing on these

allotments after five years of rest will irreparably harm these areas by degrading sage-grouse

habitat, increasing invasive weeds, and increasing the likelihood of destructive fire, both through

grazing and given the Hammonds' longstanding pattern of fire-setting to increase forage for their

cattle. These environmental impacts, incurred without the full and public analysis NEPA

requires, irreparably harm Plaintiffs.

12.    For these reasons, Plaintiffs request that this Court vacate and remand the

Secretary's decision renewing the permit and BLM's reissuance of the permit; declare that BLM

violated NEPA and FLPMA by reissuing the permit and without a full NEPA analysis based

upon its flawed determination that the permit met the criteria for using a CX and was consistent

with the land use plans; declare that the Secretary and BLM violated FLPMA by not analyzing or

incorporating management thresholds and defined responses required to protect sage-grouse in

the reissued permit; and enjoin BLM from allowing grazing on these four allotments until the

Department of the Interior has fully complied with FLMPA, NEPA, and its own regulations.

## JURISDICTION AND VENUE

13.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action

arises under the laws of the United States, including NEPA, FLPMA, the APA, and the Equal

Access to Justice Act, 28 U.S.C. § 2412 *et seq*. Plaintiffs thus seek judicial review of final

administrative actions of the Secretary and BLM. *See* 5 U.S.C. § 704 (actions reviewable). An

actual, justiciable controversy exists between the parties, and the requested relief is therefore

proper under 28 U.S.C. §§ 2201–02 and 5 U.S.C. § 701–06.

14.     Venue is proper in this Court under 28 U.S.C. § 1391 and LR 3-2(b) because all

or a substantial part of the events or omissions giving rise to the claims herein occurred within

this judicial district, defendants reside in this district, and the public lands and resources and

agency records in question are located in this district.

15.     The federal government has waived sovereign immunity in this action pursuant to

5 U.S.C. § 702.

## PARTIES

16.     Plaintiff WESTERN WATERSHEDS PROJECT (WWP), is a non-profit

corporation dedicated to protecting and conserving the public lands and natural resources in

Oregon and the West. WWP has staff and offices in Oregon, Idaho, Wyoming, Montana,

Nevada, and Arizona. Since its inception, WWP has advocated to curb ecological abuses from

public lands livestock grazing throughout the West, including in Oregon. WWP and many of its

members and supporters have long-standing interests in preserving and conserving greater sage-

grouse populations and sagebrush habitats in Oregon and other states across the range of the

greater sage-grouse.

17. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a non-profit organization dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems. The Center was founded in 1989 and is based in Tucson, Arizona, with offices or staff throughout the country, including in Portland, Oregon. It has more than 63,000 members, including many who reside in, explore, and enjoy sage-grouse and sagebrush ecosystems in Oregon and throughout the West. The Center advocates for sound public land management to protect species habitat, including habitat for greater sage-grouse and other sagebrush obligates in Oregon and elsewhere. The Center's officers, staff, and members regularly visit public lands and sagebrush habitats for recreational, scientific, educational and other pursuits, and intend to continue to do so in the future.

18. Plaintiff WILDEARTH GUARDIANS (Guardians) is a nonprofit organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the West. Guardians has over 165,000 members and supporters, many of whom have long advocated for the protection and restoration of sagebrush habitats and the species that depend upon them and for responsible land management. Headquartered in Santa Fe, New Mexico, Guardians maintains several other offices around the West, including an office in Portland, Oregon.

19. The Plaintiff organizations place a high priority on protecting and conserving sagebrush ecosystems and curbing ecologically harmful grazing throughout the West, including in Oregon. They undertake a wide range of activities including education, advocacy, scientific study, and litigation in order to protect and conserve sagebrush ecosystems, often through reducing the effects of ecologically harmful livestock grazing, and to communicate to the public and policy-makers about the values of sagebrush habitats in Oregon.

20.     Plaintiffs' members, supporters, and/or staff live, work, recreate, study, and otherwise use and enjoy public lands in Oregon, including public lands in and around the Malheur National Wildlife Refuge and Steens Mountain, where Hammond grazes cattle. Plaintiffs' members, supporters, and/or staff frequently engage in hiking, camping, cycling, wildlife observation, photography, and other activities on public land on and around Steens Mountain and the Malheur National Wildlife Refuge, including the Hammond grazing allotments. They have enjoyed viewing sage-grouse, redband trout, and other wildlife on Steens mountain and the Hammond grazing allotments and been upset by witnessing habitat degradation due to Hammond's grazing in those areas. They and their friends and family members have been shot at or otherwise harassed by Hammond's principals/affiliates.

21.     Defendant DAVID BERNHARDT is the Secretary of the Interior and is responsible for former Secretary Ryan Zinke's Decision renewing the Hammond grazing permit. *See* Fed. R. Civ. P. 25(d). He is sued in his official capacity.

22.     Defendant JEFFREY ROSE is District Manager of Burns District BLM, and is responsible for signing a letter determining that the permit reissuance met the requirements for using a CX and did not require further NEPA analysis and for determining that renewal of the Hammond grazing permit was in conformance with the relevant land use plans. He is sued in his official capacity.

23.     Defendant BUREAU OF LAND MANAGEMENT (BLM) is an agency of the United States within the Department of the Interior charged with managing the Oregon federal lands at issue according to federal statutes and regulations. BLM authorizes livestock grazing—including by Hammond—on federal lands it manages.

COMPLAINT—8

24.    Plaintiffs have Article III standing to bring this action because they are directly injured by the procedural and substantive FLPMA, NEPA, and APA violations alleged herein, which are redressable by this Court. Plaintiffs are directly injured by the Secretary's unlawful Decision renewing Hammond's grazing permit because it harms their strong interests in having Executive officials and federal agencies obey federal law and in ecologically sound grazing management. Plaintiffs are further injured by the Secretary's and BLM's renewal and reissuance of the grazing permit without required NEPA analysis because it deprives the agency and the public of full information concerning the effects of the permit renewal decision. The unlawful permit renewal decision threatens irreparable harm to sagebrush ecosystems, sage-grouse, Wilderness quality lands, and redband trout and their riparian habitat, all of which Plaintiffs value and enjoy, further harming Plaintiffs' interests.

25.    Plaintiffs' injuries would be redressed if this Court reversed and vacated the Secretary's Decision, as well as District Manager Rose's Decision; declared the Secretary's decision to renew the Hammond grazing permit unlawful because Hammond did not have a satisfactory record of performance; declared unlawful District Manager Rose's issuance of the permit and determination that the permit met the criteria for using a CX and was consistent with the land use plans; ordered the Secretary and/or BLM to complete a legally-adequate NEPA analysis before renewing the Hammond permit; ordered the Secretary and BLM to consider including the mandatory management thresholds and defined responses in the permit; and enjoined the BLM from allowing grazing on the allotments unless and until BLM and the Department of the Interior have fully complied with FLPMA, NEPA, and their regulations. Unless judicial relief is granted, Plaintiffs will continue to suffer irreparable harm to their interests from unlawful livestock grazing under the grazing permit.

## STATEMENT OF FACTS

### A. Factual Background.

*i.   Hammond's grazing permit.*

26.     Hammond Ranches, Inc. (Hammond) is a livestock ranching business. It is controlled by Dwight Hammond, who is the president, and Dwight's son Steven, who is the vice-president (the Hammond principals).

27.     Dwight and Steven Hammond are affiliates of Hammond. Under the Department of the Interior grazing regulations, "affiliate" is defined as "an entity or person that controls . . . an applicant, permittee or lessee. The term 'control' means having any relationship which gives an entity or person authority directly or indirectly to determine the manner in which an applicant, permittee or lessee conducts grazing operations." 43 C.F.R. § 4100.0-5.

28.     Hammond has been the permittee of a series of grazing permits allowing it to graze four allotments on the BLM Burns District, within the Andrews Field Office: the Mud Creek, Hardie Summer, Hammond FFR, and Hammond allotments. Permitted use is as follows:

| | ALLOTMENT | LIVESTOCK NUMBER KIND | PERIOD BEGIN | END | % PL USE | TYPE USE | AUMS |
|---|---|---|---|---|---|---|---|
| OR06005 | MUD CREEK | 390 CATTLE | 05/16 | 06/30 | 100 | ACTIVE | 590 |
| OR06023 | HAMMOND | 68 CATTLE | 04/01 | 10/30 | 99 | ACTIVE | 471 |
| OR06025 | HARDIE SUMMER | 408 CATTLE | 07/01 | 09/30 | 33 | ACTIVE | 407 |
| OR06100 | HAMMOND FFR | 32 CATTLE | 04/01 | 04/30 | 100 | ACTIVE | 32 |

*ii.   Unique and important values within the Hammond allotments.*

29.     The allotments contain unique and important values.

30.     The Mud Creek allotment is largely within the Bridge Creek WSA, designated for study to be included in the National Wilderness Preservation System.

31.    The Mud Creek and Hardie Summer allotments are wholly within the Steens

Mountain CMPA. The Hammond and Hammond FFR allotments are partially within the Steens

Mountain CMPA.

32.    All of the allotments include greater sage-grouse habitats that were officially

identified in 2015 with the passage of sage-grouse amendments to all BLM land-use plans in

sage-grouse habitat, including Priority Habitat Management Areas (PHMAs) and General

Habitat Management Areas (GHMAs). The Mud Creek allotment is entirely within PHMA. The

Hardie Summer, Hammond, and Hammond FFR allotments also include GHMA. PHMAs are

"BLM-administered lands identified as having the highest value to maintaining sustainable

[greater sage-grouse] populations. . . .  These areas include breeding, late brood-rearing, winter

concentration areas, and migration or connectivity corridors." Oregon ARMPA (2015), 1–5.

GHMAs are "BLM-administered lands where some special management will apply to sustain

[greater sage-grouse] populations; areas of occupied seasonal or year-round habitat outside of

PHMA." *Id.*

33.    There is an active sage-grouse mating ground (lek) within the Mud Creek

allotment, and two other active sage-grouse leks are within two miles of the Hammond and

Hammond FFR allotments and within three miles of the Hardie Summer allotment. The

Hammond allotments lie astride a sage-grouse predicted geographic connectivity corridor and

connect with a large Sagebrush Focal Area (SFA) to the southeast. SFAs are "a subset of PHMA

… that represent recognized strongholds for [greater sage-grouse] that have been noted and

referenced as having the highest densities of [greater sage-grouse] and other criteria important

for the persistence of the species."

34.    Sagebrush is especially important for the greater sage-grouse which is a "sagebrush obligate" species that relies upon the sagebrush steppe ecosystem for all its habitat needs. Greater sage-grouse is a landscape species that uses a variety of seasonal habitats throughout the year. Sage-grouse breeding sites (leks) and associated nesting and brood-rearing habitats are especially important to the species' life cycle. The grouse have high fidelity to leks, and most hens will nest within four miles of the lek where they mated. Fire, invasive weeds, and grazing are three of the greatest threats to sage-grouse persistence on Oregon BLM lands, because they remove sagebrush and reduce sage-grouse habitat quality.

35.    Several streams on the four allotments are home to redband trout, a BLM-designated Sensitive Species. Redband trout inhabit Bridge Creek on the Hammond and Mud Creek allotments, Mud Creek which runs along the boundary of the Mud Creek allotment, and Big Bridge Creek, Little Fir Creek, Big Fir Creek, Lake Creek, and Fish Creek on the Hardie Summer and Hammond FFR allotments. Grazing has altered the structure and function of streams and ecosystems, impacted watershed processes, and contributes significantly to factors limiting redband trout populations. Redband trout are classified as a "Sensitive Species" by BLM and the Oregon Department of Fish and Wildlife (ODFW). BLM has identified several of the streams on or adjacent to these four allotments as priority streams/subwatersheds to guide development of watershed management actions to prevent water quality degradation in the Andrews and Steens CMPA RMPs. ODFW has determined that grazing on the streams on these allotments, which are tributaries of the Blitzen River, is a limiting factor for redband trout due to threats that grazing poses to water quantity, water quality, physical habitat degradation, and siltation.

//

    *iii.*     *Ecological degradation caused by livestock grazing.*

36.     Livestock grazing is detrimental for sage-grouse when it reduces height and density of grasses and forbs. Early season, intensive spring grazing by livestock negatively affects native plant communities upon which female sage-grouse depend for providing concealment of nests and later by chicks. Grazing in this period should be avoided because it overlaps the nesting and breeding season. Late season intensive grazing by livestock also negatively affects native plant communities important in providing concealment cover for early nesting female sage-grouse in the next year.

37.     Cattle grazing greatly alters the structure and composition of riparian zones and hence their inestimable value as centers of biological diversity. In the short term, herbivory can depress both plant growth and reproduction. Depressing the vigor of native plant species as well as soil disturbance by trampling facilitates the introduction and spread of exotic and noxious weeds. Herbivory also causes a corresponding decline in root biomass of riparian vegetation. At stream edges, the combination of root loss and trampling weakens and collapses banks. Bank loss and the resulting soil erosion of sediment results in down cut (*i.e.*, incised) and widened streams, as well as degradation of water quality and fish habitats.

38.     Cattle grazing also disturbs biological soil crusts and removes native vegetation. Cattle grazing facilitates the spread of cheatgrass, a non-native invasive annual grass, or "weed," and other noxious weeds. Cheatgrass invasion shortens fire cycles and may cause or contribute to the spread of wildfire. Weeds and wildfire degrade sage-grouse habitat.

    *iv.*     *Hammond principals' pattern of arsons and other disregard for public lands.*

39.     Dwight and Steven Hammond have exhibited a pattern of conduct and behavior that disregards the special values and other multiple use values the grazed allotments provide.

Between 2001 and 2006, the Hammonds established a pattern of setting fires on the public lands to remove sagebrush and juniper and increase forage for their cattle. Their conduct and behavior endangered firefighters and members of the public. Their conduct and behavior was prohibited under federal regulations and the terms and conditions of the Hammond grazing permit.

40.    On September 30, 2001, the first day of deer hunting season, 13-year old Dusty Hammond was at the Hammonds' Ranch with plans to hunt. Dusty is grandson to Dwight and nephew to Steven. Early that morning, Dusty sat at the Hammonds' breakfast table and overheard Dwight talking about his desire to burn juniper. After breakfast, the Hammonds' hunting party set out with rifles in search of game.

41.    After some driving and walking, several shots were fired by someone in the Hammonds' hunting party into a group of deer. A local hunting guide who was guiding private clients in the area witnessed the incident and saw four crippled bucks—but the Hammond party made no efforts to track or collect the wounded deer. The incident troubled the guide's clients, so he decided to move them away from the Hammonds.

42.    After shooting at the deer, the Hammonds' hunting party continued scouting for game.  Steven and Dwight started handing out boxes of matches and instructing the party to commit arson, apparently, to burn juniper. Russell Hammond, Dusty's father, showed him how to light multiple matches at a time to better catch the grass on fire.

43.    Meanwhile, the hunting guide returned to camp. Shortly after he returned, the thick smoke from the Hammonds' fires began blowing into his camp and he was forced to abandon his camp and flee with his clients, because it appeared the fire was blowing towards them.

44.    Later that day, Dwight and Steven took to the sky in their airplane to examine the burned area. They told Dusty they were going to see if the fire had gotten rid of the junipers. They also told Dusty to keep his mouth shut about the fire, and he did for many years.

45.    Soon after the fire, Dwight spoke with the BLM Burns District Range Specialist, and told him he had wanted to burn the area where the 2001 fire had burned for years, and although BLM had promised to burn it with a prescribed fire, it had not.

46.    Dwight and Steven were eventually convicted of arson in the Hardie-Hammond fire, related to this incident.

47.    On August 17, 2006, while working on flagging a cattle fence, Steven admitted to Joe Glascock, BLM Range Specialist, that he and Dwight had been setting fires in the area for years. He also told Mr. Glascock not to be surprised if more fires appeared after the next lightning storm.  Mr. Glascock reported these statements to George Orr, BLM Law Enforcement Officer.

48.    On August 21, 2006, a lightning storm hit the Steens Mountain and ignited several fires, including the Krumbo Butte Fire. Dwight told Mr. Glascock that he wished the fires were larger in size.

49.    On the night of August 22, 2006, firefighters working on the Krumbo Butte Fire noticed suspicious fire behavior downhill from their camp, with three "spot fires" that seemed out of place based on the weather and conditions. Based on the circumstances, the firefighters became concerned that someone was committing arson. Because fire can move uphill rapidly, and sleeping uphill of an active fire is very dangerous, the firefighters were forced to move their camp.

50.    Steven was later convicted of setting the three "spot fires" which endangered the firefighters' lives in the Krumbo Butte Fire.

51.    Around this same time several other fires were linked to Dwight and Steven, including fires that boxed in several firefighters, but the Hammonds were either acquitted of arson charges related to those fires or the jury did not reach a verdict.

52.    On August 24, 2006, Mr. Glascock met with Steven at the Frenchglen Hotel to discuss a proposed BLM burnout operation. He confronted Steven about Dwight lighting fires, and Steven said that if Mr. Glascock was not willing to work with the Hammonds to make the fire investigations go away, then Steven would blame Mr. Glascock for lighting the suspicious fires. He told Mr. Glascock, "if I go down, you're going down with me."

53.    District Manager Rose, who worked as a BLM fire ecologist from October 1999 through May of 2008, testified at the Hammonds' 2012 trial for arson that the fires burned sagebrush habitat, which is important for wildlife such as sage-grouse, mule deer, antelope, and elk. While fire generates forage for cattle grazing, it also kills sagebrush. Exposed, bare soils left by fire are vulnerable to invasion by nonnative weeds like cheatgrass, which increase erosion and reduce wildlife habitat. Without sufficient sagebrush cover, habitat for sage-grouse is degraded. While BLM undertook efforts to reseed the burned area to restore native wildlife habitat and prevent weed invasion, the seed mix BLM used did not include sagebrush.

54.    BLM conducted a Land Health Assessment (LHA) on the Hammond allotments in 2007. Plaintiffs have been unable to obtain that report.

55.    In a 2012 indictment, the Hammonds were charged with numerous counts of arson related to setting fire to public lands in efforts to increase forage for their cattle. They were

convicted on a total of three counts and ultimately sentenced to federal prison for the mandatory

minimum of five years.

> v.    *BLM's denial of Hammond's grazing permit renewal application and Hammond's appeal.*

56.    The Hammonds' 10-year grazing permit was slated to expire in 2014. BLM sent

the Hammonds two letters in 2013 notifying them that their grazing permit was slated to expire

and, given their noncompliance with the permit terms and conditions as evidenced by their arson

convictions, it was possible BLM would elect not to renew the permit, so they should make

alternative arrangements for their cows.

57.    On September 30, 2013, Susan Hammond (Dwight's wife and Steven's mother—

also an affiliate of Hammond) submitted an application for grazing permit renewal to BLM.

58.    On February 14, 2014, BLM issued a final decision to deny Hammond's grazing

permit renewal application and terminate its grazing preference. BLM's decision, signed by

BLM Burns District Manager Brendan Cain, concluded:

> I find that Hammond Ranches, Inc. and its affiliates have demonstrated an unacceptable record of performance. During the present permit period, Dwight and Steven were found guilty in a criminal legal proceeding of multiple instances of unauthorized burning over a period of time.
> . . .
> The fire-setting burned, destroyed, and removed vegetation on public lands without authorization and damaged U.S. property without authorization in violation of 43 C.F.R. § 4140.1. The Hammonds set the fires because they disagreed with how BLM managed the land. The Hammonds acted in the interest of improving the rangeland forage for their cattle, but not necessarily for other resources like wildlife habitat…. With non-renewal of this permit, the Hammonds will no longer have the same economic incentive to burn public land allotments without authorization and endanger people.
> . . .
> The Hammonds' behavior underlying the 2006 Krumbo Butte arson conviction—standing alone—constitutes an unsatisfactory record of performance.
> . . .
> Even if, for argument's sake only, the Hammonds' behavior underlying the 2006 Krumbo Butte arson conviction—standing alone—was not sufficient to constitute an unsatisfactory record of performance, the Hammonds' behavior, when one considers both the 2006

conviction and the 2001 convictions, also constitutes an unsatisfactory record of performance …. The 2006 arson was not an isolated incident.  Rather, it was part of a pattern of conduct by Hammond Ranches, Inc.'s owners and operators attempting to improve livestock forage at the risk of human life and multiple use resources.

Even if, for argument's sake only, the 2006 arson conviction alone, or the 2006 and 2001 arson convictions combined, were not sufficient to find an unsatisfactory record of performance, the additional fire-setting described in the criminal trial above further demonstrates an unsatisfactory record of performance …. Additionally, while the jury acquitted Dwight or Steven Hammond on some counts, the criminal standard of proof is higher than the civil standard and evidence may yet show that the Hammonds lit other fires at issue in the civil trespass case.

BLM's decision to deny the permit renewal application relied on the behavior and conduct supporting the Hammond's principals' criminal convictions, evidence of their behavior and conduct related to other counts of arson on which the jury did not reach conviction, and other evidence of the behavior and conduct by the Hammond principals that violated federal regulations. This includes the evidence summarized in Paragraphs 38–56 and 58, above.

59.    The Hammonds filed an administrative appeal with OHA and sought a stay of the decision. OHA denied the request for a stay on April 28, 2014. When OHA denied the stay, BLM's nonrenewal decision went into effect. The Hammonds' allotments were not grazed beginning in spring 2014 through at least the end of March 2019. During that period, the allotments were vacant.

60.    The Hammonds appealed the stay denial. The Interior Board of Land Appeals (IBLA) affirmed on November 23, 2016.

61.    Meanwhile, the Harney County Stock Growers' Association, the Oregon Cattlemen's Association, and the Oregon Farm Bureau Federation all filed amicus briefs in support of Hammond's appeal. They also pursued political angles.  Oregon Cattlemen's Association director Jerome Rosa claimed in a New York Times article, "I had the opportunity to have a private meeting with [Secretary Zinke] . . . . He . . . agreed that the Hammonds were good

people, and said he would talk to the [P]resident and give his blessing to release the Hammonds

from prison."

      *vi.*    *Hammond's Presidential pardons and Secretary Zinke's review of BLM's permit nonrenewal decision.*

      62.    In July 2018, President Trump granted the Hammonds full pardons. Typically,

convicts are not eligible to apply for pardon until at least five years after they are released from

prison. However, at the time of the pardons both Dwight and Steven Hammond were in jail, with

Dwight having served only three years of his sentence and Steven having served four.

      63.    During the summer of 2018, BLM collected data to inform a Land Health

Assessment (LHA) of conditions on the allotments formerly permitted to Hammond. BLM has

not produced this LHA to Plaintiff Western Watersheds Project despite a pending request under

the Freedom of Information Act. On information and belief, the LHA asserted in the fall of 2018

that all of the allotments assessed failed to meet Standard 5 for wildlife habitat, but for reasons

other than livestock grazing. It did not assess the Hammond FFR allotment. In the case of the

Mud Creek allotment, the LHA asserted the causal factor was "reduced sagebrush cover as a

result of fire history and presence of invasive annual grasses." The LHA asserted the Hammond

and Hardie Summer allotments were failing Standard 5 because of "juniper encroachment and

invasive annual grass presence."

      64.    On December 26, 2018, while the federal government was shut down, Secretary

Zinke notified OHA that he was assuming jurisdiction over Hammond's appeal of its permit

denial under 43 C.F.R. § 4.5. OHA received the notice and transmitted the Record for the case to

Secretary Zinke on December 27, 2018.

      65.    On January 2, 2019—six days later, and on Zinke's final day in office—Zinke

signed a decision renewing the Hammond grazing permit on the same terms and conditions and

directing BLM to reissue the permit within 30 days. Secretary Zinke's decision did not make the required determination whether Hammond had a satisfactory record of performance. Secretary Zinke's decision did not disturb BLM's finding in 2014 that Hammond's record of performance was unsatisfactory due to the conduct and behavior of its affiliates and multiple instances of violation of the terms and conditions of the permit and of federal regulations. Secretary Zinke did not find fault with BLM's assessment of the law and facts in its 2014 decision. Nevertheless, he set aside BLM's decision because he found that the pardons constituted unique and important changed circumstances since BLM made its decision. Zinke's decision asserted that "I find that it is consistent with the intent of the pardons—and in particular their reflection of the President's judgment as to the seriousness of the Hammonds' offenses—to renew the Hammonds' permit for the duration of the term that would have commenced in 2014." Ostensibly due to the government shutdown, Secretary Zinke's decision did not issue until January 28, 2019.

66.    Secretary Zinke provided no opportunity for public comment or appeal on his January 2, 2019 decision. The Secretary did not prepare or review any environmental analysis under NEPA prior to issuing his decision. The Secretary's decision is a final agency action subject to judicial review by this Court under FLPMA, NEPA, and the APA.

    *vii.    BLM's reissuance of Hammond's grazing permit.*

67.    On February 5, 2019, Rangeland Management Specialist Jamie McCormack circulated a memo later signed by Burns District Manager Rose. The memo referred to the Secretary's decision and stated that the Hammond permit would be renewed from February 2, 2019 to February 28, 2024, using the same livestock grazing management as the previous grazing permit. Because the summer 2018 data collection and fall 2018 LHA had asserted that the former Hammond allotments were meeting standards, or were not meeting standards for

reasons other than livestock grazing, the memo concluded that the three criteria for using a

categorical exclusion (CX) to fully process permits has been met. District Manager Rose's

signature indicated he concurred with the determination. BLM completed a CX related to the

grazing permit, noting that "the proposed action did not trigger any of the extraordinary

circumstances described in 43 C.F.R. § 46.215," and making a determination that the permit

qualified as a CX and did not require further NEPA analysis.

68.     Upon information and belief, BLM has never analyzed the environmental impacts

of grazing on the Hammond allotments in a full EA or EIS.

69.     Like the Secretary, BLM made no new determination that Hammond met the

mandatory qualification for permit renewal or that Hammond had a satisfactory record of

performance. BLM provided no opportunity for public comment on or appeal of the CX, and did

not voluntarily circulate it to Plaintiff WWP, even though WWP is an "interested public" under

BLM's grazing regulations, and is supposed to receive all documents for any action on grazing

allotments within Burns District. BLM did not provide a copy of the CX or the renewed permit

to Plaintiffs until April 2019. BLM's reissuance of the permit and determination that the permit

qualified as a CX and did not require further NEPA analysis is a final agency action reviewable

by this Court together with or separately from the Secretary's decision under NEPA, FLPMA,

and the APA.

70.     Upon information and belief, Hammond has already turned out cattle on the

Hammond and Hammond FFR allotments. Unless the Court grants the injunctive relief requested

herein, Hammond will turn out cattle on the Mud Creek allotment on May 16, 2019, and on the

Hardie Summer allotment on July 1, 2019, and cattle will continue to graze on the Hammond

allotment until October 30. Continuing to allow Hammond to graze these allotments under the

Secretary's unlawful decision without adequate NEPA compliance will irreparably harm

Plaintiffs' rights and interests, including their interests in healthy sagebrush ecosystems and

robust sage-grouse populations.

### B.  Legal Framework.

71.    Enacted in 1976, FLPMA governs BLM's management of the public lands.  43

U.S.C. §§ 1701 *et seq.* In FLPMA, Congress directed that public lands:

> be managed in a manner that will protect the quality of the scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use.

43 U.S.C. § 1701(a)(8).

72.    In enacting FLPMA, Congress found that "the national interest will be best

realized if the public lands and their resources . . . and their present and future use is projected

through a land use planning process," and it adopted FLPMA in part to establish "goals and

objectives . . . as guidelines for public land use planning . . . ." 43 U.S.C. § 1701(a)(2), (7).

Congress has directed that the Secretary of the Interior "shall manage the public lands under

principles of multiple use and sustained yield, in accordance with the land use plans developed

by him under section 1712" and "shall . . . regulate . . . the use, occupancy, and development of

the public lands."

73.    To this end, FLMPA directs that the Secretary of Interior (and hence BLM, which

has been delegated the Secretary's authority in management of the public lands) develop and

periodically revise lands use plans, and adhere to those plans in management decision-making.

*See* 43 U.S.C. § 1712(a) (Secretary "shall, with public involvement and consistent with the terms

and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans which

provide by tracts or areas for the use of the public lands"); *id.* § 1732(a) (Secretary "shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans"). When a land use plan is revised, existing resource plans and permits, contracts and other instruments are to be revised within a "reasonable period of time." 43 C.F.R. § 1610.5-3.

74.     Pursuant to this direction, BLM has produced the Steens Mountain CMPA Resource Management Plan (RMP) and Record of Decision (ROD) and the Andrews Management Unit RMP/ROD. These land use plans govern management of the Hammond grazing allotments. BLM is required to manage the area within the Steens Mountain CMPA to conserve, protect, and manage the long-term ecological integrity of Steens Mountain. The Mud Creek and Hardie Summer allotments, and parts of the Hammond and Hammond FFR allotments, lie within the Steens Mountain CMPA.

75.     Both RMPs have been amended by the Oregon Greater Sage-Grouse Approved RMP Amendment (ARMPA) and the Record of Decision (ROD) for the Great Basin Region including the Greater Sage-Grouse Sub-Regions of Idaho and Southwestern Montana, Nevada and Northeastern California, Oregon, and Utah, approved in September 2015. The new amendments, completed as part of a national planning process intended to protect the greater sage-grouse, were intended "to identify and incorporate appropriate measures in existing land use plans to conserve, enhance, and restore GRSG habitat by avoiding, minimizing, or compensating for unavoidable impacts to GRSG habitat in the context of the BLM's multiple use and sustained yield mission under FLPMA." Oregon ARMPA (2015) 1–7. In the sage-grouse amendment, BLM identified wildfire, invasive species, and grazing as three of the greatest threats to sage-grouse and sage-grouse habitat on BLM-administered lands in Oregon. *Id.* at 1–7 to 1–8.

76.     The Andrews and Steens CMPA RMPs, as amended by ARMPA, require that the NEPA analysis for renewals and modifications of livestock grazing permits/leases that include lands within SFA and PHMA will include specific management thresholds based on greater sage-grouse Habitat Objectives,  Land Health Standards, and ecological site potential, and one or more defined responses that will allow the authorizing officer to make adjustments to livestock grazing that have already been subjected to NEPA analysis.

77.     NEPA is our "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a). The NEPA process ensures that an agency carefully considers information concerning significant environmental impacts, and that the public may scrutinize the information and participate in the decision-making process. The process aims to "foster excellent action" by helping public officials understand environmental consequences and take actions that "protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c).

78.     NEPA requires agencies to study the environmental impacts of proposed actions and the reasonable alternatives that would avoid or minimize such impacts or enhance the quality of the human environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.

79.     An agency must prepare a detailed Environmental Impact Statement (EIS) for "all major federal actions significantly affecting the quality of the human environment," but may prepare an Environmental Assessment (EA) to determine whether the environmental impact of a proposed action is significant enough to warrant an EIS. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.9, 1508.11.

80.     Where appropriate, an agency may decide to use a CX for a "category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in

implementation of these regulations." 40 C.F.R. § 1508.4. Procedures for invoking categorical exclusions must provide for "extraordinary circumstances in which a normally excluded action may have a significant environmental effect." *Id.* Renewal of an expired term grazing permit generally requires the preparation of a full NEPA analysis. However, in 2014, Congress narrowly amended FLPMA to provide that grazing permits may be renewed under a CX if: (1) the issued permit "continues the current grazing management of the allotment"; and (2) the Secretary has assessed and evaluated the grazing allotment and has determined, based on that evaluation, that it is meeting land health standards or is not meeting land health standards due to factors other than existing livestock grazing. 43 U.S.C. § 1752(h). Even if these two requirements are met, BLM may not rely on a CX if extraordinary circumstances exist.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### THE SECRETARY'S DECISION TO RENEW THE HAMMOND PERMIT VIOLATED FLPMA, NEPA, AND THE APA

81.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

82.     Plaintiffs' First Claim for Relief challenges the Secretary's decision renewing the Hammond grazing permit for violating FLPMA, the Department of the Interior grazing regulations, and NEPA. This claim is brought under the judicial review provisions of the APA, 5 U.S.C. §§ 701–706.

83.     BLM's regulations implementing FLPMA provide that a mandatory qualification for applicants for grazing permit renewals is that the applicant "must be determined by the authorized officer to have a satisfactory record of performance." 43 C.F.R. § 4110.1(b). The regulations also provide that "The applicant for renewal of a grazing permit or lease . . . shall be deemed to have a satisfactory record of performance if the authorized officer determines the

applicant . . . to be in substantial compliance with the terms and conditions of the existing

Federal grazing permit." *Id*. § 4110.1(b)(1).

84.    BLM's regulations implementing FLPMA grant the Secretary authority to take

jurisdiction at any stage of any case before the Department and render the final decision in the

matter. BLM's appeal regulations do not remove the requirement that the Secretary's decision

comply with Congress's direction in FLPMA, his own regulations implementing FLPMA, or

other law. The Secretary's decision must be based on the administrative record.

85.    The Secretary renewed the Hammond grazing permit even though Hammond did

not have a satisfactory record of performance. The Secretary did not overturn BLM's finding that

Hammond lacked a satisfactory record of performance. The Secretary did not make a

determination that the Hammonds had a satisfactory record of performance. The Secretary did

not otherwise determine that Hammond had complied with the terms and conditions of its

grazing permit. Nor did the Secretary's decision make a separate finding that Hammond had a

satisfactory record of performance, or was otherwise in "substantial compliance" with the terms

and conditions of their federal grazing permit. The Secretary in his decision adopted BLM's

assessment of the law and facts in BLM's 2014 decision denying the Hammond permit renewal.

86.    Instead, the Secretary asserted that "changed circumstances"—the Hammond

principals' pardons, payment of civil fines, and record of good behavior while imprisoned and

prevented from grazing the public lands—warranted renewing their grazing permit. But that

standard is inapplicable where the Secretary was reviewing BLM's decision based on the

Record. The Secretary also misinterpreted the effect of a presidential pardon. The Secretary

failed to make any finding refuting BLM's assessment that Hammond lacked the mandatory

qualifications to hold a federal grazing permit.

87.     A pardon does not wipe away the underlying facts on which the conviction was based. Acceptance of a pardon implies a confession of guilt. Government licensing agencies may consider conduct underlying a pardoned conviction so long as that conduct is relevant to an individual's qualifications for a license or permit.

88.     Upon information and belief, the Secretary's decision was not based on the administrative record. The Secretary's decision was based on factors that Congress did not authorize to be considered in determining whether to renew grazing permits. The Secretary's decision also was based on improper political considerations that the Secretary may not lawfully consider in carrying out his duties to oversee management of the public lands. The Secretary's decision inexplicably changed direction from the findings of facts and law in the 2014 BLM decision denying renewal of the permit, without reasoned explanation.

89.     The Secretary's decision was *ultra vires* because it exceeded his authority by directing BLM to disobey Congress' clear mandate in FLPMA and the Department of the Interior's own regulations.

90.     Secretary violated NEPA by failing to prepare or consider any environmental analysis prior to issuing his decision to renew the Hammond grazing permit.

91.     For these reasons, the Secretary's decision was arbitrary and capricious, an abuse of discretion, violated FLPMA, the Department of the Interior regulations, NEPA, and the APA, and caused or threatens serious prejudice or injury to Plaintiffs' rights and interests.

//

//

//

//

**SECOND CLAIM FOR RELIEF:**
**BLM VIOLATED FLPMA, NEPA, AND THE APA BY REISSUING THE HAMMOND**
**PERMIT UNDER A CX, DETERMINING THAT NO FURTHER NEPA ANALYSIS**
**WAS REQUIRED, AND DETERMINING THE REISSUANCE COMPLIED WITH THE**
**OPERATIVE LAND USE PLANS.**

92.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

93.     Plaintiffs' Second Claim for Relief alleges that BLM violated FLPMA and NEPA

by its reissuance of the permit without determining that Hammond had a satisfactory record of

performance and by its determination that the reissuance of the permit met the requirements for

using a CX, conformed with the relevant land use plans, and did not require further NEPA

analysis, when the FLPMA provision allowing for use of a CX did not apply and extraordinary

circumstances existed. This claim is brought under the judicial review provisions of the APA, 5

U.S.C. §§ 701–706.

94.     FLPMA provides that the issuance of a grazing permit may be categorically

excluded from the requirement to prepare an EA or EIS only if all of the following are true: (1)

the issued permit or lease continues the current grazing management of the allotment; and (2) the

Secretary concerned has assessed and evaluated the grazing allotment associated with the lease

or permit, and based on the assessment and evaluation, has determined that the allotment is

meeting land health standards or is not meeting land health standards due to factors other than

existing livestock grazing. 43 U.S.C. § 1752(h).

95.     In addition, the Secretary's regulations implementing FLPMA and NEPA provide

that extraordinary circumstances precluding the use of a CX exist where the action may:

(a)  Have significant impacts on public health or safety.

(b)  Have significant impacts on such natural resources and unique geographic
characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas;
wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime

farmlands; wetlands (EO 11990); floodplains (EO 11988); national monuments; migratory birds; and other ecologically significant or critical areas.

. . .

(l)  Contribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act and EO 13112).

43 C.F.R. § 46.215; 43 C.F.R. § 46.205(c).

96.     The use of a CX to reissue the Hammond grazing permit was arbitrary, capricious, and contrary to NEPA and FLPMA because the new permit did not continue grazing on the allotments. There had been no grazing on the four Hammond allotments since 2013—for five years, at the time of the permit renewal. Grazing was suspended since OHA denied the Hammonds' request to stay the permit nonrenewal decision in 2014 until at least March 2019.

97.     The use of a CX to reissue the Hammond gazing permit was arbitrary, capricious, and contrary to NEPA and FLPMA because BLM's 2018 LHA did not evaluate the effect of grazing on the allotment, but instead evaluated the effect of non-grazing on the allotment. In addition, it was arbitrary and capricious for the LHA to conclude that Standard 5 was not being met for reasons other than livestock grazing on the Mud Creek allotment when the fire history and weed invasions on the allotment resulted from Hammond livestock grazing and (upon information and belief) from the fires set by the Hammond principals out of a desire to increase forage for their cattle.

98.     The use of a CX to reissue the Hammond grazing permit was arbitrary, capricious, and contrary to NEPA because the following extraordinary circumstances warranted further analysis in an EA or EIS, because the grazing may have:

a.     Significant impact to public health or safety by providing an incentive for the Hammonds to resume their pattern of setting fires on the public lands;

b.      Significant impacts on unique geographic characteristics and ecologically

sensitive areas—specifically, the Bridge Creek Wilderness Study Area, the Steens

Mountain CMPA, mapped sage-grouse PHMAs and GHMAs, and occupied redband trout

habitat; or may

c.      Contribute to the introduction, continued existence, or spread of noxious weeds or

non-native invasive species through livestock grazing.

99.      BLM's determinations that it could reissue the Hammond grazing permit

based upon a CX and that the reissuance complied with the Andrews and Steens CMPA RMPs as

amended by the Oregon sage-grouse land use plan amendments were arbitrary and capricious.

100.      Consequently, Defendants' renewal of the Hammond grazing permit without an

EA or EIS was arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA,

FLPMA, and their implementing regulations, which caused or threatens serious prejudice and

injury to Plaintiffs' rights and interests.

### THIRD CLAIM FOR RELIEF:
### THE SECRETARY AND BLM VIOLATED NEPA, FLPMA, AND THE APA BY RENEWING THE HAMMOND PERMIT WITHOUT CONSIDERING MEASURES TO PROTECT GREATER SAGE-GROUSE AS REQUIRED BY THE LAND USE PLAN

101.      Plaintiffs reallege and incorporate by reference all preceding paragraphs.

102.      Plaintiffs' Third Claim for Relief alleges that BLM violated NEPA and FLPMA

by renewing the Hammond grazing permit without considering or including measures required

by the governing land-use plan to protect greater sage-grouse. This claim is brought under the

judicial review provisions of the APA, 5 U.S.C. §§ 701–706.

103.      In September 2015, BLM amended all BLM land use plans covering sage-grouse

habitat in Oregon, including the Andrews and Steens CMPA RMPs, which govern management

of the Burns District Office and the Hammond grazing allotments. The new amendments were

intended to identify and incorporate appropriate measures in existing land use plans to conserve, enhance, and restore sage-grouse habitat by avoiding, minimizing, or compensating for unavoidable impacts to sage-grouse habitat.

104.    The Sage-grouse Plan amendments require that the NEPA analysis for renewals and modifications of livestock grazing permits that include lands within SFA and PHMA will include specific management thresholds based on sage-grouse Habitat Objectives, Land Health Standards, and ecological site potential, and one or more defined responses that will allow the authorizing officer to make adjustments to livestock grazing that have already been subjected to NEPA analysis.

105.    The Secretary's decision renewing the Hammond permit, BLM's CX that accompanied the reissued permit, and the permit itself, contain no specific management thresholds and defined responses to allow the authorized officer to make adjustments to grazing. This is despite the fact that all of the allotments contain sage-grouse PHMA.

106.    For these reasons, Defendants' renewal of the Hammond grazing permit without analyzing or including specific management thresholds or defined responses required by the applicable RMPs and ARMPA was arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA and its implementing, which caused or threatens serious prejudice and injury to Plaintiffs' rights and interests.

//

//

//

//

//

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.      Order, declare, and adjudge that the Secretary's decision to renew the Hammond grazing permit is unlawful and a violation of FLPMA, NEPA, and the APA;

B.      Order, declare, and adjudge that BLM's reissuance of the permit, and determinations that the Hammond permit renewal met the requirements for using a CX and conformed with the relevant land use plans, were unlawful and a violation of FLPMA, NEPA and the APA;

C.      Order the Secretary and BLM to complete a full EA or EIS to comply with NEPA;

D.      Order, declare, and adjudge that the Secretary's and BLM's failures to comply with the Andrews RMP and Steens CMPA RMP as amended by the 2015 ARMPA is unlawful and a violation of FLPMA and the APA;

E.      Issue an order vacating and remanding the Secretary's decision, the renewed permit, the CX, and/or other decisions named herein;

F.      Enjoin BLM from allowing grazing under the Hammond grazing permit unless and until Defendants have determined that Hammond meet the standards for lawful permit renewal; completed a lawful environmental analysis; included in that analysis and the permit the management thresholds and defined responses required by the relevant RMPs; and otherwise processed the permit renewal application in compliance with NEPA, FLPMA, and the APA;

G.      Award Plaintiffs their reasonable costs, litigation expenses, and attorneys' fees associated with this litigation as provided by the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*., and all other applicable authorities; and

H.      Grant such other further relief as Plaintiffs may request or the Court deems just

and proper.

DATED this 13th day of May 2019.                    Respectfully submitted,


  s/ David H. Becker
**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC

  s/ Talasi B. Brooks
**Talasi B. Brooks (*Pro hac vice application
to be filed*)**
Western Watersheds Project

  s/ Paul D. Ruprecht
**Paul D. Ruprecht (OSB # 132762)**
Western Watersheds Project

Attorneys for Plaintiffs Western Watersheds
Project, Center for Biological Diversity, and
WildEarth Guardians