**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC
4110 SE Hawthorne Blvd. # 168
Portland, OR 97214
(503) 388-9160
davebeckerlaw@gmail.com

**Talasi B. Brooks (*Pro hac vice***
***application pending*)**
Western Watersheds Project
PO Box 2863
Boise, ID 83701
(208) 336-7910
tbrooks@westernwatersheds.org

**Paul D. Ruprecht (OSB # 132762)**
Western Watersheds Project
PO Box 12356
Reno, NV 89510
(208) 421-4637
paul@westernwatersheds.org

Attorneys for Plaintiffs Western Watersheds Project, Center for Biological Diversity, and
WildEarth Guardians

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PENDLETON DIVISION

| | |
|---|---|
| **WESTERN WATERSHEDS PROJECT, CENTER FOR BIOLOGICAL DIVERSITY,** and **WILDEARTH GUARDIANS,** | Case No.: 2:19-cv-750-SI |
| Plaintiffs, | **MOTION FOR TEMPORARY RESTRAINING ORDER and/or PRELIMINARY INJUNCTION** |
| v. | |
| **DAVID BERNHARDT,** Acting Secretary of Interior, **JEFFREY A. ROSE,** District Manager Burns District Bureau of Land Management, and **BUREAU OF LAND MANAGEMENT,** | **ORAL ARGUMENT REQUESTED** **EXPEDITED HEARING AND DECISION REQUESTED** |
| Defendants. | |

## MOTION

Plaintiffs Western Watersheds Project, Center for Biological Diversity, and WildEarth Guardians (the "Plaintiffs") move under Federal Rules of Civil Procedure 65(a) and 65(b) and LR 65 for:

(1) an Order temporarily restraining the federal defendants from allowing turnout and grazing of livestock on the Mud Creek allotment—currently slated for May 16, 2019—and on the Hardie Summer allotment—currently slated for July 1, 2019—until the Court can adjudicate the Plaintiffs' motion for preliminary injunction; and

(2) an Order preliminarily enjoining federal defendants from allowing grazing of livestock on the Mud Creek, Hardie Summer, Hammond, and Hammond FFR allotments until this Court has adjudicated the merits of Plaintiffs' pending claims and any supplemental claims challenging other grazing authorizations or NEPA analyses related to these allotments, when and if they are issued. Pursuant to LR 7-1(a)(1) and Rule 65(b)(1)(B), counsel for Plaintiffs provided a copy of the Complaint by email to Brad Grenham in the Office of the Regional Solicitor, which represents Defendants. Counsel for Plaintiffs received an email indicating that Mr. Grenham had forwarded the Complaint and a notice of new action to the U.S. Attorney's Office for assignment to an attorney. Counsel for Plaintiffs also left a voice mail for Mr. Grenham, but were unable to obtain Defendants' position on this motion before it was essential to file it so that it may be heard before turnout is slated to begin on Mud Creek allotment on May 16th.

This motion is supported by the legal memorandum below and by the declarations of Dr. Clait Braun, Dr. J. Boone Kauffman, Steven Herman, Andy Kerr, George Wuerthner, and Randi Spivak, filed herewith, together with the exhibits and other supporting materials attached to these filings. These declarations also demonstrate that Plaintiffs have standing.

# TABLE OF CONTENTS

MOTION ............................................................................................................ i
TABLE OF CONTENTS ................................................................................... ii
TABLE OF AUTHORITIES ............................................................................ iv
GLOSSARY OF ACRONYMS ....................................................................... vii

INTRODUCTION ............................................................................................. 1

BACKGROUND ............................................................................................... 3

  I.    THE LEGAL FRAMEWORK ................................................................. 3
    A.    FLPMA ........................................................................................ 3
        1.    *Grazing permit renewals under FLPMA and the grazing regulations.* ................. 3
        2.    *Special protections for sage-grouse under the applicable land use plans.* ............ 4
    B.    NEPA ........................................................................................... 5

  II.    FACTUAL BACKGROUND ................................................................... 6
    A.    The Four Grazing Allotments and Their Environmental Values. ................ 6
    B.    The Hammonds' Pattern of Starting Fires and Violating Regulations. .......................................................................................... 8
    C.    BLM's Denial of Hammond's Permit Renewal and Hammond's Appeals. ................................................................................................ 12
    D.    President Trump Pardons the Hammond Principals. .......................... 14
    E.    Secretary Zinke's Decision to Renew the Hammond Grazing Permit. ..................................................................................................... 14
    F.    BLM Processes and Reissues the Hammond Permit With a CX. ........ 15

ARGUMENT ................................................................................................... 17

  I.    TRO AND PRELIMINARY INJUNCTION STANDARDS ................... 17

  II.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS ........... 18
    A.    Secretary Zinke's Decision to Renew the Hammond Grazing Permit Violated FLPMA, NEPA, and the APA. ............................... 19
        1.    *The Secretary's decision violated FLPMA and the grazing regulations.* ............ 19
        2.    *The Presidential pardons do not alter the conduct, acts, and behavior that disqualify Hammond from the mandatory qualifications for permit renewal.* ............ 23
        3.    *The Secretary violated NEPA by issuing his decision to renew the permit before any NEPA analysis was performed.* ............ 24
    B.    BLM'S Determination That a CX Sufficed for Processing the Permit Renewal Violated NEPA and FLPMA. ................................ 25
        1.    *The Hammond permit renewal did not fall within a categorical exclusion.* ....... 26
        2.    *Extraordinary circumstances precluded issuing the permit under a CX.* ........... 26

**C.    The Secretary and BLM Violated FLPMA by Renewing Hammond's Permit Without Considering and Including Measures to Protect Greater Sage-Grouse Required by the Land Use Plans.** ......................29

**III.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF**................................................................30

**IV.    THE BALANCE OF HARMS WEIGHS IN FAVOR OF AN INJUNCTION** .......33

**V.    AN INJUNCTION IS IN THE PUBLIC INTEREST** ................................35

**VI.    THE COURT SHOULD WAIVE THE BOND REQUIREMENT** .........................35

**CONCLUSION** ........................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .................. 17, 30, 33, 34, 35
*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531 (1987) .................................................. 30, 33
*Bjerkan v. United States*, 529 F.2d 125 (7th Cir. 1975) ................................................................ 24
*Burdick v. United States*, 236 U.S. 79 (1915) ........................................................................ 23, 24
*Cal. ex rel. Van de Kamp v. Tahoe Reg'l Planning Ag'y*, 766 F.2d 1319 (9th Cir. 1985) .............. 35
*Cal. v. Norton*, 311 F.3d 1162 (9th Cir. 2002) .............................................................................. 27
*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) ........................................................................ 24
*Ctr. for Biol. Diversity v. Salazar*, 706 F.3d 1085 (9th Cir. 2013) .............................................. 26
*Ctr. for Biol. Diversity v. U.S. Dep't of Interior*, 623 F.3d 633 (9th Cir. 2009) .......................... 19
*Farrell-Cooper Mining Co. v. U.S. Dep't of the Interior*, 864 F.3d 1105 (10th Cir. 2017) ........ 26
*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ...................................................... 19, 22
*Friends of the Earth v. Brinegar*, 518 F.2d 322 (9th Cir. 1975) .................................................. 35
*High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630 (9th Cir. 2004) .......................................... 31
*Hirschberg v. Commodity Futures Trading Comm'n*, 414 F.3d 679 (7th Cir. 2005) .................... 23
*Idaho Sporting Cong. v. Alexander*, 222 F.3d 562 (9th Cir. 2000) .............................................. 34
*In re North*, 62 F.3d 1434 (D.C. Cir. 1994) .................................................................................. 23
*Lair v. Bullock*, 697 F.3d 1200 (9th Cir. 2012) ............................................................................ 17
*Lands Council v. McNair*, 494 F.3d 771 (9th Cir. 2007) .............................................................. 35
*Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011) .................................................................. 17
*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000) .................................................................... 5, 25
*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................................................ 19, 22
*Nat'l Cable & Telecoms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ................. 19, 22
*Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001) .............................. 33
*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. 3:01-CV-0640-SI,
    2017 WL 1829588 (D. Or. Apr. 3, 2017) .................................................................................. 32
*Native Ecosystems Council & All. For the Wild Rockies ex rel. Davey*,
    866 F. Supp. 2d 1209 (D. Idaho 2012) ...................................................................................... 27
*Nixon v. United States*, 506 U.S. 224 (1993) ................................................................................ 23
*Nken v. Holder*, 556 U.S. 418 (2009) ............................................................................................ 17
*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ................................................................ 29
*Ocean Mammal Inst. v. Gates*, 546 F. Supp. 2d 960 (D. Haw. 2008) .......................................... 27
*Or. Natural Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016) .............................................. 20
*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ...................................... 5, 25
*Save the Yaak Comm. v. Block*, 840 F.2d 714 (9th Cir. 1988) .................................................... 25
*Seattle Audubon Society v. Evans*, 771 F. Supp. 1081 (W.D. Wash. 1991) ................................ 35
*Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir. 1989) .................................................................... 32
*Sierra Club v. U.S. Fish & Wildlife Serv.*, 235 F. Supp. 2d 1109 (D. Or. 2002) ........................ 31
*Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190 (9th Cir. 1988) ................................................ 33
*Sierra Club v. Watt*, 608 F. Supp. 305 (E.D. Cal. 1985) .............................................................. 20
*United States v. Arpaio*, 887 F.3d 979 (9th Cir. 2018) ................................................................ 23
*United States v. Hammond*, 742 F.3d 880 (9th Cir. 2014) .......................................................... 11

*United States v. Noonan*, 906 F.2d 952 (3d Cir. 1990)............................................................. 23, 24
*W. Watersheds Proj. v. Bennett*, 392 F. Supp. 1217 (D. Idaho 2005) .................................... 30, 35
*W. Watersheds Proj. v. Kraayenbrink*, 538 F. Supp. 2d 1302 (D. Idaho 2008) ............................ 3
*W. Watersheds Proj. v. U.S. Forest Serv.*, No. C 08-1460 PJH,
    2012 WL 1094356 (N.D. Cal. Mar. 30, 2012)........................................................................ 27
*W. Watersheds Proj. v. Zinke*, 336 F. Supp. 3d 1204 (D. Idaho 2018)................................ 18, 31
*Wash. v. Trump*, 847 F.3d 1151 (9th Cir. 2017) ............................................................................ 17
*Wilderness Soc'y v. U.S. Forest Serv.*, 850 F. Supp. 2d 1144 (D. Idaho 2012).......................... 27
*Wilderness Watch v. Vilsack*, 229 F. Supp. 3d 1170 (D. Idaho 2017)........................................ 30
*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ................................................................... 17

## Statutes

5 U.S.C. § 706(1) ........................................................................................................................... 19
5 U.S.C. § 706(2)(A) ................................................................................................................. 19, 22
16 U.S.C. § 460nnn-12 ................................................................................................................ 7, 27
42 U.S.C. § 4332(2)(C)..................................................................................................................... 5
43 U.S.C. § 1732(a) ..................................................................................................................... 4, 29
43 U.S.C. § 1733(g) ................................................................................................................... 21, 22
43 U.S.C. § 1752(c) ............................................................................................................... 3, 15, 22
43 U.S.C. § 1752(h) ............................................................................................................. 6, 25, 26
43 U.S.C. § 315b............................................................................................................... 3, 15, 22

## Regulations

40 C.F.R. § 1501.2 ............................................................................................................................. 5
40 C.F.R. § 1501.4 ............................................................................................................................. 5
40 C.F.R. § 1502.5 ............................................................................................................................. 5
40 C.F.R. § 1508.4 ............................................................................................................................. 6
40 C.F.R. § 1508.9 ............................................................................................................................. 5
43 C.F.R. § 1610.5–3(a)................................................................................................................. 4, 29
43 C.F.R. § 4.472(e) ................................................................................................................... 13, 26
43 C.F.R. § 4.5 ................................................................................................................................. 20
43 C.F.R. § 4.5(a)(1)....................................................................................................................... 20
43 C.F.R. § 46.215..................................................................................................... 6, 16, 25, 26
43 C.F.R. § 46.215(b) ............................................................................................................. 26, 28
43 C.F.R. § 46.215(*l*) ............................................................................................................. 26, 28
43 C.F.R. § 4100.0-8......................................................................................................................... 4
43 C.F.R. § 4110.1 ............................................................................................................................. 3
43 C.F.R. § 4110.1(b) .......................................................................................... 1, 3, 15, 20, 22
43 C.F.R. § 4130.1-1(b) ....................................................................................... 3, 15, 20, 22
43 C.F.R. § 4130.1-1(b)(1)(i).......................................................................... 4, 15, 20, 22
43 C.F.R. § 4140.1(b)(3).................................................................................... 4, 13, 21
43 C.F.R. § 4140.1(b)(4).......................................................................................... 4, 21
43 C.F.R. § 9212.1(a)................................................................................................ 4, 21
43 C.F.R. § 9212.1(c)................................................................................................ 4, 21
43 C.F.R. § 9212.1(d)............................................................................................... 4, 21
43 C.F.R. § 9212.1(f)................................................................................................ 4, 21

**Other Authorities**

60 Fed. Reg. 9894 (Feb. 22, 1995) ................................................................................. 3

Eileen Sullivan and Julie Turkewitz, *Trump Pardons Oregon Ranchers Whose Case Inspired Wildlife Refuge Takeover*, New York Times (July 10, 2018)..................................................... 14

*Hammond Ranches, Inc. v. BLM*, OR-020-14-01 (OHA Apr. 28, 2014) ..................................... 13

*Hammond Ranches, Inc. v. BLM*, 189 IBLA 41 (Nov. 23, 2016)................................................ 13

## GLOSSARY OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| CMPA | Steens Mountain Cooperative Management and Protection Area |
| CX | Categorical Exclusion |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FLPMA | Federal Land Policy Management Act |
| FWS | U.S. Fish & Wildlife Service |
| GHMA | General Habitat Management Area |
| IBLA | Department of the Interior Board of Land Appeals |
| LHA | Land Health Assessment |
| NEPA | National Environmental Policy Act |
| ODFW | Oregon Department of Fish & Wildlife |
| OHA | Department of the Interior Office of Hearings and Appeals |
| PHMA | Priority Habitat Management Area |
| SFA | Sagebrush Focal Area |
| TRO | Temporary Restraining Order |
| WSA | Wilderness Study Area |

## INTRODUCTION

On January 2, 2019—his last day in office—former Secretary of the Interior Ryan Zinke issued a decision abruptly renewing a grazing permit for Hammond Ranches, Inc. (Hammond). Ex. 1 at 4 (Decision). This decision came five years after the Bureau of Land Management (BLM), in February 2014, denied Hammond's application to renew its permit because "[t]he intentional and malicious fire-setting by principals of [Hammond] in the 2001 Hardie-Hammond Arson and August 22, 2006 Krumbo Butte Arson violated regulations applicable to the [Hammond] grazing permit and violated the permit terms." Ex. 2 at 17 (BLM Decision 4100 (ORB070)P 17 (Feb. 14, 2014)). BLM found that these violations precluded finding a "satisfactory record of performance" under the expired permit—a mandatory condition for permit renewal under the Secretary's regulations implementing the Federal Land Policy and Management Act (FLPMA). *Id.*; 43 C.F.R. § 4110.1(b).

BLM complied with Secretary Zinke's decision by issuing the permit, along with a checklist and one-page letter claiming that the permit reissuance fell within a categorical exclusion (CX) to the typical National Environmental Policy Act (NEPA) requirement to first prepare an Environmental Assessment (EA) or Environmental Impact Statement (EIS). Secretary Zinke's decision to renew the Hammond grazing permit, and BLM's reissuance of the permit without a full NEPA analysis and without considering and imposing conditions required by the applicable land use plan to protect greater sage-grouse, unlawfully authorized Hammond to graze public lands even though it lacked the satisfactory record of performance required by law.

These decisions have caused and threaten irreparable harm to Plaintiffs' rights and interests in enjoying federal lands and wildlife in their undisturbed state and in fully-informed federal land management. The four allotments in the renewed permit—Mud Creek, Hammond,

Hammond FFR, and Hardie Summer—have not been grazed since 2014. These lands have special values, which have benefitted from five years' rest from grazing. All of the allotments contain habitats identified as important to the conservation of the greater sage-grouse in the 2015 Oregon Approved Resource Management Plan Amendment (ARMPA) and accompanying Great Basin Record of Decision (ROD), and the Mud Creek and Hardie Summer allotments lie entirely within the Steens Mountain Cooperative Management and Protection Area (CMPA).

Vegetation has flourished with five years of rest, providing additional protective hiding cover for sage-grouse that breed and raise their young on the allotments during the spring. The rest has promoted recovery of riparian habitat in streams occupied by redband trout, a BLM Sensitive Species. Grazing under the permit will reverse these advances, harming the areas' special values, and, ultimately, decreasing the sage-grouse population on and around the allotments. Further, as the BLM noted five years ago, reissuing a federal grazing permit to Hammond provides an incentive for its principals to resume their pattern of arsons, jeopardizing the special values of the public lands and human safety. *See* Ex. 2 at 17. Nevertheless, BLM reissued the permit without seeking public comment and without completing a full EA or EIS.

Under the terms of the renewed permit, 68 cattle owned by Hammond began grazing on the Hammond allotment on April 1, 2019. *See* Ex. 3 at 1 (Grazing Permit No. 3602564). Three hundred-ninety more cattle will be turned out on the Mud Creek allotment on May 16, 2019, and 408 cattle turned out on the Hardie Summer allotment on July 1, 2019. *Id.* Unless the Court grants the requested relief, BLM will allow hundreds of cattle to graze the public lands due to the Secretary's and BLM's unlawful decisions. This will degrade the public lands and erase recovery of sage-grouse and redband trout habitat from five years without grazing. The requested relief is necessary to prevent irreparable harm to Plaintiffs' FLPMA- and NEPA-protected interests.

# BACKGROUND

## I.    THE LEGAL FRAMEWORK

### A.    FLPMA

#### 1.    *Grazing permit renewals under FLPMA and the grazing regulations.*

Federal law and regulations require a satisfactory record of performance for renewal of a grazing permit. FLPMA provides that, for a permittee holding an expiring grazing permit to be given first priority for renewal, the permittee must be "in compliance with the rules and regulations issued [by the Secretary] and the terms and conditions in the permit." 43 U.S.C. § 1752(c); *see id.* § 315b (Taylor Grazing Act of 1934 conditioning permit renewal on permittee compliance "with the rules and regulations laid down by the Secretary of the Interior").

The BLM grazing regulations specify "mandatory qualifications" for any applicant for grazing use on public lands. 43 C.F.R § 4110.1 (2005).[1] These include that any applicant for renewal of a grazing permit "must be determined by the authorized officer to have a satisfactory record of performance." *Id.* § 4110.1(b). The regulations provide that the authorized officer "will determine whether applicants for the renewal of permits . . . and any affiliates, have a satisfactory record of performance," and "[t]he authorized officer will not renew . . . a permit . . . unless the applicant and all affiliates have a satisfactory record of performance." *Id.* § 4130.1-1(b).

The authorized officer may only "deem the applicant for renewal of a grazing permit . . . and any affiliate, to have a satisfactory record of performance if the authorized officer determines the applicant and affiliates to be in substantial compliance with the terms and

---

[1] Citations herein to the Department of the Interior's grazing regulations in 43 C.F.R. Part 4100 are to the regulations in effect as of Oct. 1, 2005, given the injunction of a subsequent extensive revision of the regulations imposed by the district court in *Western Watersheds Project v. Kraayenbrink*, 538 F. Supp. 2d 1302, 1325 (D. Idaho 2008), *aff'd in relevant part*, 632 F.3d 472, 500 (9th Cir. 2011); *see* 60 Fed. Reg. 9894, 9927 (Feb. 22, 1995).

conditions of the existing Federal grazing permit . . . for which renewal is sought, and with the rules and regulations applicable to the permit." *Id.* § 4130.1-1(b)(l)(i).

The applicable BLM regulations prohibit "[c]utting, burning, spraying, destroying, or removing vegetation without authorization" and "[d]amaging or removing U.S. property without authorization." *Id.* § 4140.1(b)(3)–(4). BLM regulations designed to prevent wildfires— applicable to all users of public lands, including grazing permit holders—prohibit a series of acts without authorization, including to "[c]ause a fire, other than a campfire, or the industrial flaring of gas, to be ignited by any source . . . [b]urn, timber, trees, slash, brush, tundra or grass except as used in campfires . . . [l]eave a fire without extinguishing it . . . [or] [r]esist or interfere with the efforts of firefighter(s) to extinguish a fire." 43 C.F.R. § 9212.1(a), (c), (d), (f) .

## 2. *Special protections for sage-grouse under the applicable land use plans.*

FLPMA also provides that "[t]he Secretary shall manage the public lands . . . in accordance with the land use plans developed by him under section 1712 of this title." 43 U.S.C. § 1732(a). "All future resource management authorizations and actions . . . shall conform to the approved plan," and "[l]ivestock grazing activities and management actions . . . shall be in conformance with the land use plan." 43 C.F.R. §§ 1610.5–3(a), 4100.0-8. The land use plans covering the Hammond allotments are the Steens Mountain CMPA Resource Management Plan (RMP) and the Andrews Management Unit RMP, both approved in July 2005. Ex. 4 at 1–2 (Categorical Exclusion, No. DOI-BLM-ORWA-B060-2019-0003-CX (Feb. 1, 2019)).

Both of these RMPs were amended in 2015 by the Oregon Greater Sage-Grouse Approved RMP Amendment (ARMPA) with the goal of preventing greater-sage grouse from becoming endangered. Ex. 5 at 6 (Oregon ARMPA (2015)). The 2015 ARMPA defines various categories of important sage-grouse habitat requiring special protection and consideration in

management decisions, including Priority Habitat Management Areas (PHMA)—"BLM-administered lands identified as having the highest value to maintaining sustainable [greater sage-grouse] populations"—and sagebrush focal areas (SFA), a subset of PHMA that "represent[s] recognized strongholds for [greater sage-grouse]." Ex. 5 at 4–5.[2]

The 2015 Oregon ARMPA specifies "Management Decisions"—management actions for protecting and preserving sage-grouse and their habitat—including "MD LG 13" that requires that any "NEPA analysis for renewals . . . of livestock grazing permits/leases that include lands within SFA and PHMA will include specific management thresholds based on [greater sage-grouse] Habitat Objectives . . . Land Health Standards . . . and ecological site potential, and one or more defined responses that will allow the authorizing officer to make adjustments to livestock grazing that have already been subjected to NEPA analysis." *Id.* at 14.

**B.      NEPA**

Environmental review under NEPA "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). "NEPA's effectiveness depends entirely on involving environmental considerations in the initial decisionmaking process." *Metcalf v. Daley*, 214 F.3d 1135, 1145 (9th Cir. 2000) (citing 40 C.F.R. §§ 1501.2, 1502.5).

NEPA requires agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An agency may first prepare a concise EA to determine whether an EIS must be prepared. *Metcalf*, 214 F.3d at 1142; 40 C.F.R. §§ 1501.4, 1508.9. And an agency may dispense with the EIS requirement if the

---

[2] Exhibit 5 contains excerpts of the 2015 Oregon ARMPA, which is available at https://www.blm.gov/or/energy/opportunity/files/or_armpa.pdf (last visited May 11, 2019).

proposed action falls within a "categorical exclusion" (CX) and there are no "extraordinary circumstances." 40 C.F.R. § 1508.4. A CX is "a category of actions which do not individually or cumulatively have a significant effect on the human environment." *Id.*

Congress provided that BLM grazing permits may be categorically excluded if both: (1) the issued permit or lease "continues the current grazing management of the allotment," and (2) the Secretary concerned has evaluated the allotment and determined that the allotment is meeting land health standards or is not meeting standards due to factors other than existing grazing. 43 U.S.C. § 1752(h). Agencies also must "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4. BLM regulations list 12 extraordinary circumstances. 43 C.F.R. § 46.215.

## II.   FACTUAL BACKGROUND

### A.   The Four Grazing Allotments and Their Environmental Values.

Hammond Ranches, Inc. (Hammond) is a livestock ranching business owned by the Hammond family. Hammond has grazed livestock on public BLM lands, including the Hammond, Mud Creek, and Hardie Summer grazing allotments at issue here, since 1964. Ex. 2 at 1–2. It is controlled by Dwight Hammond, who is the president, and Dwight's son Steven, who is the vice-president. *Id.* at 2. Dwight and Steven Hammond are principals and "affiliates" of Hammond, the entity which is the permittee and was the applicant for renewal of the expiring grazing permit in 2014. *Id.*; *see* 43 C.F.R. § 4100.0-5 (an "affiliate" is a "person that controls . . . an applicant, permittee or lessee," with "control" meaning to have authority "to determine the manner in which an applicant, permittee or lessee conducts grazing operations").

From 2004 to 2014, Hammond held a grazing permit allowing it to graze four allotments on the BLM Burns District (within the Andrews Field Office): the Mud Creek, Hardie Summer,

Hammond FFR,[3] and Hammond allotments. *Id.* at 1–2. The now-expired Hammond grazing

permit provided for the following number of livestock and periods of use:

| ALLOTMENT | LIVESTOCK NUMBER | KIND | PERIOD BEGIN | END | AUMs[4] |
|---|---|---|---|---|---|
| MUD CREEK | 390 | CATTLE | 05/16 | 06/30 | 590 |
| HAMMOND | 68 | CATTLE | 04/01 | 10/30 | 471 |
| HARDIE SUMMER | 408 | CATTLE | 07/01 | 09/30 | 407 |
| HAMMOND FFR | 32 | CATTLE | 04/01 | 04/30 | 32 |

Ex. 2 at 2.

The allotments at issue have special values. The Mud Creek and Hardie Summer

allotments, and part of the Hammond allotment, lie within the Steens Mountain CMPA, an area

designated by Congress "to conserve, protect, and manage the long-term ecological integrity of

Steens Mountain." 16 U.S.C. § 460nnn-12; Decl. of Dr. Clait Braun Ex. 2 (filed herewith) (map

of allotments and protected areas). The Mud Creek allotment is largely within the Bridge Creek

Wilderness Study Area (WSA). *Id.* The allotments include high quality sage-grouse habitats

designated in 2015 as sage-grouse Priority Habitat Management Areas (PHMAs) and General

Habitat Management Areas (GHMAs). *Id.* The Mud Creek allotment also includes a sage-grouse

breeding ground ("lek"). *Id.* Two more leks lie less than two miles from the Mud Creek,

Hammond, and Hammond FFR allotments and within three miles of the Hardie Summer

allotment. *Id.* ¶¶ 17–18, 33 & Ex. 2. Grazing on these allotments is likely to harm sage-grouse

---

[3] A "Fenced Federal Range" allotment "is an allotment which is mostly private but contains some public land fenced within." BLM, Grazing Allotments and Pastures Spatial Data Standard at 15, *available at* https://www.blm.gov/or/datamanagement/files/GRA_Data_Standard.pdf (last visited May 11, 2019). Grazing on the Hammond FFR allotment this year ended on April 30th.

[4] An AUM "is the use of public lands by one cow and her calf, one horse, or five sheep or goats for a month." Ex. 6 (BLM Press Release, BLM and Forest Service Grazing Fees Lowered in 2019, *available at* https://www.blm.gov/press-release/blm-and-forest-service-grazing-fees-lowered-2019 (last visited May 11, 2019)).

that nest and raise their raise their young after breeding at the leks. *Id.* ¶¶ 17–18, 33.

Bridge Creek and Mud Creek, which run through or along the Hammond and Mud Creek allotments, and Big Bridge Creek (the upstream reach of Bridge Creek), Big and Little Fir Creeks, Lake Creek, and Fish Creek, which run through the Hardie Summer allotment, are home to redband trout. *See* Decl. of Dr. J. Boone Kauffman ¶ 4 & Attach. B (filed herewith); Ex. 7 at 16–17 (Draft Malheur Lakes Redband Trout Conservation Plan).[5] BLM has designated several of the streams on these allotments as priority streams for watershed management actions to prevent water quality degradation because of the presence of redband trout. Ex. 8 at 3 (Andrews RMP/ROD).[6] The Oregon Department of Fish and Wildlife has determined that grazing on the streams on these allotments, which are tributaries of the Blitzen River, is a limiting factor for redband trout because grazing threatens water quantity, water quality, physical habitat degradation, and siltation. Ex. 7 at 3–5, 8–9, 14–15, 17–18; Kauffman Decl. ¶ 7. Resumption of grazing after five years of rest and the beginning of passive recovery of the streams on these allotments is likely to harm redband trout and their habitat. Kauffman Decl. ¶¶ 5–9, 13–23.

**B.    The Hammonds' Pattern of Starting Fires and Violating Regulations.**

Hammond's principals have established a pattern of disregarding these unique values and burning the public lands to increase forage for their cattle. On May 17, 2012, Dwight and Steven Hammond were indicted for arson based on their pattern of setting fires on public lands. Superseding Indictment, *U.S. v. Dwight Hammond and Dwight (Steven) Hammond, Jr.*, No. 10-

---

[5] Exhibit 7 contains excerpts of the Oregon Department of Fish & Wildlife, Malheur Lakes Redband Trout Conservation Plan (Draft Apr. 13, 2018), which is available at https://www.dfw.state.or.us/fish/CRP/docs/DRAFT%20Malheur%20Lk%20Redband%20Plan%204-13-18.pdf (last visited May 11, 2019).

[6] Exhibit 8 contains excerpts of the Andrews RMP/ROD, which is available at https://www.blm.gov/or/districts/burns/plans/files/Andrews20ROD-RMP.pdf (last visited May 11, 2019).

CR-60066-HO (D. Or. May 17, 2012), ECF No. 104. On June 21, 2012, a federal jury found

Dwight guilty for his conduct in starting the 2001 Hardie-Hammond fire and found Steven guilty

for his conduct in starting that fire and the 2006 Krumbo Butte fire. Minutes of Proceedings, *U.S.*

*v. Dwight Hammond and Dwight (Steven) Hammond, Jr.*, No. 10-CR-60066-HO (D. Or. June 21,

2012), ECF No. 183; *see also* Ex. 2 at 2. The Hammonds were also accused of two counts related

to an August 22, 2006 arson on Lower Bridge Creek, but were acquitted; Bridge Creek runs

along the border of the Mud Creek allotment and through the Hammond allotment. *See id.* at 21;

Braun Decl. Ex. 2. The conduct that led to these verdicts—cited as findings of fact in BLM's

2014 decision denying the Hammond permit renewal application—are summarized below.

On September 30, 2001, the first day of deer hunting season, 13-year old Dusty

Hammond was at the Hammond's Ranch with plans to hunt. Ex. 2 at 5. Dusty is grandson to

Dwight and nephew to Steven. *Id.* Early that morning, overheard Dwight talking about his desire

to burn juniper. *Id.* After breakfast, the Hammonds' hunting party set out in search of game. *Id.*

After some driving and walking, someone in the Hammonds' hunting party fired several

shots into a group of deer. *Id.* A local hunting guide who was guiding private clients in the area

witnessed the incident and saw four crippled bucks—but the Hammond party made no efforts to

track or collect the wounded deer. *Id.* at 6. The incident troubled the guide's clients, so he

decided to move them away from the Hammonds. *Id.*

After shooting at the deer, the Hammonds' hunting party continued scouting for game. *Id.*

Steven and Dwight started handing out boxes of matches and instructing the party to commit

arson, apparently to burn juniper. *Id.* Russell Hammond, Dusty's father, showed him how to light

multiple matches at a time to better catch the grass on fire. *Id.*

Meanwhile, the hunting guide returned to camp. *Id.* Shortly after he returned, the thick

smoke from the Hammonds' fires began blowing into his camp and he was forced to abandon his camp and flee with his clients, because it appeared the fire was blowing towards them. *Id.*

Later that day, Dwight and Steven took to the sky in their airplane to examine the burned area. *Id.* They told Dusty they were going to see if the fire had gotten rid of the junipers. *Id.* They also told Dusty to keep his mouth shut about the fire, and he did for many years. *Id.* at 7. Soon after the fire, Dwight spoke with the BLM Burns District Range Specialist, and told him that, for years, he had wanted to burn the area where the 2001 fire had burned, and although BLM had promised to burn it with a prescribed fire, it had not. *Id.* at 6–7. Dwight and Steven were convicted of arson in the Hardie-Hammond fire, related to their conduct in this incident. *Id.* at 7.

On August 17, 2006, while flagging a fence, Steven admitted to Joe Glascock, BLM Range Specialist, that he and Dwight had been setting fires in the area for years. *Id.* He also told Mr. Glascock not to be surprised if more fires appeared after the next lightning storm. *Id.* at 7–8.

On August 21, 2006, a lightning storm hit the Steens Mountain and ignited several fires, including the Krumbo Butte Fire. *Id.* at 8. Dwight told Mr. Glascock that he wished the fires were larger in size. *Id.* On the night of August 22, 2006, firefighters working on the Krumbo Butte Fire noticed suspicious fire behavior downhill from their camp, with three "spot fires" that seemed out of place based on the weather and conditions. *Id.* Based on the circumstances, the firefighters became concerned that someone was committing arson. *Id.* Because fire can move uphill rapidly, and sleeping uphill of an active fire is very dangerous, the firefighters were forced to move their camp. *Id.* Steven was later convicted of setting the three "spot fires" which endangered the firefighters' lives in the Krumbo Butte Fire. *Id.*

Around this same time several other fires, which boxed in several firefighters, were also linked to Dwight and Steven, but the Hammonds were either acquitted of arson charges related to

those fires or the jury did not reach a verdict. *See id.* at 9–14.

On August 24, 2006, Mr. Glascock confronted Steven about Dwight lighting fires, and Steven said that if Mr. Glascock was not willing to work with the Hammonds to make the fire investigations go away, then Steven would blame Mr. Glascock for lighting the suspicious fires. *Id.* at 14. He told Mr. Glascock, "if I go down, you're going down with me." *Id.* at 14.

Jeffrey Rose, who worked as a BLM fire ecologist from October 1999 through May of 2008, testified that the fires burned sagebrush habitat, which is important for wildlife such as sage-grouse, mule deer, antelope, and elk. *Id.* at 15. While fire kills juniper and generates forage for cattle grazing, it also kills sagebrush. *Id.* Exposed, bare soils left by fire are vulnerable to invasion by non-native weeds like cheatgrass, which increase erosion and reduce wildlife habitat. *Id.* Without sufficient sagebrush cover, habitat for sage-grouse is degraded. *Id.* While BLM undertook efforts to reseed the burned area to restore native wildlife habitat and prevent weed invasion, the seed mix BLM used did not include sagebrush. *Id.*

Steven was originally sentenced to prison for a year and a day and Dwight was sentenced to prison for three months for these offenses, but the Ninth Circuit overturned those sentences as inconsistent with the mandatory minimum and remanded for resentencing. Judgement & Commitment, *United States v. Dwight Hammond and Dwight (Steven) Hammond, Jr.*, No. 10-CR-60066-HO (D. Or. Oct 30, 2012), ECF Nos. 210, 212; *United States v. Hammond*, 742 F.3d 880, 884–85 (9th Cir. 2014) (remanding for resentencing). On resentencing, the Hammonds were sentenced to serve 60 months (five years) in prison, with three years' supervised release. Judgement & Commitment, *United States v. Dwight Hammond and Dwight (Steven) Hammond, Jr.*, No. 10-CR-60066-HO (D. Or. Oct 7, 2014), ECF Nos. 234, 236.

//

**C.      BLM's Denial of Hammond's Permit Renewal and Hammond's Appeals.**

In the meantime, Hammond's permit to graze BLM lands was slated to expire on

February 28, 2014. Ex. 2 at 3. BLM sent the Hammonds two letters in 2013 notifying them that

their grazing permit was slated to expire and, given their noncompliance with the permit terms

and conditions as evidenced by their pattern of setting fire to the public lands, it was possible

BLM would elect not to renew the permit, so they should make alternative arrangements for their

cows. *Id*. at 16. On September 30, 2013, Susan Hammond (Dwight's wife and Steven's mother)

submitted an application for grazing permit renewal to BLM. Ex. 2 at 16.

On February 14, 2014, BLM denied Hammond's grazing permit renewal application and

terminated its grazing preference. Ex. 2 at 16–18. BLM's decision explained that it found "that

[Hammond] and its affiliates have demonstrated an unacceptable record of performance"

because "[t]he intentional and malicious fire-setting by principals of [Hammond] in the 2001

Hardie-Hammond Arson and August 22, 2006 Krumbo Butte Arson violated regulations

applicable to the [Hammond] grazing permit and violated the permit terms." *Id.* at 17.

The decision did not rely on the Hammonds' convictions alone as evidence of an

unsatisfactory record of performance, however. BLM found that, although either the 2006 or

2001 incidents standing alone would provide a sufficient basis to find an unsatisfactory record of

performance, "the additional fire-setting described in the criminal trial" further demonstrated an

unsatisfactory record of performance because that evidence "further demonstrates a pattern of

Hammonds' conduct violating regulations applicable to the grazing permit." *Id*. at 18. BLM

further determined that the "[t]he Hammonds' behavior violated 43 C.F.R. § 9212.1 due to the

Hammonds' interference with firefighting efforts," and that the Hammond principals' "fire-

setting burned, destroyed, and removed vegetation on public lands without authorization and

damaged U.S. property without authorization in violation of 43 C.F.R. § 4140.1." *Id.* at 17. BLM

explained that "[t]he Hammonds acted in the interest of improving the rangeland forage for their

cattle, but not necessarily for other resources like wildlife habitat . . . . With non-renewal of this

permit, the Hammonds will no longer have the same economic incentive to burn public land

allotments without authorization and endanger people." *Id.* at 17. The Hammond allotments were

not grazed from 2014 to 2018. *See* Ex. 9 at 4 (EA for Authorization of Nonrenewable AUMs).[7]

    Hammond appealed the decision and sought a stay from BLM's Office of Hearings and

Appeals (OHA). Ex. 10 at 1 (Order, *Hammond Ranches, Inc. v. BLM*, OR-020-14-01 at 1 (OHA

Apr. 28, 2014)). OHA denied the stay on April 28, 2014. *Id.* When OHA denied the stay, the

decision went into effect. 43 C.F.R. § 4.472(e). OHA ruled that the "acts for which [the

Hammonds] were found guilty" and the verdicts themselves "are conclusive as to the facts

necessary to establish a violation of the prohibition at 43 C.F.R. § 4140.1(b)(3) against 'burning,

. . . destroying, or removing vegetation without authorization.'" *Id.* at 8. OHA also found that

BLM correctly relied on other evidence of "multiple instances of the Hammonds setting fires to

eliminate juniper for the purpose of increasing forage for their cattle," *id.* at 4, and held that their

"pattern of starting fires that damage vegetation on public lands and endangers lives is

sufficiently serious to warrant permit non-renewal." *Id.* at 10.

    Hammond appealed the stay denial to the Interior Board of Land Appeals (IBLA) and

IBLA affirmed. Ex. 11 (*Hammond Ranches, Inc. v. BLM*, 189 IBLA 41 (Nov. 23, 2016)).

Meanwhile, the parties began briefing on whether the case should proceed directly to a hearing.

Ex. 1 at 2. The Oregon Cattlemen's Association, the Oregon Farm Bureau Federation, and

---

[7] Exhibit 9 contains excerpts from the BLM EA for Authorization of Nonrenewable AUMs in
Hammond Allotment, which is available at https://eplanning.blm.gov/epl-front-
office/projects/nepa/121277/170391/207034/NR_Hammond_Allotment_EA_Comment_Version.
pdf (last visited May 11, 2019).

Harney County submitted amicus briefs in support of Hammond. *Id.* They also pursued political

angles. Oregon Cattlemen's Association director Jerome Rosa claimed in a New York Times

article, "I had the opportunity to have a private meeting with [Secretary Zinke] . . . . He . . .

agreed that the Hammonds were good people, and said he would talk to the [P]resident and give

his blessing to release the Hammonds from prison." Ex. 12 at 3.[8]

### D.    President Trump Pardons the Hammond Principals.

On July 10, 2018, President Trump granted the Hammonds full pardons. *See* Exs. 13 &14

(Executive Grants of Clemency). Under Justice Department guidelines, prisoners are normally

ineligible to apply for pardon until at least five years after their release from prison, but at the

time of the pardons the Hammonds were still in prison, Dwight having served only three years of

his sentence while Steven had served four.[9]

### E.    Secretary Zinke's Decision to Renew the Hammond Grazing Permit.

On December 26, 2018, Secretary Zinke informed the OHA Administrative Law Judge

presiding over the Hammonds' case that he was assuming jurisdiction over the case, and directed

OHA to transmit all relevant filings and associated materials to his office. Ex. 15 (Secretary

Memorandum, Assumption of Jurisdiction of *Hammond Ranches, Inc. v. BLM* (Or-020-14-01)

(Dec. 26, 2018)). OHA transmitted all case files to the Secretary on December 27, 2018. Ex. 16

(OHA, Transmittal of Administrative Record (Dec. 27, 2018)). Just six days later, on his final

day in office, Secretary Zinke issued a brief, four-page decision reversing BLM's decision

---

[8] Eileen Sullivan and Julie Turkewitz, *Trump Pardons Oregon Ranchers Whose Case Inspired Wildlife Refuge Takeover*, New York Times (July 10, 2018), *available at* https://www.nytimes.com/2018/07/10/us/politics/trump-pardon-hammond-oregon.html (last visited April 29, 2019).

[9] https://www.justice.gov/pardon/legal-authority-governing-executive-clemency (last visited May 12, 2019).

denying the Hammond grazing permit renewal application, deciding instead to renew the permit. Ex. 1 at 4. The Decision directed BLM to reissue the permit within 30 days, with the same terms and conditions as the expired permit, for the remaining balance of the permit period. *Id.*

Secretary Zinke's entire rationale for his decision consists of only two sentences:

> I find that the pardons constitute unique and important changed circumstances since the BLM made its decision. In light of the Grants of Executive Clemency, the years of imprisonment, and civil damages paid by the Hammonds, I find that it is consistent with the intent of the pardons – and in particular their reflection of the President's judgment as to the seriousness of the Hammonds' offenses – to renew the Hammonds' permit for the duration of the term that would have commenced in 2014.

*Id.*

Notably, Secretary Zinke made no determination that Hammond had a "satisfactory record of performance" or was in "substantial compliance" with BLM regulations, nor did he recite any facts to supplant BLM's finding that Hammond *lacked* a satisfactory record of performance. *See id.* at 1–2, 4. Indeed, the Secretary expressly stated, "I do not find fault with BLM's assessment of the law and facts in its 2014 Decision." *Id.* at 4. Instead, it appears that he relied only on the pardons being "changed circumstances"—a standard that does not appear in FLPMA or in the "mandatory qualifications" regulations for renewing a grazing permit. *See* 43 U.S.C. §§ 315b, 1752(c); 43 C.F.R §§ 4110.1(b), 4130.1-1(b), 4130.1-1(b)(1)(i). Secretary Zinke provided no opportunity for public comment on his decision. Nor did he consider any NEPA analysis of the environmental consequences of the permit renewal prior to making his decision.

## F.    BLM Processes and Reissues the Hammond Permit With a CX.

Prior to the Secretary's decision to assume jurisdiction and renew the permit, in the fall of 2018, BLM completed Land Health Assessments (LHAs) on three of the four Hammond allotments and found—unsurprisingly, given five years free of livestock—they were either meeting standards or were not meeting standards due to factors other than livestock grazing. Ex.

4 at 2. All of the allotments assessed failed Standard 5 for wildlife habitat. *Id.* For the Mud Creek allotment, the causal factor was "reduced sagebrush cover as a result of fire history and presence of invasive annual grasses." *Id.* The Hammond and Hardie Summer allotments failed Standard 5 due to "juniper encroachment and invasive annual grass presence." *Id.*

In the wake of the Secretary's January 2, 2019 decision to renew the Hammond permit, Rangeland Management Specialist Jamie McCormack circulated a memo to Jeffrey Rose—now Burns District Manager—on February 5, 2019. Ex. 17 (Memo re: NEPA analysis (Feb. 5, 2019)). The memo begins by noting that Secretary Zinke "decided . . . to renew the Hammond Ranches Inc. grazing permit under the same terms and conditions as their previous grazing permit" and that, pursuant to the Secretary's decision, the permits would be renewed from February 2, 2019 to February 28, 2024, using the same livestock grazing management as the previous, long-expired grazing permit. *Id*. at 1. Because the 2018 LHA had found that three of the four former Hammond allotments were meeting standards after five years of rest from grazing, the memo concluded that "the three criteria for using a categorical exclusion (CX) to fully process permits has been met per the 2015 amendment to [FLPMA]." *Id*. at 2. District Manager Rose signed the memo, indicating he concurred with the determination. *Id.*

Despite the fact that the Secretary had already decided to renew the permit on the same terms and conditions as the expired 2004–2014 permit, BLM completed a pro forma CX to "fully process" the grazing permit under NEPA, noting that "the proposed action did not trigger any of the extraordinary circumstances described in 43 C.F.R. § 46.215." Ex. 4 at 1, 3. Like the Secretary's decision, BLM's February 2019 documents reflect no new determination by BLM that Hammond had a satisfactory record of performance. Neither the Secretary's decision nor BLM's CX determination included measures to protect sage-grouse that were required by the

ARMPA amendment to the Andrews and Steens CMPA RMPs. *See* Ex. 1 at 1–4, Ex. 4 at 1–6. BLM nevertheless determined that the permit renewal was "in conformance with the [land use plans], qualifies as a categorical exclusion, and does not require further NEPA analysis." Ex. 4 at 6. BLM issued a permit with the same terms and conditions to Hammond, which BLM and Hammond signed on February 13, 2019. Ex. 3. Neither the permit nor the CX were issued for public comment, or otherwise made available to the public for participation or appeal.

## ARGUMENT

## I.    TRO AND PRELIMINARY INJUNCTION STANDARDS

The standards for a temporary restraining order and a preliminary injunction are essentially the same. *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 434 (2009); *Wash. v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017). A plaintiff seeking a preliminary injunction must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The standard does not require a plaintiff to show that it is more likely than not that it will win on the merits, it must only show that there is a "'substantial case for relief on the merits.'" *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012) (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 968 (9th Cir. 2011)).

The Ninth Circuit applies a "sliding scale" approach, in which "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). When a plaintiff has met this standard, a court may issue an injunction to preserve the environmental status quo pending a final decision on the

merits. *W. Watersheds Proj. v. Zinke*, 336 F. Supp. 3d 1204, 1218–19 (D. Idaho 2018).

Unless the Court grants the injunctive relief requested here, Defendants will allow Hammond to turn out cattle onto the most high-value sage-grouse habitats on its grazing allotments based on unlawful decision by a Secretary on the day of his resignation that runs contrary to the facts before the Secretary, without the mandatory determination that Hammond had a satisfactory record of performance warranting permit renewal, and without the public process or environmental analysis NEPA requires. The actions threaten irreparable harm to Plaintiffs' interests in using and enjoying the public lands the allotments encompass for their wildlife and wilderness values, which are protected by NEPA and FLPMA.

## II.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

Plaintiffs are likely to prevail on the merits for three reasons. First, Secretary Zinke violated FLPMA and its implementing grazing regulations by his decision to renew the Hammond grazing permit, even while adopting BLM's finding that Hammond lacked a "satisfactory record of performance" because of its affiliates' history of fire-setting and permit noncompliance. The Secretary also violated NEPA by deciding to renew the permit before conducting any analysis of the environmental consequences.

Second, BLM violated NEPA by determining that the permit could be reissued under a CX, when the permit did not "continue current grazing" and extraordinary circumstances indicated further scrutiny was necessary and by reissuing the permit without a full NEPA analysis. Third, the Secretary and BLM violated FLPMA by not considering specific management thresholds and management responses in the grazing permit renewal for the protection of sage-grouse, despite the amended land-use plans' requirement that "the NEPA analysis for renewals . . . of livestock grazing permits/leases that include lands within . . . PHMA

will include specific management thresholds . . . [and] . . . responses." Ex. 5 at 14.

Violations of NEPA and FLPMA are reviewed under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06. *Ctr. for Biol. Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 641 (9th Cir. 2009). To survive scrutiny under this standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation omitted). An action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Id.*

"Unexplained inconsistency" between agency actions also is "a reason for holding an interpretation to be an arbitrary and capricious change." *Nat'l Cable & Telecoms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). An agency may change course from a previous position, but it must provide a reasoned explanation for doing so, and its action must be "permissible under the statute." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Through the APA, Congress imposes "the duty of agencies to find and formulate policies that can be justified by neutral principles and a reasoned explanation." *Id.* at 536–37 (Kennedy, J., concurring in part and concurring in the judgment). The APA therefore requires courts to compel agency action unlawfully withheld and to set aside agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §§ 706(1), (2)(A).

A.   **Secretary Zinke's Decision to Renew the Hammond Grazing Permit Violated FLPMA, NEPA, and the APA.**

1.   *The Secretary's decision violated FLPMA and the grazing regulations.*

The Secretary's decision to renew the Hammond grazing permit violated FLPMA and its

implementing regulations because a satisfactory record of performance and substantial compliance with federal regulations are mandatory qualifications for grazing permit renewal, and the facts before the Secretary demonstrated that Hammond did not have a satisfactory record of performance. Although 43 C.F.R. § 4.5 provides the Secretary "[t]he authority to take jurisdiction at any stage of any case before any employee or employees of the Department . . . and render the final decision in the matter," such authority does not alter the requirement that his decision comply with Congress's direction in FLPMA, the Department of the Interior's grazing regulations implementing FLPMA, or other law. 43 C.F.R. § 4.5(a)(1); *see, e.g.*, *Or. Natural Desert Ass'n v. Jewell*, 840 F.3d 562, 575 (9th Cir. 2016) (overturning Secretary's decision that did not comply with NEPA); *Sierra Club v. Watt*, 608 F. Supp. 305, 338 (E.D. Cal. 1985) (overturning Secretary's decision that did not comply with FLPMA).

The Department's grazing regulations require the authorized officer to determine that an applicant for permit renewal has a "satisfactory record of performance" to meet the mandatory qualifications for permit renewal. 43 C.F.R. § 4110.1(b) (the applicant "and any affiliates *must be determined* by the authorized officer to have a satisfactory record of performance") (emphasis added). The authorized officer may only deem that a permit renewal applicant has a "satisfactory record of performance" if the authorized officer also "determines the applicant *and affiliates* to be in substantial compliance with the terms and conditions of the existing Federal grazing permit . . . for which renewal is sought" and with the applicable regulations. *Id.* § 4130.1-1(b)(l)(i) (emphasis added). These findings are mandatory: the authorized officer "*will determine whether* applicants for the renewal of permits . . . and any affiliates, have a satisfactory record of performance." *Id.* § 4130.1-1(b) (emphasis added). And "[t]he authorized officer *will not renew* . . . a permit . . . unless the applicant and all affiliates have a satisfactory record of performance."

*Id*. (emphasis added).

But here, Hammond lacked the required satisfactory record of performance, as BLM found unequivocally in 2014. BLM's comprehensive decision found Hammond's principals/affiliates' documented pattern of intentional and malicious fire-setting violated the grazing regulations and the permit conditions, which precluded a determination that Hammond and its affiliates were in substantial compliance with the regulations and the terms of the permit. Ex. 2 at 17–18; *see* 43 U.S.C. § 1733(g) (prohibiting use "of the public lands contrary to any regulation of the Secretary"); 43 C.F.R. §§ 4140.1(b)(3)–(4), 9212.1(a), (c), (d), (f) (prohibiting acts including burning or destroying vegetation, damaging federal property, or causing a fire that is not a campfire to be ignited without authorization, or interfering with the efforts of firefighters to extinguish fires). The evidence BLM relied on included evidence of permit and regulations violations in addition to the specific arsons that led to the prosecutions. Ex. 2 at 7–15.

The Secretary did not supplant BLM's findings, declaring specifically that "I do not find fault with BLM's assessment of the law and facts in its 2014 Decision." Ex. 1 at 4. Nowhere in the Secretary's two paragraphs of factual findings or two-sentence rationale for renewing Hammond's permit did he determine that Hammond had displayed a satisfactory record of performance. *Id*. at 2–4. Instead, the Secretary renewed the permit *despite* Hammond's unsatisfactory record of performance based on what he characterized as "changed circumstances"—the pardons and the "President's judgment as to the seriousness of their offenses." *Id.* at 4. But Presidential pardons, or the "President's judgment," are not among the factors Congress specified be considered in determining whether grazing permits should be renewed. Notably, this rationale did not address BLM's findings as to the other conduct by Hammond's principals/affiliates that also violated several federal regulations and that also

supported its finding that Hammond's record of performance was unsatisfactory.

Because Hammond did not have a satisfactory record of performance, it did not meet the mandatory qualifications for—and was not eligible for—permit renewal, and the Secretary's decision was arbitrary and capricious. 43 C.F.R. §§ 4110.1(b). By renewing the permit despite adopting BLM's findings that Hammond did not have a satisfactory record of performance, the Secretary offered "an explanation for [the] decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 63; Ex. 1 at 1–2, 4. And by relying on the pardons, rather than on evidence of Hammond's record of performance, the Secretary relied "on factors which Congress has not intended it to consider." *Id.*; *see* 43 U.S.C. §§ 315b, 1733(g), 1752(c) (directing Secretary to consider only a permittee's record of performance in permit renewal decisions), 43 C.F.R. §§ 4110.1(b), 4130.1-1(b)(l)(i) (implementing Congress's directives). By directing BLM to reissue the permit, the Secretary directed BLM to violate FLPMA and its implementing regulations—an action "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

These hallmarks of arbitrary decisionmaking, together with the unexplained inconsistency between the BLM's findings of fact in 2014 and the Secretary's decision—and the failure to provide an explanation moored in fact for the change of course—demonstrate that the Secretary violated FLMPA, the grazing regulations, and the APA.[10] *See id.*; *see Fox Television*, 556 U.S. at 515; *Brand X*, 545 U.S. at 981.

//

---

[10] Because BLM acknowledged that the Secretary had already "decided . . . to renew the [Hammond] grazing permit under the same terms and conditions as their previous grazing permit," Ex. 17 at 1, BLM did not determine that Hammond had a "satisfactory record of performance" contemporaneous with its reissuance of the permit, and thus also violated FLPMA and the grazing permit renewal regulations when it determined land use consistency and NEPA sufficiency as it reissued the permit. *See* 43 U.S.C. §§ 315b, 1752(c); 43 C.F.R §§ 4110.1(b), 4130.1-1(b), 4130.1-1b(1)(i); *see also* Exs. 3, 4 (renewed permit and categorical exclusion).

2.  *The Presidential pardons do not alter the conduct, acts, and behavior that disqualify Hammond from the mandatory qualifications for permit renewal.*

In asserting that "changed circumstances" alone justified his decision to renew the Hammond permit, the Secretary apparently misinterpreted the legal effect of a pardon. A pardon does not "create any factual fiction" that the prior conduct somehow did not occur. *United States v. Noonan*, 906 F.2d 952, 960 (3d Cir. 1990). The Supreme Court has recognized there is a "confession of guilt implied in the acceptance of a pardon," and thus acceptance of a pardon "carries an imputation of guilt." *Burdick v. United States*, 236 U.S. 79, 91, 94 (1915); *see also United States v. Arpaio*, 887 F.3d 979, 982–83 (9th Cir. 2018) (Tallman, J., dissenting) ("Arpaio effectively conceded his guilt by accepting the pardon"). In addition, "the granting of a pardon is in no sense an overturning of a judgment of conviction by some other tribunal." *Nixon v. United States*, 506 U.S. 224, 232 (1993).

The Courts of Appeals that have examined similar questions are unanimous that the conduct that underlay pardoned convictions may be considered in determining subsequent qualifications, notwithstanding the intervening pardons. The Seventh Circuit held that "[g]overnment licensing agencies may consider conduct underlying a pardoned conviction— without improperly 'punishing' the pardoned individual—so long as that conduct is relevant to an individual's qualifications for the licensed position." *Hirschberg v. Commodity Futures Trading Comm'n*, 414 F.3d 679, 682–83 (7th Cir. 2005).

The D.C. Circuit held that a CIA official who had received a Presidential pardon could not obtain an award of attorney fees that, under the applicable statute, were available only to an individual who had not had an indictment brought against him. *In re North*, 62 F.3d 1434, 1437 (D.C. Cir. 1994). Reasoning that "[t]he pardon does not blot out guilt or expunge the indictment," the D.C. Circuit held that "[t]hough pardoned, [the official's] disability—the fact of

his indictment—remains, preventing the court from awarding him attorneys' fees." *Id.* at 1438.

And the Third Circuit held that a defendant who had received a Presidential pardon was not entitled to have the records of his conviction for violation of the Selective Service Act expunged because the pardon did not "'create any factual fiction' that [the] conviction had not occurred to justify expunction of his criminal court record." *Noonan*, 906 F.2d at 960; *see also id.* at 958–59 (noting that, in subsequent determinations related to prior conduct, "the fact of the commission of the crime may be considered" and "the effects of the commission of the offense linger after a pardon" (quoting *Bjerkan v. United States*, 529 F.2d 125, 128 n.2 (7th Cir. 1975)).

Thus, the Hammonds' acceptance of Presidential pardons did not alter the conduct, acts, and behavior on which BLM based its 2014 determination that Hammond did not meet the mandatory qualifications for permit renewal. If anything, evidence of the pardons underscored that BLM's original 2014 nonrenewal decision was appropriate because, by accepting the pardons and the attendant "confession of guilt," the Hammond principals admitted that they failed to comply with the terms and conditions of their grazing permit and applicable federal regulations by committing a series of arsons and setting other fires and otherwise violating the regulations. *Burdick*, 236 U.S. at 91. The Secretary's decision was arbitrary in relying on the Presidential pardons to set aside BLM's original permit denial decision.

### 3. *The Secretary violated NEPA by issuing his decision to renew the permit before any NEPA analysis was performed.*

Secretary Zinke also violated NEPA by issuing a decision to renew the Hammond permit on the same terms and conditions as the expired permit *prior* to informing himself of the environmental consequences of doing so. NEPA analysis is required "before any irreversible and irretrievable commitment of resources." *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988).

An agency decisionmaker violates NEPA by committing to an irreversible course of

action before considering potential environmental effects. *Metcalf*, 214 F.3d at 1143–44 (agency violated NEPA by committing to support a whaling proposal and signing a contract to do so); *Save the Yaak Comm. v. Block*, 840 F.2d 714, 718–19 (9th Cir. 1988) (agency violated NEPA by awarding contracts before preparing EAs); *see Robertson*, 490 U.S. at 349 (NEPA "ensures that the agency, *in reaching its decision*, will have available, and will carefully consider, detailed information concerning significant environmental impacts" and that environmental consequences "will not be overlooked" only to be discovered after "the die [has been] cast") (emphasis added). BLM's preparation of a CX *after* the Secretary's decision to renew the permit cannot save him from the NEPA violation here. *See Save the Yaak*, 840 F.2d at 718–19 (preparation of EAs after the decision to award contracts "did not comply with NEPA's requirements concerning the timing of [the] environmental analysis, thereby seriously impeding the degree to which [the agency's] planning and decisions could reflect environmental values").

      **B.**    **BLM'S Determination That a CX Sufficed for Processing the Permit Renewal Violated NEPA and FLPMA.**

      Upon receiving the Secretary's decision to renew the permit, BLM scrambled to respond to the Secretary's directive, purporting to comply with NEPA despite recognizing that the Secretary had already "decided . . . to renew the [Hammond] grazing permit under the same terms and conditions as their previous grazing permit." Ex. 17 at 1. Besides amounting to closing the barn doors after the horses were gone, BLM's determination that the permit could be processed using a CX and did not require further NEPA analysis was erroneous because it did not "continue current grazing" and extraordinary circumstances precluded use of a CX. 43 U.S.C. § 1752(h); 43 C.F.R. § 46.215. Even though the Department of the Interior conducted its NEPA analysis *after* the permit renewal decision was made, it was still obligated to conduct it *properly*—but BLM did not. *See Save the Yaak*, 840 F.2d at 719 (summarizing both the

"substantive inadequacies" and the "untimely preparation" of the NEPA analyses).

To comply with NEPA, an agency wishing to apply a categorical exclusion must determine first, whether the proposed action falls within a CX, and then whether extraordinary circumstances preclude use of the CX. *Ctr. for Biol. Diversity v. Salazar*, 706 F.3d 1085, 1097 (9th Cir. 2013). FLPMA provides that grazing permits for BLM lands may be categorically excluded only if the issued permit or lease "continues the current grazing management of the allotment." 43 U.S.C. § 1752(h). BLM's NEPA regulations list 12 extraordinary circumstances that would preclude use of a CX. 43 C.F.R. § 46.215.

### 1. *The Hammond permit renewal did not fall within a categorical exclusion*.

BLM erred by determining that it could renew the Hammond grazing permit under a CX because the new permit did not "continue[] the current grazing management of the allotment." 43 U.S.C. § 1752(h). When OHA denied the Hammond request for a stay, BLM's decision not to renew the permit went into effect. *See, e.g.*, *Farrell-Cooper Mining Co. v. U.S. Dep't of the Interior*, 864 F.3d 1105, 1108 (10th Cir. 2017); 43 C.F.R. § 4.472(e). In 2019, when the new grazing permit issued, the Hammond grazing allotments had lain vacant, ungrazed, and with no permit for five years. *See* Ex. 9 at 4. Current grazing management, at the time that the Secretary decided to renew the permit and BLM reissued it, was "no grazing." Thus, the CX did not apply and BLM needed to prepare a full EA or EIS to comply with NEPA and FLPMA.

### 2. *Extraordinary circumstances precluded issuing the permit under a CX*.

BLM's NEPA regulations provide that extraordinary circumstances may exist when a proposed action risks "significant impacts on . . . ecologically significant or critical areas," or when an action may "[c]ontribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species." 43 C.F.R. § 46.215(b), (*l*). "When extraordinary

circumstances are present, the agency must prepare environmental documentation despite the fact that the activity in question falls within a categorical exclusion." *Cal. v. Norton*, 311 F.3d 1162, 1170 (9th Cir. 2002). The presence of wilderness or unique geographic or ecologically significant areas is an extraordinary circumstance that precludes application of a CX. *See, e.g.*, *W. Watersheds Proj. v. U.S. Forest Serv.*, No. C 08-1460 PJH, 2012 WL 1094356, at *15 (N.D. Cal. Mar. 30, 2012) (existence of wilderness precluded CX). Existence of important species habitat may also warrant in-depth analysis under NEPA. *See, e.g.*, *Native Ecosystems Council & All. For the Wild Rockies ex rel. Davey*, 866 F. Supp. 2d 1209, 1228 (D. Idaho 2012); *Wilderness Soc'y v. U.S. Forest Serv.*, 850 F. Supp. 2d 1144, 1160-61 (D. Idaho 2012); *Ocean Mammal Inst. v. Gates*, 546 F. Supp. 2d 960, 979 (D. Haw. 2008).

      BLM's failure to recognize that extraordinary circumstances precluded NEPA compliance through a CX was arbitrary and capricious. BLM's extraordinary circumstances analysis consisted of a three-page list of signature lines for resource specialists to sign off on brief statements explaining why each extraordinary circumstance did not exist. Ex. 4 at 3–5. In fact, extraordinary circumstances exist because the allotments lie in an ecologically significant area. The Mud Creek and Hardie Summer allotments are located wholly within the Steens Mountain CMPA (as is part of the Hammond allotment). Braun Decl. Ex. 2. BLM must manage the public lands in the CMPA "to conserve, protect, and manage the long-term ecological integrity of Steens Mountain." 16 U.S.C. § 460nnn-12. The allotments are also located within greater sage-grouse priority habitats designated by the Oregon Sage-grouse ARMPA to protect sage-grouse. Braun Decl. Ex. 2. The Mud Creek allotment includes a sage-grouse lek and is thus used by the birds for nesting and brood-rearing habitat. *Id. & ¶* 17. There are two leks within two miles of the Hammond and Hammond FFR allotments, and within three miles from the Hardie

Summer allotment, which means sage-grouse probably nest on those allotments, too. *See id.*

Concerning sage-grouse, BLM acknowledged that the allotments fell within sage-grouse priority conservation areas, and indicated that "Standard 5 [related to locally important species] is not being achieved," but concluded that "livestock is not the causal factor" and that "issuance of a new permit under the same terms and conditions would not have new impacts to sage-grouse or sage-grouse habitat." Ex. 4 at 5. However, Standard 5 was not being achieved on the Mud Creek allotment due to fire history and invasive weeds, both of which are related to grazing—the fire history due to the Hammond principals' fire-setting, and the fact that grazing exacerbates the spread of weeds. *See id.* at 2; Ex. 2 at 15; Braun Decl. ¶¶ 20, 31–32 & Ex. 5. Furthermore, the land health assessment in 2018 could not have assessed the effects of grazing under the prior permit because the allotment had not been grazed for five years at the time it was conducted. BLM's boilerplate analysis failed to account for these factors. The potentially significant impacts of livestock grazing on federal lands in the CMPA, within the Bridge Creek WSA, and designated as sage-grouse PHMA—all "ecologically significant" areas—precludes use of a CX to process a permit renewal. 43 C.F.R. § 46.215(b).

BLM also concluded that "[n]oxious weeds are known to be present in and in close proximity to these allotments." Ex. 4 at 5. The two-line discussion did not address the presence of non-native invasive weeds, i.e., cheatgrass (an "invasive annual grass"). Yet "invasive annual grass presence" is a significant enough impact that it is causing all allotments surveyed to fail to meet Standard 5. *Id.* at 2. Because grazing exacerbates weed problems, Braun Decl. ¶¶ 20, 31, grazing may "[c]ontribute to the introduction, continued existence, or spread of . . . noxious weeds or non-native invasive species," precluding use of a CX. 43 C.F.R. § 46.215(*l*).

Thus, extraordinary circumstances precluded use of a CX and BLM's determination that

the permit renewal qualified for a CX and that no further NEPA analysis was required was

arbitrary and capricious.

C. **The Secretary and BLM Violated FLPMA by Renewing Hammond's Permit Without Considering and Including Measures to Protect Greater Sage-Grouse Required by the Land Use Plans.**

The Secretary and BLM violated FLPMA by not including specific management

thresholds and responses in the grazing permit renewal for the protection of sage-grouse.

FLPMA mandates that the "Secretary shall manage the public lands . . . in accordance with the

land use plans," 43 U.S.C. § 1732(a), and "[a]ll future resource management authorizations . . .

shall conform to the approved plan." 43 C.F.R. § 1610.5–3(a). "The statutory directive that BLM

manage 'in accordance with' land use plans, and the regulatory requirement that authorizations

and actions 'conform to' those plans, prevent BLM from taking actions inconsistent with the

provisions of a land use plan." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004).

In the 2015 Oregon Sage-Grouse ARMPA, which amended the Andrews and Steens

CMPA RMPs, BLM identified wildfire, invasive species, and improper grazing as three of the

greatest threats to sage-grouse and sage-grouse habitat on BLM-administered lands in Oregon.

Ex. 5 at 6-7. To protect sage-grouse, both land-use plans that cover the four allotments in this

case require that "the NEPA analysis for renewals . . . of livestock grazing permits . . . that

include lands within . . . PHMA *will* include specific management thresholds . . . [and] . . . one or

more defined responses that will allow the authorizing officer to make adjustments to livestock

grazing that have already been subjected to NEPA analysis." *Id.* at 14 (emphasis added).

Neither the Secretary's decision, nor BLM's CX (through which it claimed to comply

with NEPA and determined that the permit was consistent with the land use plans), nor the

reissued Hammond permit, included any "specific management thresholds" or "defined

responses." *See* Exs. 1, 3, 4, 17. All of the allotments contain PHMA, *see* Braun Decl. Ex. 2, and the NEPA analysis supporting the permit renewal should have included "specific management thresholds" and "defined responses" to enable the authorizing to make adjustments to grazing. By failing to even consider thresholds and responses as directed by the land use plans, BLM violated FLPMA. *See W. Watersheds Proj. v. Bennett*, 392 F. Supp. 1217, 1227–28 (D. Idaho 2005) (holding that, where the governing RMP mandated that any increase in grazing "would not be authorized unless monitoring studies indicate that the basic soil, vegetation, and wildlife resources are being protected and additional forage is available," BLM's failure to conduct any monitoring at all before approving increased grazing violated FLPMA).

For these reasons, Plaintiffs have demonstrated a substantial case for relief on the merits of their FLPMA, NFMA, and APA claims.

**III.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF**

A temporary restraining order and an injunction should issue because irreparable injury to Plaintiffs' interests will occur from grazing areas with special values for sage-grouse and redband trout that have experienced five years of rest and recovery from grazing. The Supreme Court has noted that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

Where a proposed action will harm a plaintiff environmental group's members' ability to "view, experience, and utilize" an area in its undisturbed state, they suffer irreparable harm. *See Cottrell*, 632 F.3d at 1135 (irreparable injury from logging that would harm plaintiffs' ability to enjoy area in its undisturbed state); *Wilderness Watch v. Vilsack*, 229 F. Supp. 3d 1170, 1183 (D. Idaho 2017) (irreparable harm to Plaintiffs' interest in wilderness character). This Court has held

that threatened impacts to wildlife from uninformed agency action warrant injunctive relief. *Sierra Club v. U.S. Fish & Wildlife Serv.*, 235 F. Supp. 2d 1109, 1139–43 (D. Or. 2002). "Ordinarily, a preliminary injunction maintains the status quo pending a final decision on the merits." *Zinke*, 336 F. Supp. 3d at 1218.

Livestock grazing under the Hammond permit will imperil sage-grouse, harm redband trout, and damage Plaintiffs' ability to enjoy the area in its undisturbed state. Grazing these allotments—especially after five years' rest—will harm greater sage-grouse that use the allotments for nesting and brood-rearing. Braun Decl. ¶¶ 18–22. It will cause habitat fragmentation that will harm local sage-grouse populations and potentially impact sage-grouse on a larger, regional scale by hurting connectivity with the large population inhabiting the Sagebrush Focal Area (SFA) to the south, increasing risks of localized extirpation and of being listed as endangered. *Id.* ¶¶ 14, 22–23, 34, 37 & Exs. 3–4. Grazing will set back ecological recovery that has occurred over the past five years and will particularly damage riparian areas on the allotments, including important redband trout habitat. Kauffman Decl. ¶¶ 13–15, 20–23.

Moreover, because Defendants renewed Hammond's grazing permit under a CX, these potential impacts evaded environmental review and public scrutiny, resulting in uninformed agency action which also causes irreparable harm, especially when combined with environmental impacts threatening plaintiffs' interests. *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642 (9th Cir. 2004) (in the NEPA context, irreparable harm flows from the failure to evaluate the environmental impact of a major federal action). Courts enjoin agency actions approved without adequate NEPA analysis because "*when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered.*" *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries*

*Serv.*, No. 3:01-CV-0640-SI, 2017 WL 1829588, at *12 (D. Or. Apr. 3, 2017) (quoting *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989) (Breyer, J.)). In such instances, "to set aside the agency's action at a later date will not necessarily undo the harm," because the agency and private parties will have committed to the action, and a new NEPA analysis "may bring about a *new* decision, but it is that much less likely to bring about a *different* one." *Id*.

These impacts will irreparably harm Plaintiffs' abilities to view sage-grouse, redband trout, and other wildlife, and to enjoy the public lands in their undisturbed state. Declarants Steven Herman and Andy Kerr have been visiting Steens Mountain and the Hammond allotments since the 1970s and have seen sage-grouse populations dwindle, due to in part to livestock grazing. Decl. of Steven Herman ¶¶ 13, 17 (filed herewith); Decl. of Andy Kerr ¶¶ 9–13, 21–22 (filed herewith). Impacts from resuming grazing despite likely harms to sage-grouse and redband trout, and despite the Hammond principals' history of fire-setting on public lands that destroys sage-grouse habitat and imperils human safety, irreparably harm both men's use and enjoyment of the public lands—especially because they result from top-down decision-making without process required by law. Herman Decl. ¶¶ 18–19, 23–24; Kerr Decl. ¶¶ 30–34.

George Wuerthner visits Steens Mountain annually—most recently last October. Decl. of George Wuerthner ¶ 12 (filed herewith). In July 2016, he hiked to Big Fir Creek within the Hardie Summer allotment and enjoyed seeing elk, which avoid livestock and would be less likely to be present had the allotment been grazed under the permit terms at that time. *Id.* ¶ 13. He enjoys recreating on ungrazed public lands to appreciate the ecological recovery and increased wildlife presence that results without grazing-caused degradation. *Id.* ¶¶ 14–17, 20. He is injured because the Secretary's "decision to cut short the period of rest that has occurred on these allotments, and the habitat recovery that benefits sage grouse as well as hundreds of other

species, harms [his] personal, professional, recreational, and aesthetic interest in intact and functioning ecosystems and public lands this part of southeast Oregon." *Id.* ¶ 30. And his "interest in visiting livestock-free landscapes for all of the values that accrue in those areas would be substantially and irreparably harmed by allowing cows back out after five years of rest, particularly without a robust environmental analysis of the ecological tradeoffs of doing so." *Id.*

In light of these harms to the environment and to Plaintiffs' interests flowing from those harms and the uninformed agency action in this case, the Court should issue an injunction to preserve the status quo until it can rule on the merits.

## IV.    THE BALANCE OF HARMS WEIGHS IN FAVOR OF AN INJUNCTION

To determine whether injunctive relief is appropriate, courts apply a "traditional balance of the harms analysis." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir. 2001). "[W]hen environmental injury is 'sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment.'" *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988) (quoting *Amoco Prod.*, 480 U.S. at 545).

In *Cottrell*, the Ninth Circuit found the balance of hardships between the parties tipped in favor of an environmental plaintiff and enjoined a 1,652-acre timber sale. 632 F.3d at 1134–38. The court determined the plaintiff suffered harm not only because the timber sale would eliminate the plaintiff's ability to enjoy the subject lands in their undisturbed state, but because it had been deprived of its ability to participate in the administrative appeals process, which could have resulted in significant changes to the proposed project. *Id*. at 1137–38. The hardship to the agency was only potential forgone revenue of up to $16,000 and a much more speculative loss of up to $70,000. *Id*. at 1138. Such "foregone revenues are so small that they cannot provide a significant counterweight to the harm caused to" the environmental plaintiff. *Id.*

Here, too, plaintiffs' harms outweigh any hardship to Defendants. If a temporary restraining order and injunction against grazing on the Mud Creek, Hardie Summer, and Hammond allotments do not issue, Plaintiffs will suffer irreparable harms to their interests in enjoying undisturbed sage-grouse and redband trout habitat that has recovered after five years of rest from grazing. It is rare for grazed public lands to be rested for five years, and plaintiffs will be deprived of a unique opportunity to realize the benefits of ecological recovery on these public lands. Wuerthner Decl. ¶¶ 20–22, 24–25, 30; Kauffman Decl. ¶¶ 20–23. Resuming grazing without first fully considering impacts could cause localized sage-grouse extirpations and a trend towards listing as endangered, which would irreparably harm Plaintiffs' interests in conservation and recovery of these imperiled birds. Braun Decl. ¶ 14. BLM will also act blindly, since it renewed the permit without any public process and without fully considering environmental effects, as NEPA requires—a process that could have changed the agency's decision, like in *Cottrell*. Wuerthner Decl. ¶ 23; Herman Decl. ¶ 24; Decl. of Randi Spivak ¶ 22 (filed herewith).

By contrast, BLM's countervailing harm from forgone revenue is even smaller than in *Cottrell*— only $1,981.80.[11] Thus if the Court grants the temporary restraining order and injunction Plaintiffs request, harm to BLM will be negligible. There is also little or no economic harm to Hammond because it was apparently able to conduct its livestock operations for the past five years without access to the 1,468 AUMs for which the injunction is sought. Any economic harm does not outweigh the public interest in ensuring that agencies comply with FLPMA and NEPA. *See, e.g.*, *Idaho Sporting Cong. v. Alexander*, 222 F.3d 562, 569 (9th Cir. 2000) (financial hardship to agency, permit holders, and local communities outweighed by irreparability of logging forests).

---

[11] BLM would collect only $1.35 per AUM for the 1,468 AUMs authorized for the three allotments for which Plaintiffs seek an injunction. *See* Exs. 3, 6 (listing $1.35/AUM grazing fee).

## V.      AN INJUNCTION IS IN THE PUBLIC INTEREST

The Ninth Circuit has "held time and again that the public interest in preserving nature and avoiding irreparable injury outweighs economic concerns." *Lands Council v. McNair*, 494 F.3d 771, 780 (9th Cir. 2007), *vacated on rehearing en banc on other grounds*, 537 F.3d 981 (9th Cir. 2008). The balance of harms and the public interest support an injunction based on the Secretary's and BLM's violations of FLPMA and NEPA because of "the public interest in careful consideration of environmental impacts before major federal projects go forward." *Cottrell*, 632 F.3d at 1138. The District of Idaho enjoined grazing on 28 allotments where violations of NEPA and FLPMA occurred concurrent with decline of a population of sage-grouse. *Bennett*, 392 F. Supp. 2d at 1229. Furthermore, refusal of public agencies to comply with environmental laws "invokes a public interest of the highest order: the interest in having government officials act in accordance with the law." *Seattle Audubon Society v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991).

## VI.     THE COURT SHOULD WAIVE THE BOND REQUIREMENT

Plaintiffs respectfully request that, if the Court grants the motion for injunctive relief, the Court waive the bond requirement of Rule 65(c). Exercise of the Court's discretion to waive bond is warranted because the environmental organizations here seek to enforce public rights and a substantial bond requirement would have a chilling effect on future efforts to vindicate public interests. *See, e.g.*, *Cal. ex rel. Van de Kamp v. Tahoe Reg'l Planning Ag'y*, 766 F.2d 1319, 1325 (9th Cir. 1985); *Friends of the Earth v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975).

<u>**CONCLUSION**</u>

For the reasons stated above, Plaintiffs respectfully request that this Court issue relief as requested in the Motion for Temporary Restraining Order and/or Preliminary Injunction.

Respectfully submitted this 13th of May 2019.

  s/ David H. Becker
**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC

  s/ Talasi B. Brooks
**Talasi B. Brooks (*Pro hac vice application pending*)**
Western Watersheds Project

  s/ Paul D. Ruprecht
**Paul D. Ruprecht (OSB # 132762)**
Western Watersheds Project

Attorneys for Plaintiffs Western Watersheds Project, Center for Biological Diversity, and WildEarth Guardians