**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC
4110 SE Hawthorne Blvd. # 168
Portland, OR 97214
(503) 388-9160
davebeckerlaw@gmail.com

**Talasi B. Brooks (***Pro hac vice
application pending***)**
Western Watersheds Project
PO Box 2863
Boise, ID 83701
(208) 336-7910
tbrooks@westernwatersheds.org

**Paul D. Ruprecht (OSB # 132762)**
Western Watersheds Project
PO Box 12356
Reno, NV 89510
(208) 421-4637
paul@westernwatersheds.org

Attorneys for Plaintiffs Western Watersheds Project, Center for Biological Diversity, and WildEarth Guardians

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# PENDLETON DIVISION

| | |
|---|---|
| **WESTERN WATERSHEDS PROJECT, CENTER FOR BIOLOGICAL DIVERSITY,** and **WILDEARTH GUARDIANS,**<br><br>  Plaintiffs,<br><br>  v.<br><br>**DAVID BERNHARDT**, Secretary of the Interior, **JEFFREY A. ROSE,** District Manager, Burns District Bureau of Land Management, and **BUREAU OF LAND MANAGEMENT,**<br><br>  Defendants. | Case No. 2:19-cv-750-SI<br><br>**DECLARATION OF RANDI SPIVAK** |

I, Randi Spivak, hereby declare as follows:

1. The following facts are personally known to me, and if called as a witness I would and could truthfully testify to these facts.

2. My office is located in Washington, DC. I presently reside in Washington D.C., where I have lived for 17 years.

3. For the past 25 years, I have worked to protect public lands and the habitat on public lands that native wildlife that depend on from a range of activities that degrade and harm habitat and native species.

4. Since June 2013, I have directed the public lands program for the Center for Biological Diversity ("the Center"), of which I am an active member. In my professional role, I engage in and direct public lands program staff to undertake administrative, legal, policy and campaign advocacy to protect wildlife and wildlife habitat on public lands.

5. In addition to the Center's Public Lands Program, staff of our Endangered Species Program also work to protect imperiled species including greater sage-grouse, and redband trout.

6. The Center is a membership based 501(c)(3) non-profit corporation incorporated in California and headquartered in Tucson, Arizona. In addition to our California and Arizona offices, the Center maintains offices in multiple states that cover a large portion of the range of greater sage-grouse including Oregon, Idaho, Colorado, and Nevada. As of January 8, 2019, the Center has over 69,543 members, and more than 1.4 million online supporters worldwide. The Center's members include Oregon residents with biological, health, educational, scientific research, moral, spiritual, and aesthetic interests in the health of the natural environment. These members have interests in wildlife affected by livestock grazing that degrades greater sage-grouse habitat. The Center often appears before Congress, federal agencies, and in the federal courts to

represent its members and goals and to advocate for the conservation of endangered, threatened, and at-risk species and their habitat.

7. Based on communications with Center members, officers, and staff, I have direct knowledge that Center members, officers, and staff have enjoyed observing and photographing greater sage-grouse on public land (BLM and Forest Service) in states including Oregon, Colorado, Nevada, Wyoming, and California.

8. The Center's primary mission is to protect threatened and endangered species and their habitats in both the United States and abroad. Although we pursue these objectives nationwide, much of our work focuses on advocating for habitat protection on western public lands. The Center specifically works to protect public lands administered by the Bureau of Land Management (BLM) in multiple states from the adverse impacts from a range of habitat degradation including livestock grazing, fluid mineral leasing and development, and hardrock mining, particularly impacts to greater sage-grouse, sagebrush habitat, and other sagebrush obligates as well as native fish species. We have long advocated to protect to greater sage-grouse to prevent its trajectory towards being listed, or to list the species if adequate regulatory mechanisms cannot be achieved.

9. The Center has worked on protecting greater sage-grouse since at least 2003, when it joined American Lands Alliance, Western Watersheds Project, and nineteen other organizations in submitting a petition to list the greater sage grouse as a threatened or endangered species.

10. Throughout our various efforts, several Center staff have developed a deep familiarity with legal, policy, planning, and scientific issues relating to sage-grouse conservation and causes of habitat degradation and resulting impacts to greater sage-grouse.

DECLARATION OF RANDI SPIVAK—2

11.     Since joining the Center, I have prioritized the protection of greater sage-grouse and its habitat as a key focus for the Center's public lands program.

12.     The Center's staff actively advocate for increased protections for species and habitats in the lands managed by the BLM at multiple levels including, but not limited to: comments on proposed land use and forest plans, comments on grazing decisions and associated National Environmental Policy Act documents, administrative protests, appeals to the Interior Board of Land Appeals, litigation, public education, social media advocacy, and lobbying. Specifically, the Center has engaged in the two extensive federal land management planning processes for the greater sage grouse: the 2015 revised resource management plans and the recent 2019 revised land management plans including the Oregon Approved Resource Management Plan Amendments (ARMPA).

13.     I led the Center's review and comments on the 2015 federal revised land use plans for greater sage-grouse, recommending numerous ways to strengthen them including by improving their priority habitat protections and management restrictions to protect sage-grouse from livestock grazing, energy development and other threats. During this process I met frequently with the Department of Interior's lead team developing the 2015 federal land use plans to advocate for increased protections based on the best available science, advocated on behalf of greater sage-grouse with Members of Congress, and attended numerous meetings with conservation allies to advance greater sage-grouse protection.

14.     In addition to providing extensive comments the Center administratively protested these plans for failing to follow the best available science. We are also involved in on-going litigation over the BLM and Forest Service's 2015 and 2019 sage-grouse land management plans including the Oregon ARMPAs.

DECLARATION OF RANDI SPIVAK—3

15. Center members, officers, and staff regularly observe, photograph, document, and study greater sage-grouse on public lands for recreational, scientific, educational, and other pursuits and intend to continue to do so in the future. The Center advocates on behalf of members interested in protecting the many native, imperiled, and sensitive sagebrush-dependent species and their habitats that may be affected by a range of activities that degrade sagebrush habitat and riparian systems including oil and gas drilling, livestock grazing and associated development including fences, water tanks and seeding of non-native grasses.

16. I personally continue to monitor and direct public lands staff to comment on a range of projects being proposed in greater sage-grouse habitat, engage media as to the importance of and threats to greater sage-grouse, and review and approve Center participation in litigation related to greater sage grouse.

17. Center's staff working directly on greater sage-grouse issues include three attorneys, a paralegal, a campaigner, and a conservation advocate. This team works with the Center's scientists, geographic information system specialists, and other staff to research and document the environmental consequences of proposed public lands development.

18. The Center's works to provide detailed, accurate, informative, and timely comment on projects that impact greater sage-grouse, including grazing decisions that affect sage-grouse and their habitat.

19. The Center is very concerned with former Secretary Zinke's decision to renew the Hammonds' grazing permits and allow grazing to resume in these allotments because of potential impacts to greater sage-grouse and its habitat. The Center has long advocated for sage grouse conservation as well as open and transparent public land management processes including through robust National Environmental Policy Act implementation.

20. Exacerbating this decision is the fact that it was done via a categorical exclusion. Doing so has denied the public and issue experts, including our staff and members, the opportunity to review and comment on a detailed analysis and disclosure of the potential impacts of returning livestock to these allotments that are situated on greater sage-grouse Priority Habitat Management Areas (PHMA) thereby violating the requirements of the National Environmental Policy Act, Federal Land Policy and Management Act, and Administrative Procedure Act. The Center and its members, supporters, and staff have a strong interest in having federal agencies comply with federal law.

21. Had the Center been afforded the opportunity to comment, it would have raised several issues, which could have influenced BLM's and the Secretary's decision. Specifically, among the issues we would have raised are that:

    a. The allotments at issue include high quality sage grouse habitat that have been designated as Priority Habitat Management Areas (PHMA) and General Habitat Management Areas (GHMAs) in the 2015 federal Approved Resource Management Plan Amendment (ARMPA) for Oregon, including a sage grouse lek, or breeding ground, in the Mud Creek allotment and two additional leks that are located less than two miles outside of the Mud Creek, Hammond, and Hammond FFR allotments. Leks are essential areas for mating and spring nesting and brood rearing habitat and are typically located within 2 miles of leks, but there is abundant documentation in the literature that nesting can occur up to 10-12 miles from leks and brood rearing habitats can be further away. The BLM 2015 Oregon ARMPA specifies that any permits or leases issued within SFA and PHMA will include specific management thresholds based on greater sage-grouse habitat

    objectives, land health standards and ecological site potential, including one or more defined responses that will allow the authorizing officer to make adjustments to livestock grazing that have been subjected to NEPA analysis. (ARMPA at 2-2, 2-20);

b. Former Secretary Zinke's decision to review the Hammond grazing permits and BLM's reissuance of the permit without full NEPA analysis and without the conditions required by the Oregon ARMPA to protect Greater sage-grouse deprived Center members and staff of the opportunity to review a comprehensive analysis of potential impacts to these resources including adaptive management triggers;

c. After 5 years of rest from grazing, the grasses and vegetation that have been allowed to grow now provides needed protective cover for sage-grouse nests and chicks from predators. Resumption of livestock grazing, and especially the potential for a 1,000 to 1,500 AUM increase on the Hammond allotment for the express purpose of grazing the crested wheatgrass, would reduce such vegetation cover. The rest period also allowed riparian vegetation along streams within the allotments occupied by redband trout to recover but for which renewed cattle grazing would return to degraded conditions ultimately decreasing sage-grouse populations on these allotments as well as harm fish habitat;

d. Any NEPA should have included an analysis of alternatives to restore native vegetation on these allotments to further benefit sage grouse as required by the Oregon ARMPA; and

e. Importantly, the Bureau of Land Management denied the Hammond's application to renew its permit in February 2014 because "[t]he intentional and malicious fire-setting by principals of [Hammond] in the 2001 Hardie-Hammond Arson and August 22, 2006 Krumbo Butte Arson violated regulations applicable to the [Hammond] grazing permit and violated the permit terms." Specifically, BLM found that these violations disallowed a finding of a "satisfactory record of performance" under the terms of the expired permit which is a mandatory condition for permit renewal under the Secretary's regulations implementing the Federal Land Policy and Management Act (FLPMA). Notice of Final Decision 4100 (ORB070)P (Feb. 14, 2014); 43 C.F.R. § 4110.1(b). The bottom line being that, given the fact that the Hammonds have an unsatisfactory performance stemming from their felony arson conviction, these permits were renewed illegally.

22. With the Center's participation, BLM and the Secretary may have decided to prepare a more detailed EA or EIS considering a full range of alternatives to continuing the Hammonds' grazing and, based on that analysis, might have elected to adhere to BLM's original decision not to renew the permit, or else might have imposed permit terms and conditions that would reduce harms to the Center's interests. Because a full NEPA process never occurred, that opportunity for detailed understanding of environmental impacts and alternatives to reduce or mitigate those impacts never occurred, harming the Center's interests.

23. If grazing is allowed to occur this summer on the Mud Creek and Hardie Summer allotments, or if grazing is allowed to continue on the Hammond allotment, we are concerned that any benefit achieved from the 5 years of rest from livestock grazing that has begun the process of recovering native shrub and grass habitat will be forgone. Further, allowing grazing to resume, and

in particular doubling or tripling the grazing use on these allotments as is being proposed by the BLM will degrade and fragment this habitat that is of importance to maintain connectivity within and around the area of the Steens Mountain sage grouse populations. Harms to sage-grouse at a localized, or broader population level, such as those that could occur from grazing these allotments, also harm the Center's interests in the survival and recovery of these iconic birds.

24. The requested injunctive relief that Plaintiffs are seeking from this Court will help prevent irreparable injury to the Center, its members and staff, the public, and the public lands and vital resources, such as sage-grouse.

25. Should the Court grant Plaintiffs' request for relief on the merits, it would also redress the Center's injuries from BLM's failure to comply with NEPA and Secretary Zinke's unlawful decision to reissue the permit despite the Hammonds' pattern of arsons and other violations of grazing permit terms and conditions. If the Court were to require BLM and the Secretary to prepare a thorough and detailed NEPA analysis—subject to public comment—prior to renewing the Hammonds' permit or reissuing another grazing decision concerning the permit, that result would also redress the Center's injuries from BLM's and the Secretary's inadequate NEPA.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed in Washington, D.C. on May 12, 2019.

*/s/ Randi Spivak*

---

Randi Spivak

DECLARATION OF RANDI SPIVAK—8