**BILLY J. WILLIAMS**, OSB #901366
United States Attorney
District of Oregon
**STEPHEN J. ODELL**, OSB #903530
Assistant United States Attorney
steve.odell@usdoj.gov
Office of the United States Attorney
District of Oregon
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902
Telephone:	(503) 727-1024
Facsimile	(503) 727-1117
  Of Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### PENDLETON DIVISION

| | |
|---|---|
| **WESTERN WATERSHEDS PROJECT, CENTER FOR BIOLOGICAL DIVERSITY,** and **WILDEARTH GUARDIANS**,<br><br>Plaintiffs,<br><br>v.<br><br>**DAVID BERNHARDT**, Secretary of the Interior, **JEFFERY A. ROSE,** District Manager, Burns District, Bureau of Land Management, and **BUREAU OF LAND MANAGEMENT**,<br><br>Defendants. | Case No.: 2:19-CV-750-SI<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** |

Page 1 - DEFENDANTS' RESPONSE TO PLAINTIFFS' TRO MOTION
  *Western Watersheds Proj. v. Bernhardt,* Case no. 2:19-CV-750-SI

**INTRODUCTION**

Plaintiffs' request for a temporary restraining order ("TRO")(Dkt. #7) turns on a narrow determination, namely whether Plaintiffs can carry their burden to establish that they are entitled to have this Court intercede in the Bureau of Land Management's ongoing management of the current season of livestock grazing, and prevent cattle from moving from one allotment to another pursuant to the permittee's recently renewed permit and longstanding practice, until the Court can resolve Plaintiffs' more broadly framed preliminary injunction motion.  There are two primary reasons Plaintiffs have not met, and indeed cannot meet, their burden on that question.

First, Plaintiffs have failed to show they are likely to suffer irreparable injury in the absence of the TRO they request that would specifically restrain Defendant Bureau of Land Management ("BLM") from allowing the permittee to turn its cattle onto the Mud Creek Allotment per the grazing strategy for the current season that has been underway for nearly two months.  The Supreme Court has held that such a showing is an absolute prerequisite to the provision of any such relief, even in environmental cases.  This follows primarily because the rotation Plaintiffs are asking the Court to suspend has effectively been utilized for 20 of the past 25 years and the rangeland health conditions on the allotment onto which Plaintiffs seek to prevent turnout are meeting applicable conservation standards with just one exception and, even as to that standard, BLM determined the deficiency was not due to livestock grazing.

Second, the balance of equities cannot be said to favor the TRO Plaintiffs seek, if for no other reason than they waited until May 13 to file their motion despite the fact that the decision that renewal of the permit was justified was made in January.  In addition, the permittee turned out its cattle pursuant to the Renewed Permit on or around April 1, some six weeks before Plaintiffs filed their motion.

**Page 2 - DEFENDANTS' RESPONSE TO PLAINTIFFS' TRO MOTION**
   *Western Watersheds Proj. v. Bernhardt,* Case no. 2:19-CV-750-SI

Defendants will elaborate more on these two major points and others below, all of which reinforce that the Court should deny Plaintiffs' TRO request and allow the grazing strategy that is already being implemented for the ongoing season to continue to proceed unimpeded.

**STATUTORY & REGULATORY OVERVIEW**

The Taylor Grazing Act of 1934 established that individuals seeking to graze livestock on public lands must secure a permit from the Department of the Interior. 43 U.S.C. § 315 *et seq.* As the Supreme Court explained, the specific goals of the Act "are to 'stop injury' to the lands from 'overgrazing and soil deterioration,' and 'to stabilize the livestock industry dependent on the public range.'" Public Lands Council v. Babbitt, 529 U.S. 728, 733 (2000). The Court went on to explain that, "[a]s grazing allocations were determined, the Department would issue a permit measuring grazing privileges in terms of 'animal unit months' (AUMs), *i.e.,* the right to obtain the forage needed to sustain one cow (or five sheep) for one month." *Id.* at 736.

The Federal Land Policy and Management Act ("FLPMA") of 1976 provides additional congressional direction regarding management of rangeland resources on federal public land BLM administers. 43 U.S.C. §§ 1751-53. Among other things, the Range Subchapter provides that permits for grazing on public lands ordinarily shall be issued for a 10-year term subject to such terms and conditions as BLM deems appropriate and consistent with governing law. 43 U.S.C. § 1752(a). The language in FLPMA confers such open-ended discretion on the federal land management agencies the Ninth Circuit previously concluded that, were it not for a policy pronouncement in the opening section of the statute expressing a preference for judicial review of "public land adjudication decisions," such discretion "is so broad in determining grazing capacity – necessarily exercised in accord with expert judgments" that it would forestall any judicial review whatsoever. Perkins v. Bergland, 608 F.2d 803, 805 (9th Cir. 1979).

**Page 3 - DEFENDANTS' RESPONSE TO PLAINTIFFS' TRO MOTION**
   *Western Watersheds Proj. v. Bernhardt,* Case no. 2:19-CV-750-SI

BLM has issued grazing administration regulations to implement the TGA and FLPMA at Part 4100 of chapter 43 of the Code of Federal Regulations. 43 C.F.R. § 4100-4190.1 (2005).[1] Among other things, these regulations require BLM to develop grazing administration standards and guidelines for particular geographic areas under its jurisdiction that address, at a minimum, watershed function; nutrient cycling and energy flow; water quality; habitat for species listed or proposed for listing under the Endangered Species Act or other special-status species; and habitat quality for native plant and animals. 43 C.F.R. § 4180.2(a) & (d). Upon a determination that existing grazing management practices or levels of grazing use on public lands are significant factors in failing to achieve the standards and conform with any applicable guidelines developed pursuant to this section of the regulations, BLM needs to take "appropriate action" to bring about significant progress toward fulfillment of the standards and conformance with the guidelines. 43 C.F.R. § 4180(c). In Oregon, five rangeland health standards have been adopted: upland watershed function, riparian watershed function, ecological processes, water quality, and native, threatened, and endangered, and locally important species. McCormack Declaration at ¶9.

The Steens Mountain Cooperative Management and Protection Act of 2000 ("Steens Act"), Pub. L. No. 106-399, 16 U.S.C. § 460nnn to 460nnn-122, created the 17,000–acre Steens Mountain Wilderness Area; added 29 miles to the federal Wild and Scenic River System; withdrew 1.1 million acres from mining and geothermal development; established the Wildlands

---

[1] The BLM grazing regulations set forth at 43 C.F.R. part 4100 *et seq.* were amended effective August 11, 2006. *See* 71 Fed. Reg. 39402 (July 12, 2006). However, the U.S. District Court for the District of Idaho has enjoined implementation of those regulatory amendments. Western Watersheds Proj. v. Kraayenbrink, 538 F. Supp. 2d 1302 (D. Idaho 2008). In accordance with that injunction, BLM's Assistant Director, Renewable Resources and Planning, issued Instruction Memorandum 2009-109, directing all western BLM field offices (excluding Alaska) not to implement any of the July 12, 2006, amendments to 43 C.F.R. part 4100 *et seq.* Consequently, the grazing regulations cited herein are those in effect that were adopted in 2005.

**Page 4 - DEFENDANTS' RESPONSE TO PLAINTIFFS' TRO MOTION**
   *Western Watersheds Proj. v. Bernhardt,* Case no. 2:19-CV-750-SI

Juniper Management Area; designated the nation's first Redband Trout Reserve; and established a "Cooperative Management and Protection Area" ("CMPA"). The primary purpose of the Steens Act is "to conserve, protect, and manage the long term ecological integrity of Steens Mountain for future and present generations," and the statute goes on to explain that, "to further [this] purpose … and consistent with such purpose" an objective is "to promote grazing, recreation, historic, and other uses that are sustainable." 16 U.S.C. § 460nnn-12.

**FACTUAL BACKGROUND**

Due to the relatively brief period that Defendants have had to prepare their response to Plaintiffs' TRO request as well as the fact that the Court granted their request to bifurcate the briefing on Plaintiffs' combined motion for a TRO and preliminary injunction (see Dkt. #19), Defendants will focus their discussion of the underlying facts on those that are relevant to the TRO – *i.e,* those that bear directly on the 2019 grazing strategy for the allotments at issue, and whether Plaintiffs have shown they have met their burden to establish their right to have this Court restrain BLM from continuing to manage the allotments in accordance with that strategy, and thereby allow HRI to turn out its livestock onto the Mud Creek Allotment as of June 7.[2]

As noted above, more specifically Plaintiffs' seek a TRO by which this Court would temporarily restrain Defendants from allowing turnout onto the Mud Creek Allotment until the Court can resolve their more broadly framed preliminary injunction motion. Pls.' Mot. at i. Mud Creek Allotment is some 8245 acres and exists entirely within the Steens Mountain CMPA. Exh. 1 at 5 (FEIS at 3-51).

---

[2] Defendants would note in this context that this does not mean that they concede in any way that the factual statement in Plaintiffs' Motion is wholly accurate, and would further advise that they intend to provide a more comprehensive Factual Background statement in their response to the preliminary injunction portion of the Motion upon filing that brief.

**Page 5 - DEFENDANTS' RESPONSE TO PLAINTIFFS' TRO MOTION**
    *Western Watersheds Proj. v. Bernhardt,* Case no. 2:19-CV-750-SI

In the last dozen years, BLM has performed two evaluations and determinations on the Mud Creek Allotment for each of the five rangeland health standards adopted in Oregon. McCormack Declaration at ¶11. More specifically, in a rangeland health assessment completed just last Fall, BLM determined that the Mud Creek Allotment is meeting all five of the applicable Standards except for the one related to native, threatened and endangered, and locally important species, but further found that livestock grazing is not responsible for the fact this standard is not being achieved in the allotment. *Id.* at ¶12; *see also* Determination of Standards for Rangeland Health and Guidelines for Livestock Mgmt. for Oregon, Mud Creek Allotment (Nov. 1, 2018) (2018 Mud Creek RHA) (attached as Exh. 2). Instead, it found that sagebrush habitat and cover are somewhat deficient due to juniper encroachment, recent fire history, and the presence of invasive annual grasses. Exh. 2 at 3. At the same time, it found that habitat for the sage-grouse is available for winter, leking, and nesting/early-season brood-rearing where adequate sagebrush still occurs in the allotment. *Id.* Moreover, since consistent counts at the single sage-grouse lek began in 2007, males have shown up during the mating season at the lek site even though the number has fluctuated rather substantially from year-to-year consistent with environmental conditions. *Id.*

Similarly, in the earlier Rangeland Health evaluation that BLM performed on the Mud Creek Allotment in 2007, it determined that two standards were not being met, the one for species and the one for ecological processes, but again, it was not due to livestock grazing. BLM instead determined the failure to achieve those two standards was due to recent fires that had effectively eliminated the shrub component from the plant community and wildlife habitat. McCormack Declaration at ¶ 13.

On Feb. 13, 2019, BLM Burns District Manager Jeffrey Rose issued a renewed grazing

**Page 6 - DEFENDANTS' RESPONSE TO PLAINTIFFS' TRO MOTION**
  *Western Watersheds Proj. v. Bernhardt,* Case no. 2:19-CV-750-SI

permit to Hammond Ranches, Inc. ("HRI") pursuant to direction of the Secretary of the Interior, who had exercised his authority to assume jurisdiction over HRI's administrative appeal regarding its request for such a renewal.  Exhs. 1, 3, & 15 to Pls.' Mot.  The Renewed Permit authorized HRI to graze livestock in four allotments – Hammond, Hammond FFR, Mud Creek, and Hardie Summer, with grazing authorized to commence in the first two of those allotments as of Apr. 1, 2019.  Exh. 3 to Pls.' Mot. at 1; *see also* Declaration of Jamie McCormack at ¶4.  Two of the terms and conditions attached to the Renewed Permit provide that "an actual use record shall be submitted within 15 days after completion of annual grazing use" and that "any forage authorized in excess of your permitted use or adjudicated season or number is nonrenewable and does not establish a priority for future forage allocation."  *Id.*  Moreover, although the allotments are separately named and numbered on the Renewed Permit, they are used in one integrated grazing system from April 1 to October 30.  McCormack Declaration at ¶4.

More particularly, it has long been the grazing management practice for the livestock rotation on the four allotments to begin in the Hammond FFR Allotment and then for different groups of livestock to be turned out onto the Hammond Allotment within different pastures in a staggered fashion.  McCormack Declaration at ¶¶ 5-6.  The livestock generally graze from north to south through the Hammond Allotment and are eventually combined into a single herd in preparation for their entry next into the Mud Creek Allotment, which is just to the south.  *Id.* at ¶ 6 & Map 1 on p.9.  As on-the-ground conditions indicate, livestock are moved into Mud Creek.  *Id.* at ¶ 6.

HRI has been following this same general rotation during the current 2019 grazing season, having turned out on or around April 1 onto Hammond FFR and Hammond Allotments.  Based on its initial calculations of HRI's permitted AUMs on the Hammond Allotment, BLM

**Page 7 - DEFENDANTS' RESPONSE TO PLAINTIFFS' TRO MOTION**
  *Western Watersheds Proj. v. Bernhardt,* Case no. 2:19-CV-750-SI

had orally advised HRI that it could stay on the Hammond Allotment until May 31, 2019. Letter from J. Rose to S. Hammond (May 28, 2019) (attached as Exh. 3). Regrettably, in double-checking its calculations in this regard, BLM realized it had made an error and that HRI has exceeded its permitted AUMs on the Hammond Allotment. *Id.* at 1. Around this same time, the Court set a pair of status conference calls with counsel for the parties toward the end of establishing a schedule for resolution of Plaintiffs' Motion (Dkt. ## 18 & 19). During the first of those, held on May 20, 2019, the Court inquired as to whether it would be feasible for BLM to maintain the status quo with respect to the grazing then occurring on HRI's four permit allotments until June 6 or 7, 2019, meaning that cattle would stay on Hammond Allotment a week beyond the move date that BLM had earlier advised HRI. BLM ultimately concluded that such was feasible and advised the Court of the same. In addition, it further advised HRI of its determination in this regard, given that HRI had made an independent request to be able to stay on the Hammond Allotment through July 1, 2019. Exh. 3 at 1. As BLM explained in its letter to Mr. Hammond, it based its conclusion in this regard on the added forage available from prior non-use and the opportunity to decrease fuels for wildfire due to plant conditions on the Hammond Allotment, as well as the anticipated issuance of a decision on the proposed authorization of 1000-1500 nonrenewable AUMs on the Hammond Allotment consistent with similar prior authorizations, and in light of the Court's inquiry described above. *Id.* Therefore, at present, BLM has advised HRI that it needs to at least start moving its livestock onto Mud Creek by June 7, 2019.

In addition, BLM has also prepared an Environmental Assessment ("TNR EA") on the proposed action of authorizing HRI to use between 1000-1500 temporary nonrenewable AUMs for its cattle to graze between March 1-December 15 for both of the 2019 and 2020 grazing

seasons. Exh. 9 to Pls.' Mot; *see also* McCormack Declaration at ¶ 3. This proposed action is generally consistent with the historical grazing practice that was effectively followed between 1993-2012 when BLM authorized the permittee to use between 1000-1500 nonrenewable AUMs on an annual basis pursuant to an agreement designed to manage crested wheatgrass seedings on the Hammond Allotment. Exh. 9 to Pls.' Mot. at 1. As noted in the TNR EA, the need for the proposed action arose because the lack of any livestock grazing since 2014 in the Hammond Allotment allowed some 5800 acres of crested wheatgrass to accumulate standing biomass that has reduced the health and vigor of the vegetation and created additional risk of wildfire spread due to the amount and distribution of the fine fuel the standing dead biomass represents. *Id.* at 3.

**STANDARD OF REVIEW**

The same general legal standards govern temporary restraining orders and preliminary injunctions. Fed. R. Civ. P. 65; New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 434 U.S. 1345, 1347 n.2 (1977). To be entitled to a preliminary injunction, a movant must establish: (1) a likelihood of success on the merits; (2) irreparable harm is likely to occur in the absence of the injunctive relief sought; (3) that the balance of equities tips in its favor; and (4) the requested injunctive relief would be in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Id.* at 24.

If a plaintiff can show there are "serious questions going to the merits," the Ninth Circuit has provided that a court may still issue a preliminary injunction if "the balance of hardships tips sharply in the plaintiff's favor," and plaintiff also establishes the other two prerequisites to such relief – a likelihood of irreparable injury and the requested injunctive relief would serve the public interest. Alliance for the Wild Rockies v. Pena, 865 F.3d 1211, 1217 (9th Cir. 2017)

**Page 9 - DEFENDANTS' RESPONSE TO PLAINTIFFS' TRO MOTION**
  *Western Watersheds Proj. v. Bernhardt,* Case no. 2:19-CV-750-SI

(quoting Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011)).

Thus, notwithstanding the Ninth Circuit's statements in the above-referenced Alliance for the Wild Rockies opinions, a *sine qua non* for securing a temporary restraining order remains a showing that plaintiff will likely suffer irreparable injury in the absence of the particular relief the motion seeks, regardless of any particular showing plaintiff may make on the merits. M.R. v. Dreyfus, 697 F.3d 706, 725 (9th Cir. 2012).

Moreover, this Court has recognized the already high standard for granting preliminary injunctive relief is "further heightened when the type of injunction sought is a 'mandatory injunction.'" Innovation Law Lab v. Nielsen, 310 F. Supp. 3d 1150, 1156 (D. Or. 2018)(citing Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015)). "In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." Marilyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 878-79 (9th Cir. 2009).

**ARGUMENT**

I.  PLAINTIFFS HAVE FAILED TO CARRY THEIR BURDEN OF ESTABLISHING THAT THEY WILL LIKELY SUFFER AN IRREPARABLE INJURY IN THE ABSENCE OF THE TRO THEY SEEK.

As explained above, to be entitled to the TRO they request, it is an absolute prerequisite that Plaintiffs establish that they would be likely to suffer an irreparable injury were it not to issue. Winter, 555 U.S. at 22. For the myriad of reasons set forth below, Plaintiffs have not carried this burden, nor can they given the record on the salient issues at hand.

A.  That Plaintiffs Waited More than Three Months to File their Temporary Restraining Order Motion, and Just Three Days Before they Believed the Activity They Seek the Court's Intercession to Stop was to occur Substantially Undermines Their Ability to Meet their Burden of Showing the Injuries they allege they will sustain are Truly Irreparable.

As an initial matter, the Ninth Circuit long ago established that a plaintiff's delay in seeking

**Page 10 - DEFENDANTS' RESPONSE TO PLAINTIFFS' TRO MOTION**
   *Western Watersheds Proj. v. Bernhardt,* Case no. 2:19-CV-750-SI

TRO relief substantially undermines its ability to show the irreparability of its alleged injuries. Oakland Tribune, Inc. v. Chronicle Pub. Co., 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm"). In other words, Plaintiffs cannot create the urgency or need for the Court to impose the extraordinary remedy of a TRO based on their own delay in seeking such relief. But this is precisely what the chronology of events shows happened here. As Plaintiffs acknowledge, upon assuming jurisdiction over HRI's administrative appeal from BLM's initial decision to deny renewal of its permit, the Secretary made his decision in January to reverse that initial decision and remand to the agency with instructions to renew the permit, and the Secretary made that decision public later that same month. Exh. 1 & 12 to Pls.' Mot. They further acknowledge that BLM issued HRI's Renewed Permit on Feb. 13, 2019, three months to the day before they filed their Motion seeking the TRO at issue (Dkt. #7). Pls.' Mot. at 17.

In their moving papers, Plaintiffs do not address and provide no explanation whatsoever for why they waited three months to seek emergency relief in the form of the TRO and preliminary injunction they have now, finally asked the Court to enter. Indeed, the delay appears to be even more difficult to justify upon realizing that the TRO Plaintiffs request asked the Court to temporarily restrain BLM from allowing HRI to turn out onto the Mud Creek Allotment just three days after they filed the Motion. *See* Pls.' Mot. at i (stating their understanding as of the date they filed their motion – May 13, 2019 – that the turnout onto Mud Creek they wanted the Court to temporarily restrain BLM from authorizing was then "currently slated for May 16, 2019"). Moreover, as further emblematic of Plaintiffs' dilatoriness in seeking relief with respect to the current grazing season, it is worth noting that livestock have been grazing pursuant to the Renewed Permit for almost two months now, since around April 1. Exh. 3 at 1. Along these

same lines, the preliminary injunction Plaintiffs seek actually asks for an injunction against grazing on the Hammond FFR Allotment even though its season of use expired on April 30, some two weeks before Plaintiffs filed their Motion. *Id.*

> B. <u>BLM's Fieldwork shows the Principal Resource Values in Mud Creek Allotment are for the most part meeting applicable standards notwithstanding that livestock grazing has occurred 20 of the last 25 years, and to the extent they are not, grazing is not the cause.</u>

Wholly irrespective of the issue of Plaintiffs' unexplained delay in seeking the TRO for which they have now moved, the record cannot support a judicial finding that Plaintiffs are likely to suffer an irreparable injury in the absence of their requested TRO. Because such a finding is an essential underpinning of any TRO in light of the Supreme Court's clarion ruling to that effect in <u>Winter</u>, 555 U.S. 7, on that ground alone the Court is duty-bound to deny the TRO request.

First, as Defendants noted above, within the last year BLM visited the Mud Creek Allotment for an in-depth Rangeland Health Evaluation. Exh. 2. With respect to Standard 1, which addresses watershed function in the uplands portion of the allotment, the evaluation determined the standard was being achieved, noting in support of this determination that "upland soils are exhibiting infiltration and appropriate permeability rates, storing available moisture, and showing little to no sign of erosion," and that such soils are also "supporting native vegetation." *Id.* at 1. With respect to Standard 2, which addresses watershed function in the riparian area of the allotment, the evaluation determined the standard was being achieved, noting in support that there are no natural, perennial bodies of water within the allotment, *id.* at 2, and the primary streams that run even intermittently or ephemerally through the allotment are all lined with steep rimrock walls that block or deter livestock access with few access points to such streams. McCormack Declaration at ¶ 8. In addition, in the limited areas where livestock can access Bridge Creek or Mud Creek, water gaps were installed in the 1980s to funnel livestock to cross

the streams in a focused area, thereby preventing a much broader geographic scope of potential adverse impacts from livestock to the creeks. *Id.* As a result, livestock look primarily to slake their thirst through the use of various water facilities extant in the allotment that take the form of reservoirs and a spring development, thereby relieving pressure on the creeks for water use. *Id.*

With respect to Standard 3, which addresses ecological processes in the allotment, the evaluation determined the standard was being achieved, noting in support that, even though the shrub component was lacking due to recent fire, "[n]utrient cycling is occurring effectively as evidenced by plant composition and biological activity including plant growth." Exh. 2 at 2. With respect to Standard 4, which addresses water quality within the allotment, the evaluation determined the standard was being achieved, noting in support that Big Bridge Creek, which is an intermittent tributary to, and provides seasonal flows to, Bridge Creek, which currently is meeting the Oregon Department of Environmental Quality ("DEQ") standard for the 7-day maximum temperature required for salmonids. *Id.* at 3. As alluded to above, all of the remaining stream channels in the allotment are ephemeral. *Id.*

Finally, with respect to Standard 5, which addresses native, ESA-listed, or locally important species, the evaluation determined the standard was not being achieved, but that it is not due to livestock grazing, but rather, sage-grouse habitat overall was rated as marginal as a result of the lack of sagebrush cover and continuity due to recent fires and juniper encroachment, and the presence of invasive annual grasses. *Id.*; *see also* Declaration of Matthew Obradovich at ¶ 11. At the same time, the evaluation notes that sage-grouse habitat does exist on the allotment and where it does, is suitable for winter, leking, and nesting/early-season brood rearing. Exh. 2 at 3. In addition, the one sage-grouse lek on the allotment has supported male mating activity at varying levels for more than a decade. *Id.* It is important to emphasize in this context that the

**Page 13 - DEFENDANTS' RESPONSE TO PLAINTIFFS' TRO MOTION**
  *Western Watersheds Proj. v. Bernhardt,* Case no. 2:19-CV-750-SI

evaluation underwent an interdisciplinary review by a variety of specialists, including a riparian specialist and wildlife biologist, before the final determinations were concurred with by the Field Manager overseeing the evaluation. *Id.* at 5.

Although Plaintiffs quickly acknowledge the favorable resource conditions that exist on the Mud Creek Allotment in their Motion, they try to discount or write off the results of BLM's recent in-the-field Rangeland Health Evaluation by suggesting that the positive determinations and conditions on the ground within the Allotment are solely because the allotment has not received livestock grazing use since 2014. *See* Pls.' Mot. at 15. But this ignores the fact that BLM completed an earlier similar Rangeland Health Assessment in 2007 that showed similar results insofar as the extent to which standards were not being achieved was found not be as a result of livestock grazing. McCormack Declaration at ¶ 12. More specifically, BLM determined that three of the five standards were being achieved, including all of the ones related to watershed function and water quality, but that the other two (addressing ecological processes and special-interest species) were not, but it was due to the fact that portions of the allotment had just burned and the shrub component had been eliminated not only from wildlife habitat, but also from the native plant community. *Id.*

These determinations are particularly salient here, where the grazing strategy that BLM has laid out for HRI in 2019 tracks the similar grazing management practices that have been followed on the four allotments within the Renewed Permit since 1994. McCormack Declaration at ¶¶ 5 & 6. Moreover, as the BLM Burns District Wildlife Biologist Matthew Obradovich explains, the rangeland health evaluations and determinations in 2007 and 2018 discussed above "provide a sound basis to indicate that the level and type of livestock grazing that was occurring on the three evaluated allotments [including Mud Creek] from the period prior to 2007 through

**Page 14 - DEFENDANTS' RESPONSE TO PLAINTIFFS' TRO MOTION**
  *Western Watersheds Proj. v. Bernhardt,* Case no. 2:19-CV-750-SI

2014 was not excessive or improper for the resources within those allotments and, in particular, for sage-grouse or its habitat." Obradovich Declaration at ¶ 12.  As the Supreme Court noted in Winter, the fact that the activity a plaintiff seeks to preliminarily enjoin is not a "new type of activity with completely unknown effects on the environment" is a pertinent factor for a court to consider when assessing whether an irreparable injury is likely to occur.  555 U.S. at 23.

- C. The Evidence Plaintiffs Have Submitted is Virtually Entirely Inapposite because It Does Not Focus on the Central Inquiry before the Court for purposes of their specific TRO Request – Whether they will likely suffer irreparable injury if the TRO does not issue.

The main evidence Plaintiffs submit in their ultimately unavailing effort to support their burden to show they will likely sustain irreparable injury if the TRO they seek is not granted are the declarations filed in support of their Motion of Dr. Clait E. Braun (Dkt. #8) and Dr. J. Boone Kauffman (Dkt. #9).  See Pls.' Mot. at 31.  But these declarations fall well short of the mark to enable Plaintiffs to meet their burden, for three primary reasons.

First, neither Dr. Braun nor Dr. Kauffman state that they have ever been to the Mud Creek Allotment, nor from their assertions does it appear they actually have.  See Braun Declaration at ¶¶ 10 & 33-34; Kauffman Declaration at ¶¶ 4 & 10.  This is an important element to provide personal knowledge necessary to form a well-grounded expert opinion about potential impacts to natural resources.  Defendants would rhetorically ask the Court to consider the hue and cry that would ensue if BLM were to perform a NEPA analysis on the prospective environmental effects of a proposed action without ever having visited the site of the proposed action subject to analysis?  In contrast, as explained above, BLM has done intensive fieldwork in the Mud Creek Allotment and its agency experts are intimately familiar with the conditions and resources it contains.  See Declaration of Matthew Obradovich at ¶¶ 5-7 (nothing that he has conducted field work in the Mud Creek Allotment and certain oversights in which he infers Dr. Braun engaged

**Page 15 - DEFENDANTS' RESPONSE TO PLAINTIFFS' TRO MOTION**
   *Western Watersheds Proj. v. Bernhardt,* Case no. 2:19-CV-750-SI

as a result of not having been to the allotment himself).

Second, nothing in either Dr. Braun's nor Dr. Kauffman's declarations really comes close to focusing on the relevant inquiry at hand for purposes of Plaintiffs' pending TRO request, which is whether the Court's declination to restrain BLM from allowing HRI to turn onto the Mud Creek Allotment per its adjusted 2019 grazing strategy will be likely to cause any irreparable injury to sage-grouse or riparian habitat. Instead, both declarations speak about potential impacts to such resources in the most glittering generalities, but such vague propositions detached from any connection to the actual relief that Plaintiffs seek cannot possibly support the necessary judicial finding of likely irreparable injury that would justify the imposition of such relief. In the same vein, both declarations do not distinguish between impacts vis-à-vis the respective allotments, and so their opinions appear to be that any livestock grazing anywhere within any of the four allotments, at any level, would cause unacceptable impacts. *See* Kauffman Declaration at ¶¶ 4, 8, & 13 (all creeks allegedly at risk), ¶ 15 (all allotments allegedly at risk); Braun Declaration ¶¶ 16-18, 22-23, 33-34 (assertions addressing all allotments without distinction).

Third, and in some ways most important, both Dr. Braun and Dr. Kauffman fail to acknowledge, let alone distinguish between, properly managed and implemented livestock grazing, and that carried out improperly or without appropriate management. This is critical because myriad sources indicate that properly managed grazing does not present a threat to sage grouse. *See, e.g.,* Oregon Sage-Grouse Action Plan at 149 ("Appropriate livestock grazing regimes are compatible with sage-grouse habitat needs")(2015); ODFW GSG Conservation Assessment & Strategy at 43 ("The effects of grazing on the structure and composition of sage-grouse habitat can be positive, negative or neutral and will vary with timing and intensity of use and a host of environmental factors")(2011); U.S. Fish & Wildlife Service, Proposed Rule, 80

Fed. Reg. 59,858, 59,909 (Oct. 2, 2015)("Properly managed grazing may benefit sage grouse").

D. Plaintiffs' Efforts to Boot-Strap an Irreparable Injury based on a Putative Procedural Injury are Unsound & Not Supported by the Case Law on which they Seek to Rely.

Finally, Plaintiffs also contend that they are likely to suffer irreparable injury based on the alleged procedural violations they assert BLM committed in their claims on the merits pursuant to the National Environmental Policy Act ("NEPA"). Pls.' Mot. at 31-32. Their contention cannot withstand scrutiny, however, for two main reasons.

First, it reflects a misreading of the case law on which they stand in making the contention, as both of the opinions Plaintiffs cite involve a scenario in which the court had ruled against the defendant agencies on the merits following a full adjudication, not a situation involving a request for a TRO or other form of preliminary injunctive relief. *See* High Sierra Hikers Ass'n v. Blackwell, 390 F.3d 630, 641 (9th Cir. 2004)(court stating that, "[h]aving concluded that the Forest Service committed clear NEPA violations, we now turn to the equitable relief ordered by the district court"); National Wildlife Fed'n v. NMFS, 2017 WL 1829588, Slip Op. at *2 (D. Or. Apr. 3, 2017) (this Court acknowledging that, because it "has already decided the merits of the ESA and NEPA claims in this case, the Court finds the factors for granting permanent injunctive relief to be more appropriate in considering the pending motions"). Thus, the focus was on whether allowing a proposed action to go forward or continue to be implemented without modification was appropriate in the face of a fully adjudicated NEPA violation after all sides had received adequate opportunity to be heard, quite a different scenario from the one at hand here.

Second, such an approach would run against the grain of the Supreme Court's crystalline teaching on standing, which has been that the mere assertion of a procedural injury does not absolve plaintiff of the need to show that it has been, or is reasonably certain to be, adversely and concretely affected by a proposed action it is challenging. Lujan v. Defenders of Wildlife, 504

**Page 17 - DEFENDANTS' RESPONSE TO PLAINTIFFS' TRO MOTION**
  *Western Watersheds Proj. v. Bernhardt,* Case no. 2:19-CV-750-SI

U.S. 555, 572-73 & n. 8 (1992). Certainly if such boot-strapping does not suffice in the context of standing, it certainly cannot do so for the much higher threshold required to demonstrate entitlement to the remarkable remedy of preliminary injunctive relief in federal courts.

 II.  PLAINTIFFS HAVE FAILED TO CARRY THEIR BURDEN TO SHOW THE BALANCE OF EQUITIES TIPS IN FAVOR OF THE TRO THEY SEEK.

Plaintiffs have also failed to show that the balance of equities tips in favor of the Court's granting the TRO they have requested by their Motion, for several reasons.

First, as described above, Plaintiffs' unexplained (and seemingly inexplicable) delay in the filing of their request for the TRO in the midst of an ongoing grazing season already two months underway is sufficient of itself to ensure that the equities do not stack up in their favor, as the Ninth Circuit has indicated this factor has relevance beyond the irreparable injury prong of the four-factor test.[3] Lydo Enterprises, Inc. v. City of Las Vegas, 745 F.2d 1211, 1213 (9th Cir. 1984)("A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief"). The primary case that Plaintiffs cite in this context, Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127 (9th Cir. 2011), is largely inapposite for two reasons. As an initial matter, the court found plaintiffs had established a likelihood of irreparable injury, which played a large role in its determination that avoiding such an irreparable injury helped tip the equity scales in their favor. *Id.* at 1135. Moreover, Cottrell involved the harvest of 1652 acres of tree stands on National Forest System land, which obviously would take decades to grow back. Here, on the other hand, properly managed livestock grazing only allows a percentage of use of the available vegetation each season, which grows back every year in between such seasons. *See* Pls.' Mot. at 34 (plaintiffs' discussion of recovery visible after five years of rest).

---

[3] Indeed, if the Court concurs with this point, and in light of the case law in the Ninth Circuit, it could rely upon such a finding to go ahead and deny Plaintiffs' Motion in its entirety.

**Page 18 - DEFENDANTS' RESPONSE TO PLAINTIFFS' TRO MOTION**
  *Western Watersheds Proj. v. Bernhardt,* Case no. 2:19-CV-750-SI

Second, Plaintiffs cite no cases in which a court has interposed a TRO or preliminary injunction to upend livestock grazing once the season has begun, as here, and Defendants' counsel is not aware of any.  Indeed, in a previous case under similar circumstances, this Court declined to preliminarily enjoin livestock from turning out on a specific allotment when plaintiffs did not file their motion until after grazing for the season was underway.  <u>Concerned Friends of the Winema v. Forest Serv.</u>, 2014 WL 2611344, Slip Op. at **3 7 6 (D. Or. June 11, 2014).

Third, denying the TRO would allow HRI to move onto Mud Creek consistent with its reasonable expectations when it first turned its livestock out several months ago pursuant to its Renewed Permit.  *See* Declaration of Steven Dwight Hammond at ¶¶ 30-34 (May 27, 2019).

III.    THE PUBLIC INTEREST DOES NOT FAVOR ISSUANCE OF THE TRO.

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  <u>Winter</u>, 555 U.S. at 24 (quoting <u>Weinberger v. Romero–Barcelo</u>, 456 U.S. 305, 312 (1982)) (internal quotation marks omitted). "The public interest inquiry primarily addresses impact on non-parties rather than parties."  <u>Sammartano v. First Judicial Dist. Court</u>, 303 F .3d 959, 974 (9th Cir.2002).[4]

In support of their showing on this element of the four-factor test, here Plaintiffs largely rehash in conclusory fashion arguments they have made about the merits of their claims[5] and the

---

[4] The non-party to be most directly affected by the TRO Plaintiffs request is HRI.  Toward that end, Defendants submit the Declaration of Steven Dwight Hammond that he prepared without assistance of government counsel to enable the Court to understand the adverse implications he would face from entry of either the TRO or preliminary injunction that Plaintiffs seek here.

[5] Defendants would note that, given the press of time to get this response filed, and the fact that they believe the Court does not need to address the merits of Plaintiffs' claims at this juncture in any event given that Plaintiffs have failed to meet their burden on each of the other prongs in the four-factor TRO test, Defendants are not in position to address the merits in this TRO response. They wish to confirm, however, that their declination under the circumstances from doing so does not represent and should not be construed as any concession on the merits of any of

**Page 19 - DEFENDANTS' RESPONSE TO PLAINTIFFS' TRO MOTION**
  *Western Watersheds Proj. v. Bernhardt,* Case no. 2:19-CV-750-SI

alleged likelihood of irreparable injury they will suffer if their TRO request is denied. *See* Pls.' Mot. at 35. As a result, for the same reasons Defendants set forth above to establish that the evidence *sub judice* cannot support a judicial finding of likely irreparable injury to Plaintiffs in the absence of the TRO they seek, Plaintiffs' also fail in their arguments as to why the TRO would be in the public interest. In addition, looking to congressional purposes in enacting the underlying statutes at issue can be instructive in deriving a sense of the public interest given Congress's role as the article I branch representing a broad cross-section of the nation's interests. *See* Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 545–46 (1987)(analyzing public interest prong in light of two competing statutes). In that regard, it is relevant to note that the Steens Act refers not only to conservation purposes, but also on to confirm that, in furtherance of and consistent with such purposes, a clear objective is "to promote grazing, recreation, historic, and other uses that are sustainable." 16 U.S.C. ' 460nnn-12. In like fashion, the congressional declaration of policy underlying FLPMA speaks not only to protecting their environmental and natural-resource values, but also provide for food for domestic animals. 43 U.S.C. § 1701(a)(8).

**CONCLUSION**

For the foregoing reasons, as well as those Defendants will present at the hearing on Plaintiffs' TRO request, the Court should deny the request.

Respectfully submitted this 28th day of May 2019.

                                                 BILLY J. WILLIAMS
                                                 United States Attorney

                                               *s/ Stephen J. Odell*
                                               STEPHEN J. ODELL
                                                Of Attorneys for Defendants

---

Plaintiffs' claims, and that they intend to address the merits in their response to the preliminary injunction motion upon filing that brief in short order, per the Court's scheduling order.

**Page 20 - DEFENDANTS' RESPONSE TO PLAINTIFFS' TRO MOTION**
      *Western Watersheds Proj. v. Bernhardt,* Case no. 2:19-CV-750-SI