**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC
4110 SE Hawthorne Blvd. # 168
Portland, OR 97214
(503) 388-9160
davebeckerlaw@gmail.com

**Talasi B. Brooks (*Pro hac vice*)**
Western Watersheds Project
PO Box 2863
Boise, ID 83701
(208) 336-9077
tbrooks@westernwatersheds.org

**Paul D. Ruprecht (OSB # 132762)**
Western Watersheds Project
PO Box 12356
Reno, NV 89510
(208) 421-4637
paul@westernwatersheds.org

Attorneys for Plaintiffs Western Watersheds Project, Center for Biological Diversity, and
WildEarth Guardians

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PENDLETON DIVISION

| | |
|---|---|
| **WESTERN WATERSHEDS PROJECT, CENTER FOR BIOLOGICAL DIVERSITY,** and **WILDEARTH GUARDIANS,** | Case No.: 2:19-cv-750-SI |
| Plaintiffs, | **REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| **DAVID BERNHARDT**, Secretary of the Interior, **JEFFREY A. ROSE,** District Manager, Burns District Bureau of Land Management, and **BUREAU OF LAND MANAGEMENT,** | **ORAL ARGUMENT REQUESTED** |
| | **EXPEDITED HEARING AND DECISION REQUESTED** |
| Defendants. | |

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. i
TABLE OF AUTHORITIES ......................................................................... iii
GLOSSARY OF ACRONYMS ....................................................................... v

INTRODUCTION ........................................................................................... 1

NEWLY-DISCLOSED FACTS AND ADDITIONAL BACKGROUND ............................... 3

I.   OVER THE PAST TEN DAYS, BLM HAS DISCLOSED NEW FACTS
     RELATED TO GRAZING ON THESE ALLOTMENTS THAT WERE
     NOT PREVIOUSLY AVAILABLE TO THE PUBLIC OR PLAINTIFFS ............. 3

   A.   BLM has Finally Produced the Land Health Assessments and Some
        Other Records that WWP Requested Pursuant to the Freedom of
        Information Act in February 2019. .............................................................. 3

   B.   BLM has Allowed Excess Use of the Hammond Allotment in
        Violation of the Terms of the Renewed Grazing Permit This Year
        and Devised an Updated Grazing Strategy That Apparently
        Doubles the Intensity of Authorized Use of the Mud Creek
        Allotment This Year. ..................................................................................... 4

II.   ADDITIONAL BACKGROUND INFORMATION ON SAGE-GROUSE
      AND RIPARIAN HABITAT ........................................................................ 6

   A.   Sage-Grouse Use of the Allotments and Population Status on the
        Allotments. ..................................................................................................... 6

   B.   Additional Facts About Riparian Habitat on Hardie Summer
        Allotment. ....................................................................................................... 9

III.   THE TIMING OF PLAINTIFFS' TRO/PI MOTION IS DUE PRIMARILY
       TO THE BLM'S TWO-MONTH DELAY IN PROVIDING DOCUMENTS
       TO WHICH WWP WAS LEGALLY ENTITLED IN FEBRUARY AND
       MARCH ....................................................................................................... 9

   A.   BLM did not Provide the Permit and Categorical Exclusion to
        WWP Until April 1, 2019—after Grazing Began on March 25,
        2019. ................................................................................................................ 9

   B.   The Freedom of Information Act Required the BLM Washington
        Office to Produce Records Regarding the Secretary's Decision no
        later than February 26, 2019 and Required the BLM Burns District

to Produce Records Related to the Hammond Allotments no later
than March 27, 2019. ................................................................................11

C.   The Plaintiffs' Internal Review and Vetting of This Potentially
Controversial Case, and the Need to Secure Information From
Other Sources due to the Inability to Obtain Information from
BLM, Also Contributed a Slight Delay. .................................................13

ARGUMENT ...........................................................................................................14

I.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT THE
RELIEF THEY SEEK HERE .........................................................................14

A.   The Allotments' Purported Compliance With Land Health
Standards Does not Defeat Plaintiffs' Showing Of Irreparable
Harms, Especially Because the Allotments are Failing Standard 5. ....15

1.   *Livestock Grazing is Likely to Cause Irreparable Harm to Sage-Grouse and to*
*Plaintiffs' Interests in Their Persistence and Recovery.* ................................ 16

2.   *Livestock Grazing is Likely to Cause Irreparable Harm to Redband Trout and to*
*Plaintiffs' Interests in That Species.* .............................................................. 19

B.   Plaintiffs Have Articulated Procedural Irreparable Harms. ................22

II.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS ..........................25

III.  THE BALANCE OF HARMS WEIGHS IN FAVOR OF AN INJUNCTION .......26

IV.   AN INJUNCTION IS IN THE PUBLIC INTEREST ..........................................31

V.    THE COURT SHOULD WAIVE THE BOND REQUIREMENT ........................32

CONCLUSION ....................................................................................................... 32

## **TABLE OF AUTHORITIES**

**Cases**

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ............................. 30
*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531 (1987) ..................................... 22
*City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975) ............................................ 25
*Garcia v. Google*, 786 F.3d 733 (9th Cir. 2015) ...................................................... 29
*Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211 (9th Cir. 1984) ................... 27
*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000) ...................................................... 24
*Monsanto v. Geertson Seed Farms*, 561 U.S. 139 (2010) ........................................... 22
*N. Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466 (9th Cir. 1986) ....................................... 32
*N.D. ex rel. Parents v. Haw. Dep't of Educ.*, 600 F.3d 1104 (9th Cir. 2010) .................... 29
*Nat'l Parks & Conservation Ass'n v. FAA*, 998 F.2d 1523 (10th Cir. 1993) .................... 10
*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
      No. 3:01-CV-0640-SI, 2017 WL 1829588 (D. Or. Apr. 3, 2017) ........................... 22
*Native Ecosystems Council v. Marten*, 334 F. Supp. 3d 1124 (D. Mont. 2018) ............ 27, 29
*Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374 (9th Cir. 1985) ............ 27
*Or. Natural Desert Ass'n v. BLM*, 625 F.3d 1092 (9th Cir. 2010) ................................. 26
*Or. Natural Desert Ass'n v. Green*, 953 F. Supp. 1133 (D. Or. 1997) ........................... 20
*Or. Natural Desert Ass'n v. Gutierrez*, 409 F. Supp. 2d 1237 (D. Or. 2006) .................... 12
*Or. Natural Desert Ass'n v. Lohn*, 485 F. Supp. 2d 1190 (D. Or. 2007) ......................... 21
*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
      588 F.3d 718 (9th Cir. 2009) ........................................................................ 31
*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,
      2008 WL 2523819 (E.D. Cal. June 20, 2008) ................................................... 12
*Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir. 2005) ............................. 32
*Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir. 1989) ................................................. 23
*Sierra Forest Legacy v. Sherman*, 646 F.3d 1161 (9th Cir. 2011) ............................... 16
*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981) .................................................... 16
*W. Watersheds Proj. v. Dyer*, Nos. 4-cv-181, 2-cv-521,
      2009 WL 484438 (D. Idaho Feb. 26, 2009) ..................................................... 19
*W. Watersheds Proj. v. Salazar*, No. 4:08-CV-516-BLW,
      2011 WL 4526746 (D. Idaho Sept. 28, 2011) .................................................. 19
*W. Watersheds Proj. v. Zinke*, 336 F. Supp. 3d 1204 (D. Idaho 2018) ......................... 23
*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ............................................ 13, 21

**Statutes**

43 U.S.C. § 1712 (f) .......................................................................................... 10
43 U.S.C. § 1752(c) .......................................................................................... 25

**Regulations**

40 C.F.R. § 1506.6(a) ........................................................................................ 10
40 C.F.R. § 1506.6(b) ........................................................................................ 10
43 C.F.R. § 4100.0-5 ......................................................................................... 10
43 C.F.R. § 4130.1-1(b) ..................................................................................... 25
43 C.F.R. § 4130.2(b) ................................................................................... 10,11
43 C.F.R. § 4160.1(a) ........................................................................................ 10

43 C.F.R. § 4160.3(b) ............................................................................................................... 10

**GLOSSARY OF ACRONYMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| AUM | Animal Unit Month |
| BLM | Bureau of Land Management |
| CMPA | Steens Mountain Cooperative Management and Protection Area |
| CX | Categorical Exclusion |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FLPMA | Federal Land Policy Management Act |
| FWS | U.S. Fish & Wildlife Service |
| GHMA | General Habitat Management Area |
| IBLA | Department of the Interior Board of Land Appeals |
| LHA | Land Health Assessment |
| NEPA | National Environmental Policy Act |
| ODFW | Oregon Department of Fish & Wildlife |
| OHA | Department of the Interior Office of Hearings and Appeals |
| PHMA | Priority Habitat Management Area |
| SFA | Sagebrush Focal Area |
| TRO | Temporary Restraining Order |
| WSA | Wilderness Study Area |

## INTRODUCTION

As Plaintiffs demonstrated in their motion and supporting declarations, livestock grazing that removes tall grasses and forbs in priority sage-grouse habitat during nesting and brood-rearing season can be as harmful ecologically as cutting trees that serve as nesting and sheltering habitat for birds and small mammals. In both instances, the species depend on the vegetation for protection from predators and for sustenance; although the size of the vegetation is different, the harm from removing it is no less irreparable to the well-being of the species and to the interests of those—like Plaintiffs—with interests in the conservation and recovery of the species.

Grazing in the Mud Creek and Hardie Summer allotments is likely to cause irreparable harm to those interests. In the short term, during nesting and brood-rearing periods, sage-grouse depend on tall grass cover to hide from predators and depend on forbs for nutrition to ensure survival of chicks. If livestock remove this grass cover and outcompete sage-grouse in foraging for forbs, sage-grouse broods are more likely to die before reaching adulthood. In the long term, this chronic lack of reproductive success is likely to lead to extirpation of local sage-grouse populations, which affects the health and persistence of sage-grouse populations regionally.

Defendants now attempt to rebut this showing by describing the allotments' purported ecological health based on post-hoc declarations and non-public Land Health Assessments that show both allotments are failing Standard 5, which is intended to protect sensitive wildlife like sage-grouse. BLM also claims the failure is unrelated to livestock grazing, even though the allotments are failing that standard due to the effects of the 2006 Grandad fire, which BLM accused the Hammond principals of setting to increase forage for their cattle.

The Land Health Assessments do not rebut Plaintiffs' showing of likely irreparable harm. Defendants' filings lack any specific information about the status of the sage-grouse that use the

allotments—even though the 2019 lek count for the South Bridge Creek lek on the Mud Creek allotment declined to only two birds. Defendants ignore the very real harms that grazing causes to nesting sage-grouse and to the long-term persistence of the birds that use these allotments in favor of platitudes about vegetation growing back and generalized assertions about the ecological health of these allotments that do not address either the number of sage-grouse of the acute harms that grazing causes to these imperiled birds. Defendants' reliance on partial and non-public records only underscores that Defendants needed to consider and disclose to the public likely environmental impacts in a NEPA analysis before reissuing the Hammond permit.

Defendants take issue also with the alleged delay in Plaintiffs' seeking injunctive relief. Yet Plaintiffs filed their Motion only six weeks after receiving the 2019–2024 Hammond permit and supporting CX/Decision from BLM. In truth, the vast majority of any delay can be laid at Defendants' feet—for failing to disclose the reissued permit and the NEPA CX that accompanied it for nearly two months, until six days after grazing had already begun on the allotments, despite Plaintiff WWP's status as an "interested public" in the BLM Burns District, and by taking nearly three months to produce the Land Health Assessments and other documentation related to the allotments that WWP sought through the Freedom of Information Act (FOIA). Defendants' withholding of information from the public and from the Plaintiffs actually weighs in favor of granting the requested injunctive relief.

Plaintiffs' interests in the protection of sage-grouse, redband trout, and undisturbed natural environments on Steens Mountain will be irreparably harmed if five to ten years of passive restoration of the sagebrush ecosystem and riparian habitats is erased. As Plaintiffs have shown, and further demonstrate through the Second Declaration of Dr. Clait E. Braun (filed herewith), scheduled turnout on the Mud Creek allotment threatens irreparable harms to their

interests in enjoying the area in its undisturbed state, and in persistence and recovery of sage-grouse in the area and regionally. Because in this case there is also a strong likelihood that Plaintiffs will succeed on the merits, and the balance of equities and the public interest weigh in favor of a restraining order, this Court should grant Plaintiffs' motion and restrain grazing on the Mud Creek and Hardie Summer allotments until the parties can brief and the Court can rule on Plaintiffs' motion for a preliminary injunction.

## <u>NEWLY-DISCLOSED FACTS AND ADDITIONAL BACKGROUND</u>

**I.    OVER THE PAST TEN DAYS, BLM HAS DISCLOSED NEW FACTS RELATED TO GRAZING ON THESE ALLOTMENTS THAT WERE NOT PREVIOUSLY AVAILABLE TO THE PUBLIC OR PLAINTIFFS**

**A.    BLM has Finally Produced the Land Health Assessments and Some Other Records that WWP Requested Pursuant to the Freedom of Information Act in February 2019.**

As described in more detail below, on May 20, 2019, BLM finally disclosed Land Health Assessments and some of the other documents relating to its assessment of the ecological conditions on the allotments that WWP requested on February 27, 2019, under the Freedom of Information Act (FOIA). Defendants and their declarants rely on several of these documents in Response to Plaintiffs' May 13, 2019 TRO/PI Motion, but attach a copy of only the most recent Land Health Assessment for Mud Creek allotment. *See, e.g.*, Defs.' Resp. at 6, 12–15 (ECF No. 21) & Ex. 2; *see generally* McCormack Decl. (ECF No. 22), Obradovich Decl. (ECF No. 23). These documents were unavailable to Plaintiffs when they filed their motion. Plaintiffs have provided some of these, along with additional data about sage-grouse populations that use the allotments, to Dr. Braun, who used the information to supplement and expand the expert opinion he submitted in his first Declaration. Plaintiffs also discovered new information among the FOIA responses about riparian and water quality monitoring on the allotments, summarized below.

**B.    BLM has Allowed Excess Use of the Hammond Allotment in Violation of the Terms of the Renewed Grazing Permit This Year and Devised an Updated Grazing Strategy That Apparently Doubles the Intensity of Authorized Use of the Mud Creek Allotment This Year.**

As Exhibit 3 to their Response, Defendants attach a May 28, 2019, letter to Hammond issued "to ensure a common understanding of the grazing strategy for" 2019 on the four Hammond allotments. Defs.' Resp. Ex. 3. This letter includes a very different set of figures than appear in the renewed permit regarding allowable grazing on the allotments. *Compare id. with* Pls.' Mot. (ECF No. 7) Ex. 3 at 1. Specifically, the May 28, 2019 letter states that "to confirm then, the 2019 grazing strategy will proceed as follows:"

| ALLOTMENT | SEASON OF USE | AUMs |
|-----------|---------------|------|
| MUD CREEK | 6/8 – 6/30 | 590 |
| HAMMOND | 3/25 – 6/7 | 471 |
| HARDIE SUMMER | 7/1 – 9/14 | 407 |
| HAMMOND FFR | 4/1 – 4/30 | 32 |

Defs.' Resp. Ex. 3 at 2. Unlike the renewed permit, the revised strategy omits the number of livestock, *see* Pls.' Mot. Ex. 3 at 1, but includes an asterisk next to the AUM figure for the Hammond allotment requiring an "[a]ctual use report to be submitted for billing of AUMs over permitted"—acknowledging that Hammond has violated the terms of its permit and grazed in excess of the permitted amount on the Hammond allotment. *See* Defs.' Resp. Ex. 3 at 2.

This is confirmed by the fact that the renewed permit for Hammond authorizes 68 cattle to graze on the Hammond allotment from April 1 to October 30, Pls.' Mot. Ex. 3 at 1, but that BLM somehow made a "calculation error" and allowed 490 cattle onto the Hammond allotment, and that grazing actually began on March 25, six days earlier than allowed under the permit. Defs.' Resp. Ex. 3 at 1–2 (confirming there has been an "exceedance"). Defendants do not explain why the permittee would *ever* be allowed to put 490 cattle on an allotment for which its

permit authorizes 68, or why grazing was allowed to commence nearly a week earlier than permitted. Nor do they explain why the permittee itself could not have checked BLM's "calculation" and determined that 490 cattle are more than the 68 allowed under the permit.

BLM emphatically states in the permit itself that "[l]ivestock grazing use that is different from that authorized by a permit or lease MUST be applied for prior to the grazing period and MUST be filed with and approved by the authorized officer before grazing use can be made." Pls.' Mot. Ex. 3 at 3. But there is no evidence that Hammond applied for advance authorization to begin grazing more than seven times as many livestock as permitted on the Hammond allotment—the permittee apparently simply did it, forcing BLM to retroactively endorse the action in its May 28, 2019, letter to cover for BLM's own management failure.

Additionally, the May 28, 2019, letter apparently authorizes another violation of the permit that could significantly increase the likelihood of irreparable harm from grazing the Mud Creek allotment under the new "common understanding of the grazing strategy" for 2019. The period of use for Mud Creek is now stated as 6/8 to 6/30, with 590 AUMs, and an unstated number of cattle. Defs.' Resp. Ex. 3 at 2. However, an AUM represents the use of public lands by one cow and her calf for a month. Pls.' Mot. Exs. 3 at 4, 6. The new period of use of Mud Creek is 23 days—less than one month. The 590 AUMs listed in the new strategy for that 23-day period calculates out to an apparent authorization of 769 cattle (769 cattle x 23 days ÷ 30 days per month = 590 AUM)—nearly double the 390 cattle allowed on Mud Creek allotment under the permit. Pls.' Mot. Ex. 3 at 1. This high-intensity grazing during sage-grouse nesting season is likely to cause irreparable harm to sage-grouse.

//

//

II.    **ADDITIONAL BACKGROUND INFORMATION ON SAGE-GROUSE AND RIPARIAN HABITAT**

A.    **Sage-Grouse Use of the Allotments and Population Status on the Allotments.**

During the spring, sage-grouse gather in courtship areas called leks. Ex. 1 at 1 (U.S. Fish & Wildlife Service, "Beginner's Guide to Greater Sage-Grouse, *available at* https://www.fws.gov/greatersagegrouse/factsheets/Primer1-SGBeginnersGuide.pdf (last visited May 29, 2019). State wildlife agencies (including the Oregon Department of Fish & Wildlife) typically estimate sage-grouse population abundance based upon counts of males at leks in the spring. Second Braun Decl. ¶ 15. The average distance between a lek and a female's nest observed in five studies ranged from 2.1 mi to 4.8 mi, but actual distances can be highly variable, and most nesting occurs within two miles of a lek. Ex. 1 at 1; *see* Second Braun Decl. ¶ 19. Proximity of appropriate nesting and brood-rearing habitat to leks is important to sage-grouse reproductive success.

"Productive nesting areas are typically characterized by sagebrush with an understory of native grasses and forbs, with horizontal and vertical structural diversity that provides an insect prey base, herbaceous forage for pre-laying and nesting hens, and cover for the hen while she is incubating." Ex. 1 at 1; *see* Second Braun Decl. ¶¶ 6–7. "Shrub canopy and grass cover provide concealment for sage-grouse nests and young, *and are critical for reproductive success*." Ex. 1 at 1 (emphasis added); *see* Second Braun Decl. ¶¶ 7–8.

"Overall, the average nest success for sage-grouse in habitats where sagebrush has not been disturbed is higher than for sage-grouse nesting in disturbed habitats." Ex. 1 at 1. Sage-grouse experience "low nesting rates, small clutch sizes, low sage-grouse chick survival and limited re-nesting. This low rate of productivity slows recovery from population losses and limits population irruptions. During the spring and summer sage-grouse will primarily eat insects and

forbs, but they rarely stray from the edge of sagebrush, which provides cover year round." *Id.* Livestock grazing during these seasons is therefore likely to harm sage-grouse by removing the protective grasses that conceal them and by creating competition for food sources. Second Braun Decl. ¶¶ 6–8, 22–23, 27.

On the Mud Creek and Hardie Summer allotments, grazing occurs in precisely the seasons when it is most harmful to sage-grouse. *Id.* ¶¶ 22–23, 27. Permitted grazing on the Mud Creek allotment would occur in mid-May through June, during which the grass cover and forbs on the allotment are most important to nesting and brood-rearing sage-grouse. Second Braun Decl. ¶¶ 20, 22. The Mud Creek allotment contains a sage-grouse lek, and sage-grouse likely use the area surrounding the lek for nesting and brood-rearing. *Id.* ¶¶ 21–22. BLM's 2018 Land Health Assessment for the Mud Creek allotment stated that the allotment provides lekking and nesting/early-season brood rearing habitat for sage-grouse where adequate sagebrush still exists. Defs.' Resp. Ex. 2 at 3. However, the sage-grouse habitat on the Mud Creek allotment is still suffering from the effects of fires in 2006—in particular, the Grandad fire, which burned the Mud Creek lek. Second Braun Decl., Ex. 1 at 10. The Hammond principals were accused of setting that fire and their actions formed part of the basis for BLM's 2014 decision not to renew Hammond's grazing permit. *See* Pls.' Mot. Ex. 2 at 9–13, 21. The Grandad fire removed the sagebrush/shrub component and caused or exacerbated cheatgrass infestations on the allotment. *Id.* at 8–9; Defs.' Resp. Ex. 2 at 1. Grazing risks suppressing native forb growth and sagebrush regeneration, and contributing to the spread of cheatgrass. Second Braun Decl. ¶¶ 9, 24.

Grazing on the Hardie Summer allotment is also detrimental. The Hardie Summer allotment provides year-round habitat for sage-grouse where sagebrush is present. Second Braun Decl. Ex. 3 at 3. The allotment contains riparian areas with abundant vegetation that may be used

by sage-grouse in summer. *Id.* at 1–3. Use by livestock from July 1 to September 30, as permitted, likely causes livestock impacts to these important riparian areas—which are also home to redband trout—and livestock likely compete with sage-grouse for crucial forage and hiding cover. Second Braun Decl. ¶ 23. In addition, the Hardie Summer allotment also suffers from the cheatgrass invasions in burn scars on adjacent allotments, which create weed pressure and fire risk on the allotment. *Id.* ¶ 24 & Ex. 3 at 3. Livestock grazing will exacerbate these problems. *Id.* ¶ 24.

The lek on the Mud Creek allotment (which Oregon Department of Fish & Wildlife calls "South Bridge Creek") and the North Bridge Creek leks to the north of the Mud Creek allotment already appear to be showing the effects of degraded habitat conditions on the Hammond allotments. Both lek complexes are located on or near the Hammond grazing allotments and birds that mate on those leks are likely to use the Hammond allotments—including the Mud Creek and Hardie Summer allotments. *Id.* ¶¶ 5, 14, 19. After the 2006 Grandad fire, between 2007 and 2019, lek counts for the South Bridge Creek lek on the Mud Creek allotment briefly swelled to 34 birds in 2011, but have since declined to only two birds in 2019. *Id.* ¶ 16.[1] Similarly, one of the two North Bridge Creek leks is now unoccupied while the other declined from 22 males in 2007 to only 9 males in 2019. *Id.* ¶ 17. Both lek complexes are fragile and in danger of becoming unoccupied. *Id.* ¶ 19. "Reintroducing livestock grazing to allotments that likely provide important nesting and brood-rearing habitat for birds that mate on these leks could cause these sage-grouse leks to become inactive and the population of birds using the Hammond allotments to be extirpated." *Id.*

---

[1] Evidently, the Mud Creek allotment was not grazed for at least one season following the Grandad fire, which may explain some of the population gains between 2007 and 2011. Second Braun Decl. ¶ 16.

### B.    Additional Facts About Riparian Habitat on Hardie Summer Allotment.

As Plaintiffs explained in their TRO/PI motion, redband trout, a sensitive salmonid, are present in several streams on the Hardie Summer allotment: Big Bridge Creek, Big and Little Fir Creeks, Lake Creek, and Fish Creek. Pls.' Mot. at 8 & Exs. 7–8. Nevertheless, the 2007 and 2018 Land Health Assessments for the allotment reveal that riparian monitoring on the allotment has been spotty at best. In 2007, for example, the Land Health Assessment stated that "no trend data for riparian areas is available," "[r]iparian monitoring has not been established for the Hardie Summer allotment," assessments for properly functioning condition (PFC) had not been completed on Big Bridge Creek, and that "[w]ater quality information has not been collected." Second Braun Decl. Ex. 2 at 1, 14. Nevertheless the assessment concluded the allotment met standards for water quality because "[a]ll streams in the allotment are in [PFC] with well developed growth of riparian vegetation. *Id*. at 18. Likewise, in 2018, a photo trend assessment determined the streams were in PFC—the first such assessment in at least 18 years. *Id.* at 2. Although water quality still had not been assessed, BLM concluded it was "suitable" to use the PFC assessment as a surrogate for water quality and again concluded the allotment was meeting standards on that basis. *Id*. at 3. It appears water quality has not been assessed on the allotment in over 20 years and stream surveys have only occurred at decades-long intervals.

## III.    THE TIMING OF PLAINTIFFS' TRO/PI MOTION IS DUE PRIMARILY TO THE BLM'S TWO-MONTH DELAY IN PROVIDING DOCUMENTS TO WHICH WWP WAS LEGALLY ENTITLED IN FEBRUARY AND MARCH.

### A.    BLM did not Provide the Permit and Categorical Exclusion to WWP Until April 1, 2019—after Grazing Began on March 25, 2019.

Federal Defendants in this case delayed production of and hindered access to documents essential to the development of this litigation, despite requirements in FLPMA, NEPA, and the Department of the Interior grazing regulations that the Secretary of the Interior and BLM involve

the public in grazing management decisions and to disclose to the public decisions related to

grazing and related NEPA analyses. For example, FLPMA requires the BLM to allow the public

to be involved in management decisions. 43 U.S.C. § 1712 (f) ("The Secretary shall allow an

opportunity for public involvement and . . . establish procedures . . . to give . . . the public,

adequate notice and opportunity to comment upon and participate in the formulation of plans and

programs relating to the management of the public lands."); *see Nat'l Parks & Conservation

Ass'n v. FAA*, 998 F.2d 1523, 1531 (10th Cir. 1993) ("Congress, through FLPMA . . . , has

determined that the public has a right to participate in actions affecting public lands").

BLM's grazing regulations establish a category of "interested public," someone who has

"[s]ubmitted a written request to BLM to be provided an opportunity to be involved in the

decisionmaking process as to a specific allotment." 43 C.F.R. § 4100.0-5. BLM must consult

with, and send copies of grazing decisions to, organizations that have requested "interested

public" status. *See, e.g., id.* §§ 4160.1(a), 4160.3(b); *see also id.* § 4130.2(b) (BLM "shall

consult, cooperate and coordinate with . . . the interested public prior to the issuance or renewal

of grazing permits and leases."). Similarly, NEPA requires that "[a]gencies shall . . . [m]ake

diligent efforts to involve the public in preparing and implementing their NEPA procedures" and

"[p]rovide public notice of . . . the availability of environmental documents so as to inform those

persons and agencies who may be interested or affected." 40 C.F.R. § 1506.6(a)-(b).

WWP has sought "interested public" status with the BLM Burns District for many years,

most recently in September 2018. Declaration of Paul D. Ruprecht ¶¶ 3, 6 (filed herewith). WWP

is an "interested public" for the Burns District. Based on WWP's status as an interested public,

the BLM Burns District should have provided WWP with copies of the Categorical Exclusion

(CX) and the renewed Hammond permit when those were issued—the former on February 4,

2019, and the latter on February 13, 2019. Pls.' TRO/PI Mot. Exs. 4, 3. BLM did not do so.

Moreover, it should have consulted with WWP *prior* to issuing either. 43 C.F.R. § 4130.2(b).

In an effort to get more information regarding grazing on the Hammond allotment, WWP

also submitted a FOIA request to the BLM Oregon State Office on February 27, 2019—about

which more in the following section. Ruprecht Decl. ¶ 9 & Ex. B. On March 25, 2019, in

response to Mr. Ruprecht's follow-up request to obtain a copy of the permit and NEPA CX

decision, Rhonda Karges—BLM Burns District's Andrews/Steens Field Manager—responded

that "Yes, a permit was issued to Hammond Ranches, Inc. I understand WWP has filed a FOIA,

so the information will be provided to you under that request." *Id*. Ex. A at 1.

After Mr. Ruprecht again pointed out that WWP is an "interested public" and that BLM

Burns had advised that no response to the FOIA request would be forthcoming until at least May

22, 2019, District Manager Rose finally sent WWP the permit, the CX, and the February 5, 2019

memo regarding the NEPA analysis on April 1, 2019. *Id*. ¶ 10 & Ex. A at 1; *see* Pls.' Mot Exs. 4

(renewed permit), 3 (CX), 17 (Feb. 5, 2019 memo). Plaintiffs have since learned that the BLM

Burns District provided these documents six days *after* livestock grazing began on the Hammond

allotment. Defs.' Resp. Ex. 3 at 2 (showing that livestock turned out on the Hammond allotment

on 3/25/19, six days before authorized in the renewed permit). Prior to receiving these

documents, it was impossible for WWP to begin meaningful evaluation of potential factual and

legal challenges to BLM's decision to reissue the permit under a CX.

> **B.    The Freedom of Information Act Required the BLM Washington Office to**
> **Produce Records Regarding the Secretary's Decision no later than February**
> **26, 2019 and Required the BLM Burns District to Produce Records Related**
> **to the Hammond Allotments no later than March 27, 2019.**

To its credit, the BLM Burns District did provide WWP with a copy of the Secretary's

decision on January 30, 2019,[2] Ruprecht Decl. ¶ 7, but at the same time advised WWP that "the details of how [the BLM Burns District] will implement this decision have not been finalized." Ruprecht Decl. Ex. A at 2. Also on January 30, 2019, WWP submitted a FOIA request to the BLM Washington Office seeking all documents related to the Secretary's decision. *Id*. ¶ 8. The BLM Washington Office has never responded to this request or produced any of the requested documents, despite repeated follow-up requests. *Id*.

In its attempt to obtain more information about the BLM decisions and grazing on the Hammond allotment, WWP submitted a FOIA request to the BLM Oregon State Office on February 27, 2019. *Id*. ¶ 9 & Ex. B. BLM produced its initial interim response on May 20, 2019—a week after the Plaintiffs filed the complaint and the pending motions—and therefore some of the materials attached to the declarations supporting this reply brief was not available to the Plaintiffs (and the general public) at the time the case and pending motions were filed.

The BLM Washington Office should have produced documents responsive to WWP's first FOIA request no later than February 26, 2019, and the BLM Oregon State Office should have produced documents no later than March 27, 2019. FOIA generally requires production of responsive records within 20 working days after receipt of a request. 5 U.S.C. § 552(a)(6)(A)(i); *see, e.g.*, *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 2008 WL 2523819, at *5 (E.D. Cal. June 20, 2008) ("Although the statute in terms provides that an agency must merely notify the requester within twenty days of whether to respond to the request, courts consistently treat the twenty-day deadline as the agency's deadline to provide the responsive documents."); *Or. Natural Desert Ass'n v. Gutierrez*, 409 F. Supp. 2d 1237, 1248 (D. Or. 2006).

---

[2] WWP also received this decision the previous day from Interior Solicitor Brad Grenham. ECF No. 27–1.

Indeed, because the 2018 Land Health Assessment relates to a grazing allotment for which WWP is an "interested public," that document should also have been provided to WWP as a matter of course to allow it to participate in the putatively public process for making grazing management decisions—rather than being withheld until May 20, 2019, after it was too late for Plaintiffs to evaluate before they had to seek injunctive relief. *See* Defs.' Resp. Ex. 2; *supra* p. 10. The BLM's untimely responses to WWP's FOIA requests prevented Plaintiffs from having essential evidence available when they filed their motions for injunctive relief.

C.   **The Plaintiffs' Internal Review and Vetting of This Potentially Controversial Case, and the Need to Secure Information From Other Sources due to the Inability to Obtain Information from BLM, Also Contributed a Slight Delay.**

Plaintiffs attempted to obtain evidence and information about the Hammond allotments from other sources as they evaluated potential legal challenges to the permit renewal decision and reissuance of the permit, although this process was hampered by BLM's delays in producing the relevant documents. Declaration of Talasi B. Brooks ¶¶ 3–5. After BLM produced the permit and the CX on April 1, 2019, WWP decided to seek injunctive relief and collected the necessary evidence and supporting documentation. *Id.* ¶¶ 5–7. Because Plaintiffs must meet the four factor test for injunctive relief in *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008), Plaintiffs attempted to secure evidence from other sources since BLM denied them access to the permit, the CX, the Land Health Assessments, and other documents related to the allotments for many months after the Secretary and BLM actually issued the decisions governing grazing on these allotments this year. *Id.* ¶ 7. Although Plaintiffs, and in particular WWP, acted with diligence under the circumstances, their internal processes and limited resources did contribute somewhat to the delay in filing the suit. *Id.* ¶¶ 5–7.

//

## ARGUMENT

I. **PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT THE RELIEF THEY SEEK HERE**

Plaintiffs have demonstrated two types of likely irreparable harm from grazing on the Mud Creek and Hardie Summer allotments. Pls.' Mot. at 7–8, 30–33. First, they showed likely irreparable harms to their environmental interests in enjoying the areas in their undisturbed state, and particularly in the persistence and recovery of sage-grouse and redband trout. *Id*. at 31–33. Continued grazing of these allotments will irreparably harm sage-grouse in the short term by removing grass cover that provides concealment for nests and chicks and is critical to reproductive success. Ex. 1 at 1; Second Braun Decl. ¶¶ 7–8. In the long term, continued grazing is likely to cause the abandonment of the South Bridge Creek lek on the Mud Creek allotment and possibly the North Bridge Creek leks located within two miles to the north of the Mud Creek allotment. Second Braun Decl. ¶ 19 & Ex. 4 (map showing names of leks and locations). Those losses threaten persistence of sage-grouse on a regional scale because the leks exist in an important connectivity corridor. Second Braun Decl. Ex. 5 (map showing regional genetic connectivity corridors). Grazing will also denude streambanks of recovering riparian vegetation, and increase stream temperatures, degrading redband trout habitat on the Hardie Summer allotment and further harming Plaintiffs' interests. Kauffman Decl. ¶¶ 13–17, 22 (ECF No. 9).

Second, Plaintiffs showed they suffered procedural irreparable harm because Defendants overlooked all of these likely effects by reissuing the permit without a full and public environmental assessment (EA) or environmental impact statement (EIS) as required by NEPA, but nevertheless authorized grazing on the allotments. Pls.' Mot. at 31–33. Defendants acted without adequate information about the effects of renewing the permit on sensitive fish and wildlife, and are proceeding blindly with the action while attempting to justify it based upon

post-hoc rationalizations and information about allotment conditions that was never subject to public review and comment.

Defendants attack Plaintiffs' harms with three main arguments: First, Defendants claim that Plaintiffs' alleged delay in moving for injunctive relief shows their harms are not irreparable. *See* Defs.' Resp. at 2, 10–12, 18. Because this argument goes more to the balance of the equities than irreparable harm, it is addressed below at pp. 26–28; *see also supra* pp. 9–13. Second, they claim that BLM's Land Health Assessments prove irreparable harm to the environment is unlikely. Defs.' Resp. at 12–15. And, finally, they contend that Plaintiffs have not shown cognizable harms from BLM's failure to conduct a public and adequate NEPA analysis. Defs.' Resp. at 17–18. Each argument fails.

### A. The Allotments' Purported Compliance With Land Health Standards Does not Defeat Plaintiffs' Showing Of Irreparable Harms, Especially Because the Allotments are Failing Standard 5.

Defendants argue that Plaintiffs have failed to show irreparable harm because non-public Land Health Assessments conducted after the allotments had been rested from grazing for five years (or, in the case of the Hardie Summer allotment, 8–10 years, *see* Second Braun Decl. Ex. 3 at 2) indicate the allotments are meeting four out of five Land Health Standards.[3] BLM cannot rely on these Land Health Assessments to defeat Plaintiffs' showing of irreparable harm because they do not reflect the status of sage-grouse, redband trout, or other sensitive resources on the

---

[3] Defendants' are wrong that the 2007 Land Health Assessment for Mud Creek defeats Plaintiffs' argument that the 2018 Land Health Assessments do not show the effects of grazing. Although the 2007 Land Health Assessment for the Mud Creek allotment reached similar conclusions to the ones in the 2018 assessment, it too occurred after rest from grazing. The 2007 Land Health Assessment states that livestock had then been "excluded from the Mud Creek allotment since the wildfire of 2006." Second Braun Decl. Ex. 1 at 1. Thus it is not at all clear that the 2007 assessment actually assesses the effects of livestock grazing, as Defendants claim. Defs.' Resp. at 14.

allotments. Indeed, BLM has never analyzed or disclosed to the public the status of sage-grouse or redband trout on the allotments, and Plaintiffs have been required to reconstruct the missing analysis from publicly-available documents in an effort to discern potential effects.

The expert declarations and other evidence Plaintiffs have submitted meet the standard for showing irreparable harm to support injunctive relief. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (given the "limited purpose" of a preliminary injunction, a preliminary injunction may be granted on the basis of "procedures that are less formal and evidence that is less complete than in a trial on the merits."). The Court owns no deference to agency officials when weighing the equities of an injunction, and "[d]eference to agency experts is particularly inappropriate when their conclusions rest on a foundation tainted by procedural error." *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1186 (9th Cir. 2011).

> 1. *Livestock Grazing is Likely to Cause Irreparable Harm to Sage-Grouse and to Plaintiffs' Interests in Their Persistence and Recovery.*

To the limited extent BLM's Land Health Assessments reflect habitat condition for sage-grouse, Defendants admit that both the Mud Creek and Hardie Summer allotments failed Standard 5 for special status species despite long periods of rest from grazing. Defs.' Resp. Ex. 2 at 4 (in 2018, Mud Creek Allotment had been rested "since early 2013,"); Second Braun Decl. Ex. 3 at 2 (in 2018, Hardie Summer Allotment had been rested for 8-10 years). These failures largely stemmed from the lingering effects of the 2006 Grandad fire, which the Hammond principals were accused of setting to increase forage for their cattle. *See* Second Braun Decl. Ex. 1 at 15 (Mud Creek Allotment burned in Grandad fire); Pls.' Mot. Ex. 4 at 2 (Hardie Summer Allotment failing Standard 5 due to effects of fire); *id.* Ex. 2 at 9–13 (describing the Hammond

principals' involvement in Grandad fire).[4] Nevertheless the Land Health Assessments blame the failure to meet standards on fire without acknowledging the link to grazing by Hammond.

The fire-degraded habitat conditions caused by the Hammond principals' possible arson continue to harm sage-grouse, but neither Defendants' Response Brief, their declarations, nor the Land Health Assessments themselves meaningfully describe how sage-grouse use the allotments. Plaintiffs learned through independent analyses that the South Bridge Creek lek on the Mud Creek allotment declined to only two strutting males in 2019, and that the North Bridge Creek leks to the northeast have also been declining over the past ten years, with one of the leks now unoccupied. Second Braun Decl. ¶ 16–17 & Ex. 7. These faltering numbers suggest that the leks are still suffering from the aftereffects of fire and that new grazing disturbance could prove catastrophic to already-fragile sage-grouse populations that use the allotments. *Id.* ¶¶ 19, 27. Dr. Braun believes that recommencing grazing on the Mud Creek allotment will likely lead sage-grouse to abandon the South Bridge Creek lek on that allotment, and that it may affect persistence of the North Bridge Creek lek as well. *Id.*

Grazing the Mud Creek allotment in May and June risks particular harms to sage-grouse. Spring grazing on the Mud Creek allotment likely harms sage-grouse because sage-grouse depend on high grass to provide forage for nesting hens and chicks and concealment for nests and young chicks. Ex. 1 at 1; Second Braun Decl. ¶¶ 6–8, 22, 27. The U.S. Fish & Wildlife Service recognizes that such grass cover is "critical for reproductive success" in sage-grouse, and that "the average nest success for sage-grouse in habitats where sagebrush has not been disturbed is higher than for sage-grouse nesting in disturbed habitats." Ex. 1 at 1; *see* also Second Braun

---

[4] The Mud Creek allotment also failed Standard 5 in the 2007 Land Health Assessments for the same reason; the Hardie Summer assessment appears to have been done before the consequences of wildfire could be factored in. Second Braun Decl. Exs. 1 at 20 & 2 at 13.

Decl. ¶¶ 6–8, 22, 27.

 While seeming to insinuate that sage-grouse do not use the Mud Creek allotment for nesting or brood-rearing, Defendants' declarant Mr. Obradovich admits that females have been observed coming to breed on the Mud Creek lek. Obradovich Decl. ¶ 12. Females typically nest within about two miles of a lek. Braun Decl. ¶ 17; Second Braun Decl. ¶ 19; Ex. 1 at 1 (U.S. Fish & Wildlife Service reporting average distances from lek to nests of between 2.1 miles and 4.8 miles). The 2018 Land Health Assessment claims suitable habitats for nesting and brood-rearing exist on the allotments. Defs.' Resp. Ex. 2 at 3. As Dr. Braun explained, early-season grazing is "known to be detrimental to sage-grouse" because cattle use forbs and grasses that sage-grouse depend upon for food and hiding cover. Braun Decl. ¶ 18 (ECF No. 8); Second Braun Decl. ¶¶ 6–8, 22, 27. Similarly, sage-grouse also likely use the year-round habitat on the Hardie Summer allotment in summer, when cattle are present, and cattle degrade and destroy the riparian areas and wet meadows sage-grouse need during that part of their lifecycle. Second Braun Decl. ¶ 23.

 Grazing will further harm sage-grouse by exacerbating habitat degradation. The Mud Creek and Hardie Summer allotments are already suffering from cheatgrass invasions postfire. *Id* ¶ 24. Reintroducing grazing will compound these problems. Braun Decl. ¶ 32. Livestock spread greater amounts of weed seed than do native ungulate browsers. Second Braun Decl. ¶ 8. Cheatgrass also suppresses the initiation and growth of sagebrush seedlings, reducing the likelihood of sagebrush recovery. Second Braun Decl. ¶ 9. Grazing crested wheatgrass seedings prevents reestablishment of native forbs and grasses that sage-grouse depend upon, further causing risk of cheatgrass invasion. Braun Decl. ¶¶ 30–31. Cheatgrass establishment increases fire risk and shortens fire cycles. Second Braun Decl. ¶ 9. Federal Courts have acknowledged how livestock grazing contributes to the susceptibility of the sagebrush steppe landscape to

increased and repeated fires. *W. Watersheds Proj. v. Dyer*, Nos. 4-cv-181, 2-cv-521, 2009 WL

484438, at *7, *10–11 (D. Idaho Feb. 26, 2009) (finding that livestock grazing promotes

cheatgrass, which has contributed to dramatic increase in fires affecting sagebrush habitat); *see*

*also W. Watersheds Proj. v. Salazar*, No. 4:08-CV-516-BLW, 2011 WL 4526746, at *8 (D.

Idaho Sept. 28, 2011) (noting relationship between fire, weeds, and grazing). All of these

impacts from grazing are likely to cause harm to sage-grouse.

The added stressor of grazing on the allotments could extirpate the local sage-grouse

population, harming connectivity with adjacent, larger sage-grouse populations. Second Braun

Decl. ¶¶ 19, 27. The population of sage-grouse that uses the South Bridge Creek and North

Bridge Creek leks exists in a predicted sage-grouse genetic connectivity corridor that connects

with a large SFA southwest of Steens Mountain. Second Braun Decl. Ex. 5 (regional map). By

cutting off or damaging connectivity with other populations, the health of the larger, regional

population is also imperiled. Braun Decl. ¶¶ 23–28. The Plaintiffs here have established that they

have an interest in the persistence and recovery of sage-grouse, particularly on Steens Mountain

where the birds should be more protected by the Priority Habitat Management Area (PHMA)

designation and their presence within the Steens Mountain CMPA. *See* Pls.' Mot. at 4–5, 7–8,

31–33; Herman Decl. ¶¶ 13, 17–19, 23–24 (ECF No. 10); Kerr Decl. ¶¶ 9–13, 21–22, 30–34

(ECF No. 11); Wuerthner Decl. ¶¶ 12–17, 20 (ECF No. 12). Allowing grazing to resume on Mud

Creek and Hardie Summer allotments will irreparably harm sage-grouse that nest and rear chicks

there and consequently the Plaintiffs' interests in the species' recovery.

> **2.   *Livestock Grazing is Likely to Cause Irreparable Harm to Redband Trout and to Plaintiffs' Interests in That Species.***

Resuming grazing on the Hardie Summer allotment after 8–10 years' rest also threatens

irreparable harm to redband trout. As Plaintiffs explained in their PI/TRO Motion, redband trout

are present in Big Bridge Creek, Big and Little Fir Creeks, Lake Creek, and Fish Creek. Pls.'
Mot. at 8. Riparian monitoring on the allotment appears to have been spotty at best and BLM has
not conducted water quality monitoring, though its Land Health Assessments from 2007 and
2018 nevertheless conclude the allotment is meeting standards. Second Braun Decl. Exs. 2 at 1,
14, 18 & 3 at 2–3. The 2018 conclusion is hardly surprising: By 2018, livestock had been absent
from the allotment for 8–10 years. Second Braun Decl. Ex. 3 at 2. As Dr. Kauffman noted,
riparian habitat may be expected to have begun recovering in that amount of time. Kauffman
Decl. ¶ 22.

Recommencing livestock grazing on the allotment will undo this recovery. Livestock will
trample stream banks, widen stream channels, and denude riparian areas of vegetation, in all
streams they are able to access on the allotments. Kauffman Decl. ¶¶ 15, 20, 22. These effects
will impede riparian function and make the streams more susceptible to higher summertime
water temperatures and other effects associated with climate change. *Id*. ¶ 20. All of these
impacts will harm redband trout in the streams on the Hardie Summer allotment.

The harmful effects of livestock grazing on riparian ecosystems are well-known to this
Court. In a case that ultimately led to the removal of livestock from parts of the Blitzen River
system—of which Bridge Creek and Mud Creek are tributaries—this Court recognized that
"[g]razing has had a broad scale affect upon the riparian and upland vegetation in the Blitzen
River System. . . . The detrimental effects of grazing in riparian systems is well documented and
the Blitzen River system exhibits the usual effects." *Or. Natural Desert Ass'n v. Green*, 953 F.
Supp. 1133, 1145 (D. Or. 1997). The Court recognized "that the primary cause of the overheated
water and siltation in the river is denuded and collapsed streambanks due to grazing." *Id*.
(quotation omitted). Elsewhere in arid Eastern Oregon, the Court has recognized that "[l]ivestock

grazing can degrade salmonid habitat by removing riparian vegetation, destabilizing stream

banks, widening stream channels, promoting incised channels, lowering water tables, reducing

pool frequency, increasing soil erosion, and altering water quality. These effects can reduce

cover, increase summer water temperatures, promote formation of anchor ice in winter, and

increase sedimentation into spawning and rearing habitats." *Or. Natural Desert Ass'n v. Lohn*,

485 F. Supp. 2d 1190, 1192 (D. Or. 2007), vacated, No. CIV 06-946-KI, 2007 WL 2377011 (D.

Or. June 11, 2007), and vacated as moot, 308 F. App'x 102 (9th Cir. 2009).

Moreover, these new effects may escape notice because BLM does little monitoring. It

has inferred all water quality temperature monitoring from riparian vegetation, rather than direct

temperature measurement. Second Braun Decl. Exs. 2 at 18 & 3 at 2. However, the Oregon

Department of Fish & Wildlife has explained that grazing is a limiting factor for redband trout in

these streams, and that several streams on these allotments, including Bridge Creek, Mud Creek,

and Fish Creek, "are included on the ODEQ 303(d) list of impaired waterways" for year-round

or summer water temperature. Pls.' Mot. Ex. 7 at 16. BLM is tracking riparian condition on this

allotment haphazardly and its conclusory assertions of compliance with aquatic and riparian

standards provide little to no basis for tracking longterm trends. Without any baseline or

benchmarks established, the likelihood of irreparable harm from BLM's unexamined action—

which has real potential to damage sensitive fish populations—is even greater.

Finally, BLM's effort to claim that reinitiating grazing after five years' rest is only a

continuation of grazing and not "a new type of activity with completely unknown effects on the

environment" fails to acknowledge the distinguishable facts of *Winter*. 555 U.S. at 23. In that

case the activities at issue had been going on for 40 years, but the latest series of exercises had

been approved only after the Defendant had taken a hard look at the environmental consequences

of its actions in a 293-page EA. *Id.* The checklist CX here provides no such "hard look," especially because it issued with no opportunity for public comment and with the decision to renew the permit on the same terms and conditions already made. Indeed, Plaintiffs are aware of *no* comprehensive EA or EIS in which BLM has thoroughly evaluated the effects of grazing on the allotments. Thus, even if grazing is not a "completely new activity," its effects on the environment are "unknown" here in light of the rest from grazing that has occurred over the past five to ten years.

### B. Plaintiffs Have Articulated Procedural Irreparable Harms.

Procedural irreparable harms are equally cognizable in the preliminary injunction/TRO context as in the permanent injunctive relief context, and Defendants' effort to distinguish the cases upon which Plaintiffs rely is misguided. As the Supreme Court has explained, "[t]he standard for a permanent injunction is essentially the same as for a preliminary injunction, but the plaintiff does not have to show a likelihood of success on the merits because actual success has been achieved." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 & n.12 (1987). In both preliminary and permanent injunctive relief instances, a plaintiff must establish a likelihood of irreparable injury. *Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010). Thus, the irreparable injuries courts have recognized in the permanent injunction context may inform the irreparable injury analysis here. *See e.g.*, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. 3:01-CV-0640-SI, 2017 WL 1829588, at *12 (D. Or. Apr. 3, 2017) (recognizing irreparable harm from procedural injuries).

Nevertheless, courts have also recognized that harms from undertaking federal actions without proper NEPA analysis may be irreparable and form the basis for injunctive relief in the preliminary injunction context. Judge (later Justice) Breyer, writing for the First Circuit in 1989,

explained that "the harm at stake is a harm to the *environment,* but the harm consists of the

added *risk* to the environment that takes place when governmental decisionmakers make up their

minds without having before them an analysis (with prior public comment) of the likely effects

of their decision upon the environment." *Sierra Club v. Marsh*, 872 F.2d 497, 500–01 (1st Cir.

1989) (Breyer, J.) (vacating district court decision not to enter preliminary injunction). The

District of Idaho recently adopted this "bureaucratic steamroller" theory to issue a preliminary

injunction based upon an oil and gas leasing instruction memorandum that did not allow for

adequate public comment because "an incomplete observance of environmental laws and

procedure (through abbreviated NEPA reviews and less complete public comments or none at

all), aided by agency inertia, combine to create irreparable harm." *W. Watersheds Proj. v. Zinke*,

336 F. Supp. 3d 1204, 1241 (D. Idaho 2018).

The risk to the environment that occurs when agency decisionmakers make up their

minds without a full NEPA analysis or public comment is particularly pronounced here. BLM

reissued Hammond's grazing permit based upon a checklist CX and non-public Land Health

Assessments, without public comment, and without considering or disclosing actual sage-grouse

use of the grazing allotments at issue. As a result, BLM ignored the declining status of sage-

grouse leks on and adjacent to the allotments and failed to consider or mitigate for the particular

risk to birds from grazing during the permitted seasons. It also wholly ignored how harms to

sage-grouse from resuming grazing could affect local or regional sage-grouse populations. The

only specific information regarding sage-grouse use of the allotments in BLM's "record" appears

in Mr. Obradovich's Declaration, where he asserts that sage-grouse have continued to use the lek

on the Mud Creek allotment, females have been observed coming to breed, and that since the lek

has not been abandoned, "there must still be some connectivity to the other leks such as those

that exist to the east and the south." Obradovich Decl. ¶ 12. Although this information supports Plaintiffs' position that sage-grouse nest on that allotment, it also is general and incomplete, and has also been provided as a post-hoc rebuttal to justify a decision that has already been made. *See Metcalf v. Daley*, 214 F.3d 1135, 1143–44 (9th Cir. 2000) (agency violated NEPA by a written commitment to support a whaling proposal before completing NEPA analysis). If Plaintiffs had been afforded an opportunity, they would have addressed this and other shortcomings and might have persuaded BLM to prepare a full EA or EIS, better protecting their interests. *See, e.g.*, Decl. of Randi Spivak (ECF No. 13) ¶¶ 20–22 (describing specific issues Plaintiffs would have raised and how that could have affected the decision-making process).

Even though neither specific information concerning sage-grouse use of the allotments, nor the Land Health Assessments, had been made available to the public, Defendants claim that Plaintiffs cannot show irreparable harm because their expert declarations rely on too many "generalizations." Def's Resp. Br. 15-17. The agency chides Plaintiffs for failing to move for injunctive relief sooner, even though it failed to timely produce the factual information that formed the basis for its decision. *See supra* pp. 9–13. Adding insult to injury, Defendants also claim that they must be allowed to proceed with grazing on the allotments despite having failed to adequately evaluate the environmental effects of that grazing. *See* Defs.' Resp. at 19 (arguing Court should not "upend" grazing once it has already begun). This is precisely the sort of bureaucratic commitment to unconsidered action that forms the basis for irreparable harm in the NEPA context.

Finally, Defendants appear to contend based upon Article III standing precedent that procedural harm, standing alone cannot form the basis for irreparable injury. Defs.' Resp. at 17–18. This novel formulation of the legal standards misunderstands or ignores the principle set

forth by the First Circuit in *Marsh* and adopted by this Court in *National Wildlife Federation* that the harm from a NEPA violation is the added risk to the environment from uninformed decision-making—a risk that Plaintiffs have shown is eminently present here. It also misinterprets the standing caselaw of this Circuit which provides that procedural injuries are cognizable so long as they are asserted by a plaintiff "having a sufficient geographical nexus to the site of the challenged project that he may be expected to suffer whatever environmental consequences the project may have." *City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir. 1975).

## II.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

Defendants decline to address Plaintiffs' likelihood of success on the merits. Defs.' Resp. at 19 n.5. However, it bears repeating that the fundamental claim in this case is that *all* of the grazing on these allotments is illegal because Secretary of the Interior Ryan Zinke arbitrarily and unlawfully renewed a grazing permit for a permittee which did not have the "satisfactory record of performance"—a mandatory qualification for retaining the privilege of grazing on public land. 43 U.S.C. § 1752(c) (compliance with regulations and terms of permit is necessary for permit renewal); 43 C.F.R §§ 4110.1(b), 4130.1-1(b) (an applicant must be determined to have a satisfactory record of performance based on substantial compliance with the terms of the permit and applicable regulations). It is undisputed here that (1) BLM determined, in 2014, that Hammond *lacked* a satisfactory record of performance, and therefore should be denied renewal of its permit, and (2) Secretary Zinke *adopted* BLM's factual and legal conclusions. Pls.' Mot. at 8–13, 15, 21–22. Those facts control, despite the Presidential pardons, and render the Secretary's decision to renew the Hammond permit arbitrary and capricious. *Id.* at 23–24. Plaintiffs are likely to succeed on this claim, which alone justifies vacatur of the unlawfully renewed permit.

Plaintiffs are also likely to succeed on their other claims, which address the lack of public

participation in the BLM's hastily-conducted (and hidden from the public) CX process and the

obligation under the land use plans to provide special protection for sage-grouse on these

allotments. Defendants ignore the NEPA issue completely in their Response, and their course of

conduct in not immediately providing the reissued permit and CX to WWP as an "interested

public" and subsequent attempts to brush off WWP's efforts to gather information about the

environmental conditions of these allotments underscore how essential it is that the public,

including WWP, be allowed to participate in the NEPA process and the "democratic

decisionmaking" required when an agency undertakes a NEPA analysis. *Or. Natural Desert*

*Ass'n v. BLM*, 625 F.3d 1092, 1099 (9th Cir. 2010); *see supra* pp. 9–13.

BLM acknowledges that it made a NEPA decision in conjunction with renewing the

permit. Obradovich Decl. ¶ 14. However, the BLM's Response and supporting declarations are

otherwise silent about the mandatory obligation in the applicable land use plan to protect greater

sage-grouse Priority Habitat Management Areas (PHMA)—like all of the Mud Creek allotment

and most of the Hardie Summer allotment—that any "NEPA analysis for renewals . . . of

livestock grazing permits/leases that include lands within . . . PHMA *will include* specific

management thresholds based on [greater sage-grouse] Habitat Objectives . . . Land Health

Standards . . . and ecological site potential, and one or more defined responses that will allow the

authorizing officer to make adjustments to livestock grazing that have already been subjected to

NEPA analysis." Pls.' Mot. Ex. 5 at 14. There is no exception in this mandatory land use plan

language for renewals under CXs—despite the suggestion otherwise in the Obradovich

Declaration. Obradovich Decl. ¶ 14.

## III.     THE BALANCE OF HARMS WEIGHS IN FAVOR OF AN INJUNCTION

Plaintiffs have explained above at pp. 9–13 that BLM's foot-dragging in producing the

permit, the CX, and documents related to grazing on the allotments—despite their legal obligations to do so under FLPMA, NEPA, BLM's regulations, and FOIA—was largely responsible for the delay in filing this suit and seeking injunctive relief. These facts negate Defendants' arguments that the delay in seeking injunctive relief should count against Plaintiffs in balancing harms. Defs.' Resp. at 2, 10–12, 18.

Defendants cite to *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) and *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) for the proposition that the alleged delay in seeking injunctive relief undermines Plaintiffs' ability to show irreparable harm or that the balance of harms tips in their favor. Defs.' Resp. at 11, 18. However, as the District of Montana recently noted when confronted with a similar argument from other federal defendants, "Defendants expect more from the cited cases than their facts will allow." *Native Ecosystems Council v. Marten*, 334 F. Supp. 3d 1124, 1133 (D. Mont. 2018). That Court explained that '[t]he Court in *Oakland Tribune* was addressing a problem which had 'been in effect for a number of years.' 762 F.2d at 1377, while the Court in *Lydo Enterprises* was dealing with a plaintiff who had 'delayed five years before taking any action,' 745 F.2d at 1213." *Id.*

In *Native Ecosystems Council*, the District of Montana addressed an allegation that plaintiffs had been aware of the date the logging project was set to begin (July 1, 2018) about ten months before plaintiffs filed their motion for a preliminary injunction/temporary restraining order on June 15, 2018. *Id.* That Court rejected the argument that plaintiffs had been dilatory because it was facing only "a delay of months." *Id.* The Court concluded that "[w]hile the timing of Plaintiffs Motion is not ideal for either the Defendants or the Court, the Court is not convinced that a ten-month delay should impact the efficacy of Plaintiffs' request." *Id.*

By comparison, in this case, Plaintiffs filed their suit and their TRO/PI motion only six weeks after the Defendants finally disgorged copies of the permit and CX that Plaintiffs challenge—and one week *before* BLM Burns District provided (on May 20, 2019) the Land Health Assessments upon which Defendants and their Declarants rely so heavily in response to Plaintiffs' motion. Plaintiffs did not have these fundamental documents available to them when they moved for injunctive relief. Under the circumstances, WWP and its co-plaintiffs have acted diligently to try to gather information that BLM *by law* should have provided to WWP in the first half of February (in the case of the permit and CX) and no later than the end of March (in the case of the materials related to grazing on the Hammond allotments requested in WWP's February 27, 2019 FOIA request).

What is inexplicable in these circumstances is how the Defendants can assert that Plaintiffs have acted inequitably when Defendants failed to comply with their legal obligations to provide documents related to the grazing decisions and to ensure public participation and transparency in its grazing decisions. It is not clear how a litigant is supposed to challenge an agency decision if the agency hides that decision until after the action approved in the decision has already been going on for six days. Indeed, the fact that BLM did not produce the permit and CX until *after* grazing had begun makes Defendants' suggestion that grazing should never be halted after it has begun that much more nefarious: endorsement of such position would give the agency a perverse incentive to always withhold grazing decisions until after cattle had turned out, and then claim that it is too late to halt grazing that has already begun. Defs. Resp. at 19. Nor is it clear how a litigant is supposed to evaluate and build a case if the agency refuses to comply with its statutory duty of transparency under FOIA to promptly produce the very documents that the agency itself eventually relies on to oppose the plaintiffs' motion.

Plaintiffs regret that their internal vetting processes also contributed slightly to the delay, *see supra* p. 13, but submit that the equities regarding the timing of the pending motion actually tip in favor of Plaintiffs and against Defendants—or, at a minimum, should not "impact the efficacy of Plaintiffs' request." *Native Ecosystems Council*, 334 F. Supp. 3d at 1133.

In addition, the new information Defendants provided with their Response lightens the scale on the side of potential harm to Defendants or to Hammond. Because BLM miscalculated and allowed grazing to begin early on the Hammond allotment with seven times the number of cattle allowed under the renewed permit, *see* Defs.' Resp. Ex. 3, it has directed Hammond to cease grazing the Hammond allotment as of June 7, 2019. *Id*. at 2. Thus the remaining grazing at issue, now, in the pending TRO/PI motion are the 997 AUMs authorized for Mud Creek and Hardie Summer allotments described in the updated grazing strategy announced two days ago.[5]

Based on the 997 AUM figure, the potential harm to Defendants of restraining (and eventually enjoining) grazing on Mud Creek and Hardie Summer allotments is only $1,345.95. *See* Pls.' Mot. Ex. 6 ($1.35/AUM grazing fee). Although Defendants attach a declaration by one of the Hammond principals, they advance no argument regarding harm to the permittee other than an expectation interest in being allowed to graze. Defs.' Resp. at 19. The expectations of a

---

[5] In addition, because the update grazing strategy grazing for this year provides that grazing will be completed on the Hammond FFR and Hammond allotments by June 7, 2019, the only grazing that Plaintiffs are seeking to restrain or enjoin at this moment is grazing that has not already begun on the Mud Creek and Hardie Summer allotments. Defs.' Resp. Ex. 3. Contrary to Defendants' suggestion, Defs.' Resp. at 10, Plaintiffs seek prohibitory, rather than mandatory, injunctive relief, because plaintiffs are seeking to preserve the status quo—not an order requiring BLM to take any affirmative action. A mandatory injunction is one that "goes well beyond simply maintaining the status quo *pendente lite*." *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (quotations and brackets omitted). The status quo refers to the last uncontested status which preceded the pending controversy. *N.D. ex rel. Parents v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1112 n.6 (9th Cir. 2010). In this case, the status quo is the ungrazed condition of the allotments prior to the resumption of grazing under the unlawful permit and CX.

permittee that holds an illegal permit should count little in any balancing of harms—particularly when its principal asserts an unsubstantiated financial harm—over $100,000—that is contradicted by statistics from the U.S. Department of Agriculture show that private land grazing fees in Oregon in 2018 averaged $17.50 per AUM—and thus 997 AUMs might cost Hammond no more than about $16,000 ($17.50 - $1.35 x 997 = $16,101.55). Ex. 2.[6]

These amounts are less than the amounts that the Ninth Circuit determined could not provide a "significant counterweight to the harm caused to" the environmental plaintiff in *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). *Cottrell* is not distinguishable. *See* Defs.' Resp. at 18. Here, Defendants have not even attempted to refute Plaintiffs' showing of likely success on the merits, which is laid out in detail in the opening memorandum and highlighted above. Pls.' Mot. at 18–30. And, in terms of ecological harm *to the sage-grouse*—which depend on tall grasses for protection from predators and for food while nesting and raising their young—grazing is likely to cause irreparable harm in both the short- and long-term, making it more likely that sage-grouse chicks will be killed by predators or starvation, and threatening the extirpation of the local populations and adverse effects on regional populations. *See supra* pp. 14, 16–19. The likely harm to Plaintiffs' interests in the nesting and brood-rearing birds, as well as redband trout, on the Mud Creek and Hardie Summer allotments outweighs the minimal harm to Defendants if a temporary restraining order issues.

Defendants also do not explain why it is inequitable to prohibit a permittee that apparently has already violated the terms of its permit within the first two months of grazing this year from continuing to graze. The renewed permit allows Hammond to have 68 cattle on the Hammond allotment from April 1 to October 30. Pls.' Mot. Ex. 3 at 1. But we now learn that *490*

---

[6] https://www.nass.usda.gov/Charts_and_Maps/Grazing_Fees/gf_am.php (visited May 28, 2019)

cattle are on that allotment. Defs.' Resp. Ex. 3 at 1. And that grazing began there on March 25. *Id*. at 2. And that BLM has had to issue a new letter "to ensure a common understanding of the grazing strategy for this season"—which appears to double the number of livestock authorized on the Mud Creek allotment compared to the actual permit. *See id.*; *see also supra* p. 5. Defendants' suggestion that "appropriate" or "properly managed" grazing somehow avoids harm to sage-grouse seems woefully misplaced when BLM's slapstick shuffling of cows on these allotments resembles the Keystone Kops more than actual "management." Defs.' Br. at 16–18. Ultimately, the balance of harms tips sharply in favor of Plaintiffs.

## IV.    AN INJUNCTION IS IN THE PUBLIC INTEREST

By not attempting to defend the Secretary's lawless behavior in renewing a grazing permit for an unqualified applicant whose principals committed multiple violations of the terms of their permit and federal laws and regulations, Defendants side-step addressing the public interest in having federal officers comply with the law. Defs.' Resp. at 19–20. The public consequences of denying injunctive relief are serious here, because it would allow a permittee which BLM itself fought for five years to keep from grazing to be allowed to continue grazing under an illegal permit that was not promulgated with the public participation and environmental analysis required by NEPA or the protections for affected sage-grouse required by FLPMA and the applicable land use plans. *See S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009) (holding that issuance of an injunction pending consideration of environmental impacts under NEPA comported with the public interest).

Federal defendants are wrong that there is a countervailing public interest in allowing Hammond to continue to graze illegally. Courts have repeatedly held that private interests—such as the economic interests of Hammond—are subordinated to the public interest, and that, where

there is a likelihood of irreparable environmental harm, "more than pecuniary harm must be demonstrated" to avoid injunctive relief. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1124–25 (9th Cir. 2005) (affirming preliminary injunction because, while developer "may suffer financial harm," without injunction "unlawful disruption to the desert is likely irreparable"); *N. Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466, 471 (9th Cir. 1986) (irreparable environmental harm outweighed competing harm to miners despite potential for "real financial hardship"). The Court must also consider the public participation and environmental protection purposes of FLPMA and NEPA, which take precedent over the private interest of the grazing permittee in this case.

## V.    THE COURT SHOULD WAIVE THE BOND REQUIREMENT

Defendants have made no argument that Plaintiffs should require a bond, and Plaintiffs therefore respectfully request that the Court waive the bond requirement of Rule 65(c).

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Court issue relief as requested in the Motion for Temporary Restraining Order (ECF No. 7 at i).

Respectfully submitted this 30th of May 2019.

 s/ David H. Becker
**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC

 s/ Talasi B. Brooks
**Talasi B. Brooks (*Pro hac vice*)**
Western Watersheds Project

 s/ Paul D. Ruprecht
**Paul D. Ruprecht (OSB # 132762)**
Western Watersheds Project

Attorneys for Plaintiffs Western Watersheds Project, Center for Biological Diversity, and WildEarth Guardians