# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **WESTERN WATERSHEDS PROJECT, CENTER FOR BIOLOGICAL DIVERSITY,** and **WILDEARTH GUARDIANS**, | Case No. 2:19-cv-0750-SI **OPINION AND ORDER** |
| Plaintiffs, | |
| v. | |
| **DAVID BERNHARDT**, Secretary of the Interior, **JEFFREY ROSE,** District Manager Burns District Bureau of Land Management, and **BUREAU OF LAND MANAGEMENT**, | |
| Defendants. | |

David H. Becker, LAW OFFICE OF DAVID H. BECKER, LLC, 4110 SE Hawthorne Blvd. No. 168, Portland, OR 97214; Talasi B. Brooks, WESTERN WATERSHEDS PROJECT, INC., P.O. Box 2863, Boise, ID 83701; Paul David Ruprecht, WESTERN WATERSHEDS PROJECT, INC., PO Box 12356, Reno, NV 89510. Of Attorneys for Plaintiffs.

Billy J. Williams, United States Attorney, and Stephen J. Odell, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiffs bring this action challenging Defendants' grant of a renewed Grazing Permit

(the "Permit") to Hammond Ranches, Inc. ("HRI") on four allotments—Mud Creek, Hammond,

Hammond FFR, and Hardie Summer. Plaintiffs argue that then-Secretary of the Interior Ryan

Zinke[1] and Defendant Bureau of Land Management ("BLM") acted arbitrarily and capriciously in violation of the Administrative Procedures Act ("APA")[2] because they failed to follow the requirements of the National Environmental Policy Act of 1969 ("NEPA"),[3] the Federal Land Policy and Management Act of 1976 ("FLPMA"),[4] and applicable BLM regulations. Plaintiffs allege that Defendants violated these statutes and regulations when Secretary Zinke ordered that HRI's previous grazing permit be renewed without conducting the analyses required by the FLPMA, BLM regulations, and NEPA, and under the 2015 Oregon Greater Sage-Grouse Approved RMP Amendment ("GSG-ARMPA"). Plaintiffs also allege that Defendants violated these statutes when BLM issued a categorical exclusion environmental review and approval ("CX") and the approved Permit without performing the required analyses. Plaintiffs further allege that they were not provided copies of the Permit and CX until April 2019, after the first wave of grazing had already begun.

Plaintiffs filed a motion for temporary restraining order ("TRO") and preliminary injunction to enjoin grazing on the four allotments. Before the Court is Plaintiffs' TRO motion. Plaintiffs request an order temporarily enjoining Defendants from allowing turnout and grazing of livestock on the Mud Creek and Hardie Summer allotments, until the Court can adjudicate Plaintiffs' motion for preliminary injunction. Defendants respond to Plaintiffs' motion for a TRO by arguing that Plaintiffs have not demonstrated that they will suffer irreparable harm in the absence of immediate temporary relief, and that the balance of the equities and public interest

---

[1] Defendant David Bernhardt is the current Secretary of the Interior.

[2] 5 U.S.C. §§ 701 *et seq.*

[3] 42 U.S.C. §§ 4321 *et seq.*

[4] 43 U.S.C. §§ 1701 *et seq.*

considerations do not support issuing a temporary restraining order. Defendants do not argue that Plaintiffs have failed to show a likelihood of success on the merits. Defendants also did not dispute most of the facts presented by Plaintiffs. On June 3, 2019, the Court held a hearing on Plaintiffs' motion. For the reasons discussed below, the Court grants Plaintiffs' motion for a temporary restraining order.

## STANDARDS

### A. Motions for Temporary Restraining Order

In deciding whether to grant a motion for TRO, courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction.[5] *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule

---

[5] A TRO, however, is necessarily of a shorter and more limited duration than a preliminary injunction. The duration of a TRO issued without notice may not exceed 14 days but may be extended once for an additional 14 days for good cause; in addition, the reasons for such an extension must be entered in the record. Fed. R. Civ. P. 65(b)(2). When a TRO is issued with notice and after a hearing, however, the 14-day limit for such orders issued without notice does not apply. *See Horn Abbot Ltd. v. Sarsaparilla Ltd.*, 601 F. Supp. 360, 368 n.12 (N.D. Ill. 1984). Nevertheless, absent consent of the parties, "[a] court may not extend a 'TRO' indefinitely, even upon notice and a hearing." *Id.* Accordingly, unless the parties agree otherwise, a court should schedule a preliminary injunction hearing to occur not later than 28 days after the date that the court first issues a TRO.

that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

In the context of a contested (*i.e.*, not *ex parte*) TRO, some district courts have explained that the requirement of a likelihood of irreparable harm should be evaluated only in the intervening period between when the TRO motion is heard and when a motion for preliminary injunction can be decided. *See, e.g.*, *Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 202 (D.D.C. 2011); *Trefelner v. Burrell Sch. Dist.*, 655 F. Supp. 2d 581, 588-89 (W.D. Pa. 2009). These cases generally cite to Rule 65(b) of the Federal Rules of Civil Procedure, which relates to *ex parte* TROs, or to Supreme Court or circuit court case law involving *ex parte* TROs, without explanation for why those authorities should apply to a contested TRO. The Court could not find, and Defendants did not cite, any appellate decision applying this standard to a contested TRO. Most cases, however, when considering irreparable harm in the context of a contested TRO, cite the standard of irreparable harm applicable to a motion for preliminary injunction and do not limit consideration of the plaintiff's claimed irreparable harm only to the time period before a preliminary injunction motion can be heard. *See, e.g.*, *Marin All. for Med. Marijuana v.*

*Holder*, 866 F. Supp. 2d 1142, 1159 (N.D. Cal. 2011); *Zango, Inc. v. PC Tools Pty Ltd.*, 494 F.

Supp. 2d 1189, 1194 (W.D. Wash. 2007).

The Court concludes that in considering irreparable harm for a contested TRO, the Court

is not limited only to harm that may occur before a preliminary injunction motion can be heard.

Instead, when a plaintiff seeks preliminary injunctive relief, the Court may look to whether the

plaintiff has shown a likelihood of irreparable harm occurring between the time of the motion

and when a final decision on the merits can be entered.

Additionally, "a temporary restraining order serves a purpose different from that of a

preliminary injunction. 'The purpose of a temporary restraining order is to preserve an existing

situation *in statu quo* until the court has an opportunity to pass upon the merits of the demand for

a preliminary injunction.'" *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 107 (2d Cir. 2009)

(quoting *Pan Am. World Airways, Inc. v. Flight Eng'rs' Int'l Ass'n, PAA Chapter*, 306 F.2d 840,

842-43 (2d Cir. 1962)); *see also Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226 (6th

Cir. 1996) ("[T]he purpose of a TRO under Rule 65 is to preserve the *status quo* so that a

reasoned resolution of a dispute may be had."); *Bronco Wine Co. v. U.S. Dep't of Treasury*, 997

F. Supp. 1309, 1313 (E.D. Cal. 1996) ("The purpose of a TRO is to preserve the *status quo*

pending a full hearing on a preliminary injunction."). The Court therefore considers whether the

*status quo* would materially change before a preliminary injunction could be heard.

**B. National Environmental Policy Act**

NEPA "is our basic national charter for protection of the environment." 40 C.F.R.

§ 1500.1(a).[6] "NEPA requires that 'to the fullest extent possible . . . all agencies of the Federal

---

[6] The Council on Environmental Quality promulgates regulations implementing NEPA (40 CFR Parts 1500-1508) that are binding on federal agencies and are given substantial deference by courts. *See Cal. ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 789 n.3 (9th Cir. 2014) (given substantial deference by courts);

Government shall' complete an environmental impact statement (EIS) in connection with 'every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment.'" *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 640-41 (9th Cir. 2014) (alteration in original) (quoting 42 U.S.C. § 4332(2)(C)). "In addition to the proposed agency action, every EIS must '[r]igorously explore and objectively evaluate all reasonable alternatives' to that action. 40 C.F.R. § 1502.14(a). The analysis of alternatives to the proposed action is 'the heart of the environmental impact statement.'" *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010) (second citation omitted). The purpose of NEPA is twofold: "(1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011). "In order to accomplish this, NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005) (citation omitted).

## C. Federal Land Policy and Management Act and BLM Regulations

Grazing on federal lands is governed by, among other statutes and regulations, the Taylor Grazing Act of 1934[7] ("Taylor Grazing Act") and the FLPMA. The Taylor Grazing Act requires persons seeking to graze livestock on public lands to obtain a permit from the Department of the Interior. The Taylor Grazing Act provides for the "orderly use, improvement, and development of the range" on public lands, 43 U.S.C. § 315a, and conditions renewal of a grazing permit on

---

*ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1138 n.3 (9th Cir. 1998) (binding on federal agencies).

[7] 43 U.S.C. § 315, *et seq*.

compliance with rules and regulations. 43 U.S.C. § 315b. The goals of the Taylor Grazing Act "are to 'stop injury' to the lands from 'overgrazing and soil deterioration,' to "provide for their use, improvement and development," and 'to stabilize the livestock industry dependent on the public range.'" *Pub. Lands Council v. Babbitt*, 529 U.S. 728, 733 (2000) (quoting 48 Stat. 1269). "As grazing allocations were determined, the Department would issue a permit measuring grazing privileges in terms of 'animal unit months' (AUMs), *i.e.*, the right to obtain the forage needed to sustain one cow (or five sheep) for one month." *Id.* at 735; *see also* 43 C.F.R. § 4100.0-5 (defining AUM).

The FLPMA provides additional direction for the management of public lands. "In enacting FLPMA, 'Congress declared that it is the policy of the United States to manage the public lands in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air, and atmospheric, water resource, and archeological values.'" *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 498-99 (9th Cir. 2011) (quoting *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 581 F.3d 1063, 1075 (9th Cir. 2009)). The FLPMA instructs that permits for grazing on public lands ordinarily shall be issued for a 10-year term, subject to such terms and conditions as BLM deems appropriate and consistent with governing law. 43 U.S.C. § 1752(a). The FLPMA also establishes that, for a permittee holding an expiring grazing permit to be given first priority for renewal, the permittee must be "in compliance with the rules and regulations issued [by the Secretary] and the terms and conditions of the permit." 43 U.S.C. § 1752(c).

BLM has issued regulations to implement the Taylor Grazing Act and the FLPMA. 43 C.F.R. §§ 4100-4190.1 (2005).[8] BLM's regulations specify "mandatory qualifications" for an applicant for a permit for grazing on public lands. 43 C.F.R. § 4110.1. These include that any applicant for renewal of a grazing permit "*must be* determined by the authorized officer to have a satisfactory record of performance." *Id.* § 4110.1(b) (emphasis added). The regulations further provide that the authorized officer "*will determine* whether applicants for the renewal of permits . . . and any affiliates, have a satisfactory record of performance," and that "[t]he authorized officer *will not renew* . . . a permit . . . unless the applicant and all affiliates have a satisfactory record of performance." *Id.* § 4130.1-1(b) (emphasis added). A satisfactory record means that the applicant is in "substantial compliance with" regulations applicable to the permit. *Id.* § 4110.l(b)(l). BLM regulations applicable to a grazing permit prohibit: "(3) Cutting, burning, spraying, destroying, or removing vegetation without authorization"; and "(4) Damaging or removing U.S. property without authorization." *Id.* § 4140.l(b). BLM also has regulations applicable to preventing wildfires, which apply to users of public lands, including grazing permit holders. These regulations prohibit, without authorization, a user to: "[c]ause a fire, other than a campfire, or the industrial flaring of gas, to be ignited by any source; [b]urn, timber, trees, slash, brush, tundra or grass except as used in campfires; [l]eave a fire without extinguishing it; [or] [r]esist or interfere with the efforts of firefighter(s) to extinguish a fire." *Id.* § 9212.1(a), (c), (d), (f).

_____

[8] Although BLM issued amended regulations in 2006, those regulations have been enjoined by the U.S. District Court for the District of Idaho, *see W. Watersheds Project v. Kraayenbrink*, 538 F. Supp. 2d 1302 (D. Idaho 2008), and are not in effect for the relevant BLM field office.

FLPMA also directs the BLM to develop and maintain comprehensive Resource Management Plans ("RMPs") that govern all aspects of public land management, including grazing administration. 43 U.S.C. § 1712. Grazing permits must be consistent with RMPs. 43 U.S.C. § 1732(a); 43 C.F.R. § 4100.0-8. RMPs constrain grazing permits by determining where grazing will or will not be allowed and by setting environmental standards that grazing permits must meet. *See* 43 U.S.C. § 1732(a) (requiring management "in accordance with the [RMPs]"); *id.* § 1752(c)(1) (conditioning renewal of grazing permits on lands remaining available for grazing in accordance with RMPs).

The land use plans covering the four allotments at issue in this case are the Steens Mountain Cooperative Management and Protection Area ("CMPA") Resource RMP and the Andrews Management Unit RMP, both approved in July 2005. In 2015 both of these RMPs were amended by the Oregon GSG-ARMPA. The GSG-ARMPA defines various categories of important sage-grouse habitat requiring special protection and consideration, including Priority Habitat Management Areas ("PHMAs"), General Habitat Management Areas ("GHMAs"), and Sagebrush Focal Areas ("SFAs"), which are a subset of PHMAs. PHMAs are "BLM-administered lands identified as having the highest value to maintaining sustainable [greater sage-grouse] populations." GHMAs are "BLM-administered lands where some special management will apply to sustain [greater sage-grouse populations; areas of occupied seasonal or year-round habitat outside of PHMA[s]." SFAs are areas that "represent recognized strongholds for [greater sage-grouse]."

The 2015 GSG-ARMPA also specifies certain "Management Decisions." One of these requires that any "NEPA analysis for renewals . . . of livestock grazing permits/leases that include lands within SFA and PHMA will include specific management thresholds based on

[greater sage-grouse] Habitat Objectives . . . Land Health Standards . . . and ecological site potential, and one or more defined responses that will allow the authorizing officer to make adjustments to livestock grazing that have already been subjected to NEPA analysis."

## D. Administrative Procedures Act

Neither NEPA nor the FLPMA provide a separate standard of review. Thus, claims under these Acts are reviewed under the standards of the APA. *See Jewell*, 747 F.3d at 601 (NEPA); *Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 994 (9th Cir. 2013) (FLPMA). Under the APA, "an agency action must be upheld on review unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Jewell*, 747 F.3d at 601 (quoting 5 U.S.C. § 706(2)(A)). A reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (quotation marks and citation omitted). The reviewing court's inquiry must be "thorough," but "the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *Id.* (quotation marks and citation omitted).

Although a court's review is deferential, the court "must engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it." *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2007). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see also Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001) ("The presumption of agency expertise can be rebutted when its decisions, while relying on scientific expertise, are not reasoned."). The

reasoned-decisionmaking requirement, the Supreme Court has often observed, includes a duty to explain any "departure from prior norms." *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973); *see also Int'l Union, UAW v. NLRB*, 802 F.2d 969, 973-74 (7th Cir. 1986) ("[A]n administrative agency is not allowed to change direction without some explanation of what it is doing and why."). A court also "must not 'rubber-stamp' . . . administrative decisions that [it] deem[s] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 858 (9th Cir. 2005) (first alteration in original, remaining alterations added).

## FINDINGS OF FACT

Based on the evidence presented by the parties, the Court finds the following facts are more likely true than not:

### Background of HRI's Permit

1.      HRI is a family-owned Oregon ranching corporation. Its shareholders are Steven Dwight Hammond, his wife Earlyna Hammond, and his parents Dwight Lincoln Hammond and Susan Hammond, through their Trust. Steven Hammond is the President of HRI, Dwight Hammond is the Vice President, and Earlyna Hammond is the Secretary.

2.      HRI began grazing on public BLM lands in 1964. Before the Permit at issue in this case, the most recent permit granted to HRI was Permit No. 3602564, which had a term from March 1, 2004 to February 28, 2014. This permit authorized, for each year, 390 cattle and 590 AUMs on Mud Creek, from May 16 to June 30; 68 cattle and 471 AUMs on Hammond, from April 1 to October 30; 408 cattle and 407 AUMs on Hardie Summer, from July 1 to September 30; and 32 cattle and 32 AUMs on Hammond FFR, from April 1 to April 30.

3.	On February 14, 2014, BLM denied HRI's Application for Permit Renewal. BLM explained that under its regulations permit holders and their "affiliates" must be in compliance with the rules and regulations issued by the Secretary of the Department of the Interior and the terms and conditions in the permit. BLM found that Steven Hammond and Dwight Hammond were affiliates of HRI. BLM also found that their criminal convictions for intentionally setting fires on public lands violated the regulations prohibiting cutting, burning spraying, destroying, or removing vegetation without authorization and damaging or removing U.S. property without authorization. 43 C.F.R. § 4140.1. BLM further concluded that the Hammonds' conduct violated 43 C.F.R. § 9212.1(a), (c), (d), and (f).

4.	BLM summarized in detail the witness testimony at the criminal trial, and characterized this testimony as demonstrating "how the Hammonds violated BLM grazing regulations and the terms of [HRI's] grazing permit, endangered the lives of numerous individuals, including firefighters, and altered ecological conditions on public lands." BLM described testimony of the Hammonds lighting multiple fires.

5.	Steven Hammond was convicted of two counts, one relating to a 2001 fire and one relating to a 2006 fire. Dwight Hammond was convicted of one count, relating to a 2006 fire. The jury acquitted the Hammonds of several charges. The jury could not reach a verdict on several charges and the judge had the jury continue deliberations on those charges. While the jury was deliberating, the prosecution and defense reached an agreement and the trial ended.

6.	In reaching its Final Decision, BLM accepted the sworn testimony at trial and, after a "thorough[] review[]," rejected the protest filed by HRI that the sworn testimony was inaccurate or incomplete.

7.    BLM concluded that HRI and its affiliates had an unsatisfactory record of performance. BLM stated: "The Hammond fire-setting maliciously and knowingly placed public recreationists, firefighters, and BLM range staff at high risk just to further [HRI's] grazing interests." BLM also noted that the "Hammonds set the fires because they disagreed with how BLM managed the land. The Hammonds acted in the interest of improving the rangeland forage for their cattle, but not necessarily for other resources like wildlife habitat."

8.    BLM concluded that each criminal conviction, standing alone or in combination, constitutes an unsatisfactory record of performance. BLM explained:

> The Hammonds' malicious disregard for human life and public property shows contempt for BLM regulation of public land. The Hammonds' interference with firefighting efforts is antithetical to orderly use of resources. The Hammonds' disregard for orderly and planned prescribed burning that accounts for ecological objectives and human safety is incompatible with the orderly use and improvement of resources. The BLM carefully plans and conducts prescribed burns to meet ecological objectives, such as retaining sagebrush and bitterbrush habitat. By taking matters into their own hands and burning public lands outside of the official BLM process, the Hammonds altered the Burns District's prescribed fire management strategy for years to come. Good stewardship is more than just producing grass for livestock—it requires orderly conduct that protects the multiple objectives of public lands and the lives of those who work and recreate on public lands.

9.    BLM also concluded that the Hammonds' "additional fire-setting described in the criminal trial," outside of their criminal convictions, constituted an unsatisfactory record of performance. BLM found that "the testimony shows a pattern of intentional fire-setting by Dwight and Steven Hammond—beyond the fires for which they were convicted—demonstrating their callous disregard for human life and BLM multiple use objectives for the land."

10.    HRI appealed BLM's decision and sought a stay of the decision. On April 28, 2014, the Office of Hearings and Appeals ("OHA") denied the Hammonds' motion for a stay and

BLM's decision went into effect. OHA found that the criminal convictions were sufficient to establish violations of governing regulations. OHA also found that BLM correctly relied on other evidence of "multiple instances of the Hammonds setting fires to eliminate juniper for the purpose of increasing forage for their cattle" and held that their "pattern of starting fires that damage vegetation on public lands and endangers lives is sufficiently serious to warrant permit non-renewal."

11.     HRI appealed the stay denial to the Interior Board of Land Appeals, and it affirmed. Meanwhile, in the appeal the OHA was considering, the assigned judge was evaluating whether to have the case proceed to summary judgment or directly to a hearing. Industry trade organizations began lobbying then-Secretary of the Interior Zinke and President Donald J. Trump. Between May and November 2018, briefs were filed before the assigned OHA judge.

12.     On July 10, 2018, President Trump issued Executive Grants of Clemency, pardoning Steve and Dwight Hammond for their crimes and commuting their sentences. Steve Hammond had served three years of his five-year sentence and Dwight Hammond had served four years of his five-year sentence.

13.     On December 28, 2018, Secretary Zinke exercised his authority to assume jurisdiction over the appeal. On January 2, 2019, his last day in office, Secretary Zinke issued his decision. He set out the factual and procedural history of the case in slightly more than one page, the applicable law in slightly more than one page, and his analysis in one paragraph. Secretary Zinke's analysis, in its entirety, states:

>    I find that the pardons constitute unique and important changed
>    circumstances since the BLM made its decision. In light of the
>    Grants of Executive Clemency, the years of imprisonment, and
>    civil damages paid by the Hammonds, I find that it is consistent
>    with the intent of the pardons—and in particular their reflection of
>    the President's judgment as to the seriousness of the Hammonds'

offenses—to renew the Hammonds' permit for the duration of the term that would have commenced in 2014. The Hammonds' continuance of grazing will depend on compliance with BLM's grazing regulations. I do not find fault with BLM's assessment of the law and facts in its 2014 Decision and I reiterate BLM's concern for human safety on public lands. The safety of our Nation's firefighters and others working and recreating on public lands remains paramount. I will ask BLM to keep the Office of the Secretary apprised of any permit compliance and human safety issues.

14.    Secretary Zinke concluded his decision by remanding "the matter to BLM with instructions to renew, within 30 days of the date of this decision, the permit under the same terms and conditions for the balance of the renewal period."

15.    On February 5, 2019, BLM Rangeland Management Specialist Jamie McCormack circulated a memorandum to Burns District Manager Jeffrey Rose. This memorandum noted that Secretary Zinke had directed BLM to renew the Permit under the same terms and conditions as the previous permit. The memorandum stated that BLM had conducted standards and guidelines assessments and evaluations in 2018 on the four allotments, standards were being achieved except the standard relating to species, the failure of that standard was not caused by grazing, and thus the Permit qualified for a CX under the FLPMA, which constitutes compliance with NEPA. Mr. Rose concurred with this conclusion.

16.    The CX was dated February 1, 2019, but signed on February 4 and 5, 2019. It concluded that "the proposed action did not trigger any of the extraordinary circumstances described in 43 C.F.R. § 46.215." The CX also concluded that the Permit was "in conformance with the [land use plans], qualifies as a categorical exclusion, and does not require further NEPA analysis."

17.    On February 13, 2019, Jeffrey Rose of BLM and Steve Hammond of HRI signed the Permit, with an effective date of February 1, 2019 through February 28, 2024.

**Plaintiffs' Receipt of the Permit and CX**

18.     On January 29, 2019, counsel for Plaintiff Western Watersheds Project ("Western Watersheds") noted the media coverage of Secretary Zinke's decision and asked the Department of the Interior and BLM for a copy of that decision. Both agencies provided a copy that same day. BLM noted, however, that they had just received the decision and "the details of how we will implement this decision have not been finalized."

19.     Plaintiffs requested copies of documents relating to the decision, including a copy of the Permit, and submitted a request under the Freedom of Information Act ("FOIA"). On March 25, 2019, Plaintiffs again requested a copy of the Permit, noting that Western Watersheds had not yet received a copy. BLM responded that because Western Watersheds had submitted a FOIA request, the information would be provided under that request.

20.     On April 1, 2019, counsel for Wester Watersheds responded to BLM, noting that the statutory deadline under FOIA had expired without a response, BLM had indicated it would not provide any response to the FOIA request until May 22, 2019, Western Watersheds believed it had a right to the information as an "interested party" under BLM regulations, and it would be a simple matter to email a copy. BLM provided a copy of the Permit and CX to Western Watersheds on April 1, 2019.

**Characteristics of the Allotments**

21.     The Mud Creek and Hardie Summer allotments lie within the Steens Mountain CMPA. This area was designated by Congress with the purpose "to conserve, protect, and manage the long-term ecological integrity of Steens Mountain for future and present generations." 16 U.S.C. § 460nnn-12(a). Objectives of this designation include to promote grazing, recreation, historic, and other uses that are sustainable, and to ensure the conservation,

protection, and improved management of the ecological, social, and economic environment of the CMPA, including geological, biological, wildlife, riparian, and scenic resources. *Id.* § 460nnn-12(b)(2), (4).

22.     To assess the effects of this grazing, BLM developed a set of standards to measure the status of the soil, vegetation, riparian areas, and wildlife on the range. The standards are known as the Standards for Rangeland Health.

23.     BLM performed evaluations of Standards for Rangeland Health on the allotments in 2007 and 2018. The 2007 evaluation concluded that the Mud Creek allotment was not meeting two of the five standards, Standard 5 that relates to native species, species listed under the Endangered Species Act ("ESA"), or locally important species, and Standard 3 that relates to ecological processes. The 2018 evaluation concluded that the allotment was not meeting the standard for species. The Hardie Summer allotment also was found not to meet Standard 5.

24.     The allotments include Greater Sage-Grouse habitats designated in 2015 as PHMAs and GHMAs. The Mud Creek allotment also includes a sage-grouse breeding ground ("lek"), known as the South Bridge Creek lek. Two more leks, known as North Bridge Creek Nos. 1 and 2, lie less than two miles from the Mud Creek, Hammond, and Hammond FFR allotments and within three miles of the Hardie Summer allotment.

25.     The Greater Sage-Grouse is a bird that requires large expanses to meet its seasonal habitat requirements. The loss of habitat from fragmentation decreases the connectivity between seasonal habitats, potentially resulting in the loss of population.

26.     BLM has designated the Greater Sage-Grouse as a "sensitive" species. This requires that the "species be afforded, at a minimum, the same protections as candidate species for listing under the ESA; and provides that BLM Field Office managers are responsible for

implementing the policy, including by [e]nsuring actions are evaluated to determine if special status species objectives are being met." *W. Watersheds Project v. Dyer*, 2009 WL 484438, at *8 (D. Idaho Feb. 26, 2009) (quotation marks omitted) (alteration in original).

27.     The Greater Sage-Grouse requires sagebrush for every part of its life cycle. In spring, nesting and brood-rearing sage-grouse use sagebrush for cover and forage. In summer, sagebrush is used for cover and forage as the birds move from nesting and brood-rearing sites to wetter areas. In the fall and winter, sage-grouse use sagebrush is for food.

28.     Sage-grouse also require tall grasses for cover and forbs for food in spring and during nesting and brood-rearing. Forbs also attract insects that are vital to young chicks. Sage-grouse also rely on the edges of riparian habitats near meadows and stream areas.

29.     Non-sagebrush habitat, including tall grasses, can provide Sage-grouse nesting habitat.

30.     BLM personnel have seen male and female sage-grouse in the lek on Mud Creek.

31.     Livestock grazing is known to be detrimental for sage-grouse because it reduces the height and density of grasses and forbs. Livestock grazing also increases susceptibility of Wyoming big sagebrush ecosystems to cheatgrass invasion as livestock trample biological soil crusts, suppress native bunchgrasses, and shorten fire-return. Domestic livestock disperse exotic seeds at about two orders of magnitude greater than do native ungulates, further increasing cheatgrass spread. Cheatgrass is highly flammable and suppresses sagebrush initiation and growth.

32.     When grazing is allowed after fire damage, cattle will destroy native vegetation and spread cheatgrass, whereas sagebrush steppe in the absence of grazing is more fire resistant.

33.     Livestock grazing has been linked to juniper expansion. Juniper expansion is one of the reasons the Mud Creek allotment failed Standard 5.

34.     The areas containing the South Bridge Creek and North Bridge Creek leks burned in the 2006 fire set by the Hammonds. The number of birds attending the South Bridge Creek lek rebounded after the fire but has again declined. The North Bridge Creek No. 1 lek is no longer active. The North Bridge Creek No. 2 lek has varied in its use, generally around the low teens, with 2019 showing 9 males using the lek.

35.     The permitted grazing on Mud Creek and Hardie Summer is likely to cause harm to Greater Sage-Brush habitat and status by likely: (1) reducing tall grasses and forbs during breeding and nesting season in the Mud Creek allotment; (2) reducing cover for nesting hens and chicks to avoid predation; (3) increasing the spread of cheatgrass; (4) reducing the chances of sagebrush recovery and increasing the chances of juniper expansion; (5) reduce the forage available to nesting hens and chicks; (6) creating habitat fragmentation, including with the SFA south of Steens Mountain; and (7) degrading the riparian areas and wet meadows of the Hardie Summer allotment. Because BLM has approved intensive grazing the month of June on Mud Creek, some of this harm is likely to be immediate. Additionally, because of the fragile state of the lek on Mud Creek, its connectivity to the surrounding leks, and sensitive status of the Greater Sage-Grouse, harm to the Mud Creek lek is likely to cause irreparable harm to neighboring leks.

## CONCLUSIONS OF LAW

**A.  Likelihood of Success on the Merits**

Plaintiffs carry the burden at the TRO and preliminary injunction stage for the same elements that they must prove at trial, and Defendants carry the burden for the elements and affirmative defenses that they must prove at trial. *Gonzales v. O Centro Espirita Beneficente UNIAO do Vegetal*, 546 U.S. 418, 429 (2006) ("The point remains that the burdens at the

preliminary injunction stage track the burdens at trial."). The Court concludes that Plaintiffs have

shown a likelihood of success on the merits and Defendants have not presented any defense or

challenged Plaintiffs' arguments in this regard. *See, e.g.*, *Kinetic Fuel Tech., Inc. v. Total Fuel*

*Sols. LLC*, 2016 WL 1399342, at \*2 (W.D.N.Y. Mar. 7, 2016), *report and recommendation*

*adopted*, 2016 WL 1389616 (W.D.N.Y. Apr. 6, 2016) (concluding, in evaluating the plaintiff's

likelihood of success that "[t]here being no defenses put forth by GRF, this factor weighs in

Kinetic's favor"); *York v. Bank of Am.*, Case No. 14-cv-02471-RS, Docket No. 11 at 2 (N.D. Cal.

June 3, 2014) (granting TRO when the defendants failed to respond, noting that "[i]n the absence

of a response from defendants, it is impossible to tell whether, or on what grounds, defendants

would oppose York's request," and providing only a cursory review of the plaintiff's likelihood

of success).

Plaintiffs have sufficiently shown that Secretary Zinke ordered the Permit be granted, and

HRI and BLM complied with this order by granting the Permit without first making a finding

that HRI had a satisfactory record of performance and had been in compliance with the

governing statutes and BLM regulations. Secretary Zinke reaffirmed all the 2014 factual findings

of BLM, which had found that HRI did not have a satisfactory record of performance and was

not in compliance with governing statutes and regulations. Secretary Zinke did not make any

contradictory findings. Secretary Zinke instead relied on the pardon granted by President Trump.

In his decision, Secretary Zinke cited case law that holds that a pardon does not overturn a

judgment of conviction, does not clear a person of the underlying conduct of conviction,

constitutes a confession of guilt, and does not preclude a government agency from considering

the underlying conduct in evaluating permit applications. Nonetheless, he relied on the pardons

as "unique and important changed circumstances" that apparently (although not explicitly)

rendered HRI either now in compliance with regulations and with a satisfactory performance record or somehow eligible for a permit despite not being in compliance and without a satisfactory performance record. Plaintiffs have shown a substantial likelihood of proving that pardons do not have that legal effect and that by relying on them the Secretary "offered an explanation for [the] decision that runs counter to the evidence before the agency" and relied "on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Such conduct is arbitrary and capricious. *Id.*

Secretary Zinke also apparently did not consider the conduct cited by BLM in its 2014 decision other than the criminal convictions. Such conduct was not affected by the Grants of Executive Clemency. Furthermore, neither Secretary Zinke nor BLM provided a reasoned explanation for the departure from their 2014 precedent (denying the permit renewal) to the 2019 decision (granting the Permit). *See, e.g.*, *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1070 (9th Cir. 2018) ("Because the 2010 Finding indicated that listing the arctic grayling was warranted irrespective of the Vatland study and recognized the ability of arctic grayling to migrate to tributaries, the 2014 Finding was required to provide a reasoned explanation for FWS's change in position."); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) ("'Unexplained inconsistency' between agency actions is 'a reason for holding an interpretation to be an arbitrary and capricious change.'" (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005))).

Plaintiffs also have shown a likelihood of success on the merits on their claims that Secretary Zinke, in issuing his order and BLM in following it and issuing the Permit and in issuing the CX, violated NEPA and the FLPMA. Defendants did not prepare an EA or EIS and

did not evaluate the special considerations of the sage-grouse as set forth in the 2015 GSG-ARMPA. Plaintiffs have also shown a likelihood of success on their argument that the Permit did not qualify for a CX or was subject to the "extraordinary circumstances" exception.

## B. Likelihood of Irreparable Harm

### 1. Delay

Defendants' first argument is that Plaintiffs' unreasonable delay in filing their motion for injunctive relief is reason enough to deny the motion for TRO. Defendants argue that the decisions at issue occurred in January and February 2019 and Plaintiffs waited until May 13, 2019, after grazing had begun in the Hammond and Hammond FFR allotments and only a few days before grazing was originally scheduled in the Mud Creek allotment, to file their motion.

The Ninth Circuit has noted that "[d]elay by itself is not a determinative factor in whether the grant of interim relief is just and proper." *Aguayo ex rel. NLRB v. Tomco Carburetor Co.*, 853 F.2d 744, 750 (9th Cir. 1988). The Ninth Circuit also has noted that delay is most relevant when it "suggests that 'the harm has occurred and the parties cannot be returned to the status quo.'" *Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993), *vacated on rehearing en banc on other grounds*, 19 F.3d 449 (9th Cir. 1994) (quoting *Tomco*, 853 F.2d at 750). Additionally, the court has emphasized that a "long delay" before seeking injunctive relief "implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

Plaintiffs allege in their Complaint that they did not receive a copy of the Permit and CX until April 2019, despite being "interested parties" under BLM regulations who should have received copies and despite having requested copies from Oregon BLM and the Department of the Interior for months, including under FOIA. The Court ordered supplemental briefing from the parties on this issue.

Defendants admit that they did not provide copies of the Permit and CX until April 1, 2019, the day that grazing under the Permit was scheduled to begin, although six days after it actually began. Defendants argue that because the regulations require providing copies of "proposed" actions to interested parties and Secretary Zinke had already made the decision to grant the Permit, BLM was not required to provide copies to any interested party. Regardless of the merits of this argument, the Court finds that it was reasonable for Plaintiffs not to file their motion until they had a copy of both the Permit and the CX. The Court thus considers whether the six-week delay was unreasonable or supports denying the motion.

Plaintiffs provide an explanation for the delay, noting that given Defendants' refusal to provide information, Plaintiffs had to get additional information from other sources through FOIA in order to meet their burden of proof. Plaintiffs also note that they were constrained by limited resources and internal procedures. Courts are most skeptical of unexplained delays that allow the *status quo* to change. *See, e.g.*, *Cal. Pac.*, 991 F.2d at 544 ("[T]he district court may legitimately think it suspicious that the party who asks to preserve the status quo through interim relief has allowed the status quo to change through unexplained delay." (quoting *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1092 n. 27 (3rd Cir. 1984))).

The Court does not find six weeks to be a "long" delay that undermines Plaintiffs' motion. *See Native Ecosystems Council v. Marten*, 334 F. Supp. 3d 1124, 1133 (D. Mont. 2018) ("While the timing of Plaintiffs Motion is not ideal for either the Defendants or the Court, the Court is not convinced that a ten-month delay should impact the efficacy of Plaintiffs' request."). The Court notes, however, that under the circumstances of this case, Plaintiffs risked a denial, or at least a partial denial relating to Mud Creek, by filing their TRO motion only two days before the commencement of part of the action Plaintiffs were requesting be enjoined. This is not

appropriate for an *ex parte* motion, and Defendants are entitled to sufficient time to be heard and file a response. Had BLM not voluntarily delayed implementing the Mud Creek grazing, the Court would be evaluating the circumstance in which the Ninth Circuit expresses concern about delay—when the harm has already occurred, and the *status quo* is changed. Because such circumstances are not present, the Court does not reach whether a denial would have been appropriate. As the situation stands, the harm has not yet occurred, the motion seeks to preserve the *status quo*, and the Court does not find that delay alone demonstrates a lack of irreparable harm.

### 2. Likely Harm to Sage-Grouse

Defendants argue that BLM conducted a Rangeland Health Evaluation on the Mud Creek allotment[9] and the evaluation determined the allotment was meeting four out of five standards. BLM concluded that the Mud Creek allotment did not meet Standard 5, relating to species. BLM found that sage-grouse habitat overall was rated as "marginal" because of the lack of sagebrush cover and continuity due to recent fires and juniper encroachment, and the presence of invasive annual grasses. The evaluation found that sage-grouse habitat does exist on the allotment and where it does, it is suitable for winter, leking,[10] and nesting and early spring brood rearing. Although Defendants do not discuss Summer Hardie, Plaintiffs note that it, too, failed Standard 5 relating to special status species.

Plaintiffs respond that they have shown a likelihood of irreparable harm because BLM's Rangeland Health Evaluation does not properly analyze the status of sage-grouse or redband

---

[9] Defendants' response focuses solely on the Mud Creek allotment even though Plaintiffs' motion for a TRO requests relief for both the Mud Creek and Summer Hardie allotments.

[10] A "lek" is a sage-grouse breeding ground and "leking" is breeding.

trout and the full implications of grazing on their status or habitat. That is partially why Plaintiffs

argue that the NEPA violation is so detrimental in this case. Plaintiffs also note that the 2018

evaluation was done after many years of non-grazing (five years for Mud Creek and 8-10 years

for Hardie Summer) and the previous 2007 evaluation was also done after some period of non-

grazing (one year for Mud Creek and a few years for Hardie Summer). Plaintiffs further argue

that one of the reasons these allotments fail Standard 5 is because of damage from a fire—one of

several fires that the HRI affiliates were accused of setting to increase their available grazing

acreage. Thus, argue Plaintiffs, there is a connection between the cause of the failure (fire

damage) and HRI's grazing (HRI's affiliates setting fires to increase grazing acreage) that was

ignored by Defendants in concluding that the failure is not associated with grazing, and allowing

HRI to graze these allotments as the beneficiary of an illegal permit exposes these allotments to

likely additional harm. Moreover, argue Plaintiffs, the fact that both allotments fail Standard 5

shows that sage-grouse and its habitat are at risk in these allotments. Plaintiffs assert that adding

the well-known habitat harm of livestock to allotments that are already failing Standard 5 is

likely to cause irreparable harm.

Plaintiffs contend that the information submitted by Defendants does not discuss the

status of the sage-grouse in the affected allotments, but through independent analyses Plaintiffs

have discovered that the South Bridge Creek lek on the Mud Creek allotment has declined to

only two males and the North Bridge Creek leks also have been declining, and one is now

unoccupied. Plaintiffs argue that these already fragile populations are exposed to greater risk if

grazing is recommended. Plaintiffs' expert[11] opines that grazing on the Mud Creek allotment will

_____

[11] Defendants argue that the Court should not consider the testimony of Plaintiffs' experts
because they did not personally view the Mud Creek or Hardie Summer allotments. The Court
rejects this argument. Plaintiffs' experts' opinions are based on their education and experience

likely lead sage-grouse to abandon the South Bridge Creek lek and it may affect the North Bridge Creek leks as well.

Plaintiffs also note that the U.S. Fish & Wildlife Service recognizes that high grass cover is "critical for reproductive success" in sage-grouse and that "the average nest success for sage-grouse in habitats where sagebrush has not been disturbed is higher than for sage-grouse in disturbed habitats." Thus, Plaintiffs argue, allowing grazing in May and June is particularly harmful to sage-grouse. Plaintiffs also note that U.S. Fish & Wildlife have recognized that high grasses, in and of themselves, can serve as nesting habitat for sage-grouse.

Plaintiffs additionally argue that grazing will harm sage-grouse by exacerbating the problem of habitat degradation. The Mud Creek and Hardie Summer allotments suffer from cheatgrass invasions after the fire. "Livestock grazing is one vector by which cheatgrass and other invasive weeds are spread into and then displace native vegetation." *Dyer*, 2009 WL 484438, at *11; *see also Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 229 F. Supp.

---

and involve topics that do not require that they personally view the Mud Creek or Hardie Summer allotments. Defendants also argue that the opinion of these experts should not be considered because they do not appear to distinguish between "properly managed" grazing and grazing without "appropriate management." Whether the grazing is or has been appropriately or properly managed, however, is part of the underlying question of this case. A grazing permit that is issued illegally or in an arbitrary and capricious manner is not properly managed grazing. Moreover, Plaintiffs contend that grazing on the Hammond allotment commenced six days early and involved 490 cattle instead of 68 as approved in the Permit without any application for a deviation (in violation of the Permit). At oral argument, counsel for Defendants stated that BLM made a "error" and allowed the additional 422 cattle without following proper procedure. Plaintiffs questions whether this is "proper" management. Plaintiffs also question whether BLM's "revised strategy" as set forth in its May 28, 2019 letter, which changes the grazing dates on Mud Creek to June 7 through June 30, 2019, but allows for the same (and not a prorated) number of AUMs as was allowed for the previously-approved 30 days of grazing, is "proper" management. Plaintiffs calculate that the same AUMs over 23 days would allow up to 769 cattle instead of the Permit's authorized 390, despite no analysis being done as to whether this additional cattle and intense grazing would be harmful to the Mud Creek. At this stage of the litigation, the Court rejects Defendants' argument that Plaintiffs' experts lack credibility because they do not consider the subject grazing to be "proper" grazing.

2d 1140, 1148 (D. Or. 2002) (noting that the "increasing spread of noxious weeds[,] especially by cattle" needed to be considered in a new EIS). Cheatgrass also reduces the likelihood of sagebrush recovery and increases the risk of fire. *Dyer*, 2009 WL 484438, at *7, 10-11.

The Court is particularly concerned that Defendants are relying on a general Rangeland Health Assessment that is not a full EIS, or even an EA, to argue that sage-grouse habitat and status will not be harmed by the proposed grazing, particularly in light of the 2015 GSG-ARMPA. The Rangeland Health Assessments are cursory, involving only a few paragraphs for each standard. For example, the Mud Creek review for Standard 3, ecological processes, notes that the allotment reference point includes either Wyoming big sagebrush or low sagebrush with grasses, and the allotment should be 60-75 percent grasses, 10 percent forbs, and 15-30 percent shrubs. The site was found to be 77-80 percent grasses, 20-23 percent forbs, and 0 percent shrubs. Yet this standard was marked as achieved even though the shrub component was found "lacking." Additionally, under Standard 5 it states that "[s]age-grouse habitat is available for winter, leking, nesting/early-season brood rearing where adequate sagebrush still occurs" and the "Rationale" notes that the "abundance" of sagebrush is "much lower than is expected of a reference community." These references indicated that there is sagebrush, despite the discussion in Standard 3 stating that allotment has 0% shrubs. This inconsistency is not explained.

Moreover, the Rangeland Health Assessments do not include the type of analyses required by NEPA. For example, they do not consider the effects of the particular proposed action (the specific grazing allowed by the Permit) and do not consider alternatives to the action as is required by an EIS and as discussed in the 2015 GSG-ARMPA. They do not evaluate factors such as connectivity to neighboring leks. In short, they are not a substitute for the analysis required by NEPA, particularly for allotments that are, and have been, failing the standard for

special status species. The Court is also concerned because the previous grazing, and the previous NEPA analysis on these allotments, was done before the 2015 GSG-ARMPA. The amendment was specifically implemented to provide additional protections to Greater Sage-Grouse, and those considerations have not been fully considered with respect to grazing on these allotments.

Plaintiffs' expert opines that the added stressor of grazing on the allotments could extirpate the local sage-grouse population, harming connectivity with adjacent, larger sage-grouse populations. Plaintiffs' expert also discusses the importance of the lek located on the Mud Creek allotment, the danger to hens and chicks in the month of June that are likely nesting on the Mud Creek allotment, and the importance of high grasses and forbs to hens and chicks.

Defendants' expert states that he has seen females coming to breed in the lek on the Mud Creek allotment. Defendants' expert notes generally that sage-grouse avoid areas with greater than four percent juniper, although he does not state that any particular area of the Mud Creek allotment has greater than four percent juniper. He also states generally that the nearest "suitable" sagebrush for nesting is three miles from the Mud Creek lek. He does not, however, state that he has not observed any nesting on the Mud Creek allotment. High grasses can also provide habitat for nesting.

At this stage of the litigation, the Court is considering the expert testimony through declarations and not live testimony subject to cross examination. The Court also notes that some of the facts are not directly disputed between the experts but are indirectly or inferentially disputed. Evaluating all of the evidence and keeping in mind the purpose of a TRO to preserve

the *status quo* until a preliminary injunction hearing can be held,[12] the Court finds that at this stage in the litigation, Plaintiffs sufficiently show a likelihood of harm to sage-grouse habitat and status on the Mud Creek and Hardie Summer allotments, especially if grazing were allowed in June.

### 3. Likely Harm from NEPA Violation

Plaintiffs argue that they have shown a likelihood of irreparable injury from Defendants' alleged violation of NEPA. When a court finds a likelihood of success on the merits of a NEPA claim coupled with likely environmental harm, the NEPA violation generally is found to rise to the level of irreparable harm supporting preliminary injunctive relief. *See, e.g.*, *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24 (D.D.C. 2009) ("When a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury.") (citing cases); *cf. Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989); *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 40-41 (D.D.C. 2013). This is because

> [t]he NEPA duty is more than a technicality; it is an extremely important statutory requirement to serve the public and the agency *before* major federal actions occur. If plaintiffs succeed on the merits, then the lack of an adequate environmental consideration looms as a serious, immediate, and irreparable injury. Although the *balancing* of this harm against other factors is necessarily particularized, the injury itself is clear.

*Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985) (emphasis in original) (citations omitted).

The First Circuit made a similar point in *Marsh*:

---

[12] The Court views the *status quo* to be as Mud Creek and Hardie Summer currently stand—with no grazing.

NEPA is not designed to prevent all possible harm to the environment; it foresees that decisionmakers may choose to inflict such harm, for perfectly good reasons. Rather, NEPA is designed to influence the decisionmaking process; its aim is to make government officials notice environmental considerations and take them into account. Thus, *when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered*. . . . Moreover, to set aside the agency's action at a later date will not necessarily undo the harm. The agency as well as private parties may well have become committed to the previously chosen course of action, and new information—a new EIS—may bring about a *new* decision, but it is that much less likely to bring about a *different* one. It is far easier to influence an initial choice than to change a mind already made up.

It is appropriate for the courts to recognize this type of injury in a NEPA case, for it reflects the very theory upon which NEPA is based—a theory aimed at presenting governmental decision-makers with relevant environmental data *before* they commit themselves to a course of action. This is not to say that a likely NEPA violation automatically calls for an injunction; the *balance* of harms may point the other way. It is simply to say that a plaintiff seeking an injunction cannot be stopped at the *threshold* by pointing to additional steps between the governmental decision and environmental harm."

*Marsh*, 872 F.2d at 500 (emphasis in original). Plaintiffs have shown likely irreparable harm from Defendants' alleged NEPA violations.

Because the Court finds that Plaintiffs have demonstrated likely harm to Greater Sage-Grouse and from their allegations of violations of NEPA, the Court does not reach Plaintiffs' argument regarding harm to redband trout.

## C. Balancing the Equities

In weighing equities, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). Defendants argue that Plaintiffs' delay in filing the motion is sufficient to tip the balance of the equities in Defendants' favor. For the same reasons

that the Court rejected a finding that delay was sufficient to reject Plaintiffs' assertion of irreparable harm, the Court rejects Defendants' argument here.

Defendants argue this element as if the Court was not going to make a finding of likelihood of success on the merits. Defendants' choice not to offer any defense against Plaintiffs' argument going to success on the merits does not, however, preclude the Court from deciding that factor. Because the Court finds that Plaintiffs' have shown a likelihood of success on the merits and irreparable harm to a sensitive species, the injury to Plaintiffs is significant.

Defendants argue that Plaintiffs should not be able to "disrupt" livestock grazing after the "season" has begun. This argument fails for two reasons. The first reason is that Defendants did not timely provide a copy of the Permit or CX until after the "season" had begun, and Plaintiffs should not be precluded from obtaining relief because Defendants refused for months, despite repeated requests by Plaintiffs, to provide the documents needed for Plaintiffs to file their motion. For Defendants to wait until after grazing commenced to provide necessary documents and then argue that because the motion was filed after grazing has commenced the equities tip in Defendants favor would result in the perverse incentive for Defendants to continue to engage in such deleterious behavior.

The second reason is that grazing has not yet begun on Mud Creek or Hardie Summers and the Court declines to consider grazing on all four allotments as one single action. Under the Permit, HRI was only supposed to graze 100 head of cattle beginning in April on the Hammond (68) and Hammond FFR (32) allotments and then graze 390 on the Mud Creek allotment beginning the middle of May (which was later delayed to June). This significant change in the

number of cattle (nearly four times as many) supports that the grazing between allotments is not merely moving the same cattle from point A to point B.[13]

Defendants' injury of losing approximately $2,000 in grazing fees is not substantial. Steven Dwight Hammond, President of HRI, however, submits a declaration regarding the injury to HRI. Mr. Hammond states that any nonpermanent (or permanent) injunction precluding HRI from grazing on public lands would preclude HRI from using thousands of acres of its own private lands because otherwise HRI would have to fence off its private lands. Mr. Hammond does not, however, explain how HRI was able to use its private lands during the past five years when HRI was not able to graze on public lands, if HRI did not fence its private lands and a fence is a necessity.

Mr. Hammond also describes that because HRI believed that it would be able to graze on the public lands, it did not renew the leases it had been using for the past five years and would have to make other arrangements at this late date. He asserts that HRI would likely be required to pay as much as $35 per head per month for other grazing land, resulting in a loss of $105,000, or maintain them on private land with supplemental feed, at a cost of $174,000. Mr. Hammond also explains that rounding up the cattle would be time consuming and potentially dangerous to the young calves.

Defendants' argument relating to HRI's purported injury amounts essentially to four paragraphs of Mr. Hammond's declaration and arguing that denying the TRO would "allow HRI to move onto Mud Creek consistent with its reasonable expectations when it first turned its livestock out several months ago pursuant to its Renewed Permit." There is some confusion in

---

[13] The Court expresses no opinion on whether if the grazing was the same between the allotments it would make a difference in this analysis.

the record regarding the amount of cattle that is or should have been grazing at this point. The permit authorized only 100 cattle to be grazed in the Hammond and Hammond FFR allotments combined. It appears from the record that HRI grazed 490 head of cattle on Hammond and it is unknown exactly how many were grazed on Hammond FFR. No application for a variation to the Permit, as required under the Permit itself, was provided to the Court, nor was any approval of such deviation. Defendants filed a letter dated May 28, 2019, from BLM to HRI discussing how BLM had "miscalculated" and that 490 cattle does not constitute 471 AUMs on the Hammond allotment. This letter, however, does not clear up the ambiguity, because the Permit still authorizes only 68 cattle on the Hammond allotment.[14]

Although there is no evidence in the record, based on the representation of counsel for Defendants at the hearing, it appears that the additional cattle beyond the authorized amount was an error by BLM and not HRI. Nonetheless, the Court finds that the harm discussed by Mr. Hammond relating to "rounding up and moving" cattle is not applicable to Plaintiffs' motion for a TRO because the Court is not ordering that any cattle be relocated.

The Court also considers that denying the TRO may lead to the harm that Defendants and HRI are concerned about—if additional cattle are moved onto Mud Creek (because the Permit authorizes a significant increase in the number of cattle from the Hammond and Hammond FFR allotments to the Mud Creek allotment) and then the Court grants Plaintiffs' preliminary injunction motion, HRI will have to round up even more cattle and move them off the range. The

---

[14] At oral argument, counsel for Defendants stated that BLM made an error by allowing, based on "past practices," additional AUMs on the Hammond allotment. Counsel did not explain how allowing additional AUMs without complying with the applicable regulations and procedures was following "past practices," when it appears from the record that past practices involved following procedures to grant authorization for additional AUMs.

harm is less significant to HRI in precluding grazing before it begins on Mud Creek with additional cattle than afterward.

Plaintiffs also respond to Mr. Hammond's assertion regarding HRI's potential monetary losses by citing statistics from the U.S. Department of Agriculture that private land grazing fees in Oregon in 2018 averaged $17.50 per AUM, which results in around $16,000 for HRI's 997 AUMs. Plaintiffs cite *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011), which held that losses of $16,000 to potentially $70,000 did not outweigh the environmental harm alleged by the plaintiffs.

The Ninth Circuit has emphasized that although weighing economic considerations with environmental harms "is not easy, it is not unprecedented. [The Ninth Circuit has] held time and again that the public interest in preserving nature and avoiding irreparable injury outweighs economic concerns." *Lands Council v. McNair*, 494 F.3d 771, 780 (9th Cir. 2007), *vacated on rehearing en banc on other grounds*, 537 F.3d 981 (9th Cir. 2008) (finding that the balance of equities supports the plaintiffs, even when the economic harm included laying off personnel). Courts also have repeatedly held that when the government does not properly follow the law or regulations, balancing the equities favors the plaintiff. *See, e.g.*, *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (noting that "[i]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available" (quoting *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *aff'd in part, rev'd in part, and remanded by Arizona v. United States*, 567 U.S. 387 (2012)); *J.L. v. Cissna*, 341 F. Supp. 3d 1048, 1070 (N.D. Cal. 2018) (noting that the balance of equities factor weighs in favor of the plaintiffs "when plaintiffs have also established that the government's policy violates federal law"). Considering

all the equities—that Defendants likely issued the Permit in violation of the law, HRI received the benefits of a permit that Plaintiffs have shown a likelihood of success that Defendants issued in violation of federal laws and regulations, the likely irreparable harm to a sensitive species, and the monetary harm to HRI of between $16,000 and possibly more than $100,000, the Court finds that they tip in favor of Plaintiffs.

## D. Public Interest

Defendants argue that for the same reasons Plaintiffs do not show irreparable harm, they do not show this factor. Because the Court has found irreparable harm, this argument is rejected. Defendants also argue that because the underlying statutes support both "conservation" and "grazing" and other uses, Plaintiffs fail to show this factor. Because the statutes support both uses, this argument is without merit. Additionally, because NEPA's purpose has not been met, considering statutory goals and purposes tips slightly in favor of Plaintiffs.

When determining the public interest, a court "primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 947 (9th Cir. 2002). When the alleged action by the government violates federal law, the public interest factor weighs in favor of the plaintiff. *See Valle del Sol*, 732 F.3d at 1029; *see also Inland Empire-Immigrant Youth Collective v. Nielsen*, 2018 WL 1061408, at *21 (C.D. Cal. Feb. 26, 2018) ("In addition, the Court again notes the public interest that exists in ensuring that the government complies with its obligations under the law and follows its own procedures." (quotation marks omitted)); *Coyotl v. Kelly*, 261 F. Supp. 3d 1328, 1344 (N.D. Ga. 2017) ("[T]he public has an interest in government agencies being required to comply with their own written guidelines instead of engaging in arbitrary decision making."). This factor thus weighs in favor of Plaintiffs.

### E. Conclusion

All four *Winter* factors weigh in favor of Plaintiffs. They have met their burden to demonstrate a need for temporary injunctive relief.

### F. Bond

Rule 65 of the Federal Rules of Civil Procedure directs that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Federal courts, however, have discretion as to the amount of security and may even dispense with the security requirement altogether. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("'Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*.'" (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003))); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("'The district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review.'" (quoting *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985))). The Court has considered the relative hardships and the likelihood of success on the merits and concludes that to require any security in this case would be unjust. Thus, the Court waives the requirement of a bond.

## TEMPORARY RESTRAINING ORDER

**IT IS ORDERED** that Plaintiffs' Motion for Temporary Restraining Order is **GRANTED**, and until this Court orders otherwise and except as otherwise expressly permitted by this Temporary Restraining Order, from June 4, 2019, at 3:10 p.m. and for the next 28 days, or until such time as the parties agree in writing to amend, supersede, or terminate this TRO:

1.      Defendants are enjoined from allowing turnout and grazing of livestock by Hammond Ranches, Inc. on the Mud Creek allotment or on the Hardie Summer allotment.

2.      The Court will hold a hearing on Plaintiffs' motion for preliminary injunction on June 28, 2019, at 10:00 a.m. in Courtroom 15B of the Mark O. Hatfield United States Courthouse in Portland, Oregon.

## CONCLUSION

Plaintiffs' motion for a temporary restraining order (ECF 7) is granted.

**IT IS SO ORDERED**.

DATED this 5th day of June, 2019.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge