**T. Beau Ellis**, OSB #093437
beau.ellis@vf-law.com
**Matthew A. Martin**, OSB #126314
matt.martin@vf-law.com
**VIAL FOTHERINGHAM LLP**
17355 SW Boones Ferry Road, Suite A
Lake Oswego, OR 97035
T: (503) 684-4111
F: (503) 598-7758
*Attorneys for Amicus Curiae*
*Oregon Farm Bureau Federation*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| **WESTERN WATERSHEDS PROJECT**, **CENTER FOR BIOLOGICAL DIVERSTY**, and **WILDEARTH GUARDIANS**, | Case No.: 2:19-cv-00750-SI |
| | BRIEF OF AMICUS CURIAE OREGON FARM BUREAU FEDERATION |
| Plaintiffs, | |
| v. | |
| **DAVID BERNHARDT**, Secretary of the Interior, **JEFFREY A. ROSE**, District Manager Burns District Bureau of Land Management, and **BUREAU OF LAND MANAGEMENT**, | |
| Defendants. | |

**VIAL FOTHERINGHAM LLP**
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823-003

TABLE OF CONTENTS

TABLE OF CONTENTS

TABLE OF AUTHORITIES

INTEREST OF AMICUS CURIAE ........................................................................1

INTRODUCTION ..................................................................................................1

LEGAL STANDARD .............................................................................................1

ARGUMENT ........................................................................................................3

I.     Plaintiffs are not entitled to a preliminary injunction because they cannot demonstrate they will suffer irreparable harm before a decision on the merits is reached.......................................................3

       A.     Plaintiffs' alleged harms are neither irreparable nor certain...4

1.     Plaintiffs' claimed procedural harms cannot establish irreparable injury sufficient to warrant a preliminary injunction............................................6

2.     Plaintiffs' alleged environmental and aesthetic harms are of insufficient magnitude, not irreparable, and lack certainty.......................................12

   a.   The magnitude of Plaintiffs' claimed injuries is significantly below the warrant of a preliminary injunction....................................................14

   b.   Plaintiffs' own experts demonstrate that Plaintiffs' alleged injuries are not irreparable.............................................................................18

   c.   Plaintiffs' alleged injuries are speculative—there is no certainty that they will occur before the Court can issue a decision on the merits.................20

II.    Plaintiffs are not entitled to a preliminary injunction because they cannot demonstrate a likelihood of success on the merits................21

       A.     The Hammond permit renewal fell within a categorical exclusion................................................................................23

       B.     No extraordinary circumstances precluded issuing the permits under a CX................................................................................27

CONCLUSION..................................................................................................31

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Am. Wild Horse Campaign v. Zinke*, 353 F. Supp. 3d 971 (D. Nev. 2018) ................. 35

*Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531 (1987) ............................ 8, 12, 22

*Anderson v. United States*, 612 F.2d 1112 (9th Cir. 1979) ............................................. 15

*Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988)............... 15, 20

*Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799 (10th Cir. 1991)................ 31

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971)................... 34, 35

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ......................................................... 14, 21

*Clune v. Publishers' Ass'n of New York City*, 214 F. Supp. 520 (S.D.N.Y. 1963)....... 15

*Com. of Mass. v. Watt*, 716 F.2d 946 (1st Cir. 1983)..................................................... 10, 11

*Conservation Cong. v. Finley*, 774 F.3d 611 (9th Cir. 2014) ........................................... 31

*Conservation Law Found., Inc. v. Busey*, 79 F.3d 1250 (1st Cir.1996)........................ 13

*Consol. Canal Co. v. Mesa Canal Co.*, 177 U.S. 296 (1900) ....................................... 14, 21

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015)........ 8

*Defs. of Wildlife v. Salazar*, 812 F. Supp. 2d 1205 (D. Mont. 2009) ............................. 20

*EarthLink, Inc. v. FCC*, 462 F.3d 1 (D.C. Cir. 2006) ....................................................... 33

*Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466 (9th Cir. 1984) ................... 15

*Heideman v. S. Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003) .................................... 25

*Idaho Rivers United v. United States Army Corps of Engineers*, 156 F. Supp. 3d 1252 (W.D. Wash. 2015)......................................................................................... 20, 21

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970 (9th Cir. 1991) .................... 2

*Marbled Murrelet v. Babbitt*, 83 F.3d 1060 (9th Cir. 1996) .......................................... 19

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ........................................... 9

**VIAL FOTHERINGHAM LLP**
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823-003

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. 3:01-CV-0640-SI, 2017 WL 1829588 (D. Or. Apr. 3, 2017) ..................................................................................... 19

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508 (9th Cir. 1994) ................... 5

*Nevada v. United States*, 364 F. Supp. 3d 1146 (D. Nev. 2019) ......................... 9, 13, 20

*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Engineers*, 817 F. Supp. 2d 1290 (D. Or. 2011) ......................................................................................................................... 16

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ........................... 10

*Salt Lake Tribune Publ'g Co. v. AT & T Corp.*, 320 F.3d 1081 (10th Cir. 2003).. 15, 21

*Sampson v. Murray*, 415 U.S. 61 (1974) ................................................................... 5, 15

*Save Our Ecosystems v. Clark*, 747 F.2d 1240 (9th Cir. 1984) ..................................... 8

*Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281 (9th Cir. 2013) ................... 2, 3

*Short v. Brown*, 893 F.3d 671 (9th Cir. 2018) .............................................................. 2

*Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir. 1989)............................... 7, 9, 10, 11, 12, 13

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ............................................................ 29

*State of Connecticut v. Com. of Mass.*, 282 U.S. 660 (1931) ...................................... 15

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978) ..................................................... 5

*The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008).................................. 16, 33

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985) ....................................................... 9

*Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969 (2d Cir.1989) .................. 24

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981) .......................................................... 3

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982)................................................... 4

*Wildearth Guardians v. U.S. Forest Serv.*, 668 F. Supp. 2d 1314 (D.N.M. 2009) ...... 28

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)............. 1, 2, 4, 5, 7, 9, 13, 14, 18

**VIAL FOTHERINGHAM LLP**
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

**<u>Statutes</u> & <u>Regulations</u>**

40 C.F.R. § 1508 ..................................................................................................... 27

43 C.F.R. § 46.215 .............................................................................................. 32, 33

43 C.F.R. 46.205 ................................................................................................... 27

43 U.S.C. § 1752 ......................................................................................... 27, 28, 31

Carl Levin and Howard P. 'Buck' McKeon National Defense Authorization Act for
    Fiscal Year 2015, Pub. L. No. 113-291, § 3023, 128 Stat. 3292, 3762 ................... 28

Consolidated Appropriation Act, 2005, Public L. No. 108-447, § 339, 118 Stat. 2909,
    3103 ..................................................................................................................... 28

Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, § 421, 121 Stat. 1844,
    2149 ..................................................................................................................... 28

**<u>Other</u> <u>Authorities</u>**

Bryan A. Garner, The Law of Judicial Precedent 92 ...................................... 14

**VIAL FOTHERINGHAM LLP**
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR 97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

## INTEREST OF AMICUS CURIAE

The Oregon Farm Bureau Federation ("OFB") respectfully submits these legal arguments as amicus curiae. OFB is a statewide non-profit organization representing the interests of farmers and ranchers throughout Oregon for more than 75 years. With over 6,700 member-family farmers and -ranchers, OFB is Oregon's largest general farm organization. OFB's primary goal is to promote educational improvement, economic opportunity, and social advancement for its members and the farming, ranching, and natural resources industry as a whole.

## INTRODUCTION

OFB offers this brief in opposition to Plaintiffs' request for a preliminary injunction. OFB and its members would be harmed through the precedent of such an injunction, where the record insufficiently demonstrates any irreparable harm; there's an effort to bootstrap the alleged procedural violations to insignificant purported environmental harm as the basis for the requested injunction; and the Interior Secretary's authority to issue grazing permits under a categorical exclusion to a full NEPA analysis is challenged. In these circumstances, the Court should decline Plaintiffs' invitation to dramatically expand their "right" to such an injunction in contravention of firmly established precedent.

## LEGAL STANDARD

A preliminary injunction "[i]s an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Under *Winter*, parties seeking a

**VIAL FOTHERINGHAM LLP**
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

preliminary injunction must establish: "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (citing *Winter*, 555 U.S. at 20). Where the requesting party cannot demonstrate a likelihood of success, a court may still grant a preliminary injunction where there are "'serious questions going to the merits'—a lesser showing than likelihood of success on the merits— . . . the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)) (emphasis in original). Any resulting injunction "must be tailored to remedy the specific harm alleged." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).

Findings of fact and conclusions of law made in ruling on a temporary restraining order generally are not binding at later stages of the case. *See Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 631 n.5 (9th Cir. 2016) ("[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR 97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

ARGUMENT

I.    **Plaintiffs are not entitled to a preliminary injunction because they cannot demonstrate they will suffer irreparable harm before a decision on the merits is reached.**

OFB's members farm and ranch throughout Oregon, and many members graze under federal permits.  OFB is concerned about the precedent that would be set by entering a preliminary injunction without a showing of true irreparable harm.  OFB has seen an increase in challenges to grazing authorizations over the past several years.  A preliminary injunction in these cases can cause a complete loss of a rancher's livelihood, particularly when they cannot find other lands to support their operation on short notice.  The consequences of a preliminary injunction on a rancher and their community can be extreme, and it should only be granted where the plaintiff has made a true showing of irreparable harm.  The harm alleged by Plaintiffs in this case does not rise to this level, and OFB's membership is concerned about the precedent that would be set by this decision.

While Plaintiffs have not demonstrated that they are likely to succeed on the merits, Plaintiffs' prospect for success on the merits is ultimately immaterial as they cannot demonstrate that the remaining *Winter* factors mandate entry of a preliminary injunction. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."). The injuries that Plaintiffs seek to avoid through the Court's equitable powers are of insufficient magnitude and imminence to warrant a preliminary injunction, and the public interest is served best by

**VIAL FOTHERINGHAM LLP**
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

deference to Congressional preferences for continued use of the land for grazing, and maintaining predictability for grazing permit holders and applicants. The circumstances present here do not justify withdrawing the Hammond allotments from productive use during the pendency of this litigation.

### A.    Plaintiffs' alleged harms are neither irreparable nor certain.

The second *Winter* factor requires plaintiffs to demonstrate they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. There must be "a definitive threat of future harm . . . , not mere speculation." *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994).[1] Any evaluation of this factor must be preceded by a specific demarcation of the claimed harm—what irreversible injury "is likely in the absence of an injunction"? *Winter*, 555 U.S. at 22; *see also id.* ("[A]pplicant must demonstrate that in the absence of a preliminary injunction, 'the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered[.]'" (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1, p. 139 (2d ed. 1995)); *Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("[T]he basis of injunctive relief in the federal courts has always been irreparable harm[.]"); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any

---

[1] *Burlington Northern* concerned the Endangered Species Act; however, such a requirement would apply with even greater force to a claim brought under NEPA. *Compare Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978) ("The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost."), *with Winter*, 555 U.S. at 23 (describing NEPA's purpose as ensuring informed decision-making).

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

irreparable harm is therefore grounds for refusing to issue a preliminary injunction[.]").

Plaintiffs claim they will suffer an irreparable procedural injury without the requested preliminary injunction. Pls.' TRO Reply at 22–25. They also assert three broad categories of more speculative injuries: (1) harm to the greater sage-grouse; (2) harm to the redband trout; and (3) harm to "Plaintiffs' ability to enjoy the area in its undisturbed state." Pls.' PI Mot. at 31.

A procedural injury, alone, cannot create an irreparable harm such that Plaintiffs are entitled to a preliminary injunction, and Plaintiffs' other purported harms—at least those that would accrue through the Court's decision on the merits—are too speculative, too general, and too *de minimis* for the extraordinary relief sought. All the alleged harms lack a crucial, necessary link to Plaintiffs' underlying procedural claims. Indeed, Plaintiffs and their experts blend the circumstances of this case—the grazing of approximately 1500 AUMs on four relatively small allotments—with the case they want to bring—an attack on all permitted grazing with the purported potential to impact sage-grouse or redband trout. *See, e.g.*, First Kauffman Decl. ¶ 23 (The relevant species "would be best served by eliminating grazing in these allotments."). With proper focus given to the discrete harms likely attributable to a denial of a preliminary injunction, Plaintiffs cannot demonstrate any threatened irreparable harm.

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

1.    *Plaintiffs' claimed procedural harms cannot establish irreparable injury sufficient to warrant a preliminary injunction.*

Plaintiffs argue that Defendants' alleged failure to comply with NEPA—a procedural violation—is sufficient to establish an irreparable injury. They claim that Defendants' flawed decision-making process "result[ed] in uninformed agency action [that] also causes irreparable harm[.]" Pls.' PI Br. (see ECF No. 7 at 31); Pls.' TRO Reply at 23. Plaintiffs' argument as to the sufficiency of a procedural injury is premised on a First Circuit case, *Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir. 1989). But subsequent Supreme Court precedent calls *Marsh* into question and the Ninth Circuit has explicitly held that a procedural injury is an insufficient basis to find irreparable harm. Plaintiffs' claimed procedural violation, without substantially more, cannot satisfy their burden to establish irreparable harm.

*Winter* is incompatible with the concept that a pure procedural harm can satisfy a plaintiff's required showing for a preliminary injunction. Under *Winter*, NEPA's function is the provision of information, allowing the agency to consider, but ultimately disregard, evidence of a resulting environmental harm. *See Winter*, 555 U.S. at 23. The Court does not discuss a resulting risk to the environment; indeed, such a concern—and the concept of an independent procedurally-based irreparable harm—is inconsistent with the Court's decision to allow the challenged practice to proceed despite the government's own evidence of environmental harm. *See id.* at 19–20, 23 (vacating an injunction despite evidence of significant harm to marine mammals because the government took a "hard look" and the practice has a 40-year history). Moreover, under an analogous statutory scheme, the Supreme

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

Court more explicitly reversed a prior Ninth Circuit decision that had held

"[i]rreparable damage is presumed when an agency fails to evaluate thoroughly the

environmental impact of a proposed action[,]" *Save Our Ecosystems v. Clark*, 747

F.2d 1240, 1250 (9th Cir. 1984). *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S.

531, 545 (1987) ("This presumption is contrary to traditional equitable principles

and has no basis in ANILCA.").

The Ninth Circuit has recognized, in post-*Winter* decisions, that a pure

procedural harm cannot satisfy the irreparable harm standard for a preliminary

injunction to issue. *See Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d

1075, 1088–89 (9th Cir. 2015) (considering whether recent Supreme Court decisions

effectively overruled prior cases that presumed irreparable harm after a finding of a

procedural violation—a failure to observe the consultative requirements of the

Endangered Species Act ("ESA")). The court explained:

> [E]ven though *Winter* and *Monsanto*[2] address NEPA, not the
> ESA, they nonetheless undermine the theoretical foundation for
> our prior rulings on injunctive relief in *Thomas*[3] and its
> progeny. Indeed, *Thomas*'s reasoning explicitly relied on the
> presumption of irreparable injury that we had previously
> recognized in the NEPA context.

*Id.* at 1090. Thus, Plaintiffs' cannot show irreparable harm on the basis of a NEPA

violation alone. *See Nevada v. United States*, 364 F. Supp. 3d 1146, 1153–54 (D.

Nev. 2019) (rejecting *Marsh* in concluding "procedural harm, standing alone, cannot

---

2 *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).

3 *Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985).

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

support the necessary finding of a likelihood of irreparable harm"). In light of

*Winter* and *Cottonwood*, Plaintiffs' reliance on *Marsh* for the proposition that a pure

procedural violation may rise to the level of an irreparable harm is misplaced.

In both *Marsh* and *Winter*, the courts discussed the purpose behind NEPA

and how that affected an evaluation of irreparable harm, reaching incongruent

conclusions. *Compare Marsh*, 872 F.2d at 500–01 (describing that purpose as to

minimize "the added risk to the environment" from uninformed decisionmakers),

*with Winter*, 555 U.S. at 23 ("Part of the harm NEPA attempts to prevent . . . is

that, without one, there may be little if any information about prospective

environmental harms and potential mitigating measures."), *and Robertson v.*

*Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("NEPA itself does not

mandate particular results[.]"). *Marsh* must yield to *Winter*.

Moreover, even if the Supreme Court has not implicitly overruled *Marsh*, its

holding does not help Plaintiffs in this matter. *Marsh* relied heavily on a prior First

Circuit decision, *Com. of Mass. v. Watt*, 716 F.2d 946 (1st Cir. 1983). *See Marsh*, 872

F.2d at 499–501. In *Watt*, the court justified describing a NEPA procedural harm as

irreparable by focusing on the potential difficulty of altering a "previously chosen

course of action[.]" *Watt*, 716 F.2d at 952; *see also Marsh*, 872 F.2d at 500–01

("[B]ureaucratic decisionmakers (when the law permits) are less likely to tear down

a nearly completed project than a barely started project."). *Watt* and *Marsh* cannot

be divorced from their facts, which justified the circuit court's fear of an unwavering

decision-maker in a way the circumstances here cannot. Both cases involved agency

**VIAL FOTHERINGHAM LLP**
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

approvals of massive industrial projects requiring substantial private investment and attendant reliance interests. *See Marsh*, 872 F.2d at 498 (enjoining "efforts to build a new six-berth marine dry cargo terminal[, which] . . . . would not only require Maine to dredge the channel, clear the island and build a causeway connecting the island to the mainland (for a highway and a railroad spur), but it would also lead to considerable secondary development on the island"); *Watt*, 716 F.2d at 947–98 (enjoining the auction of oil drilling rights for 488 tracts impounding approximately 55.7 million barrels of oil). The challenged decision here is staggeringly modest in comparison, concerning four grazing allotments for approximately 1500 AUMs. Moreover, the permanence of industrial development, construction undertakings, and the resulting reluctance to tear them down after an unfavorable merits decision produces an irreparable injury unlike anything that could result from *cyclical* grazing permits. *Compare Marsh*, 872 F.2d at 504 ("[R]esidents, workers, businesses, as well as government agencies, may, for example, all become ever more attached to the causeway and to the island development[.]"). Whether grazing occurs this year has no bearing on whether it occurs the following year. Cattle are not fixed to the land; they can be moved, as they are at the end of each grazing season, if the Court ultimately resolves the merits in Plaintiffs' favor. Further, grazing has occurred on this property for generations, and allowing it to continue in the short-term will not result in harm to the environment in a similar matter to a large, permanent development. Without any credible threat of economic waste or upset reliance interests, the procedural

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

harm holdings of *Watt* and *Marsh* are inapplicable. *See* Bryan A. Garner, The Law of Judicial Precedent 92 ("For one decision to be precedent for another, the facts of the two cases need not be identical. But they must be *substantially similar, without material difference*.") (emphasis added).

At any rate, in *Marsh*, the court viewed the harm arising from an alleged NEPA violation in terms of risk to the environment rather than as some abstract harm to procedure. *See Marsh*, 872 F.2d at 500 ("the added risk to the environment . . . when governmental decisionmakers make up their minds without [a NEPA analysis]"). But the irreparable quality of the harm, the court held, resulted from a fear that decisionmakers would become entrenched in their position regardless of any future NEPA analysis. *See id.* at 501 ("the potentially irreparable nature of this decisionmaking risk"). In light of subsequent Supreme Court cases, *Marsh*'s holding should be limited to circumstances where a concrete risk to the environment occurs alongside a procedural harm, allowing that latter injury to act as additional evidence of irreparable harm.[4] *See, e.g.*, *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987) ("If such [environmental] injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."); *Marsh* 872 F.2d at 501 ("[T]he district court should take account of the potentially irreparable nature of this decisionmaking risk to the

---

[4] The Court recognized as much in ruling on Plaintiffs' request for a temporary restraining order, requiring a showing of "likely environmental harm" in addition to a NEPA violation. (*See* ECF No. 37 at 29.)

PAGE 10 – BRIEF OF AMICUS CURIAE OREGON FARM BUREAU FEDERATION

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR 97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

environment[.]"). The First Circuit has recognized as much, holding *Marsh* does "not mean that a likely NEPA violation automatically calls for an injunction; the balance of harms may point the other way." *Conservation Law Found., Inc. v. Busey*, 79 F.3d 1250, 1272 (1st Cir.1996) (internal quotation marks omitted).

In this context, BLM has a long history of managing grazing on public land and on the Hammond allotment in particular. *See Winter*, 555 U.S. at 23 (rejecting substantial evidence of irreparable harm because the Navy was "not conducting a new type of activity with completely unknown effects on the environment"). Unlike the circumstances in *Marsh*, BLM's extensive history, experience, and technical knowledge of the interplay between grazing and any potential environmental impact make a NEPA analysis significantly less impactful. Thus, the fears embodied by the *Marsh* decision are not present here. *See Nevada*, 364 F. Supp. 3d at 1152 ("The government is seeking to transport and stage plutonium as it has done for decades. Given these considerations, it is unlikely that a failure to [comply with NEPA] will cause irreparable harm to the general NEPA decision-making process absent this Court issuing an injunction here."). Plaintiffs' argument that a pure procedural harm is sufficient for an injunction is contrary to both *Winter* and *Cottonwood* and would require a rote application of *Marsh* to dissimilar circumstances.

Plaintiffs claim of procedural harm cannot support their request for a preliminary injunction.

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

2. *Plaintiffs' alleged environmental and aesthetic harms are of insufficient magnitude, not irreparable, and lack certainty.*

Separately, Plaintiffs claim two categories of non-procedural harms in an effort to boot-strap these harms to the alleged NEPA violation as the basis for their requested preliminary injunction: (1) environmental risks (i.e. injuries to sage-grouse and redband trout), and (2) aesthetic risks (i.e. injuries to Plaintiffs' ability to utilize and enjoy the environment). Pls.' PI Mot. at 31.

Plaintiffs must make a "clear showing" that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. To satisfy this standard, Plaintiffs alleged harms must be tested:

(1)    Are they of sufficient magnitude or severity?[5]

(2)    Are they irreparable?[6]

---

[5] *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("[I]rreparable injury [requires] . . . a "likelihood of *substantial and immediate irreparable injury*.") (emphasis added); *Consol. Canal Co. v. Mesa Canal Co.*, 177 U.S. 296, 302 (1900) (An "injunction will not issue . . . to restrain an act the injurious consequences of which are merely trifling."); *Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1979) ("[M]andatory injunctions, however, are not granted unless extreme or very serious damage will result and are not issued in doubtful cases[.]" (quoting *Clune v. Publishers' Ass'n of New York City*, 214 F. Supp. 520, 531 (S.D.N.Y. 1963), *aff'd* 314 F.2d 343 (2d Cir. 1963)).

[6] *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."); *Salt Lake Tribune Publ'g Co. v. AT & T Corp.*, 320 F.3d 1081, 1105 (10th Cir. 2003) ("Irreparable harm, as the name suggests, is harm that cannot be undone, such as by an award of compensatory damages or otherwise.").

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

(3)     Are they certain to occur before the Court reaches a decision on the

merits in the absence of a preliminary injunction?[7]

Here, Plaintiffs' claimed harm are none of these things.

Defendants, in their response brief, persuasively argue that Plaintiffs' claims

of harm, particularly those reliant on the testimony of expert witnesses, are

scientifically infirm. Defs.' PI Resp. at 16–20; *see also Nw. Envtl. Def. Ctr. v. U.S.*

*Army Corps of Engineers*, 817 F. Supp. 2d 1290, 1315 (D. Or. 2011) ("[A] court must

defer to 'the reasonable opinions of [the agency's] own qualified experts even if, as

an original matter, a court might find contrary views more persuasive.'" (quoting

*The Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008)). While OFB

concurs in Defendants' evaluation and weighing of the parties' various experts, the

Court need not do the same. Even accepting the veracity of Plaintiffs' expert

testimony, which OFB does for the purposes of its argument below, they cannot

establish irreparable harm sufficient to justify an injunction.

---

[7] *See Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984) ("Speculative injury does not constitute irreparable injury."); *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("[A] plaintiff must demonstrate *immediate threatened injury* as a prerequisite to preliminary injunctive relief.") (emphasis added); *State of Connecticut v. Com. of Mass.*, 282 U.S. 660, 674 (1931) ("Injunction issues to prevent existing or presently threatened injuries. One will not be granted against something merely feared as liable to occur at some indefinite time in the future.").

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

a.    *The magnitude of Plaintiffs' claimed injuries is significantly below the warrant of a preliminary injunction.*

Without an injunction, Plaintiffs allege that grazing on the Hammond allotments will negatively disrupt the reproductive capacity of sage-grouse within those allotments, setting back the ecological recovery that has occurred during the grazing hiatus. *See* Pls.' PI Br. at 31. They make similar allegations as to the redband trout. *See id.* Plaintiffs' experts opine that a resumption of grazing will fragment the local sage-grouse habitats, which increases the risk of "localized extirpation and of being listed as endangered." *Id.* For sage-grouse, Plaintiffs feared injury can be generalized as: (1) grazing causes some decrease in suitable habitats through the reduction in grass height and introduction of invasive grass species, *see* First Braun Decl. (ECF No. 8) ¶¶ 16–18; and (2) a decrease in suitable habitats results in some reduced probability of reproduction, some increase in chick mortality, and some potential for habitat fragmentation, *id.* at ¶¶ 19–20, 22–25. Plaintiffs' feared injury to the redband trout can be similarly generalized. *See* First Kauffman Decl. (ECF No. 9) ¶¶ 6–7 (cattle cause some degradation in riparian habitat through a variety of mechanisms); *id.* at ¶¶ 7, 22 (riparian habitat degradation leads to some increase in stream temperature and some decrease in water quality); *id.* at ¶¶ 13, 22 (these changes cause some increase in redband trout mortality). In each instance, the purported harm is several steps removed from grazing activity, and grazing is not alleged to be the direct cause of decreased viability of sage-grouse reproduction. While this does not entirely eliminate the purported harm, it limits its magnitude.

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

Plaintiffs experts—likely for good reason—do not offer a quantitative assessment of the absolute magnitude of the alleged harm from allowing grazing on the Hammond allotments, *cf.* Herman Decl. (ECF no. 10) ¶ 15 ("It is clear that the link between population declines and grazing has not been adequately studied[.]"); however, those numbers can be inferred. Plaintiff Western Watersheds Project produced a map of occupied and pending leks in and around the Hammond allotments. *See generally* First Braun Decl., Exs. 3, 4. This map shows an area of southeastern Oregon that is approximately 5,125 square miles; the Hammond allotments are approximately 39.1 square miles, *see* Pls.' PI Mot., Ex. 2 at 1 (39,070 acres). As the parties have discussed, there is one lek within the Hammond allotments and two others within two to three miles. But there are approximately 150 leks displayed on the map. *See* Frist Braun Decl., Exs. 3, 4. Even assuming for the sake of argument that those three leks are completely abandoned, which goes much further than Plaintiffs' experts, *see id.* at ¶¶ 25–26 (discussing lek connectively generally), the magnitude of the purported harm (expressed as the number of chicks who would have been born and survived adolescence, but for grazing) is unlikely to be noteworthy. As an upper bound, as again Plaintiffs' experts only discuss possibilities, the sage-grouse population would be expected to lose no more than 2% of its potential reproductive capacity (abandonment of 3 leks out of approximately 150 currently occupied). While OFB believes Plaintiffs have not demonstrated this is even a remote possibility, the greatest potential impact the Plaintiffs can allege is still insignificant.

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

In *Winter*, the Supreme Court declined to find irreparable injury where "[e]ven under the Navy's own figures, . . . the [challenged action] would cause 564 physical injuries to marine mammals, as well as 170,000 disturbances to marine mammals' behavior." *Winter*, 555 U.S. at 19–20, 23–24. Plaintiffs have not alleged a quantitative injury, but any reasonable interpretation of their experts' written testimony can only support harms several orders of magnitude less than those found deficient in *Winter*. "This is . . . a case where the court is considering the loss of only a small number of animals within the listed species," so an injunction is not warranted. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. 3:01-CV-0640-SI, 2017 WL 1829588, at *6 (D. Or. Apr. 3, 2017), *recon. den.*, 2017 WL 10965951 (D. Or. Nov. 21, 2017), *and aff'd in part, appeal dismissed in part*, 886 F.3d 803 (9th Cir. 2018).

Even if this case were brought under the ESA, which carries a lessor burden for issuance of an injunction, Plaintiffs alleged injury is still insufficient to warrant an injunction. Under the ESA, "habitat modification" must "*significantly impair*[] the breeding and sheltering of a protected species" to cause sufficient harm warranting an injunction. *See Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1067 (9th Cir. 1996), *as amended on denial of reh'g* (June 26, 1996) (emphasis added). Likewise, even where species "are listed as threatened or endangered under the ESA[,] courts require a showing that the identified harm to the species is significant vis-a-vis the overall population, and not just that individual animals are likely to be injured." *Idaho Rivers United v. United States Army Corps of Engineers*, 156 F.

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

Supp. 3d 1252, 1262 (W.D. Wash. 2015) (internal quotation marks omitted) (collecting cases). Again, even under the worst case posited by Plaintiffs' experts,[8] the only threat is to three out of 150 leks; there is thus no probability that the species will be "significantly impaired" by permitting grazing on the Hammond allotments.  *See, e.g.*, *Defs. of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1210 (D. Mont. 2009) (declining to enjoin a hunting season that would result in a loss of "20% of the wolf population").

Plaintiffs alleged aesthetic harms are similarly deficient. Looking only at the approximately 5,125 square miles surrounding the Hammond allotments, Plaintiffs would be denied the opportunity to a small fraction of it (approximately 0.76%). *See* First Braun Decl., Ex. 2. Indeed, much of the Hammond allotments are privately owned, so Plaintiffs would be unable to enjoy that land in any event. The best Plaintiffs can achieve in this case is a limited suspension of grazing on 39.1 square miles of land resulting, per their own experts, in an alleged modest uptick in the numbers of sage-grouse and redband trout. In other words, Plaintiffs' alleged injuries are the lost opportunity to view a very specific piece of land without cattle

---

[8] Plaintiffs' experts baldly assert that allowing grazing could "possibly contribute to localized extirpation or the need for [ESA] listing." *E.g.*, First Braun Decl. ¶ 14. While such an injury would be of sufficient magnitude, Plaintiffs make no effort to establish such an outcome as even remotely certain in the period before the Court renders a decision on the merits. *See Nevada*, 364 F. Supp. 3d at 1151 ("Allegations of irreparable harm must be supported with actual evidence, and not merely conclusory statements or unsupported allegations." (citing *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674–75 (9th Cir. 1988)). Given the ongoing recovery effort in sage-grouse and redband trout in Harney County, this result is not likely to occur.

PAGE 17 – BRIEF OF AMICUS CURIAE OREGON FARM BUREAU FEDERATION

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

and to view those particular animals that would have been born but-for grazing.

Such an injury is "merely trifling" and cannot support injunction relief. *See Consol.*

*Canal*, 177 U.S. at 302; *Idaho Rivers*, 156 F. Supp. 3d at 1264 (declining to find

irreparable injury where the plaintiff "has a relationship with the . . . species as a

whole, and not with individual animals").

Because Plaintiffs' alleged injuries, even accepting their experts' testimony *in*

*toto*, are not "substantial," Plaintiffs cannot show irreparable harm sufficient to

justify injunctive relief. *Lyons*, 461 U.S. at 111.

> b.   *Plaintiffs' own experts demonstrate that Plaintiffs' alleged*
> *injuries are not irreparable.*

It is axiomatic that a preliminary injunction will not issue unless the harm

demonstrated is irreparable. "Irreparable harm, as the name suggests, is harm that

cannot be undone, such as by an award of compensatory damages or otherwise."

*Salt Lake Tribune*, 320 F.3d at 1105.  Environmental harms, because they are

"often permanent or at least of long duration," are sometimes—but not always—

considered *a priori* irreparable. *See Amoco*, 480 U.S. at 545. Such an assumption is

not warranted in this case, particularly given the weakness of the written testimony

proffered by Plaintiffs' experts.

Portions of the Hammond allotments have gone un-grazed for between five

and ten years. Plaintiffs experts unanimously praise this regenerative period. *See,*

*e.g.*, First Braun Decl. ¶ 36 ("Gains to sage-grouse habitat improvements associated

with 5 years' rest . . ."); First Kauffman Decl. ¶ 8 ("[T]hese streams exhibit a great

resilience following the cessation of livestock grazing."); *id.* at ¶ 22 (noting "positive

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

benefits of recovery" after five years). And Plaintiffs describe their potential injury as "occur[ing] from grazing areas . . . that have experienced five years of rest and recovery[.]" Pls.' PI Br. at 30. Based upon the statements of Plaintiffs' experts, allowing grazing during the pendency of this action cannot cause *irreparable* harm.

Because Plaintiffs seek a preliminary injunction, any alleged irreparable harm is temporally constrained to that which would occur between the filing of the complaint and a decision on the merits. Even making accommodation for the Court's crowded docket, this case will reach a merits decision in no more than two years. Plaintiffs and their experts, who speak in broad, generalized assertions, never address what irreparable injury would result if grazing occurred for up to two years.[9] Plaintiffs' expert would, were she testifying consistently with her declaration, have to answer, "Nothing" because there is "a lag time, of perhaps 2–10 years, in sage-grouse response to habitat changes." *See* First Braun Decl. ¶ 29.  At any rate, this land has been grazed for generations and Plaintiffs have not demonstrated that grazing for two seasons will significantly alter the landscape from how it has been managed for generations for purposes of sage-grouse recovery.

Plaintiffs' claims of an aesthetic injury are similarly deficient. To claim such injuries would lead to irreparable harm would divorce that term from its conceptual moorings. Yes, if cattle are allowed to graze on the Hammond allotments during the pendency of this case, Plaintiffs will be unable to enjoy viewing the land without

---

[9] Because the 2019 grazing season is almost over, this would likely be just a single additional season.

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

cattle. Similarly, if the grazing decreases the reproductive success of the sage-grouse or redband trout, Plaintiffs will be unable to enjoy those particular never-born animals—not sage-grouse in general or even the sage-grouse in the approximately 147 other unaffected leks in the approximately 5,125 miles surrounding the Hammond allotments, First Braun Decl., Ex. 2, but those specific 'lost opportunity' sage-grouse. To find irreparable injury here would be to throw open the doors of equity to any harm, no matter how minor the magnitude, that has a temporal component (deprivation of the opportunity to enjoy particular wilderness on a specific date) or can be described at a sufficiently granular level (deprivation of the opportunity to enjoy a yet-unborn sage-grouse).

Without any colorable claim of an *irreparable* harm, Plaintiffs are not entitled to a preliminary injunction.

> c. *Plaintiffs' alleged injuries are speculative—there is no certainty that they will occur before the Court can issue a decision on the merits.*

As discussed elsewhere, Plaintiffs' alleged harms to the sage-grouse and redband trout are too uncertain both in as an open-ended inevitability and, more correctly, limited to the period until a decision on the merits. A sufficient injury is one "that is neither remote nor speculative, but actual and imminent." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989).

Even accepting the testimony of Plaintiffs' experts, the lack of specificity is striking. *See, e.g.*, First Braun Decl. ¶ 14 ("[L]ivestock grazing . . . would . . . "*possibly* contribute to localized extirpations or the need for [ESA] listing.")

**VIAL FOTHERINGHAM LLP**
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR 97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

(emphasis added); *id.* at ¶ 15 (reporting habitat fragmentation could "*potentially*

result[] in the loss of populations"). Per Plaintiffs' experts, grazing will

"potentially/possibly" cause *some* decrease in grass height and *some* introduction of

invasive grasses, which will cause *some* decrease in suitable habitats, which will

cause *some* decrease in reproductive success and *some* increased chick mortality.

While this could lead to error propagation concerns, Plaintiffs' experts have offered

no qualitative assessment such as the probabilities of each successive chain. More

problematically, there is no limitation of these vague probabilities to the period-in-

question. Nonetheless, Plaintiffs' cognizable harm here is exponentially (cubic)

smaller than the probability of the only conceptually simple concept—grazing leads

to decreased grass height.

        Plaintiffs have not demonstrated actual irreparable harm. And even if the

Court accepts the written testimony of Plaintiffs' experts, Plaintiffs' still cannot

demonstrate "an injury [that is] certain, great, actual and not theoretical."

*Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). Because

Plaintiffs cannot demonstrate irreparable harm, their request for a preliminary

injunction should be denied regardless of the three other *Winter* factors.

## II.    Plaintiffs are not entitled to a preliminary injunction because they cannot demonstrate a likelihood of success on the merits.

        The use of a categorical exclusion ("CX") to authorize grazing on federal lands

is of critical importance to OFB and its members.  Due to funding constraints and

resource limitations, Congress has clearly stated its intent for continued grazing to

be authorized through use of a CX.  As such, use of a CX is the primary means

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

through which grazing permits are issued in Oregon.  OFB's members rely on the

use of the CX to continue their grazing authorizations.  The use of the CX is critical

to the continuation of grazing in Oregon, and is compatible with the current

Resource Management Plan and public lands management in the State.  Further,

any constraints on the use of a CX would have a detrimental effect on Oregon's

rural communities.  Livestock is the top agricultural commodity and primary

economic driver in many parts of rural Oregon, and many of these ranches rely on

federal grazing permits.  The use of the CX is the primary way this grazing is

authorized.  The correct interpretation of the CX is critical to OFB and its members.

     Plaintiffs challenge BLM's reliance on a CX to satisfy its obligations under

NEPA. *See* Compl. ¶¶ 92–100; Pls.' PI Br. at 25–29. They argue that the

circumstances present—a multi-year gap in grazing—were not amenable to CX.

Further, they argue that "extraordinary circumstances" prohibited use of a CX.

Because Plaintiffs' arguments regarding BLM's use of a CX are inconsistent with

Congress's express preference for minimizing unnecessary obstacles to grazing on

public lands and fails to accord the requisite deference to the underlying decision,

Plaintiffs will be unable to establish a likelihood of success on the merits of this

claim.

     An agency may avoid preparing an EIS/EA under NEPA if the proposed

agency action falls within a CX unless "extraordinary circumstances" provide

otherwise. 40 C.F.R. § 1508.4. A category of agency actions may be excluded where

they "do not individually or cumulatively have a significant effect on the human

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

environment and which have been found to have no such effect in procedures adopted by a Federal agency in [the] implementation of these regulations." 40 C.F.R. § 1508.4. Importantly, Congress may also "establish categorical exclusions by legislation, in which case the terms of the legislation determine how to apply those categorical exclusions." 43 C.F.R. 46.205(d). In this case, Congress has authorized the "issuance of a grazing permit" under a CX. 43 U.S.C. § 1752(h).

## A.    The Hammond permit renewal fell within a categorical exclusion.

The issuance of a grazing permit is subject to a CX where, in relevant part: "the issued permit or lease continues the current grazing management of the allotment[.]" 43 U.S.C. § 1752(h)(1).[10]  To understand the meaning of this statutory requirement, one must first recognize that Congress did not adopt it in a vacuum. While 43 U.S.C. § 1752(h) was codified as such in 2014, its codification followed numerous similar statutes prior to its adoption. Federal law first conditioned the categorical exclusion of grazing permits on the continuation of "current grazing management" in a rider to a 2004 appropriations bill, which applied to grazing permits authorized during fiscal years 2005–2007. Consolidated Appropriation Act, 2005, Public L. No. 108-447, § 339, 118 Stat. 2909, 3103. In 2007, Congress extended this legislation to apply during fiscal year 2008. *See* Consolidated

---

[10] The statute also requires, in relevant part, that the Secretary "has assessed and evaluated the grazing allotment associated with the lease or permit" and "has determined that the allotment . . . is not meeting land health standards due to factors other than existing livestock grazing." 43 U.S.C. § 1752(h)(1). Plaintiffs do not challenge the agency action on these grounds. *See* Pls.' PI Br. at 25.

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

Appropriations Act, 2008, Pub. L. No. 110-161, § 421, 121 Stat. 1844, 2149. As

stated, the language was permanently codified in 2014 with the adoption of 43

U.S.C. § 1752(h). *See* Carl Levin and Howard P. 'Buck' McKeon National Defense

Authorization Act for Fiscal Year 2015, Pub. L. No. 113-291, § 3023, 128 Stat. 3292,

3762.

    In categorically excluding grazing permits from NEPA, Congress was

motivated by an "extreme[] concern[] with the lack of progress the [government]

ha[d] made in completing the environmental review of grazing allotments" and

found that a "more prudent course [was] to make the environmental review process

more efficient by reducing the amount of documentation and expense required to

conduct [them] . . . where the level of complexity of environmental issues is

negligible." *Wildearth Guardians v. U.S. Forest Serv.*, 668 F. Supp. 2d 1314, 1323

(D.N.M. 2009) (citations and internal quotations omitted).

    In *Wildearth Guardians*, the agency renewed grazing permits on various

allotments, but instead of authorizing grazing for six months out of the year, as

with the prior permits, the new permits authorized yearlong grazing. *See id.*

at 1328. The renewed permits also omitted a pasture rotation requirement and

authorized cow and calf pairs to graze instead of yearlings. *See id.* In deciding

whether this satisfied the current grazing management standard, the court cited a

guidance letter issued by the agency (Forest Service) in 2005, shortly after the first

appropriations rider was adopted. *See id.* at 1327. The letter defined current

grazing management as "the current management actions being implemented over

**VIAL FOTHERINGHAM LLP**
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

the last three to five years. It incorporates the timing, intensity, frequency, and duration of grazing that has been implemented through existing allotment management plans and/or annual operating instructions *and should reflect adaptive management flexibility* that has been responsive to needed adjustments in permitted actions . . . . For an allotment where an allotment management plan is not currently in place, *implementation or modification of minor management practices . . . may be categorically excluded . . . .*" *Id.* (emphasis added). While recognizing that the guidance letter was not binding, the court concluded that it was entitled to *Skidmore* deference, found it "persuasive," and held that the new permits, while allowing for more intensive grazing than their predecessors, continued current grazing management and were therefore properly categorically excluded. *See id.* at 1328, 1333 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Plaintiffs' argue for a very literal construction of the requirement that the permit "continues the current grazing management of the allotment." Because of the multi-year gap in actual grazing, Plaintiffs contend that the standard cannot be met. But as *Wildearth Guardians* illustrates, the "current grazing management" standard is a flexible one. It considers management action over multiple years prior to the permit request. *See id.* at 1327. Moreover, Plaintiffs' construction is inconsistent with agency use of the term in practice; current grazing management looks to the history of *grazing* not a short-term absence of grazing. *See, e.g.*, Defs.' PI Resp., Ex. 3 at 5 ("Do Grazing Management Practice . . .? Yes. The season,

**VIAL FOTHERINGHAM LLP**
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

timing, frequency, duration, and intensity of [grazing] . . . are tailored to site specific conditions.")

BLM's determination that it could review the Hammond grazing permits under a CX comports with this understanding of the current grazing management standard and is therefore entitled to similar deference. In *Wildearth Guardians*, the court deferred to an agency determination that permit modifications authorizing significantly more grazing than was previously allowed qualified as "minor" and, therefore, that the new permits "continue[d] current grazing management." Here, the court should similarly defer to BLM's determination that, notwithstanding the fact that the Hammond grazing allotments had gone unused for a period, the new permits did in fact "continue[] current grazing management." These allotments have been managed for grazing for decades, and a short period of non-grazing does not undo years of grazing management. The authorization continued the current management of the allotment, which has been ongoing for decades.

Further weighing in favor of this deference is that the BLM's decision is consistent with the legislative history of the 2004 appropriations rider and, by extension, 43 U.S.C. § 1752(h). Specifically, categorical exclusion of grazing permits was intended to make the "environmental review process more efficient by reducing the amount of documentation and expense . . . for allotments *where the level of complexity of environmental issues is negligible.*" *See id.* at 1323 (discussing Congressional intent) (emphasis added). While there is no question that Plaintiffs contend the *impacts* of the Hammond grazing permits on the environment are

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

significant, they have not argued that the environmental *issues* themselves are
"complex." In this respect, what Plaintiffs are truly asking is that the court either
reweigh the evidence or substitute its judgment for that of BLM—something which
it cannot do. *See Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th
Cir. 1991) (so stating); *accord Conservation Cong. v. Finley*, 774 F.3d 611, 617 (9th
Cir. 2014) ("[W]hen reviewing scientific judgments and technical analyses within
the agency's expertise, the reviewing court must be at its most deferential."
(internal quotation marks omitted)). Plaintiffs, thus, cannot show that they are
likely to succeed on the merits with respect to the current grazing management
requirement.

### B.    No extraordinary circumstances precluded issuing the permits under a CX.

Plaintiffs also argue that BLM applied the CX despite the presence of
extraordinary circumstances. In particular, Plaintiffs claim that two extraordinary
circumstances should have applied to the permit renewal because it would:

(1)    "[h]ave significant impacts on . . . other ecologically significant or
critical areas"; or

(2)    "[c]ontribute to the introduction, continued existence, or spread of
noxious weeds or non-native invasive species[.]"

43 C.F.R. § 46.215(b), (*l*).

Plaintiff characterizes BLM's extraordinary circumstances analysis as "a
three-page list of signature lines for resource specialists to sign off on brief
statements explaining why each extraordinary circumstance did not exist." Pls.' PI

**VIAL FOTHERINGHAM LLP**
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

Mot. at 27. The first notable—and only accurate—thing about this characterization is that it acknowledges that the analysis does, in fact, *explain* why extraordinary circumstances did not exist. More specifically, Plaintiffs argue that the analysis arbitrarily and capriciously (1) concluded that livestock is not the causal factor of the allotments' fire history and invasive weeds and (2) inappropriately relied on BLM's 2018 land health assessment, which Plaintiffs assert was inaccurate.

As to the relationship between grazing and fire, the record contains no evidence correlating the two; indeed, the inverse relationship exists in BLM's analysis because grazing reduces the fuel load available to permit fire in the first instance. This is yet another instance where Plaintiffs ask the Court to impermissibly substitute its judgment for that of the agency. *See Lands Council,* 537 F.3d at 993. (Courts "are to conduct a 'particularly deferential review' of an 'agency's predictive judgments about areas that are within the agency's field of discretion and expertise ... as long as they are reasonable.'" (quoting *EarthLink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006)). While Plaintiffs focus on the relationship between grazing and fire or weed problems *in general*, the extraordinary circumstances inquiry is more focused than that. Under BLM's regulations, extraordinary circumstances exist "for *individual actions* within categorical exclusions" that may have significant impacts. *See* 43 C.F.R. § 46.215. Thus, the question is not whether grazing causes fires generally, but whether granting the grazing permit at issue in this case, in particular, may increase fire risk. Plaintiffs have not presented evidence to that effect, and it should be noted that, if Plaintiffs'

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823-003

bare assertion that *all* grazing is related to fires were enough to trigger an extraordinary circumstance, grazing permits could never be issued under a CX in areas subject to Standard 5.

With respect to noxious weeds, BLM's analysis is more detailed than Plaintiffs admit. By dismissing the analysis on this point as a "two-line discussion," Plaintiffs conveniently avoid having to acknowledge that it specifically states that "[t]he weeds are currently not present in sufficient quantity to be considered a significant impact." If that were not enough, the analysis adds that "[t]reatments are ongoing." Plaintiffs have provided no evidence that these calculations or efforts are inaccurate or insufficient to prevent significant impact. Plaintiffs desire for the agency to weigh the evidence differently does not demonstrate the agency erred or show a likelihood of success on the merits.

Finally, Plaintiffs provide no support for their argument that BLM's reliance on the 2018 assessment was inappropriate because it is impossible to assess the effects of grazing on an allotment five years after grazing has ceased. Grazing has occurred on these parcels, with occasional gaps, for many years, giving BLM the technical experience necessary to make such determinations. Moreover, BLM specifically identifies the 2015 GSG-ARMPA as applicable to the renewed grazing permit, and it states that the latter is consistent with the former because it is specifically provided for in the underlying RMPs. *See* Defs.' PI Resp., Ex. 4 at 1–2. Furthermore, as Plaintiffs acknowledge, BLM's extraordinary circumstances analysis recognizes that "[a] portion of the allotment falls within Priority Areas for

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

Conservation for Greater sage-grouse." BLM was necessarily aware of the limitations contained in the GSG-ARMPA, and in weighing them against the expectations of the RMPs, determined that renewing the grazing permit was most in conformance with both. Plaintiffs may disagree with how BLM weighed that evidence, but that falls within BLM's prerogative. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (The Court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."); *Am. Wild Horse Campaign v. Zinke*, 353 F. Supp. 3d 971, 985 (D. Nev. 2018) ("[C]ourts are not permitted to reweigh the evidence and substitute their judgment for that of the agency.") (citing *Overton Park*, 401 U.S. at 416).

For the foregoing reasons, Plaintiffs have failed to show that BLM's issuance of the Hammond grazing permits was arbitrary or capricious. Thus, they are unable to show a likelihood of success on the merits of their second claim.

///

///

///

///

///

///

///

///

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003

CONCLUSION

Amicus Curiae Oregon Farm Bureau Federation respectfully requests that the Court deny Plaintiffs' motion for a preliminary injunction (ECF No. 7).

CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains 7,927 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

Respectfully Submitted,

Dated this 14th day of June, 2019.    VIAL FOTHERINGHAM LLP

/s/ T. Beau Ellis
T. Beau Ellis, OSB #093437
Matthew A. Martin, OSB #126314
17355 SW Boones Ferry Road, Suite A
Lake Oswego, OR 97035
T: (503) 684- 4111
F: (503) 598-7758
E: beau.ellis@vf-law.com
*Attorneys for Amicus Curiae*
*Oregon Farm Bureau Federation*

PAGE 31 – BRIEF OF AMICUS CURIAE OREGON FARM BUREAU
FEDERATION

VIAL FOTHERINGHAM LLP
17355 SW Boones Ferry Rd., Suite A
Lake Oswego, OR  97035
Phone: 503-684-4111
Fax: 503-598-7798
P15823–003