**Dominic M. Carollo,** OSB No. 093057                     Hon. Michael H. Simon
Email: dcarollo@yockimlaw.com
Yockim Carollo LLP
630 SE Jackson Street, Suite 1
P.O. Box 2456
Roseburg, Oregon 97470
Phone: (541) 957-5900
Fax: (541) 957-5923

Of Attorneys for Harney County

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **WESTERN WATERSHEDS PROJECT, CENTER FOR BIOLOGICAL DIVERSITY,** and **WILDEARTH GUARDIANS,**<br><br>                 Plaintiffs,<br><br>  v.<br><br>**DAVID BERNHARDT**, Secretary of the Interior, **JEFFREY ROSE**, District Manager Burns District Bureau of Land Management, and **BUREAU OF LAND MANAGEMENT**,<br><br>                 Defendants. | Case No. 2:19-cv-0750-SI<br><br>*AMICUS CURIAE* BRIEF OF HARNEY COUNTY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

*AMICUS CURIAE* BRIEF OF HARNEY COUNTY

I.    INTRODUCTION

Plaintiffs seek to enjoin Hammond Ranches, Inc. ("HRI") from grazing on BLM grazing allotments located in the Cooperative Management and Protection Area ("CMPA") designated

under the Steens Act.[1] The motion should be denied because enjoining grazing would exacerbate the risk of catastrophic wildfire, negatively impact the County's agriculturally-based economy, and run contrary to overarching purposes Congress emphasized in the Steens Act. *See* Declaration of Harney County Commissioner Mark Owens ("Owens Decl."), submitted herewith, at ¶¶ 4-5, 8-10. Further, an injunction would exacerbate tensions in the local community relating to federal land management policy by vindicating extreme ideologies precipitated by the Hammond family situation. *Id.* at ¶ 11. The County is trying to move on from those controversies, fueled by extreme ideologies on both ends of the spectrum (the Bundys and plaintiffs). *Id.* An injunction will only reopen old wounds. *Id.* Whereas, denying the injunction would allow the local community to continue to heal. *Id.*

Moreover, all of these impacts would disproportionately affect the County and the local community compared to plaintiffs, whose allegations of injuries are primarily founded on their interest in merely *visiting* the County. *Cf.* Plfs. Mot. (Dkt. No. 7) at 32 ("Steven Herman and Andy Kerr have been *visiting* Steens Mountain and the Hammond allotments since the 1970s") (emphasis added). The local community has to *live* with the consequences of an injunction as part of their everyday lives. An injunction won't merely affect local Harney County's citizen's enjoyment of a vacation or sight-seeing trip; rather, what is at stake is the quality of their life, the social fabric of their communities, and their ability to earn a livelihood. *See generally* Owens Decl.; *see also* Declaration of Fred I. Otley (Dkt. No. 43) ("Otley Decl.") and Declaration of Ruth E. Danielson (Dkt. No. 44) ("Danielson Decl."). These considerations weigh heavily in favor of <u>denying</u> the injunction.

---

[1] The Steens Mountain Cooperative Management and Protection Act of 2000 ("Steens Act"), Pub. L. No. 106-399, 16 U.S.C. § 460nnn to 460nnn-122.

Page **2** of **10** – *AMICUS CURIAE* BRIEF OF HARNEY COUNTY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

For all of these reasons, Harney County respectfully requests that the Court deny plaintiffs' pending motion for a preliminary injunction.

## II. THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH IN FAVOR OF DENYING THE INJUNCTION

### A. The Court Must Consider the Impacts of an Injunction on the Local Community.

In discussing the balance of harms and public interest factors, plaintiffs primarily focus on cases that predate the Ninth Circuit's decision in *The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) (en banc) and the Supreme Court's decision in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). *See* Plfs. Mot. (Dkt. No. 7) at 33-35. Curiously, plaintiffs cite the Ninth Circuit's vacated decision in *Lands Council v. McNair*, 494 F.3d 771, 780 (9th Cir. 2007) for the proposition that "the public interest in preserving nature and avoiding irreparable injury outweighs economic concerns." Plfs. Mot. at 35. Yet, in vacating that very decision, an *en banc* panel of the Ninth Circuit recognized that considerations of the "risk of catastrophic fire, insect infestation, and disease, and … the public's interest in aiding the struggling local economy and preventing job loss" were prime considerations under the balance of harms and public interest prongs of the preliminary injunction test. *The Lands Council v. McNair*, 537 F.3d at 1005 (citation omitted); *id.* ("[t]hough preserving environmental resources is certainly in the public's interest, the Project benefits the public's interest in a variety of other ways.").

Moreover, since *Lands Council*, the Ninth Circuit has reaffirmed that the balance of harms and public interest does not always favor an injunction when alleged environmental injury is at issue. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) ("the district court did not clearly err in finding that the economic stakes, in combination with the safety concerns and reforestation efforts, outweighed any harm to environmental interests. *Economic harm may indeed be a factor in considering the balance of equitable interests*.) (emphasis added); *see also*

Page **3** of **10** – *AMICUS CURIAE* **BRIEF OF HARNEY COUNTY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

*Greater Hells Canyon Council v. Stein,* No. 2:17-CV-00843-SU, 2018 WL 7254696, at *5 (D. Or. Dec. 18, 2018) (same). Indeed, the Ninth Circuit has emphasized "[w]e will not grant a preliminary injunction … unless those public interests [in environmental injury] *outweigh* other public interests that cut in favor of not issuing the injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) (emphasis added). Thus, in sum, this Court must weigh the competing harms and public interests put forward by the County and other local constituents such as Mr. Otley and Ms. Danielson, in deciding whether to issue an injunction. Harney County respectfully submits that due consideration of the interests of the local community that would be most affected by an injunction should compel the Court to deny plaintiffs' motion.

As demonstrated in the declarations of Commissioner Owens, Mr. Otley, and Ms. Danielson, harms to the local community due to an injunction far outweigh the alleged harms to plaintiffs in the absence of an injunction, an injunction would be contrary to the purposes of the Steens Act, and an injunction would be contrary to the public interests represented by the local Harney County community. However, as a backdrop for the Court's consideration of these interests, it is important for the Court to understand the overarching purposes of the Steens Act and, in particular, its creation of the CMPA (the *Cooperative* Management and Protection Area).

### B. The Steens Act Disfavors Litigation-Driven Federal Land Management.

In the Steens Act, Congress established a new way of doing business in the realm of federal land management. Prior to the Act's conceptualization, in 1998, former Secretary of Interior Bruce Babbitt "suggested to [President] Bill Clinton that he use the Antiquities Act to establish a Steens Mountain National Monument." *Owyhee Canyonlands: There's no better time*

*to protect an Oregon gem*, The Oregonian (November 24, 2010)

http://www.oregonlive.com/opinion/index.ssf/2010/11/owyhee_canyonlands_theres_no_b.html

(last accessed June 14, 2019). In Secretary Babbitt's own words, the Steens Act reflects a locally-created, locally-negotiated alternative to a National Monument designation:

> As word spread of a possible designation, we opted instead to let Oregonians develop a plan, rather than imposing protection through a national monument from Washington D.C. Working with local elected officials and a broad range of stakeholders, **an Oregon solution** was formulated.
>
> After much consultation and back-and-forth discussion with local stakeholders, what emerged was congressional legislation that protected more than a half-million acres of public land. **Because it was a local solution, the result was a bipartisan bill sponsored by the entire Oregon congressional delegation that passed without controversy**.

*Id.* (emphasis added).

The reason the Steens Act's "Oregon solution" gained local support is because it emphasized the promotion and protection of the cultural, economic, and social health of the Steens Mountain area in Harney County, Oregon *through cooperative management*. The express purposes of the Act include:

> (b) PURPOSES.—The purposes of this Act are the following:
>
> (1) To maintain the cultural, economic, ecological, and social health of the Steens Mountain area in Harney County, Oregon.
>
> […]
>
> (5) To provide for and expand <u>cooperative</u> management activities between public and private landowners in the vicinity of the Wilderness Area and surrounding lands.
>
> […]
>
> (9) To establish a citizens' management advisory council for the <u>Cooperative</u> Management and Protection Area.
>
> (10) To maintain and enhance <u>cooperative</u> and innovative management practices

> between the public and private land managers in the Cooperative Management and Protection Area.
>
> (11) To promote viable and sustainable grazing and recreation operations on private and public lands.
>
> […]
>
> (13) To authorize only such uses on Federal lands in the **_Cooperative_** Management and Protection Area that are consistent with the purposes of this Act.

Pub. L. No. 106–399 (106th Congress), 114 Stat. 1655 (Short Title and Purposes) (emphasis added).

In short, the hallmark of the "Oregon solution" is the concept of "cooperative management" with a focus on outcomes that would be positive for the local Harney County community. *See also* 16 U.S.C. § 460nnn-12(b)(1) ("to maintain and enhance *cooperative* and innovative management projects, programs and agreements between tribal, public, and private interests in the Cooperative Management and Protection Area"); 16 U.S.C. § 460nnn-12(b)(5) ("to promote and foster *cooperation*, communication, and understanding and to *reduce conflict* between Steens Mountain users and interests") (emphasis added). Rather than impose a large, restrictive National Monument, Congress designated the virtually unique CMPA, which encompasses a mix of federal, state, and private land. Congress, and the stakeholders', intent with creating the CMPA was to move away from contentious, litigation-driven federal land management policy, to a cooperative approach.

Here, contrary to the Congressional policy of disfavoring litigation in the CMPA, plaintiffs have sought—at the last minute and after the grazing season commenced—an injunction prohibiting HRI from grazing on allotments within the CMPA. This litigation strategy is the antithesis of cooperative management. While, of course, the Steens Act does not immunize BLM from lawsuits alleging violations of the law, Congress's emphasis on

cooperative management provides the relevant prism through which the Court should analyze the propriety of an injunction in light of the competing harms and public interests at stake. In this case, the harms and public interests weighing against an injunction are serious and substantial.

### C. An Injunction Would Inflict Serious Harm on the Local Community and be Contrary to the Public Interest.

Enjoining HRI from grazing would exacerbate the risk of catastrophic wildfire, negatively impact the County's agriculturally-based economy and run contrary to overarching purposes Congress emphasized in the Steens Act. *See* Owens Decl. at ¶¶ 4-5, 8-10. Further, an injunction would exacerbate tensions in the local community relating to federal land management policy by vindicating extreme ideologies precipitated by the Hammond family situation. *Id.* at ¶ 11. These impacts on the local community should be given great weight because they will affect the quality of life and the very social fabric of the people that live in Harney County, *id.* at ¶ 10, unlike plaintiffs' declarants who are merely visitors. While Harney County appreciates seasonal tourists and visitors, and their contributions to the local economy, Owens Decl. at ¶ 3, people's everyday quality of life and ability to earn a living is more substantially and directly affected by the threat of catastrophic wildfire and a strong agricultural economy. *Id.* at ¶¶ 3, 5, 8-10. Accordingly, an injunction would be directly contrary to local public interests. *Id.* at ¶ 12.

As explained by Commissioner Owens, Harney County consists of approximately 10,226 square miles in Southeastern Oregon, with a total population of approximately 7,500. Owens Decl. at ¶ 2. Approximately 75% of the County's land base is publicly owned, of which the BLM manages the vast majority. The Cooperative Management and Protection Area (CMPA), designated by the Steens Act, alone comprises approximately 20 percent of the land base in

Harney County. The significance of the high proportion of federal land ownership to the County's economy and quality of life for local citizens cannot be overstated.

Put simply, agriculture is the backbone of Harney County's economy, with particular emphasis on livestock production. *Id.* at ¶ 3. Employment in Harney County is 49% public, 51% private and, of the private, 33% are directly involved in agriculture. *Id.* at ¶ 6. In 2017, there was a total of $82,296,000 worth of commodity sales in Harney County, of which $52,695,000, or 64%, were direct animal sales from the beef industry. *Id.* However, with so much of the county being federally-owned, agriculture in Harney County is inextricably "linked with federal land management decisions, and in particular those relating to livestock grazing." *Id.* at ¶ 4. Without consistent and reliable access to forage on BLM lands, Harney County's economy would suffer substantially. *See id.* at ¶¶ 3, 6.

Although this case only concerns HRI's grazing permit, citizens in Harney County "are tight-knit community that depend on one another. Every single landowner and citizen engaged in the agricultural sector represents an important and vital part of [the county's] economic and social fabric. This includes, but is not unique to, the Hammond family." *Id.* at ¶ 5. Thus, prohibiting HRI from grazing would have a direct negative impact on the Harney County agricultural economy, both this year and into the future. *Id.*

Further, the risk of catastrophic wildfire is a major factor in this case. Commissioner Owens has personally visited the HRI allotments and observed first hand the build up of fuels and the risk of wildfire that is of equal concern to Mr. Otley and Ms. Danielson. *Id.* at ¶¶ 7-8. As a person experienced in, and earns his living from, agriculture, Commissioner Owens observed a "time-sensitive and critical need to graze [the] allotments" in order to reduce the threat of catastrophic wildfire." *Id.* As Commissioner Owens explains, "[i]t is important to

understand that, while catastrophic wildfire has severe environmental impacts on land and wildlife, it also threatens human health and safety and has devastating impacts on our local economy and way of life." *Id.* at ¶ 9. In 2012, the Long Draw fire ripped through Harney County, Oregon's largest fire since becoming a state in 1865. *Id.* This fire, along with the Miller Homestead fire (which burned near Frenchglen), destroyed buildings, powerlines, livestock and pastures were all lost in the fire, and the County is still recovering from the lasting effects today. *Id.* As a result, one of the County's top priorities is advocating for active management of federal lands to mitigate the risks of having a repeat catastrophic event. *Id.* Livestock grazing is an absolutely essential component of any effective management plan. *Id.* An injunction in this case, prohibiting grazing on pastures that are at risk of wildfire, would substantially injure the County's interests in avoiding a repeat of the Long Draw and Miller Homestead disasters.

Finally, the social impact of an injunction cannot be overstated. The Bundy occupation in Harney County inflicted a considerable social cost to the local community and the people of Harney County want to move on from it. *Id.* at ¶ 11. The County and local community was exploited by, and suffers the social consequences of, special interests seeking to exploit the Hammond situation by bring attention to extreme ideologies (on both ends of the spectrum) regarding federal land management policy.[2] *Id.* Harney County, thus, respectfully submits that an injunction in this case is likely to reopen old wounds and exacerbate tensions in the local

---

[2] For instance, the primary objective of lead plaintiff Western Watersheds Project is to end public land grazing in the West based on ideology that, among other things, denigrates the importance of public land grazing for rural communities like Harney County. *See* https://www.westernwatersheds.org/public-lands-ranching/ (last accessed June 14, 2019). This ideology is incompatible with Congress's direction that the CMPA be managed *cooperatively* to "*promote* viable and sustainable grazing and recreation operations on private and public lands" and "*promote* grazing, recreation, historic, and other uses that are sustainable." Pub. L. No. 106–399 (106th Congress), 114 Stat. 1655; 16 U.S.C. § 460nnn-12 (emphasis added). Put another way, Plaintiffs' ideology is a non-starter, practically and legally, for both for the local community and under the Steens Act. Consequently, granting an injunction, which plaintiffs will use to promote their ideology, would be directly contrary to the local public interest and the Steens Act.

Page **9** of **10** – *AMICUS CURIAE* **BRIEF OF HARNEY COUNTY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

community. *Id.* Denying the injunction will allow the community to continue to heal and move on with the simple way of life, strong connection to the land, and environmental ethic which has preserved and protected Steens Mountains for more than a century—long before the Steens Act was ever contemplated.

### III.   CONCLUSION

Based on the foregoing, Harney County respectfully request that the Court deny plaintiffs' motion for a preliminary injunction.

Respectfully submitted this 25th day of June, 2019.

            **YOCKIM CAROLLO LLP**

            s/ Dominic M. Carollo
            **Dominic M. Carollo,** OSB No. 093057
            630 SE Jackson Street, Suite 1
            P.O. Box 2456
            Roseburg, Oregon 97470
            Phone: (541) 957-5900
            Fax: (541) 957-5923

            Of Attorneys for Harney County