**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC
4110 SE Hawthorne Blvd. # 168
Portland, OR 97214
(503) 388-9160
davebeckerlaw@gmail.com

**Talasi B. Brooks (*Pro hac vice*)**
Western Watersheds Project
PO Box 2863
Boise, ID 83701
(208) 336-9077
tbrooks@westernwatersheds.org

**Paul D. Ruprecht (OSB # 132762)**
Western Watersheds Project
PO Box 12356
Reno, NV 89510
(208) 421-4637
paul@westernwatersheds.org

Attorneys for Plaintiffs Western Watersheds Project, Center for Biological Diversity, and
WildEarth Guardians

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PENDLETON DIVISION

| | |
|---|---|
| **WESTERN WATERSHEDS PROJECT, CENTER FOR BIOLOGICAL DIVERSITY,** and **WILDEARTH GUARDIANS,** | Case No.: 2:19-cv-750-SI |
| Plaintiffs, | **REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| **DAVID BERNHARDT**, Secretary of the Interior, **JEFFREY A. ROSE,** District Manager, Burns District Bureau of Land Management, and **BUREAU OF LAND MANAGEMENT,** | **ORAL ARGUMENT REQUESTED** **EXPEDITED HEARING AND DECISION REQUESTED** |
| Defendants. | |

## **AMENDED MOTION**

Plaintiffs Western Watersheds Project, Center for Biological Diversity, and WildEarth Guardians (Plaintiffs), hereby amend their motion under Federal Rules of Civil Procedure 65(a) and 65(b) and LR 65, ECF No. 7, to request an Order preliminarily enjoining federal defendants from allowing grazing of livestock on the Mud Creek or Hardie Summer allotments until this Court has adjudicated the merits of Plaintiffs' pending claims and any supplemental claims challenging other grazing authorizations or NEPA analyses related to these allotments, when and if they are issued. Plaintiffs reserve their right to renew their request for injunctive relief prohibiting grazing on the Hammond and Hammond FFR allotments if a resolution of the claims on the merits does not occur before the scheduled start of grazing in April 2020.

This Amended Motion is supported by the Complaint in the matter, Plaintiffs' original Motion for Temporary Restraining Order and/or Preliminary Injunction, and all supporting briefing and exhibits, as well as the Third Declaration of Dr. Clait E. Braun, Second Declaration of Dr. Boone Kauffman, Declaration of Dr. Dale McCullough, and attached materials filed herewith.

# TABLE OF CONTENTS

AMENDED MOTION ................................................................................ i
TABLE OF CONTENTS .......................................................................... ii
TABLE OF AUTHORITIES ...................................................................... iv
GLOSSARY OF ACRONYMS ................................................................... vi

INTRODUCTION .................................................................................... 1

ADDITIONAL FACTUAL BACKGROUND ............................................... 3

   I.     THE HARDIE SUMMER ALLOTMENT .......................................... 3
   II.    THE MUD CREEK ALLOTMENT ................................................... 6
   III.   BLM GRAZING MANAGEMENT .................................................. 7

ARGUMENT ........................................................................................... 9

   I.     PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM
        ABSENT THE RELIEF THEY SEEK .......................................... 9

     A.   Plaintiffs Have Established Irreparable Harm to Their Interests in
        Viewing, Utilizing, and Experiencing the Allotments and the Sage-
        Grouse and Redband Trout They Support in Their Undisturbed
        State. ................................................................................... 10

        1.    *Resuming Grazing is Likely to Cause Irreparable Harm to Plaintiffs' Interests in*
        *These Allotments in Their Undisturbed Condition* ........................................ 11

        2.    *Resuming Grazing is Likely to Cause Irreparable Harm to Sage-Grouse and to*
        *Plaintiffs' Interests in Their Persistence and Recovery.* ................................. 13

        3.    *Resuming Grazing is Likely to Cause Irreparable Harm to Redband Trout and to*
        *Plaintiffs' Interests in Their Persistence and Recovery.* ................................. 15

     B.   The 2018 RHAs do not Defeat Plaintiffs' Showing of Irreparable
        Harms. .................................................................................. 17

        1.    *Neither RHA Addressed Impacts to Sage-grouse or Redband Trout From*
        *Livestock Grazing on the Mud Creek and Hardie Summer Allotments.* ................. 17

        2.    *The 2018 RHAs Show Both Allotments are Failing Standard 5.* ........................ 18

        3.    *The Hardie Summer RHAs are not Reliable Because They are not Based on*
        *Adequate Monitoring Data or Rely on Data Gathered Before the Grandad Fire* ........ 20

**C.   Plaintiffs' Irreparable Harm From Grazing Without Adequate NEPA Analysis.** ........................................................................20

**D.   Livestock Grazing on These Allotments is Not Likely to be Proper.** ....................23

**II.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS** ..........................24

**A.   The Secretary Never Found HRI had a Satisfactory Record of Performance.** ..............................................................................25

**B.   BLM and the Secretary Violated Their Obligations to Comply With NEPA and FLPMA in Renewing and Reissuing the Permit.** ...............................28

**1.   *Additional Legal Standards.*** ................................................... 28

**2.   *Defendants Violated NEPA by Electing to Fully Process the Permit Through a CX Rather Than an EA or EIS.*** ........................................ 29

**3.   *Defendants Violated FLMPA by Failing to Comply With the GSG-ARMPA.*** ..... 32

**III.   THE BALANCE OF HARMS WEIGHS IN FAVOR OF AN INJUNCTION** .......33

**IV.   AN INJUNCTION IS IN THE PUBLIC INTEREST** .................................36

**V.   THE COURT SHOULD WAIVE THE BOND REQUIREMENT** .........................37

**CONCLUSION** ...................................................................... 37

## TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. Christensen*, 663 Fed. App'x 515 (9th Cir. 2016) .......................... 10

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ............................... 10, 11, 33

*Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712 (9th Cir. 2003) ........................... 11

*Backcountry Against Dumps v. Abbott*, 491 F. App'x 789 (9th Cir. 2012) ................................ 28

*Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166 (9th Cir. 2002) .................................... 21

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015) .................... 21

*Defenders of Wildlife v. Bernal*, 204 F.3d 920 (9th Cir. 2000) ............................................... 11

*Gen. Motors Corp. v. United States*, 496 U.S. 530 (1990) ..................................................... 28

*Greater Hells Canyon Council v. Stein*,
     No. 2:17-cv-00843-SU, 2018 WL 7254696 (D. Or. Dec. 18, 2018) ................................... 10

*Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156 (D.D.C. 2002) ........................... 29

*Indigenous Envtl. Network v. U.S. Dep't of State*, 369 F. Supp. 3d 1045 (D. Mont. 2018) ........ 22

*Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549 (9th Cir. 2006) ............................... 32

*League of Wilderness Defenders/Blue Mountains Biodiversity Proj. v. Connaughton*,
     752 F.3d 755 (9th Cir. 2014) ........................................................................................ 36

*Marbled Murrelet v. Babbitt*, 83 F.3d 1060 (9th Cir. 1996) .................................................. 11

*Meister v. U.S. Dep't of Agric.*, 623 F.3d 363 (6th Cir. 2010) .............................................. 30

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ............................................... 21

*Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining*,
     No. CV 15-106-M-DWM, 2017 WL 5047901 (D. Mont. Nov. 3, 2017) ............................. 36

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
     463 U.S. 29 (1983) .............................................................................................. 25, 27

*Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058 (9th Cir. 2010) ............................. 28

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803 (9th Cir. 2018) .................. 10

*Natural Res. Def. Council v. Morton*, 388 F. Supp. 829 (D.D.C. 1974) .................................. 29

*Nev. v. United States*, 364 F. Supp. 3d 1146 (D. Nev. 2019) ................................................ 21

*Or. Nat. Desert Ass'n v. Kimbell*,
     No. CIV. 07-1871-SU, 2008 WL 4186913 (D. Or. Sept. 5, 2008) ................................. 16, 34

*Or. Natural Desert Ass'n v. Green*, 953 F. Supp. 1153 (D. Or. 1997) ................................... 16

*Or. Natural Desert Ass'n v. McDaniel*, 751 F. Supp. 2d 1145 (D. Or. 2010) .......................... 31

*Or. Natural Desert Ass'n v. Singleton*, 75 F. Supp. 2d 1139 (D. Or. 1999) ............................ 35

*Sierra Club v. EPA*, 762 F.3d 971 (9th Cir. 2014) .............................................................. 28

*Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir. 1989) ........................................................... 22

*United States v. Arpaio*, 887 F.3d 979 (9th Cir. 2018) ........................................................ 26

*W. Watersheds Proj. v. Bennett*, 392 F. Supp. 2d 1217 (D. Idaho 2005) ........................ 31, 34, 35

*W. Watersheds Proj. v. Zinke*, 347 F. Supp. 3d 554 (D. Idaho 2018) ................................ 30, 32

*WildEarth Guardians v. U.S. Forest Serv.*, 668 F. Supp. 2d 1314 (D.N.M. 2009) .................... 31

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ........................................................... 18

*Ziffrin, Inc. v. United States*, 318 U.S. 73 (1943) .......................................................... 28, 32

**Statutes**

43 U.S.C. § 1732(g) ........................................................................................................ 27

43 U.S.C. § 1752(c)(2) ......................................................................................... 29, 30, 31, 32

43 U.S.C. § 1752(h) ........................................................................................................ 30

## Regulations

40 C.F.R. § 1508.4 ........................................................................................................ 30

43 C.F.R. § 4.21(a)(3) ................................................................................................... 31

43 C.F.R. § 4.21(b)(4) ................................................................................................... 31

43 C.F.R. § 4.403 ........................................................................................................... 31

43 C.F.R. § 4.472(e) ...................................................................................................... 31

43 C.F.R. § 4.5(a) .......................................................................................................... 31

43 C.F.R. § 46.205 ........................................................................................................ 30

43 C.F.R. § 46.205(a) .................................................................................................... 31

43 C.F.R. § 46.205(c)(1) ............................................................................................... 30

43 C.F.R. § 46.215(b) ............................................................................................. 31, 32

43 C.F.R. § 46.215(*l*) ............................................................................................. 31, 32

43 C.F.R. § 4110.1 ........................................................................................................ 26

43 C.F.R. § 4110.1(b) ................................................................................................... 25

43 C.F.R. § 4110.1(b)(1) ............................................................................................... 25

43 C.F.R. § 4110.1-1(b)(2) ........................................................................................... 27

43 C.F.R. § 4140.1(b)(3) ............................................................................................... 27

43 C.F.R. § 4140.1(b)(4) ............................................................................................... 27

43 C.F.R. § 4160.1(a) ...................................................................................................... 7

## Other Authorities

U.S. Const. Art. IV § 3 .................................................................................................. 27

Council on Environmental Quality, Final Categorical Exclusion Guidance,
    75 Fed. Reg. 75628 (Dec. 6, 2010) ......................................................................... 30

BLM, IM 2018-023, "Incorporating Thresholds and Responses into Grazing Permits/Leases"
    (Dec. 27, 2017) ........................................................................................................ 33

## GLOSSARY OF ACRONYMS

APA             Administrative Procedure Act

ARMPA           Approved Resource Management Plan Amendment

AUM             Animal Unit Month

BLM             Bureau of Land Management

CMPA            Steens Mountain Cooperative Management and Protection Area

CX              Categorical Exclusion

EA              Environmental Assessment

EIS             Environmental Impact Statement

FLPMA           Federal Land Policy Management Act

FFR             Fenced Federal Range

FWS             U.S. Fish & Wildlife Service

GHMA            General Habitat Management Area

GSG-ARMPA       2015 Oregon Greater Sage-Grouse Approved RMP Amendment

HRI             Hammond Ranches, Inc.

IBLA            Department of the Interior Board of Land Appeals

RHA             Land Health Assessment

NEPA            National Environmental Policy Act

ODFW            Oregon Department of Fish & Wildlife

OFB             Oregon Farm Bureau Federation

OHA             Department of the Interior Office of Hearings and Appeals

OSU             Oregon State University

PHMA            Priority Habitat Management Area

PI              Preliminary Injunction

PFC             Proper Functioning Condition

RHA             Rangeland Health Assessments

RMP             Resource Management Plan

SFA             Sagebrush Focal Area

TRO             Temporary Restraining Order

WSA             Wilderness Study Area

## INTRODUCTION

In response to Plaintiffs' Motion for Preliminary Injunction, Defendants largely reiterate arguments that they already made—and this Court already rejected—in opposing Plaintiffs' request for a Temporary Restraining Order (TRO). These contentions amount to an assertion that the Court should allow grazing to continue on all allotments where it is permitted under the unlawfully-issued Hammond Ranches, Inc. (HRI) permit because it had already started on two allotments before Plaintiffs filed their Motion. But "grazing on all four allotments [is not] one single action." TRO Op. at 31 (ECF No. 37). Grazing has not begun on the Mud Creek or Hardie Summer allotments and should not be allowed to commence under the unlawful permit. Defendants' argument only reveals that they are deeply committed to allowing grazing despite the lack of analysis required by NEPA, underscoring the need for injunctive relief to prevent the bureaucratic steamroller effect the Court recognized in granting the TRO. *Id.* at 29–30.

While Plaintiffs' original Motion also requested that the Court enjoin HRI from grazing on the Hammond and Hammond FFR allotments, grazing has already occurred on those allotments in 2019 during the time of year when it would be most harmful to sage-grouse there and irreparable harm has already occurred. Grazing ceased on the Hammond FFR allotment on April 30, and is presently slated to cease on the Hammond allotment by July 2. Plaintiffs now seek an injunction only against grazing on the Hardie Summer and Mud Creek allotments until the Court has ruled on the merits.[1] *See* TRO Op. at 23–24, 29 n.12 (injunction is now sought only as to the allotments where harm has not yet occurred this year).

---

[1] Plaintiffs respectfully submit that, if the administrative record is lodged promptly, the merits can be briefed and argued by January or February 2020. If the merits of Plaintiffs' claims have not been resolved before grazing is set to resume in April 2020, Plaintiffs reserve the right to seek further injunctive relief to prevent turnout on the Hammond and Hammond FFR allotments.

Absent the requested relief, grazing the Hardie Summer and Mud Creek allotments will cause irreparable harm to Plaintiffs' interests.[2] Both allotments and the sage-grouse PHMA they contain are still recovering from the effects of the 2006 Grandad fire this Court found more likely than not was set by the HRI principals—and are thus especially vulnerable to harm from grazing. Grazing is likely to cause irreparable harm to Plaintiffs' interests in sage-grouse by mowing down grasses and forbs that sage-grouse depend upon for hiding cover and nutrition, by damaging riparian areas that are the birds' preferred summer habitat, and by impeding sagebrush reestablishment. Grazing also is likely to irreparably harm Plaintiffs' interests in sustaining the ecological recovery that has occurred during the rest from livestock grazing on the allotments since 2013. It will likely damage riparian areas and water quality, thereby harming redband trout, and further harming Plaintiffs' interests. Grazing will not reduce alleged wildfire risk from the buildup of "fuels" like cheatgrass—rather, it is likely that allowing grazing to resume would *increase* the risk of fire on these allotments.

Finally, it appears that BLM may already have allowed HRI at least 1,000 AUMs of unpermitted excess use on the Hammond allotment—more than the 997 AUMs that would remain ungrazed on these two allotments if the amended motion is granted—offsetting any economic harm to HRI from the amended injunction. To prevent irreparable harm to Plaintiffs' interests from further grazing, the Court should enjoin BLM from authorizing HRI to graze on the Mud Creek and Hardie Summer allotments until it has ruled on the merits.

---

[2] Although Defendants now appear to claim that the Mud Creek allotment will not be grazed this year, BLM could again change is mind in the absence of a Court Order and authorize grazing on that allotment. *See* Pls.' TRO Reply Br. at 4–5 (ECF No. 28) (describing changes to permitted use done informally); Defs.' PI Resp. (ECF No. 39) Ex. 4 at 1–2 (allowing use on Hammond and Hammond FFR allotments even though permitted use was exceeded); *infra* pp. 7–9.

## ADDITIONAL FACTUAL BACKGROUND

This Court made 35 findings of facts that are more likely than not true in its TRO Opinion based on the evidence before it. TRO Op. at 11–19. To the extent Defendants do not challenge those findings or repeat arguments from their TRO Response about facts that the Court already ruled more likely than not to be true, Plaintiffs rely on those factual findings to support their amended motion. This section summarizes key facts relevant to Plaintiffs' amended motion.

## I.    THE HARDIE SUMMER ALLOTMENT

The Hardie Summer allotment comprises 6,008 acres of public lands and 3,775 acres of private lands (9,783 acres total). Defs.' TRO Resp. (ECF No. 21) Ex. 1 at 6. Most of the allotment, much of which is classified as sage-grouse PHMA, burned in the 2006 Grandad fire, which HRI principals more likely than not set. Ex. 1 at 3 (map showing fire history);[3] Ex. 2 (map of Grandad fire perimeter); TRO Op. at 19. The allotment provides year-round habitat for sage-grouse, which are likely present throughout the allotment between July and September, in both PHMA and GHMA on the allotment. Ex. 1 at 1 (map showing PHMA and GHMA); Ex. 3 at 1 (map showing likely presence of sage-grouse in summer), 2 (map showing "good condition sagebrush" throughout the allotment);[4] Second Braun Decl. (ECF No. 29) Ex. 3 at 3. However, where the 2006 fire burned, it caused high mortality of sagebrush: BLM's Jamie McCormack

---

[3] Exhibit 1 is a slightly updated and clarified set of the maps that previously were attached to the two Braun Declarations, which Plaintiffs will also use as demonstratives at the hearing.

[4] Exhibit 3 is a set of maps generated from the Sage Grouse Data Viewer, a publicly available interactive map by Oregon State University (OSU). *Available at* https://tools.oregonexplorer.info/OE_HtmlViewer/index.html?viewer=sagegrouse (last accessed June 21, 2019). It includes a map produced by the OSU Institute for Natural Resources showing seasonal habitat for greater sage-grouse during summer months (July–September), with predictions based on sage-grouse presence data from telemetry studies and lek counts, topography, climate, soils, and vegetation characteristics.

states that it is likely to take at least 13 years—and possibly 50 to 100 years—for low sagebrush and Wyoming big sagebrush to reestablish. Second McCormack Decl. ¶ 10 (ECF No. 40). The unburned portion of the Hardie Summer allotment provides good quality summer brood-rearing habitat for sage-grouse, and its importance to the species is elevated by the fire damage in adjacent areas. Third Declaration of Clait E. Braun ¶¶ 30, 33–37 (filed herewith).

The allotment is entirely located within the Steens Mountain CMPA and contains about 9.4 miles of riparian habitat in five perennial and intermittent streams (Big Bridge Creek, Big and Little Fir Creeks, Lake Creek, and Fish Creek), of which 3.3 miles flow on public lands. Ex. 1 at 1; Second McCormack Decl. ¶ 4, Table 1. These streams are home to redband trout, a BLM Sensitive Species. Ex. 1 at 1; *see* Davies Decl. ¶ 9 (ECF No. 41).

In September 2007, BLM issued a Rangeland Health Assessment (RHA)[5] of the allotment and found that it was meeting all standards. However, no trend data for riparian areas was available, and the RHA noted that "[r]iparian monitoring has not been established in the Hardie Summer Allotment." Second Braun Decl. Ex. 2 at 1–2, 14. An assessment for Properly Functioning Condition (PFC) on the allotment had been done in 1999 and may have only assessed one stream: Little Fir Creek. Davies Decl. ¶ 13. BLM completed a second PFC assessment on Big Fir Creek on August 10, 2006—prior to the August 21–22, 2006 Grandad fire. *Id.* ¶ 14. Water quality information had not been collected from any of the streams—yet the 2007 RHA concluded that water quality standards were being achieved based on the PFC rating for the two streams. Second Braun Decl. Ex. 2 at 17–18. Based on data collected in June 2006 (prior to the Grandad fire), the 2007 RHA concluded that all standards, including Standards 3 and 5, were being met—even though over half of the allotment had burned the previous year and the

---

[5] The terms "Rangeland Health Assessment" and "Land Health Assessment" are interchangeable.

ecological status for upland vegetation condition had not been assessed since 1982. *Id*. at 17–19.

The next RHA, in 2018, determined that conditions had declined since 2007: Standard 5 was *not* being met in 2018. Second Braun Decl. Ex. 3 at 3. Although "sagebrush and riparian vegetation within the allotment offer suitable year-round conditions for sage-grouse habitat," the RHA ranked habitat as "marginal" because of juniper encroachment into sagebrush and riparian areas and because "[r]emaining sagebrush habitat is also at risk of fire due to infestations of invasive annual grasses." *Id*. Dr. Braun found that, actually, habitat conditions are very good in unburned areas. Third Braun Decl. ¶¶ 31, 33. The RHA claimed that grazing was not responsible for current habitat conditions, without recognizing the link between HRI's grazing and the 2006 fire. Second Braun Decl. Ex. 3 at 3. Neither the 2018 nor the 2007 RHA includes any assessment of sage-grouse status or trends on the allotment.

Neither the 2007 or 2018 RHA included any evaluation of redband trout habitat conditions or the status of redband trout in the streams on the allotment. *See* Second Braun Decl. Exs. 2, 3. This may be because PFC assessments are not intended to evaluate fish habitat conditions. The PFC Technical Reference attached to the Davies Declaration (Attachment 2) expressly provides that PFC analyses do not evaluate whether riparian areas contain good fish habitat. Davies Decl. Att. 2 at 8; Ex. 4 (excerpt of that page from the Technical Reference). The Technical Reference calls for identification of values that "include fish and wildlife habitat." *Id.* But then it explains that "[a] PFC assessment provides fundamental information regarding the physical function and condition of the riparian area; however, additional information is often needed to obtain a comprehensive assessment of riparian condition." *Id.* "Fish or wildlife habitat and water quality assessments are examples of additional resource assessments that may be needed to characterize overall riparian condition in preparation for subsequent activities." *Id.*

## II.       THE MUD CREEK ALLOTMENT

The Mud Creek allotment contains 8,245 acres of public land entirely within the Steens Mountain CMPA. Second Braun Decl. Ex. 1 at 1, 6. There is a sage-grouse lek on the allotment, but sage-grouse use of the area is likely transitory because of the degraded habitat condition. Ex. 1 at 1; Third Braun Decl ¶¶ 17–21. This allotment, and the lek, burned in the 2006 Grandad fire. *See* Ex. 2. The eastern part of the allotment contains "good condition sagebrush" and several areas where sage-grouse are likely or probably present during the summer. Ex. 3 at 1, 2; Third Braun Decl. ¶ 21. But the allotment is still recovering from the fire, which destroyed the sagebrush/shrub vegetation component and exacerbated cheatgrass infestations, causing damage that will likely take decades to recover. *See* Third Braun Decl. ¶¶ 20, 23; Second Braun Decl. ¶ 16. In 2019, only two birds were counted on Mud Creek (South Bridge Creek) lek, and the lek is likely to become inactive due to lack of usable sage-grouse habitat in the immediate vicinity. Second Braun Decl. ¶¶ 21–22. BLM's 2007 RHA—also based on June 2006 field surveys—on the Mud Creek allotment found it was failing Standard 3 and Standard 5 due to elimination of the sagebrush/shrub component by the 2006 Grandad fire. Second Braun Decl. Ex. 1 at 1, 18–20. Greater sage-grouse habitat was found to be in unsatisfactory condition. *See id.* at 8.

BLM's 2018 RHA on the Mud Creek allotment again found the allotment failing Standard 5 due to elimination of the shrub component by fire, but inexplicably found that Standard 3 was being met even though the shrub component was lacking. Defs.' TRO Resp. Ex. 2 at 3; TRO Op. at 27. The 2018 RHA for Mud Creek allotment also failed to acknowledge the link between the 2006 fire set by HRI's principals to increase forage for their livestock and poor sage-grouse habitat conditions. Defs.' TRO Resp. Ex. 2 at 3. Neither RHA for the Mud Creek allotment contained a detailed analysis of sage-grouse populations or status on the allotment.

### III.    BLM GRAZING MANAGEMENT

Dr. Kauffman states that, in his expert opinion, "[l]ivestock grazing is the principal cause of ecosystem degradation [on the allotments] and continued grazing will only exacerbate ecosystem degradation." Second Declaration of Dr. Boone Kauffman ¶ 6 (filed herewith). Nevertheless, BLM has repeatedly demonstrated that it will not, or cannot, require HRI to conform to grazing seasons, stocking numbers, or use limits set out in the 2019–2024 HRI grazing permit. Absent an injunction from this Court, there is thus nothing to prevent BLM from authorizing grazing on the Mud Creek and Hardie Summer allotments once the TRO expires.

The HRI grazing permit authorizes 68 cattle to graze 471 AUMs on the Hammond allotment between April 1 and October 30. Pls.' Mot. Ex. 3 at 1. However, this year, BLM allowed HRI to begin grazing on the Hammond allotment on March 25—six days before grazing was allowed to commence under the permit—and the agency's "calculation error" allowed 490 cattle to graze—seven times the number allowed by the permit. Defs.' TRO Resp. Ex. 3 at 1–2.

Even though HRI had exceeded its authorized AUMs by May 28, *id*. at 1, BLM has now allowed HRI's cattle to remain on the Hammond allotment until July 2nd "under these unique and exigent circumstances" simply because BLM claims that forage remains available. Defs.' PI Resp. (ECF No. 39) Ex. 4 at 1. Defendants suggest that such additional grazing may be justified by an Environmental Assessment BLM prepared for a proposal to authorize 1,000–1,500 temporary nonrenewable AUMs on the Hammond allotment. Defs.' PI Resp. at 11. However, no decision on the temporary nonrenewable AUMs has been issued yet.[6]

BLM also changed the "grazing strategy" on the Mud Creek and Hardie Summer

---

[6] When a proposed decision does issue, the regulations require that it be sent to Plaintiff Western Watersheds Project as an interested public. 43 C.F.R. § 4160.1(a) .

allotments to diverge from the permit—despite no evidence of any application for a variation from the permit, contrary to the permit's express terms, TRO Op. at 33. On Mud Creek allotment, BLM switched from the permitted 390 cattle from May 16 to June 30 for 590 AUMs to—apparently—769 cattle from June 8 to June 30 for the same 590 AUMs. Defs.' TRO Resp. Ex. 3 at 2. On the Hardie Summer allotment, BLM switched from the permitted 408 cattle from July 1 to September 30 for 407 AUMs to—apparently—493 cattle from July 1 to September 14 for the same 407 AUMs.[7] *Id.*; *see* Pls.' Mot. Ex. 3 at 3. In both instances, BLM *increased* the intensity of grazing by authorizing higher numbers of cattle for shorter periods of time, which intensifies impacts to any wildlife using the allotments at the time when cattle are present.

In a letter following the June 4th TRO, BLM allowed continued excess use of the Hammond allotment, but also alerted HRI that it would not be able to graze the Mud Creek allotment this year—although it could be allowed to trail livestock through that allotment. Defs.' PI Resp. Ex. 4 at 2. BLM made what appears to be yet another adjustment to the previously-adjusted Hardie Summer allotment authorization, stating now that the maximum number of cattle allowed on Hardie Summer would be the 408 cattle allowed in the permit, but it is unclear whether the period of use is the July 1–September 30 period allowed in the permit, or the July 1–September 14 period authorized by the BLM's May 28, 2019 letter.

Given these ever-changing variations of the permit terms, there appears to be nothing to prevent BLM from allowing grazing on the Mud Creek allotment despite the permitted period for that allotment (May 16 to June 30) being past. Presumably, Mud Creek allotment also contains

---

[7] These calculations account for the fact that Hardie Summer allotment is classified as "33% public land use," Pls.' Mot. Ex. 3 at 1. Thus under the permit, 408 cattle x 3 full months x 0.33 is approximately 407 AUMs—but under the revised grazing strategy that ends grazing on Hardie Summer on September 14, approximately 493 cattle x 2.5 months x 0.33 equals 407 AUMs.

"substantial available or unused forage"—the same justification BLM gave to allow grazing to continue on the Hammond allotment despite the permitted AUMs having been exceeded on that allotment by May 28. *See* Defs.' PI Resp. Ex. 4 at 1.

## ARGUMENT

### I.    PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM ABSENT THE RELIEF THEY SEEK

In Plaintiffs' Motion and in their TRO Reply Brief, they demonstrated three types of harm are likely from resuming grazing: harm to their interests in enjoying the area in its undisturbed state, harm to their interests in protecting sage-grouse and redband trout, and harm to their interests in federal action that is fully informed by consideration of environmental impacts. Defendants renew their attack on these harms by claiming that the 2007 and 2018 RHAs show the allotments are supposedly in good ecological condition and are not being negatively affected by livestock grazing. Defs.' PI Resp. at 16–17. They recycle arguments to discredit Plaintiffs' experts, *id*. at 18–20, that this Court already rejected. TRO Op. at 25 n.11. And finally, Defendants (and amicus Oregon Farm Bureau Federation (OFB)) claim that procedural injury standing alone cannot form the basis for irreparable harm post-*Winter*—even though such harm is accompanied by likely concrete environmental and aesthetic injuries. Defs.' PI Resp. 20–21. The Court rejected similar arguments in issuing the TRO and it should reject them equally now.

Defendants' insistence that the RHAs, in particular, refute irreparable harm is misplaced, and the experts for Plaintiffs and Defendants find themselves talking past one another. Defendants' experts focus on showing that the habitat conditions on the allotments are meeting the standards BLM sets for "rangeland," or where they are not, supposedly, grazing is not the cause. Plaintiffs' experts, by contrast, focus on the species concerned, and on the effects of adding additional stress from grazing to sage-grouse and redband trout, both Sensitive Species.

BLM's description of rangeland condition in the RHAs does not assess how rangeland and riparian areas serve as habitat for these imperiled species, or the status of the species on the allotments. In contrast, Plaintiffs' experts establish that the combined effects of fire and past management have resulted in severely degraded habitat conditions for sage-grouse in particular, and resumption of grazing could reverse riparian recovery, harming redband trout.

### A. Plaintiffs Have Established Irreparable Harm to Their Interests in Viewing, Utilizing, and Experiencing the Allotments and the Sage-Grouse and Redband Trout They Support in Their Undisturbed State.

"Plaintiffs seeking injunctive relief must show that they themselves are likely to suffer irreparable harm absent an injunction." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018). Environmental plaintiffs may show irreparable harm by showing harm to their interests in viewing, utilizing and experiencing an area where an action is slated to occur in its undisturbed state. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (upholding finding of irreparable harm where plaintiff asserted "that the Project will harm its members' ability to 'view, experience, and utilize' the areas in their undisturbed state").

Alternatively, plaintiffs may show their members use the project area for wildlife viewing or aesthetic purposes and the project will cause harm to habitat for a wildlife species. *All. for the Wild Rockies v. Christensen*, 663 Fed. App'x 515, 517 (9th Cir. 2016) (plaintiffs demonstrated irreparable harm by showing they "use the project areas for wildlife viewing, and the projects will clearly cause harm to significant portions of lynx habitat."); *see also Greater Hells Canyon Council v. Stein*, No. 2:17-cv-00843-SU, 2018 WL 7254696, at *4 (D. Or. Dec. 18, 2018) (irreparable harm would result where logging, although "modest," would harm Plaintiffs' recreational, aesthetic, spiritual, economic, and ecological use of the project area).

Plaintiffs alleging harms from projects on federal lands do not have to show the proposed

project will destroy all similar environments they could possibly enjoy—damage to the project

area inflicts irreparable harm. *Cottrell*, 632 F.3d at 1135 (finding logging that would prevent

Plaintiffs' use and enjoyment of 1,652 acres (or about 2.5 square miles) of forest was "hardly a

de minimus injury.").[8]

### 1. *Resuming Grazing is Likely to Cause Irreparable Harm to Plaintiffs' Interests in These Allotments in Their Undisturbed Condition.*

Plaintiffs have demonstrated that resuming grazing is likely to irreparably harm their

interests in enjoying the Mud Creek and Hardie Summer allotments in their undisturbed state, as

well as their interests in enjoying sage-grouse and redband trout and their habitats on the

allotments. The three Declarations of Plaintiffs' members assert that they use and enjoy the

allotments and the sagebrush and riparian habitat there, and will be injured if HRI resumes

grazing. George Wuerthner visits Steens Mountain annually. Wuerthner Decl. ¶ 13 (ECF No.

12). He visited the Hardie Summer allotment in 2016, while it was in the midst of the current

five years of rest, where he hiked along Big Fir Creek. *Id.* As an ecologist, he has a strong

interest in observing how ungrazed sites, which are "extremely rare in the West," function and

recover when livestock are removed, and he plans to revisit the allotments this fall to see how

recovery has progressed along Big Fir Creek. *Id.* ¶¶ 14, 24–25.

---

[8] Although "[i]n the absence of exceptional circumstances, which are not present here, [a court does] not address issues raised only in an amicus brief," *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 719 n.10 (9th Cir. 2003), there is no requirement of showing irreparable harm at the species level, despite OFB's suggestion to the contrary. OFB Br. at 16–17 (ECF No. 47-1). Irreparable harm can be based on likely injury to even a single member of a species, or to a single, localized area of habitat. *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000) (irreparable harm could be based on showing that a pygmy-owl occupied a construction site, and that construction on the site would result in harm to the pygmy-owl); *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1067–68 (9th Cir. 1996) (evidence of occupied nesting habitat and likely effect of proposed action on birds' behavioral patterns due to habitat modification sufficient to show likely harm, without showing direct effect on any specific bird).

Steven Herman has been observing sage-grouse and their habitat on Steens Mountain since the 1970s and has "longstanding scientific, recreational, and aesthetic interests in the birds and their habitat," which will be harmed by HRI's grazing. Herman Decl. ¶¶ 7, 10, 13, 17–21, 23 (ECF No. 10). Andy Kerr also has been recreating on the allotments and nearby public lands for decades, enjoys observing sage-grouse and their habitat, and advocated for their protection through the Steens Mountain CMPA—and plans to return there this September to observe and enjoy ungrazed conditions. Kerr Decl. ¶¶ 10–14, 18–21, 24–25, 30–35 (ECF No. 11).

Plaintiffs will not be able to enjoy these public lands in their undisturbed state if grazing resumes. Grazing will erase the ecological recovery that the allotments have experienced over the past five years. Kauffman Decl. ¶ 8 (ECF No. 9); Second Kauffman Decl. ¶¶ 16–21; Third Braun Decl. ¶ 22. Dr. Kauffman states that full ecological recovery will take 40–50 years for the Mud Creek allotment and "at least 20" years for the Hardie Summer allotment. Second Kauffman Decl. ¶ 36. Due to the allotments' history of fire disturbance, full recovery of the sagebrush steppe could take 40–60 years, and disrupting the passive recovery that has now begun could "exacerbate existing weed infestations, decreasing the likelihood of recovery of sagebrush and increasing the likelihood of additional wildfires, and negatively affect potential recovery of the sage-grouse population that uses the area." Second Braun Decl. ¶ 26; Third Braun Del. ¶¶ 20, 23. It will take potentially as many as 50 or 100 years for low sagebrush and Wyoming big sagebrush to return following the wildfires of 2006. Second McCormack Decl. ¶ 10.

As the Declarations establish, the harm from undoing five years of passive restoration will not just abate during the next growing season, as Defendants suggest, but will take decades or more to repair, if it is reparable at all—and resuming grazing that cuts off this passive restoration will likely cause irreparable harm to Plaintiffs' members and their long-standing

interests in observing undisturbed areas that are recovering naturally, free from livestock.

    **2.**   ***Resuming Grazing is Likely to Cause Irreparable Harm to Sage-Grouse and to Plaintiffs' Interests in Their Persistence and Recovery.***

        The threat to Plaintiffs' interests in sage-grouse from resumption of livestock grazing is immediate and long-lasting. Dead sage-grouse cannot be reanimated. Lek counts have declined significantly on the leks on and adjacent to the allotments, with the 2019 lek count for the Mud Creek allotment detecting only two birds. Second Braun Decl. ¶¶ 16–17 & Ex. 7. BLM's own post-Grandad fire Burned Area Emergency Stabilization Plan recommended "[s]hould monitoring indicate that numbers are in decline or previously used leks have been abandoned, active rehabilitation/restoration of sagebrush habitat should be conducted"—but this has never occurred on the Mud Creek allotment, or on most or all of the Hardie Summer allotment. Ex. 5 at 12. "Reintroducing livestock grazing to allotments that likely provide important nesting and brood-rearing habitat for birds that mate on these leks could cause these sage-grouse leks to become inactive and the population of birds using the Hammond allotments to be extirpated." Second Braun Decl. ¶ 19. In turn this could "affect regional sage-grouse populations by harming connectivity to the Sagebrush Focal Area to the southeast of Steens Mountain." *Id.*

        Dr. Braun describes specific ways in which livestock grazing is likely to harm sage-grouse by removing vegetation and competing for food, and increasing the risk of cheatgrass infestation and therefore of fire. Second Braun Decl. ¶¶ 7–10, 21–27. Sage-grouse use the Hardie Summer allotment and the eastern part of the Mud Creek allotment for summer habitat between July and September. Ex. 3 at 1. They use summer habitat on the Hardie Summer allotment in particular for brood-rearing given its overall good sagebrush cover and high quality. Third Braun Decl. ¶¶ 30, 33. Grass and forb cover is important for nesting and brood rearing when hens are nesting and rearing young—which later contribute to the number of males counted on leks the

following spring. *Id.* ¶ 41. During the summer, presence of abundant grasses and forbs in riparian areas are critical for sage-grouse survival. *Id.* ¶¶ 8–9. Grazing is likely to destroy or damage these components, harming their value for sage-grouse during the time when they are most important to the birds. Second Braun Decl. ¶ 27. Grazing also is likely to prevent recovery of sagebrush and restoration of native grasses. Third Braun Decl. ¶ 28. The harm from these effects is likely to be irreparable given the birds' fragile status. Second Braun Decl. ¶ 27.

BLM's Matthew Obradovich faults Dr. Braun for failing to identify exactly which factor is the cause of the declining lek trend counts. As Dr. Braun explains in his Third Declaration, the data do not necessarily permit a clear inference about causal factors. Nevertheless, Dr. Braun states that it is highly likely that livestock grazing is a proximate factor in the serious decline in number of males counted from over the past two decades as grazing is the predominant land use in these allotments. Third Braun Decl. ¶ 39. Dr. Braun disagrees with Mr. Obradovich's assessment that livestock grazing has not caused the observed vacillation in lek counts, due to the complexity of factors associated with those counts and the prevalence of grazing on the allotments. *Id.* ¶ 40. He also explains that, contrary to Mr. Obradovich's assumption that sage-grouse can only survive in habitat that contains all of the elements they need, sage-grouse may use even habitats that do not contain the "full complement" of habitat needs, especially in spring and summer, when they forage on forbs and can live in areas without sagebrush. *Id.* ¶ 42.

Both Dr. Braun and Dr. Kauffman strenuously object to the unsupported statements in the Second Obradovich and Second McCormack Declarations suggesting that "proper" livestock grazing reduces risk of wildfire by reducing fine fuels. This is because grazing increases the spread of cheatgrass which, in turn, increases risk of wildfire. Second Braun Decl. ¶ 8; Second Kauffman Decl. ¶ 31. Grazing will not reduce cheatgrass because livestock are unlikely to graze

on cheatgrass or crested wheatgrass in the summer when they are already dried, and grazing would instead "result in extreme overuse of the native grasses and forbs . . . ." Second Kauffman Decl. ¶ 29. Grazing changes the fire regime by promoting high-severity fires, rather than "relatively frequent low severity fires." *Id*. ¶ 25. Grazing will not decrease risk of high-intensity wildfires, and will reduce the ecosystem's ability to recover from any wildfires that occur. *Id*. ¶¶ 27, 30. This is yet another way in which grazing is likely to cause irreparable harm to the Plaintiffs by posing a threat to habitat vital to sage-grouse persistence and recovery.

> **3.  *Resuming Grazing is Likely to Cause Irreparable Harm to Redband Trout and to Plaintiffs' Interests in Their Persistence and Recovery.***

Grazing also will cause irreparable harm to plaintiffs' interests in redband trout and their habitat in Big Fir Creek and elsewhere on the allotments. Grazing is "a limiting factor for redband trout conservation due to threats from grazing to water quantity, water quality, physical habitat degradation, and siltation." Kauffman Decl. ¶ 7. Where the Hardie Summer allotment burned, redband trout were "subject to population declines in fire affected sites due to stream sedimentation and increased water temperatures." Ex. 5 at 3. Livestock are likely to trample stream banks, widen stream channels, and denude riparian areas of vegetation in all streams they are able to access on the allotments. Kauffman Decl. ¶¶ 15, 20, 22; Second Kauffman Decl. ¶¶ 8–9. This is especially true of Big Fir Creek, which Dr. Kauffman describes as recovering and fragile. Second Kauffman Decl. ¶¶ 14–17. These effects are likely to further increase stream temperatures, which, in turn, will decrease redband trout fitness and survival. *Id*. ¶¶ 11–12, 15.

Defendants dispute that resumption of grazing on Hardie Summer allotment is likely to damage the riparian areas of the allotment, but Defendants and their expert do not dispute the fact that, if damage to riparian areas occurs, such damage is likely to harm redband trout. *See generally* Declaration of Linsday Davies (ECF No. 42). Indeed, the only article Defendants'

expert, Lindsay Davies, cites describes that the purpose of riparian buffers—a "permanent area of trees, usually accompanied by shrubs and other vegetation"—is precisely to "supply food, cover, and thermal protection to fish," and thus that removal of such vegetation is likely to remove such cover and thermal protection, thereby harming fish. *Id*. Attach. 15 at 3.

This Court has recognized that "[i]t is largely undisputed" that grazing can degrade habitat for salmonids like redband trout by "removing riparian vegetation, destabilizing stream banks, widening stream channels, promoting incised channels, lowering water tables, reducing pool frequency, increasing soil erosion, and altering water quality," which in turn harm salmonids because "[t]hese effects can reduce cover, increase summer water temperatures, promote formation of anchor ice in winter, and increase sedimentation into spawning and rearing habitats." *Or. Nat. Desert Ass'n v. Kimbell*, No. CIV. 07-1871-SU, 2008 WL 4186913, at *1 (D. Or. Sept. 5, 2008), *order vacated in part*, No. CIV 07-1871-HA, 2009 WL 1663037 (D. Or. June 15, 2009); *see also Or. Natural Desert Ass'n v. Green*, 953 F. Supp. 1153, 1145 (D. Or. 1997) (recognizing detrimental effects of grazing on riparian systems on Steens Mountain).

The harmful effects of grazing on riparian systems and redband trout are equally well-established. Kauffman Decl. ¶ 7 (citing ODFW 2018). Livestock will likely trample redds and banks, increasing stream sedimentation and otherwise impairing redband trout reproduction and survival. Second Kauffman Decl. ¶¶ 11–12, 15, 17. These effects of grazing will make the streams more susceptible to higher summertime water temperatures and other effects associated with climate change, decreasing chances for redband trout persistence into the future. *Id.* ¶¶ 17, 33–34; Kauffman Decl. ¶ 20; Declaration of Dale A. McCullough (filed herewith).[9]

---

[9] The McCullough Declaration provides background regarding redband trout and a literature survey of the science describing how temperature and sediment increases harm salmonids that this Court has previously determined to be undisputed and which Defendants do not dispute here.

Erasing the allotments' recovery—and the consequent harms to sage-grouse and redband trout and their habitats—will irreparably harm Plaintiffs' ability to enjoy the allotments in their undisturbed state. Allowing grazing threatens to cause the South Bridge Creek lek to become inactive, Second Braun Decl. ¶ 19, will retard sagebrush reestablishment in the burned areas on the allotments, *id. ¶* 9, and will likely harm sage-grouse that mate on other leks but use the habitat on the Hardie Summer and Mud Creek allotments, *id*. ¶¶ 21–26. It will degrade habitat for redband trout and decrease their survival on the allotments. Second Kauffman Decl. ¶¶ 10–12. Plaintiffs have demonstrated that injunctive relief is required to prevent these harms.

**B.  The 2018 RHAs do not Defeat Plaintiffs' Showing of Irreparable Harms.**

The 2007 and 2018 RHAs do not refute Plaintiffs' showing of irreparable harm to their interests in sage-grouse and redband trout for three reasons. First, the RHAs do not analyze the effects of grazing on sage-grouse or redband trout and cannot substitute for a public analysis that considers such effects. *See* TRO Op. at 27–28. Second, the 2018 RHAs show that both allotments fail Standard 5 for sensitive species including sage-grouse, due to the effects of the 2006 Grandad fire, despite long periods of rest from grazing. And finally, the 2007 Hardie Summer RHA is not reliable because it is based on paltry monitoring data and its conclusions rely entirely on data collected before the 2006 Grandad fire.

**1.  *Neither RHA Addressed Impacts to Sage-grouse or Redband Trout From Livestock Grazing on the Mud Creek and Hardie Summer Allotments.***

Compliance with land health standards does not suffice to show that harms to sage-grouse, redband trout, or riparian habitat are not likely to occur because the RHAs do not analyze effects to the species. Neither 2018 RHA assessed the status of sage-grouse using the allotments or the significance of those local populations to the species as a whole. Instead, one noted that the lek on the Mud Creek allotment continues to be attended although male counts at the lek

have fluctuated, and that "[t]here are no known sage-grouse leks within the [Hardie Summer] allotment," although year-round habitat for sage-grouse exists on that allotment. Second Braun Decl. Ex. 3 at 3. Neither 2018 RHA addressed the status of redband trout or their habitat conditions at all—beyond sporadic and incomplete PFC assessments completed at seven- to ten-year intervals, which, as described above, do not actually evaluate *fish habitat* but rather only riparian areas above the water. *See supra* p. 5; *see also* Ex. 8 (BLM PFC Technical Reference stating same). These RHAs are not publicly available, so their content and conclusions have never been reviewed or subject to public vetting. *See* TRO Op. at 27–28.

BLM's assertion that reinitiating grazing after five years' rest is only a continuation of grazing and not "a new type of activity with completely unknown effects on the environment" fails to acknowledge the distinguishable facts of *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 23 (2008). In *Winter*, the activity at issue had been going on for 40 years, but the latest series of exercises had been approved only after the agency had taken a hard look at the environmental consequences in a 293-page EA. *Id.* The checklist CX here provides no such "hard look," especially because it issued with no opportunity for public comment and with the decision to renew the permit already made. Indeed, Plaintiffs are aware of *no* comprehensive EA or EIS in which BLM has thoroughly evaluated the effects of grazing on these allotments. Even if grazing may not be a "completely new activity," its effects on the environment are "unknown" here in light of the rest from grazing that has occurred over the past five to ten years and declines in species and habitat following the 2006 fires.

### 2. *The 2018 RHAs Show Both Allotments are Failing Standard 5.*

Moreover, both the Mud Creek and Hardie Summer allotments are still recovering from the effects of the 2006 Grandad fire—which burned after HRI had grazed the allotments for

years. *E.g.*, Second Braun Decl. Ex. 3 at 11; Third Braun Decl. ¶¶ 17–22, 30–36 (describing current ecological conditions). Both allotments failed to meet Standard 5, in part, because of those effects. Second Braun Decl. Ex. 3 at 3; Defs.' TRO Resp. Ex. 2 at 3. Both RHAs claimed that grazing was not the causal factor in failing to meet Standard 5 without recognizing that the HRI principals' likely arson in the Grandad Fire—conducted to increase forage for their cattle— caused the fire damage. Second Braun Decl. Ex. 3 at 3; Defs.' TRO Resp. Ex. 2 at 3.

The 2018 RHAs confirm that, even though there has been five years of rest from grazing, they continue to suffer from the effects of the 2006 fire. Dr. Braun explained, "[w]here grazing is allowed after an area has burned, cattle will destroy native vegetation and spread cheatgrass, causing ecological devastation." Second Braun Decl. ¶ 10; *see also* Second Kauffman Decl. ¶ 27 ("Grazing in the first 5 postfire years will severely diminish this important fire/native vegetation establishment"). Defendants have not refuted these statements, instead relying on unsupported assertions that grazing would reduce fine fuels and thus the risk of fire. Second McCormack Decl. ¶ 18; Second Obradovich Decl. ¶ 12 (ECF No. 41). Recommencing grazing on the Mud Creek and Hardie Summer allotments will set back recovery that has occurred, prevent sagebrush reestablishment, exacerbate cheatgrass invasions, and virtually ensure a higher-intensity, more likely catastrophic fire, if the area does burn. Second Kauffman Decl. ¶¶ 25–27, 29–31.

Defendants make much of the fact that the 2018 RHA for the Hardie Summer allotment found the allotment was meeting the other four standards for rangeland health, and that the 2007 RHA found it was meeting all standards. Defs.' PI Resp. at 17–18. This ignores, however, that even though the allotment was placed in a "Maintain" management category in 2004, its condition actually *declined* between 2007 and 2018 despite five years' rest from grazing, due to the lingering effects of the 2006 Grandad fire. Second Braun Decl. Ex. 2 at 3.

### 3. *The Hardie Summer RHAs are not Reliable Because They are not Based on Adequate Monitoring Data or Rely on Data Gathered Before the Grandad Fire.*

Although Defendants claim that the 2018 Hardie Summer RHA's finding that the allotment is meeting standards indicates successful management, "[m]onitoring of the condition and trend of the ecological condition of the allotments has been wholly inadequate to determine how land management is affecting the public's natural resources." Second Kauffman Decl. ¶ 22. Big Bridge Creek, Big and Little Fir Creeks, Lake Creek, and Fish Creek contain redband trout, yet in the past 20 years, BLM has only monitored Little Bridge Creek, Big Fir Creek, and Little Fir Creek for PFC. Second Braun Decl. Ex. 2 at 1–2, 14; Ex. 3 at 2. There is no PFC assessment for Lake Creek, Big Bridge Creek, or Fish Creek. BLM nevertheless concluded in both 2007 and 2018 that the allotment was meeting Standard 2 (for Watershed Function—Riparian), while noting in 2007 that "the riparian areas need more monitoring." Second Braun Decl. Ex. 2 at 2.

In addition, BLM has apparently never conducted water quality monitoring on the allotment and inferred it was meeting Standard 4 for water quality because three streams on the allotment were meeting PFC. Second Braun Decl. Ex. 3 at 3. It appears that the 2007 RHA only arrived at its conclusion that the allotment was meeting standards because it relied upon assessments completed in 2006 before the fire occurred, *see* Second Braun Decl. Ex. 2 at 17— making its utility for evaluating likely grazing effects to the current, post-fire, degraded habitat essentially nil. The RHAs do not form a strong basis for inferences about the effects of grazing on fish habitat on the Hardie Summer allotment or on redband trout.

### C. Plaintiffs' Irreparable Harm From Grazing Without Adequate NEPA Analysis.

Defendants' PI Response only confirms that BLM is deeply committed to its decision to allow grazing despite these harms, even though it has never completed an adequate NEPA analysis—in a striking illustration of the bureaucratic momentum that forms a basis for

injunctive relief when procedural injury is coupled with concrete environmental and aesthetic harms. Defendants reiterate their arguments that Plaintiffs improperly rely on cases involving permanent injunctions for Plaintiffs' arguments regarding procedural harms and that, in any case, such harms are not cognizable under *Winter*. Defs.' PI Resp. at 20–21.

Irreparable harm from violations of NEPA is equally cognizable in the preliminary injunction/TRO context as in the permanent injunctive relief context because both require an identical showing of likely irreparable harm. Pls.' TRO Reply at 22–23. Defendants do not explain why a likelihood of success on the merits of a NEPA claim cannot justify injunctive relief to prevent irreparable harm to the environment that flows from uninformed and unconsidered decision-making. Indeed, it seems such relief is even *more* appropriate in the preliminary relief context, especially where, as here, the challenged action is partially in effect.

Irreparable harm is "a harm that a court would be unable to remedy even if the movant would prevail in the final adjudication."  Moore's Federal Practice 3d § 65.06[2], 65-22. Irreparable harm flowing from failure to comply with NEPA is cognizable because "the test for determining if equitable relief is appropriate is whether an injunction is necessary to effectuate the congressional purpose behind the statute." *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 (9th Cir. 2002). "While a court may not presume that a NEPA violation requires an injunction, it may take into account the principles [of encouraging agency reliance on complete information and evaluating environmental consequences through public comment] embodied in the statute in considering whether an injunction would be appropriate." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 183 (2010) (Stevens, J., dissenting).[10]

---

[10] *Cottonwood Environmental Law Center v. U.S. Forest Service*, 789 F.3d 1075, 1088-89 (9th Cir. 2015) and *Nevada v. United States*, 364 F. Supp. 3d 1146, 1153–54 (D. Nev. 2019), are not to the contrary. Both cases held only that a court may not *presume* irreparable harm from a

When courts issue relief preventing agencies from undertaking actions without adequate NEPA analysis, they do so to prevent "harm to the *environment,* [from] the added *risk* to the environment" when agencies make decisions without public comment and a proper evaluation of the environmental effects of their decisions. *Sierra Club v. Marsh*, 872 F.2d 497, 500–01 (1st Cir. 1989) (emphasis in original). In such cases, allowing the agency to authorize or undertake activities that could have adverse environmental effects "raise the risk of bureaucratic momentum" that could bias the required analysis in favor of its intended result. *Indigenous Envtl. Network v. U.S. Dep't of State*, 369 F. Supp. 3d 1045, 1049-50 (D. Mont. 2018). The harm arises from "the practical fact that bureaucratic decisionmakers (when the law permits) are less likely to tear down a nearly completed project than a barely started project." *Marsh*, 872 F.2d at 500–01.

Applying this principle would not allow Plaintiffs to obtain injunctive relief without demonstrating irreparable injury. In *Indigenous Environmental Network*, for instance, an injunction issued to prevent this bureaucratic steamroller effect, but only as to ground-disturbing activities that could skew subsequent environmental analysis and decisionmaking—such as preparing pipe storage and contractor yards near rights-of-way, preparing worker camps, and mowing rights-of-way to discourage migratory bird nesting. 369 F. Supp. 3d at 1049–51.

Defendants' actions and arguments here demonstrate the risk of prejudicing the agency's decision by allowing continued grazing. Although BLM has never completed an adequate NEPA analysis analyzing the effects of grazing on these allotments, Defendants argue that, because HRI began grazing under the unlawful permit, it cannot be ordered to stop grazing because that would interfere with HRI's expectations. Defs.' PI Resp. at 1, 31–34. Taken to its logical extreme,

---

NEPA violation—not that a court may not *find* irreparable harm from a NEPA violation when it is accompanied by likely concrete aesthetic or environmental harms.

livestock grazing could *never* be enjoined once *any* grazing began under a ten-year term permit—which cannot be the law. Further, BLM continues to allow HRI to graze seven times the permitted number of cattle on the Hammond allotment, even though HRI has exceeded its authorized AUMs for the year. Defs.' PI Resp. Ex. 4 at 1. This only shows that Defendants are deeply committed to allowing grazing, regardless of how the Court ultimately resolves the questions of the Decision's lawfulness or need for environmental review, underscoring the need for injunctive relief until Defendants undertake an honest environmental analysis.

**D.  Livestock Grazing on These Allotments is Not Likely to be Proper.**

Although Defendants criticize Plaintiffs' experts for failing to discuss "properly managed grazing," it is impossible to conclude that grazing management on these allotments is "proper." If it is true as Jamie McCormack asserts that proper grazing is defined as "grazing that . . . meets the physiological needs of the desirable vegetation, and provides for the establishment of desirable plants," BLM is demonstrably failing that standard on the Mud Creek allotment by allowing grazing that will promote cheatgrass spread and retard or prevent sagebrush re-establishment. Second McCormack Decl. ¶ 7; *see* Second Braun Decl. ¶ 9. Monitoring of ecological conditions has been too spotty to infer trends, and the conclusory assertion of compliance with standards in the 2007 Hardie Summer RHA in particular has little support. The 2018 RHAs reveal only the conditions after five years of rest from grazing.

Indeed, despite BLM's obligation to manage the CMPA for the "long-term ecological integrity of Steens Mountain," it appears that the overall management of grazing within the CMPA is deplorable. 16 U.S.C. § 460nnn-12. When the Andrews/Steens RMP was prepared in 2004, of the 74 allotments within the CMP, 33 were classified as "Improve"—including the Mud Creek allotment—which must be "managed to improve current unsatisfactory resource

conditions." Defs.' TRO Resp. Ex. 1 at 4–5. Only eight allotments, including Hardie Summer, were categorized as "Maintain," to be "managed to maintain current satisfactory resource conditions and will be actively managed so that resource values do not decline." *Id*. at 4.[11] The condition of the Hardie Summer allotment has declined since 2007 despite its Maintain status.

Defendants suggest that, because the 2007 RHAs, prepared after the August 2006 Grandad fire but based on data gathered before the fire, showed that standards were being met, grazing was somehow "proper." This ignores the impropriety of a permittee *setting fire to the landscape and sagebrush* that, more than a decade later, remains largely unavailable for sage-grouse. Grazing in burned areas on the allotments—and on the Mud Creek allotment in particular—will prevent establishment of sagebrush and other desirable vegetation and promote cheatgrass dominance, thereby failing to achieve BLM's own measure of propriety. Second Braun Decl. ¶¶ 8-10. Likewise, BLM's ever-shifting permissions and direction to HRI, that authorized increases in the number of livestock and intensity of grazing on three of the allotments, demonstrate that grazing is not and is unlikely to be "proper" on these allotments. *Supra* pp. 7–9. And finally, the authorized grazing allows for 50 percent utilization, which is significantly higher than what science considers "proper." Third Braun Decl. ¶ 43; Defs.' PI Resp. Ex. 4 at 1–2.

## II.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

Plaintiffs are likely to prevail on the merits because the Secretary unlawfully renewed HRI's grazing permit when HRI lacked the satisfactory record of performance required by law. BLM then elected to process the permit under NEPA via a CX, without the EA or EIS typically

---

[11] 33 "custodial" allotments "include a high percentage of private lands and are managed custodially while protecting existing resource values." Defs.' TRO Resp. Ex. 1 at 4.

required by law for grazing permit renewals, even though the reissuance did not meet the

requirements to proceed under a CX. And, although the allotments at issue include sage-grouse

PHMA, that NEPA analysis did not consider or apply any measures required by the Oregon

GSG-ARMPA to protect sage-grouse from the effects of livestock grazing.

Defendants argue that the Court should surmise from the Secretary's one-paragraph

analysis that the Secretary "implicitly" found HRI's record of performance satisfactory. Defs.' PI

Resp. at 22–28. Defendants also contend that, because the Department of the Interior has some

discretion as to when it prepares a NEPA analysis, BLM's deeply flawed CX provided adequate

NEPA coverage and that the Oregon GSG–ARMPA does not apply. Each argument fails.

### A.  The Secretary Never Found HRI had a Satisfactory Record of Performance.

Defendants do not dispute that the regulations require an applicant seeking renewal of a

grazing permit to "be determined [by the authorized officer] to have a satisfactory record of

performance." Defs.' PI Resp. at 22 (quoting 43 C.F.R. § 4110.1(b)). Nor do they dispute that the

authorized officer must determine "the applicant and affiliates to be in substantial compliance

with the terms and conditions of the existing federal grazing permit." 43 C.F.R. § 4110.1(b)(1).

Because the Secretary's Decision lacks any such finding, or facts necessary to support such

finding, Defendants' counsel attempts to create one out of thin air, with the word "implicitly"

doing the heavy lifting. Neither the facts nor the law support the inferences Defendants urge.

To survive scrutiny under the APA, an agency must "examine the relevant data and

articulate a satisfactory explanation for its action including a "rational connection between the

facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[C]ourts may not accept appellate counsel's *post hoc*

rationalizations for agency action." *Id*. at 50. "It is well-established that an agency's action must

be upheld, if at all, on the basis articulated by the agency itself." *Id*.

The Secretary's rationale for his decision here consists of one paragraph. Pls.' Mot. Ex. 1 at 4. The paragraph does not state that HRI had a "satisfactory record of performance." The Secretary does not provide any analysis that could support finding a satisfactory record of performance, and indeed states "I do not find fault with BLM's assessment of the law and facts," *id*.—facts which *preclude* finding a satisfactory record of performance because they show HRI did not comply with the terms and conditions of its grazing permit. Instead, he states "I find it is consistent with the intent of the pardons—and in particular their reflection of the President's judgment as to the seriousness of the offenses—to renew the Hammonds' permit . . . ." *Id*.

Secretary Zinke's reliance on the pardons cannot serve as a surrogate for finding a satisfactory record of performance because the pardons demonstrate that HRI did *not* have a satisfactory record of performance. By accepting pardons, the HRI principals effectively conceded guilt for burning public rangelands in violation of the terms and conditions of their grazing permit. *See United States v. Arpaio*, 887 F.3d 979, 982–83 (9th Cir. 2018) (Tallman, J., dissenting) ("Arpaio effectively conceded his guilt by accepting the pardon"). The pardons only confirmed that HRI was not in "substantial compliance" with the terms of its grazing permit and did not meet the mandatory criteria for grazing permit renewal. 43 C.F.R. § 4110.1. In the assessment of facts and law that the Secretary endorsed, BLM found in 2014 that HRI violated the terms and conditions of its permit through the arsons for which its principals were convicted, and through their conduct in setting other fires for which they did not meet the criminal standard for guilt but could be held civilly liable. Pls.' Mot. Ex. 2 at 17–18. As this Court noted, Secretary Zinke "did not consider the conduct cited by BLM in its 2014 decision other than the criminal convictions . . . which was not affected by the Grants of Executive Clemency." TRO Op. at 21.

Moreover, Secretary Zinke was wrong in assuming that the President's "judgment" as to the seriousness of the offenses—which is not evident on the face of the pardons—could override the requirement for a satisfactory record of performance. The U.S. Constitution grants Congress, not the Executive, the "power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." U.S. Const. Art. IV § 3. Through FLPMA, Congress directed the Secretary to regulate the use of public lands, and specified that "[t]he use, occupancy, or development of any portion of the public lands contrary to any regulation of the Secretary or other responsible authority, or contrary to any order issued pursuant to any such regulation, is unlawful and prohibited." 43 U.S.C. § 1732(g).

The Secretary's regulations make burning the public rangelands and destruction of United States property unlawful and prohibited. 43 C.F.R.§ 4140.1(b)(3)-(4). Violating federal regulations also violated the terms and conditions of the Hammonds grazing permit, precluding finding a satisfactory record of performance. Pls.' Mot. Ex. 2 at 17–18. The President's judgment does not make *the Secretary* free to overlook violations of FLPMA or the grazing regulations, or renew a grazing permit without finding the satisfactory record of performance required by law.

On this record, the Secretary's decision to renew the permit violated FLPMA and the APA because it does not reflect a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43). As this Court found, the Secretary provided no reasoned explanation for his departure from BLM's 2014 decision not to renew HRI's grazing permit, and the decision was arbitrary and capricious. TRO Op. at 21.[12]

---

[12] The Court inquired whether there is any set of circumstances under which a grazing permit could be restored to HRI. Although the facts related to the expired 2004–2014 permit preclude renewal of that permit because it is impossible to show a satisfactory record of performance, HRI might not be precluded from someday applying for a new grazing permit under 43 C.F.R. § 4110.1-1(b)(2) , under which different standards, including mandatory NEPA analysis, apply.

**B. BLM and the Secretary Violated Their Obligations to Comply With NEPA and FLPMA in Renewing and Reissuing the Permit.**

**1. *Additional Legal Standards.***

Defendants are incorrect that the law in effect in February 2014—such as Section 325 and related appropriation riders, or the absence of the 2015 GSG-ARMPA—defeats Plaintiffs' NEPA and FLPMA claims. Defs.' PI Resp. at 28–30. This is because the law in effect in early 2014 has no relevance here: binding Supreme Court and Ninth Circuit precedent hold that an agency making a final decision on an administrative appeal must follow the law in effect at the time it makes its final decision on the permit—not the law in effect at a previous time when an agency subdivision made an initial decision. *E.g.*, *Ziffrin, Inc. v. United States*, 318 U.S. 73, 78 (1943) ("a change of law pending an administrative hearing must be followed in relation to permits for future acts"). Were this not so, "the administrative body would issue orders contrary to the existing legislation." *Id.*; *see also Gen. Motors Corp. v. United States*, 496 U.S. 530, 540 (1990) (holding that the agency was bound to enforce the administrative guidelines in effect when it takes final action). Even where an agency could exercise "grandfathering" authority to exempt actions from new regulatory requirements, it must enforce the regulations in effect at the time the permit is finally issued. *Sierra Club v. EPA*, 762 F.3d 971, 983 (9th Cir. 2014).

It is undisputed here that the final agency actions subject to judicial review in this case are the Secretary's decision to renew the permit and BLM's permit reissuance under a CX. *See Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1064–65 (9th Cir. 2010) (IBLA decision, not BLM's original decision, was the final agency action for review); *Backcountry Against Dumps v. Abbott*, 491 F. App'x 789, 792 (9th Cir. 2012) ("the BLM's Record of Decision ("ROD") was effective after the stay pending administrative appeal was denied. However, that stay denial did not transform the ROD into final agency action" because "there

was no final agency action on the administrative appeal"). Whether it is BLM, the IBLA, or the Secretary that issues a final decision of the Department of the Interior, that decision must comply with the law in effect when the final decision is made.

### 2.  *Defendants Violated NEPA by Electing to Fully Process the Permit Through a CX Rather Than an EA or EIS.*

Defendants were required to comply with NEPA in renewing and reissuing HRI's grazing permit, but they failed to do so. The Secretary made no effort to comply with NEPA, and BLM conducted a NEPA analysis, but wrongly determined that it could fully process the permit under a CX. Defendants unlawfully renewed and reissued the permit in violation of NEPA.

Renewing or reissuing a grazing permit typically requires NEPA analysis. Congress has directed federal agencies to "include in . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement" describing the environmental effects of the action and alternatives to the action. 42 U.S.C. § 4332. Interpreting the application of this requirements to grazing decisions, the U.S. District Court for the District of Columbia held that NEPA requires "adequate individualized assessment of the impact of . . . grazing on local environments." *Natural Res. Def. Council v. Morton*, 388 F. Supp. 829, 840 (D.D.C. 1974); *see also Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156, 160 (D.D.C. 2002) ("NEPA requires an environmental analysis of . . . [grazing] permit reissuance.").

In late 2014, Congress amended FLPMA to create two limited exceptions to this requirement. First, it provided that "[t]he terms and conditions in a grazing permit . . . that has expired . . . shall be continued under a new permit . . . until the date on which the Secretary concerned completes any environmental analysis and documentation for the permit . . . required under [NEPA]." 43 U.S.C. § 1752(c)(2). This does not remove the requirement that BLM conduct NEPA analysis on grazing permit renewals, it merely gives the agency limited discretion

to defer that requirement. *See W. Watersheds Proj. v. Zinke*, 347 F. Supp. 3d 554, 557 (D. Idaho

2018) (interpreting virtually identical language effective previously through Section 325 of

Public Law 108-108 to find that the language allows the agency to defer, but not avoid, NEPA).

Second, it provided that a grazing permit or lease may be issued under a categorical

exclusion without first preparing an environmental assessment or environmental impact

statement under specific circumstances. 43 U.S.C. § 1752(h). However, a CX is still a form of

NEPA analysis. *See* Council on Environmental Quality, Final Categorical Exclusion Guidance,

75 Fed. Reg. 75628, 75631 (Dec. 6, 2010) ("Categorical exclusions are not exemptions or

waivers of NEPA review; they are simply one type of NEPA review"); 40 C.F.R. § 1508.4; 43

C.F.R. § 46.205. If the permit does not fall within the exception allowing it to be fully processed

using a CX, BLM must prepare an EA or EIS analyzing the impacts of grazing on local

environments before reissuing the permit to "fully process" it. 43 C.F.R. § 46.205(c)(1).

Secretary Zinke did not exercise discretion to defer the required NEPA analysis under 43

U.S.C. § 1752(c)(2)—he simply ignored any obligation flowing from NEPA. To receive

deference, an agency—even its top official—must demonstrate awareness of their legal

obligations and actually exercise any discretion those obligations afford them. Failing to do so is

an unlawful abuse of discretion. *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 367 (6th Cir.

2010) ("for courts to defer to them, agencies must do more than announce the fact of their

comparative advantage; they must actually use it. And that means, among many other things, that

the agency must apply-rather than disregard-the relevant statutory and regulatory criteria.").

BLM also elected not to avail itself of 43 U.S.C. § 1752(c)(2), instead choosing to fully

process the permit by completing a NEPA analysis—the CX allowed for in 43 U.S.C. § 1752(h).

The Court must review the actual decision BLM made in conducting a NEPA analysis using the

CX allowed by 43 U.S.C. § 1752(h), not a hypothetical situation in which BLM might have exercised discretion to defer that analysis under 43 U.S.C. § 1752(c)(2). Here, BLM's conclusion that the CX applied was wrong because the permit reissuance did not "continue current grazing," and extraordinary circumstances existed, requiring a more in-depth analysis. Pls.' Mot. at 25–29. Thus, the permit could not be fully processed under a CX, and an EA or EIS was required.

The permit renewal did not continue current grazing because, when OHA denied HRI's request for a stay in this matter, BLM's 2014 decision not to renew HRI's grazing permit became effective. 43 C.F.R. §§ 4.21(a)(3), (b)(4), 4.472(e);[13] *see W. Watersheds Proj. v. Bennett*, 392 F. Supp. 2d 1217, 1222 (D. Idaho 2005). As a result, the allotments became vacant and were not grazed for five years. Even under *WildEarth Guardians v. U.S. Forest Service*, the out-of-Circuit district court authority on which OFB relies, "current grazing management" was "no grazing" here given that five-year hiatus. 668 F. Supp. 2d 1314, 1327–28 (D.N.M. 2009).

Moreover, extraordinary circumstances existed, requiring at least the preparation of an EA. 43 C.F.R. §§ 46.205(a), 46.215(b), (*l*). Reissuing the permit risked significant impacts to sage-grouse PHMAs, the Steens Mountain CMPA, and the Bridge Creek WSA—all "ecologically significant or critical areas"—from grazing and continued potential arsons by the HRI principals. And, as Plaintiffs' experts confirm, grazing the allotments in their fragile post-fire state contributes to the spread of cheatgrass, a non-native, invasive species. *See* Second

---

[13] When Secretary Zinke assumed jurisdiction over HRI's appeal and overturned the 2014 BLM decision, his decision to renew the permit was a new final agency action that superseded BLM's earlier decision. 43 C.F.R §§ 4.403, 4.5(a); *see Backcountry Against Dumps*, 491 F. App'x at 792; *Or. Natural Desert Ass'n v. McDaniel*, 751 F. Supp. 2d 1145, 1147–51 (D. Or. 2010) (BLM decision is superseded when IBLA (or the Secretary) issues a decision on the merits of an appeal). This does not affect these separate regulatory provisions that rendered the 2014 BLM decision effective when OHA denied a stay for purposes of cutting off the HRI grazing—thereby making "current grazing" *at the time the Secretary renewed the permit* "no grazing."

Braun Decl. ¶ 10. As long as grazing "*may . . . [c]*ontribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species," BLM cannot use the CX to fully process the HRI permit. 43 C.F.R. § 46.215(*l*) (emphasis added); *see Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006) (describing whether a project "may" have a significant effect under NEPA to be "a low standard"). It is not true that BLM's CX satisfies the applicable legal requirements, as Defendants contend. Defs.' PI Resp. at 31.

In any event, it would not have been lawful to renew the permit without NEPA analysis under 43 U.S.C. § 1752(c)(2), because it appears that BLM has never prepared a NEPA analysis to disclose and evaluate the effects of grazing on the Hammond allotments. The District of Idaho held in *Western Watersheds Project v. Zinke* that a delay of 20 years in completing such an analysis would "[stretch] to the breaking point . . . the Congressional grant of a "grace period" for the agency to comply with NEPA." 347 F. Supp. 3d at 560. As far as Plaintiffs know, Defendants have never completed a full NEPA analysis associated with issuance or renewal of HRI's grazing permit—and certainly not within the last 20 years.

### 3. *Defendants Violated FLMPA by Failing to Comply With the GSG-ARMPA.*

Because the ARMPA was in effect in early 2019, when the Secretary rendered the final Decision in HRI's grazing appeal and when BLM reissued the permit using a CX, Defendants could not evade their obligation to comply with the ARMPA. *Ziffrin*, 318 U.S. at 78. Indeed, BLM recognized as much where its CX claimed the permit renewal was consistent with the ARMPA. Pls.' Mot. Ex. 4 at 1–2.

Both RMPs that cover the four allotments in this case require that "the NEPA analysis for renewals . . . of livestock grazing permits . . . that include lands within . . . PHMA will include specific management thresholds . . . [and] . . . one or more defined responses that will allow the

authorizing officer to make adjustments to livestock grazing that have already been subjected to NEPA analysis." Mot. Ex. 5 at 14. There is no exception to this requirement for NEPA analyses done in a CX, especially when the allotments at issue are not meeting land health standards. *See* BLM, IM 2018-023, "Incorporating Thresholds and Responses into Grazing Permits/Leases," at 4–5 (Dec. 27, 2017), attached as Ex. 4 to Pls' Reply to Def's Supp. Resp. (ECF No. 32-4).

Even though portions of all of the allotments—and the Mud Creek and Hardie Summer allotments in particular—are classified as PHMA, neither the Secretary's Decision, nor the CX here, considered incorporating the required thresholds and responses. The Secretary's Decision merely directed BLM to reissue the permit with the same terms and conditions within 30 days. Pls.' Mot. Ex. 1 at 4. In its NEPA analysis (the CX) determining the permit reissuance complied with the RMPs, BLM simply found that the grazed lands were identified as available for livestock grazing, and were anticipated by the RMP to be subject to continued grazing unless changes were found to be warranted by a Rangeland Health Evaluation. Pls.' Mot. Ex. 4 at 2. BLM never mentioned the ARMPA standard or considered applying it. Neither the NEPA analysis in BLM's CX, nor the Secretary's Decision, considered any management thresholds and responses that would allow adjustments to livestock grazing already subjected to NEPA analysis.

## III.    THE BALANCE OF HARMS WEIGHS IN FAVOR OF AN INJUNCTION

Defendants repeat verbatim their argument about delay, how *Cottrell* is distinguishable because it involved logging, and how and a finding of irreparable harm is precluded because grazed vegetation grows back every year. Defs.' PI Resp. at 31–32. The Court held that six weeks was not a "'long' delay that undermines Plaintiffs' [TRO] motion" because "the harm has not yet occurred, the motion seeks to preserve the *status quo*, and the Court does not find that delay alone demonstrates a lack of irreparable harm." TRO Op. at 24. Because the amended

motion seeks only to enjoin likely harm from grazing on two allotments that has not yet occurred, any prior delay is no longer an issue, and cannot affect the amended motion. *See id.*

Regrowth of vegetation alone does not address Plaintiffs' harms, which flow from the ways in which resuming grazing is likely to irreparably harm Plaintiffs' interests in ecological recovery and from likely irreparable harm to sage-grouse and redband trout. Riparian recovery on the Hardie Summer allotment will likely take at least 20 years, Second Kauffman Decl. ¶ 36, sagebrush reestablishment following fire might take up to a century, Second McCormack Decl. ¶ 10, the Mud Creek allotment will likely not recover for 40-60 years, Third Braun Decl. ¶ 20, and grazing areas like the Mud Creek lek and summer habitat on the Hardie Summer allotment where sage-grouse are already stressed is likely to lead to extirpation of that lek and population-level declines, Second Braun Decl. ¶¶ 26–27. Both allotments are still recovering from the effects of past grazing and grazing-caused wildfire and will suffer serious, long-lasting ecological harms if grazing is reinstated. Third Braun Decl. ¶¶ 22–23; Second Kauffman Decl. ¶¶ 35–36. Like harms from logging, these harms will take decades to repair, if they can be repaired at all. The District of Idaho, in *Bennett*, enjoined grazing on 28 allotments to prevent harms like these. 392 F. Supp. 2d at 1229 (enjoining grazing in conjunction with sage-grouse decline).

Defendants' arguments that an injunction in the circumstances here would be unprecedented are overblown: this Court enjoined livestock grazing on the Murderers Creek allotment in the Malheur National Forest on the very day it was scheduled to begin upon finding likely success on the merits and likely irreparable harm to steelhead from grazing. *Or. Nat. Desert Ass'n*, 2008 WL 4186913, at *8. And this Court and others have regularly enjoined grazing far more extensive than the 997 AUMs on about 14,000 acres of public lands that would remain ungrazed on the Mud Creek and Hardie Summer allotments here, without apocalyptic

consequences. *See id.* at *5 (preliminary injunction barred grazing on over 120,000 acres of public land); *see also Bennett*, 392 F. Supp. 2d at 1229 (enjoining grazing on 28 allotments); *Or. Natural Desert Ass'n v. Singleton*, 75 F. Supp. 2d 1139, 1152–53 (D. Or. 1999) (permanent injunction against grazing along the Owyhee River that represented a loss of 26,976 AUMs).

Also, any harm to Defendants or HRI from enjoining 997 AUMs on Mud Creek and Hardie Summer allotments has been diminished or possibly eliminated by the additional, unpermitted grazing BLM has allowed on the Hammond allotment due to its "calculation error" and invocation of "unique and exigent circumstances" to allow 490 cattle to graze on that allotment from late May until July 2. *See* Defs.' TRO Resp. Ex. 3 at 1–2; Defs.' PI Resp. Ex. 4 at 1. HRI has benefitted from at least 500 AUMs of unpermitted use since May 28 and—if the 490 cattle entered the Hammond allotment when turnout began on March 25—HRI has already grazed more than 1,000 unpermitted AUMs on the Hammond allotment. Pls.' Mot. Ex. 3 at 1. BLM will offset the loss of revenue from the enjoined 997 AUMs by billing HRI for the excess actual use on the Hammond allotment. Defs.' TRO Resp. Ex. 3 at 2. And HRI received $587,590 in subsidies from the U.S. Department of Agriculture between 2014 and 2017, when it was not allowed to graze on the Hammond allotments, suggesting that any financial loss from not grazing the 997 AUMs at issue here might be offset by a similar mechanism. Ex. 6 at 2.[14]

Finally, Defendants claim that grazing is necessary to reduce the risk of wildfire. Not only have Plaintiffs established that grazing will actually *increase* the risk of wildfire by exacerbating the spread of cheatgrass, Second Braun Decl. ¶ 10, Second Kauffman Decl. ¶¶ 25–31, but *the massive wildfires of 2006 occurred after the allotments had been grazed yearly for decades*. Wildfire was a natural (and unnatural) occurrence on these allotments from 1980 to

---

[14] https://farm.ewg.org/persondetail.php?custnumber=A09419096 (visited June 22, 2019).

2006 despite annual grazing. Ex. 1 at 3 (map and details of fires). And BLM itself found that

allowing HRI to resume grazing could increase the risk of wildfire by giving HRI an "economic

incentive" to burn the public lands to increase cattle forage. *See* Pls.' Mot. Ex. 2 at 17.

Under these circumstances, the public's interests in preserving five years of ecological

recovery, sustaining and recovering robust sage-grouse populations on the allotments, and

preserving important redband trout habitat outweigh any speculative risk of fire. *See League of*

*Wilderness Defenders/Blue Mountains Biodiversity Proj. v. Connaughton*, 752 F.3d 755, 766

(9th Cir. 2014) (finding public's interest in preserving elk habitat outweighed speculative fire

risk); *see also* Second Kauffman Decl. ¶ 7 ("Grazing benefits to the few are far outweighed by

the negative impacts to the public's ecosystems services by the irreparable harm created by

continued livestock grazing on these allotments.")

## IV.    AN INJUNCTION IS IN THE PUBLIC INTEREST

"The public interest analysis involves weighing the importance of preserving the

environment, following the rule of law, and avoiding environmental damage to the public against

the economic interests of [the local area and defendant]" and other non-parties. *Mont. Envtl. Info.*

*Ctr. v. U.S. Office of Surface Mining*, No. CV 15-106-M-DWM, 2017 WL 5047901, at *5 (D.

Mont. Nov. 3, 2017); TRO Op. at 35. There is a strong public interest in ensuring the

government complies with the law, TRO Op. at 35, and private economic interests are

subordinated to the public interest in avoiding environmental harm. Pls.' TRO Reply at 31–32.

Plaintiffs seek to enjoin a single permittee from grazing on two grazing allotments until

the Court can rule on whether its grazing permit was lawfully issued. While Defendants try to

document "more than pecuniary harm" to the permittee through Declarations of interested parties

and amicus briefs, the concerns they raise amount to speculative opinions that failing to

immediately graze the allotments will increase the risk of wildfire and an effort to blame

Plaintiffs for the Bundy showdown. There is no scientific evidence in the record that grazing

reduces wildfire risk, and evidence that grazing by these permittees in particular will increase it.

Plaintiffs did not occupy the Malheur Wildlife Refuge, burn federal rangelands without

permission, or otherwise participate in any extreme conduct—they merely attempt to require

BLM and the Secretary of the Interior to comply with the law. It is unlikely there will be any

catastrophic financial consequences to the livestock industry in Oregon from the narrowly-

tailored injunction sought here, given that the industry collected over $110 million in livestock

subsidies from the U.S. Department of Agriculture between 2014 and 2017. Ex. 6 at 3. And it

bears repeating that the injunctive relief requested here would achieve a result that BLM itself

fought to secure during the five years leading up to the Secretary's January 2019 Decision.

## V.      THE COURT SHOULD WAIVE THE BOND REQUIREMENT

Defendants again have made no argument that Plaintiffs should require a bond, and

Plaintiffs therefore respectfully request that the Court waive the bond requirement of Rule 65(c).

## <u>CONCLUSION</u>

For the reasons stated above, Plaintiffs respectfully request that this Court issue relief as

requested in the amended motion for preliminary injunction. *Supra* p. i.

//

//

//

//

//

//

Respectfully submitted this 25th of June 2019.

    s/ David H. Becker

**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC

    s/ Talasi B. Brooks

**Talasi B. Brooks (*Pro hac vice*)**
Western Watersheds Project

    s/ Paul D. Ruprecht

**Paul D. Ruprecht (OSB # 132762)**
Western Watersheds Project

Attorneys for Plaintiffs Western Watersheds
Project, Center for Biological Diversity, and
WildEarth Guardians