**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC
4110 SE Hawthorne Blvd. # 168
Portland, OR 97214
(503) 388-9160
davebeckerlaw@gmail.com

**Talasi B. Brooks (*Pro hac vice*)**
Western Watersheds Project
PO Box 2863
Boise, ID 83701
(208) 336-9077
tbrooks@westernwatersheds.org

**Paul D. Ruprecht (OSB # 132762)**
Western Watersheds Project
PO Box 12356
Reno, NV 89510
(208) 421-4637
paul@westernwatersheds.org

Attorneys for Plaintiffs Western Watersheds Project, Center for Biological Diversity, and WildEarth Guardians

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# PENDLETON DIVISION

| | |
|---|---|
| **WESTERN WATERSHEDS PROJECT, CENTER FOR BIOLOGICAL DIVERSITY,** and **WILDEARTH GUARDIANS,**<br><br>    Plaintiffs,<br><br>    v.<br><br>**DAVID BERNHARDT**, Secretary of the Interior, **JEFFREY A. ROSE,** District Manager, Burns District Bureau of Land Management, and **BUREAU OF LAND MANAGEMENT,**<br><br>    Defendants. | Case No. 2:19-cv-750-SI<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' SUMMARY OF ARGUMENTS REGARDING IRREPARABLE HARM [ECF NO. 71]** |

# INTRODUCTION

In their Supplemental Brief, Defendants mischaracterize the facts and the law in asserting that Plaintiffs have failed to demonstrate likely irreparable harm. Defs.' Br. (ECF No. 71).

## I.     Irreparable Injury to Plaintiffs' Interests is the Standard for Injunctive Relief.

As the Ninth Circuit explained in *National Wildlife Federation v. National Marine Fisheries Service*, Plaintiffs must "show that *they themselves* are likely to suffer irreparable harm absent an injunction." 886 F.3d 803, 822 (9th Cir. 2018) (emphasis added). Irreparable harm includes harm to an organization's members' ability to "view, experience, and utilize the areas in their undisturbed state," *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011), as well as harm to their interests in protecting members of species and their habitat. *Nat'l Wildlife Fed'n*, 886 F.3d at 818–19.

Plaintiffs do not argue that this standard "entitles" them to a preliminary injunction on the basis of de minimis disturbance. Rather, Plaintiffs have established likely irreparable harm to their interests in preserving habitat for sage-grouse and redband trout after five years of rest from grazing, and in ensuring the conservation of these species—particularly the sage-grouse, whose numbers on these allotments have plummeted in the wake of the Grandad fire. Resumption of grazing will reverse five years of ecological recovery, disturb sage-grouse nesting and brood-rearing by degrading the few high-value habitat areas left for them on the allotments after the fire, and allow cows to access and damage redband trout habitat precisely where and when redband trout are most likely to be present.

Moreover, the threat to Plaintiffs' interests in rested, recovering lands from resuming grazing on these allotments is even greater than that in *Cottrell*. There, the Forest Service proposed to disturb 1,652 acres by logging, whereas here, grazing is likely to cause ecological

PLAINTIFFS' RESPONSE REGARDING IRREPARABLE HARM—1

damage on over 14,000 acres of public lands on the two allotments—much of it used by sage-grouse and redband trout—that will take decades to repair. Pls.' PI Reply at 3, 6 (ECF No. 57); Tr. at 20, 21, 30 (June 28) (Dr. Braun testimony that grazing would set back the process of recovery from the Grandad fire, which might take 40–60 years); Second Kauffman Decl. ¶¶ 33, 35 (ECF No. 59) (Hardie Summer allotment will take 20 years to fully recover from grazing and, if ecological recovery after five years of rest is reversed, recovery may not be possible *at all*).

By arguing that "vegetation grows back quickly," unlike logged trees, Defendants again misrepresent Plaintiffs' interests here. Defs.' Br. at 12. Plaintiffs' interests lie not in the vegetation itself but in the ecological value it provides. Defendants ignore that ecological damage from grazing can be as severe and long-lasting as logging because of its immediate harm to imperiled species and the long-term consequences of such harm, such as the extirpation of a local sage-grouse population. *See* Pls.' PI Reply at 13–14. Those effects are likely to irreparably harm plaintiffs' interests in the conservation of sage-grouse and redband trout and their habitat, because livestock out-compete sage-grouse for green forage and make it easier for predators to prey on them, and because livestock remove riparian vegetation and trample streambanks, increasing temperature and sedimentation in streams critical to redband trout.[1]

---

[1] This case is not like *Concerned Friends of the Winema v. McKay*, No. 1:19-cv-516-MC, Op. & Or. at 11 (ECF No. 31), where the Court found the risk to the species at issue there "speculative, rather than imminent" in light of Forest Service-imposed affirmative measures to protect the affected species by eliminating grazing in species-occupied areas and reducing overall grazing. *Id.* at 9–10. Here, BLM has never evaluated the effects of grazing to sage-grouse and redband trout; instituted no measures to keep cows out of sage-grouse or redband trout habitat; and consistently allowed HRI to graze more livestock for longer and different periods than allowed in its grazing permit, in every year grazing has occurred since the Grandad fire. Even if BLM tried yet another "new" grazing strategy, its past inability to hold HRI to the terms of its permit would distinguish this case from *Concerned Friends*. If grazing resumes, trailing cattle through Mud Creek to graze Hardie Summer allotment threatens imminent harm to Plaintiffs' interests. *See* Pls.' Supp. Br. on July 1 Exs. (ECF No. 69) at 2–4 (describing history of excess unpermitted use and prospect that up to 590 AUMs would be grazed on Mud Creek allotment during trailing).

## II. Resuming Grazing Will Irreparably Harm Sage-Grouse and Redband Trout.

### A. Likely Irreparable Harm to Sage-Grouse.

Sage-grouse on the Mud Creek and Hardie Summer allotments are suffering a death by a thousand cuts. Defendants suggestion that "an area that is already irreparably damaged by past activity cannot be said to be irreparably injured by some potential future activity," Defs.' Br. at 13, again misses the point: irreparable harm from grazing is *more*, not less, likely because the sage-grouse numbers and habitat conditions on these allotments are in such poor shape.

The Mud Creek lek site has been damaged by fire and mismanagement, degrading its value for sage-grouse. Tr. at 31–32 (June 28); Third Braun Decl. ¶¶ 17, 19 (ECF No. 58). Resuming grazing on this already-degraded habitat, and on the remaining areas of high-quality habitat on the Hardie Summer allotment, threatens harm to sage-grouse because even minor harm to a depressed population in habitat degraded by the Grandad fire is more likely to be irreparable and lead to disappearance of the local population. *See Nat'l Wildlife Fed'n*, 886 F.3d at 821 (affirming a preliminary injunction to protect salmon based, in part, on "the continued low abundance" of the species and that salmon were "vulnerable to extinction" as a result); *Natural Res. Def. Ctr. v. Ross*, 331 F. Supp. 3d 1338, 1368–69 (Ct. Int'l Trade 2018) (plaintiffs established irreparable harm to their enjoyment of a species from threat of fishing to the species' survival); *W. Watersheds Proj. v. Bennett*, 392 F. Supp. 2d 1217, 1229 (D. Idaho 2005) (enjoining grazing in part due to sage-grouse decline); Third Braun Decl. ¶ 41.

The Record shows that grazing will harm sage-grouse. The SageCon maps—which Mr. Obradovich admitted are the best evidence available absent telemetry data—establish that sage-grouse "probably" use portions of the Mud Creek and Hardie Summer allotments during the summer. Tr. at 161–62, 172–73 (June 28). Two males were counted on the Mud Creek lek this

year, and females have been observed coming to breed on the lek, which Mr. Obradovich testified means sage-grouse are likely present on the Mud Creek allotment for at least part of the year. *Id*. at 167. Grazing will harm these sage-grouse "through competition for access to forbs and possibly space." Second Braun Decl. ¶ 20 (ECF No. 29). Mr. Obradovich and Dr. Braun agree that cattle eat green forage that hens and chicks rely on and grass they use for concealment from predators. Tr. at 14–15, 170–71 (June 28). And, grazing will retard the reestablishment of forbs and grasses, increase cheatgrass, and increase the likelihood of wildfire. *Id*. at 21.

Given the perilous state of the Mud Creek lek, resuming grazing could cause the lek "to become inactive and the population of birds using the Hammond allotment to be extirpated." Second Braun Decl. ¶ 19. The likely harm to the remaining sage-grouse on these allotments, and extirpation of this population if grazing resumes, constitute irreparable harm. *Id*. ¶¶ 19–27. Mr. Obradovich testified that many leks on Steens Mountain suffer from the same downward trend as the Mud Creek lek, making it even more likely that harm to sage-grouse from resuming grazing on these allotments will have irreparable consequences at the regional level. Tr. at 166 (June 28). But BLM did not consider these effects in a NEPA analysis, let alone try to prevent them. Indeed, the decline of the 2019 lek count to only two male birds caused Mr. Obradovich no concern, and he only learned of it from reading Dr. Braun's Declaration. *Id.*

Dr. Braun testified that the unburned habitat on the Hardie Summer allotment is "keenly important to sage-grouse" due to habitat degradation elsewhere from the 2006 fire. Tr. at 23 (June 28); *see also id.* at 25 (Dr. Braun discussing importance of maintaining pieces of good quality habitat).[2] Mr. Obradovich testified that the burned portion of the Hardie Summer

---

[2] Defendants rely on population data from *before* the 2006 fires to argue that grazing will not harm sage-grouse. Defs.' Br. at 14. But those fires resulted in a steep population decline, making the remaining available habitat much more important for sage-grouse. *See* Tr. at 54 (June 28).

PLAINTIFFS' RESPONSE REGARDING IRREPARABLE HARM—4

allotment has not recovered from the effects of the 2006 fires, although sagebrush has begun to establish in some places. *Id*. at 165–66, 172. Grazing the allotment, even at 32 percent utilization, "would be very dangerous . . . because it would compound the . . . the effect on the habitat." *Id*. at 52; *see also id*. at 23. A 30 to 32% utilization is not "proper" on either allotment because so much sagebrush habitat has already been damaged by the Grandad fire and because livestock are likely to utilize a far higher percentage of vegetation in riparian areas on which sage-grouse and redband trout depend. Tr. at 51–52, 60–63.

Sage-grouse are still using the Mud Creek lek and nearby areas, despite the damage wrought by the Grandad fire, and eventual recovery is possible if grazing is suspended—it will simply take a long time. In light of the lingering damage from the 2006 fire, enhanced protection from grazing for the remaining small population of sage-grouse is warranted right now.

### B.  Likely Irreparably Harm to Redband Trout.

Defendants urge this Court to infer irreparable harm to redband trout is unlikely from sources that do not consider grazing effects to redband trout. BLM has apparently never collected any monitoring data about redband trout populations on the allotments. Tr. at 58 (July 2). It has done no formal riparian monitoring on the allotments since before the 2006 fires. *Id*. at 49–50. Ms. Davies—the Burns District fish biologist at the time—did not help prepare the 2006 PFC assessments. *Id*. at 42. BLM has conducted no temperature monitoring on the headwaters streams in the Hardie Summer allotment and no riparian utilization monitoring. *Id*. at 58, 54.

Resuming grazing on the Hardie Summer allotment is likely to irreparably harm redband trout that inhabit the headwaters streams because, as Ms. Davies testified, cattle can access those streams, which are particularly important to redband. Tr. at 46–47 (July 2). The same low-gradient reaches where redband spawn and remain are those that are accessible to cattle. *Id*. at

112. Cattle damage riparian areas by trampling banks, which increases sedimentation and stream temperatures, and Dr. Stringham admitted they have caused those effects on the Hardie Summer allotment. *Id.* at 98, 123. All of these effects harm habitat elements redband trout need to survive. *Id*. at 70–71 (describing elements redband trout need); *id*. at 65–66 (explaining harm to habitat).

The 2006 fires increased the likelihood that these effects will occur. BLM's own post-fire vegetation map shows vegetation mortality around Big Fir and Little Fir Creeks on the Hardie Summer allotment following the 2006 fires. *Id*. at 51–52. To the extent the fires created gaps in the vegetation, Dr. Stringham's testimony establishes that cattle would likely use such "openings in the canopy" to access riparian areas. *Id.* at 123.

Moreover, Defendants' aerial photographs do not prove the areas are recovering because they do not show what kind of vegetation is present. The 2018 Hardie Summer RHA described "extensive juniper encroachment" into riparian areas, and much of the vegetation in the aerial photographs is likely to be juniper. Defs.' PI Resp. (ECF No. 39) Ex. 2 at 3.

Nor does ODFW's assessment that the Blitzen population of redband trout is stable negate the showing of irreparable harm. No showing of harm to the population is necessary. *See Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1073 (9th Cir. 1996) (harm to a single member of a species may be irreparable harm). Plaintiffs have shown likely irreparable harm from grazing to their interests in conservation of redband trout and trout habitat that is present on the allotments.

**C. Dr. Stringham's Testimony Does not Refute the Showing of Irreparable Harm.**

Defendants try to paint Dr. Braun's and Dr. Kauffman's opinions that grazing will spread cheatgrass, exacerbate the risk of fire, and increase juniper encroachment as "outliers" when in fact they represent the majority view. *See* Third Braun Decl. Exs. 2–7. ODFW agrees that "livestock grazing can impact sage-grouse by . . . damaging soil crusts in a manner that reduces

vegetation diversity and contributes to annual-grass invasion." Tr. at 127 (June 28). The U.S. Fish and Wildlife Service recognizes that grazing can cause or exacerbate juniper invasion. 75 Fed. Reg. 13912, 13933, 13937–38 (Mar. 23, 2010). Mr. Obradovich admits that grazing can serve as a vector for invasive grasses. Tr. at 171 (June 28). Exotic annual grasses "increase fire frequency." 75 Fed. Reg. at 13932. Despite this broad consensus, Dr. Stringham relies on a pseudo-replicated case study and unreplicated studies aimed at sustaining the livestock industry as bases for her opinions. *See generally* Pls. Resp. to Defs.' Supp. Exs. at 1–5 (ECF No. 72).

Dr. Kauffman explained in detail why Rosgen classifications are not a good way of estimating ecological impacts. Tr. at 97–99 (June 28). Dr. Stringham's effort to refute Dr. Kauffman's testimony regarding trampling impacts is negated by her identification of two areas of concentrated use with trampling damage on the Hardie Summer allotment, and of a third in one of BLM's photographs. Tr. at 98, 123 (July 2). And Dr. Kauffman's testimony that willows can be highlined by cattle is corroborated by Dr. Stringham's own research, which studied "Use of felled junipers to protect willows from browsing." Stringham Decl. (ECF No. 61), Att. A.

### III. **A NEPA Violation Can Support a Showing of Irreparable Harm.**

Recognizing that a violation of NEPA can cause irreparable harm when the agency commits to a course of action without adequate analysis is not the same as applying a presumption that *any* violation of NEPA constitutes irreparable harm. *See* Pls.' PI Reply at 20–21; Pls.' TRO Reply at 22–25 (ECF No. 28). Defendants' statements in litigation only confirm that they are intractably committed to allowing grazing despite their failure to conduct an adequate NEPA analysis, underscoring that injunctive relief is proper here. *See id.*

### CONCLUSION

For these reasons, the Court should grant the requested injunctive relief.

PLAINTIFFS' RESPONSE REGARDING IRREPARABLE HARM—7

Respectfully submitted this 12th of July 2019.

  s/ David H. Becker
**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC

  s/ Talasi B. Brooks
**Talasi B. Brooks (*Pro hac vice*)**
Western Watersheds Project

  s/ Paul D. Ruprecht
**Paul D. Ruprecht (OSB # 132762)**
Western Watersheds Project

Attorneys for Plaintiffs Western Watersheds Project, Center for Biological Diversity, and WildEarth Guardians

PLAINTIFFS' RESPONSE REGARDING IRREPARABLE HARM—8