# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **WESTERN WATERSHEDS PROJECT, CENTER FOR BIOLOGICAL DIVERSITY,** and **WILDEARTH GUARDIANS**, | Case No. 2:19-cv-0750-SI |
| | **OPINION AND ORDER** |
| Plaintiffs, | |
| v. | |
| **DAVID BERNHARDT**, Secretary of the Interior, **JEFFREY ROSE,** District Manager Burns District Bureau of Land Management, and **BUREAU OF LAND MANAGEMENT**, | |
| Defendants. | |

David H. Becker, LAW OFFICE OF DAVID H. BECKER, LLC, 4110 SE Hawthorne Blvd. No. 168, Portland, OR 97214; Talasi B. Brooks, WESTERN WATERSHEDS PROJECT, INC., P.O. Box 2863, Boise, ID 83701; Paul David Ruprecht, WESTERN WATERSHEDS PROJECT, INC., PO Box 12356, Reno, NV 89510. Of Attorneys for Plaintiffs.

Billy J. Williams, United States Attorney, and Stephen J. Odell, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiffs bring this action challenging Defendants' grant of a renewed Grazing Permit

(the "Permit") to Hammond Ranches, Inc. ("HRI") on four allotments—Mud Creek, Hammond,

Hammond FFR, and Hardie Summer. Plaintiffs argue that then-Secretary of the Interior Ryan

Zinke[1] and Defendant Bureau of Land Management ("BLM") acted arbitrarily and capriciously in violation of the Administrative Procedures Act ("APA")[2] because they failed to follow the requirements of the National Environmental Policy Act of 1969 ("NEPA"),[3] the Federal Land Policy and Management Act of 1976 ("FLPMA"),[4] and applicable BLM regulations. Plaintiffs allege that Defendants violated these statutes and regulations when Secretary Zinke ordered that HRI's previous grazing permit be renewed without conducting the analyses required by the FLPMA, BLM regulations, and NEPA, and under the 2015 Oregon Greater Sage-Grouse Approved RMP Amendment ("GSG-ARMPA"). Plaintiffs also allege that Defendants violated these statutes when BLM issued a categorical exclusion environmental review and approval ("CX") and the approved Permit without performing the required analyses.

Plaintiffs filed a motion for temporary restraining order ("TRO") and preliminary injunction to enjoin grazing on the four allotments. On June 4, 2019, the Court granted Plaintiffs' motion for a TRO and enjoined grazing on the Mud Creek and Hardie Summer allotments through July 2, 2019. The TRO was extended until July 17, 2019 at 5:00 p.m., by the stipulation of the parties. Before the Court is Plaintiffs' amended motion for preliminary injunction, requesting an order enjoining Defendants from allowing turnout and grazing of livestock on the Mud Creek and Hardie Summer allotments until the Court resolves the merits of this case. It is the parties' and the Court's intention to resolve the merits of the case before the 2020 grazing season begins.

---

[1] Defendant David Bernhardt is the current Secretary of the Interior.

[2] 5 U.S.C. §§ 701 *et seq.*

[3] 42 U.S.C. §§ 4321 *et seq.*

[4] 43 U.S.C. §§ 1701 *et seq.*

HRI's cattle are currently on the Hammond and Hammond FFR allotments. The cattle have not yet entered the Mud Creek or Hardie Summer allotments. Thus, the requested injunction would not require any cattle be removed from either allotment.

Defendants respond to Plaintiffs' motion for a preliminary injunction primarily by arguing that Plaintiffs have not demonstrated that they will suffer irreparable harm on the Hardie Summer allotment[5] in the absence of preliminary relief. Defendants also argue Plaintiffs fail to show that they are likely to succeed on the merits of their claims and that the balance of the equities and public interest considerations support issuing a preliminary injunction. On June 28 and July 2, 2019, the Court held an evidentiary hearing on Plaintiffs' motion.

At the beginning of the hearing on June 28th, Defendants proposed an alternative grazing plan for the Court's consideration. Under this proposed amended grazing plan, there would be no authorized grazing on the Mud Creek allotment except for when the cattle "quickly and methodically trail through" to get to the Hardie Summer allotment.[6] On the Hardie Summer allotment, the pasture known as Fir Creek[7] would be rested, and the remaining pastures would be

---

[5] Defendants did not present evidence or argument regarding irreparable harm on Mud Creek in response to this motion, although Defendants provided such information in response to Plaintiffs' motion for a TRO.

[6] Defense counsel only proposed trailing through the Mud Creek allotment "to get to Hardie Summer." The Court's order will permit "trailing through" also to return from the Hardie Summer allotment if needed, but will limit the total number of days cattle may be in the Mud Creek allotment due to the extremely poor condition of the allotment and the presence of the sage-grouse lek on the allotment.

[7] At the hearing, counsel described the pasture as "Fir Creek No. 4," but in the exhibits submitted to the Court the pasture is referenced as "Fir Creek." *See, e.g.* ECF 24, 40. The Court believes the reference to "number four" is meant to indicate that Fir Creek is the fourth of the five pastures in the Hardie Summer allotment. The Court references the pasture as it is described in the exhibits—"Fir Creek." To the extent there is, however, a difference between "Fir Creek" and "Fir Creek No. 4," the Court intends for the rested pasture to be the pasture referenced by counsel at the hearing.

grazed at a 30 percent utilization standard instead of the 50 percent utilization standard authorized in the Permit. For the reasons discussed below, the Court grants in part Plaintiffs' motion for a preliminary injunction. The Court enjoins any turnout and grazing beyond the amended grazing plan proposed by Defendants at the beginning of the June 28, 2019 hearing.

## STANDARDS

### A.  Motion for a Preliminary Injunction

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

## B.  National Environmental Policy Act

NEPA "is our basic national charter for protection of the environment." 40 C.F.R.

§ 1500.1(a).[8] "NEPA requires that 'to the fullest extent possible . . . all agencies of the Federal

Government shall' complete an environmental impact statement (EIS) in connection with 'every

recommendation or report on proposals for legislation and other major Federal actions

significantly affecting the quality of the human environment.'" *San Luis & Delta-Mendota Water*

*Auth. v. Jewell*, 747 F.3d 581, 640-41 (9th Cir. 2014) (alteration in original) (quoting 42 U.S.C.

§ 4332(2)(C)). "In addition to the proposed agency action, every EIS must '[r]igorously explore

and objectively evaluate all reasonable alternatives' to that action. 40 C.F.R. § 1502.14(a). The

analysis of alternatives to the proposed action is 'the heart of the environmental impact

statement.'" *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th

Cir. 2010) (second citation omitted). The purpose of NEPA is twofold: "(1) to ensure that

agencies carefully consider information about significant environmental impacts and (2) to

guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface*

*Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011). "In order to accomplish this, NEPA imposes

procedural requirements designed to force agencies to take a 'hard look' at environmental

consequences." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005) (citation omitted).

---

[8] The Council on Environmental Quality promulgates regulations implementing NEPA
(40 CFR Parts 1500-1508) that are binding on federal agencies and are given substantial
deference by courts. *See Cal. ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of
the Interior*, 767 F.3d 781, 789 n.3 (9th Cir. 2014) (given substantial deference by courts);
*ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1138 n.3 (9th Cir. 1998) (binding on
federal agencies).

**C.  Federal Land Policy and Management Act and BLM Regulations**

Grazing on federal lands is governed by, among other statutes and regulations, the Taylor

Grazing Act of 1934[9] ("Taylor Grazing Act") and the FLPMA. The Taylor Grazing Act requires

persons seeking to graze livestock on public lands to obtain a permit from the Department of the

Interior. The Taylor Grazing Act provides for the "orderly use, improvement, and development

of the range" on public lands. 43 U.S.C. § 315a. "The Taylor Grazing Act authorized the

Secretary of the Interior 'to issue or cause to be issued permits to graze livestock' pursuant to

'his rules and regulations.'" *United States v. Estate of Hage*, 810 F.3d 712, 717 (9th Cir. 2016)

(quoting 43 U.S.C. § 315b). "[T]he implied license under which the United States has suffered

its public domain to be used as a pasture for sheep and cattle . . . was curtailed and qualified by

Congress, to the extent that such privilege should not be exercised in contravention of the rules

and regulations." *United States v. Grimaud*, 220 U.S. 506, 521 (1911) (citation omitted).

The goals of the Taylor Grazing Act "are to 'stop injury' to the lands from 'overgrazing

and soil deterioration,' to "provide for their use, improvement and development," and 'to

stabilize the livestock industry dependent on the public range.'" *Pub. Lands Council v. Babbitt*,

529 U.S. 728, 733 (2000) (quoting 48 Stat. 1269). "As grazing allocations were determined, the

Department would issue a permit measuring grazing privileges in terms of 'animal unit months'

(AUMs), *i.e.*, the right to obtain the forage needed to sustain one cow (or five sheep) for one

month." *Id.* at 735; *see also* 43 C.F.R. § 4100.0-5 (defining AUM).

The FLPMA provides additional direction for the management of public lands. "In

enacting FLPMA, 'Congress declared that it is the policy of the United States to manage the

public lands in a manner that will protect the quality of scientific, scenic, historical, ecological,

---

[9] 43 U.S.C. § 315 *et seq*.

environmental, air, and atmospheric, water resource, and archeological values.'" *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 498-99 (9th Cir. 2011) (quoting *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 581 F.3d 1063, 1075 (9th Cir. 2009)). The FLPMA instructs that permits for grazing on public lands ordinarily shall be issued for a 10-year term, subject to such terms and conditions as BLM deems appropriate and consistent with governing law. 43 U.S.C. § 1752(a). The FLPMA also establishes that a permittee holding an expiring grazing permit will be given first priority for renewal if the permittee "is in compliance with the rules and regulations issued [by the Secretary] and the terms and conditions of the permit." 43 U.S.C. § 1752(c).

BLM has issued regulations to implement the Taylor Grazing Act and the FLPMA. 43 C.F.R. §§ 4100-4190.1 (2005).[10] BLM's regulations specify "mandatory qualifications" for an applicant for a permit for grazing on public lands. 43 C.F.R. § 4110.1. These include that any applicant for renewal of a grazing permit "*must be* determined by the authorized officer to have a satisfactory record of performance." *Id.* § 4110.1(b) (emphasis added). The regulations further provide that the authorized officer "*will determine* whether applicants for the renewal of permits . . . and any affiliates, have a satisfactory record of performance," and that "[t]he authorized officer *will not renew* . . . a permit . . . unless the applicant and all affiliates have a satisfactory record of performance." *Id.* § 4130.1-1(b) (emphasis added). A satisfactory record means that the applicant is in "substantial compliance with" regulations applicable to the permit. *Id.* § 4130.1-1(b)(1)(i). "The authorized officer may take into consideration

---

[10] Although BLM issued amended regulations in 2006, those regulations have been enjoined by the U.S. District Court for the District of Idaho, *see W. Watersheds Project v. Kraayenbrink*, 538 F. Supp. 2d 1302 (D. Idaho 2008), and are not in effect for the relevant BLM field office.

circumstances beyond the control of the applicant or affiliate in determining whether the applicant and affiliates are in substantial compliance with permit or lease terms and conditions and applicable rules and regulations." *Id.* § 4130.1-1(b)(1)(ii).

BLM regulations applicable to a grazing permit prohibit: "(3) Cutting, burning, spraying, destroying, or removing vegetation without authorization"; and "(4) Damaging or removing U.S. property without authorization." *Id.* § 4140.l(b). BLM also has regulations applicable to preventing wildfires, which apply to users of public lands, including grazing permit holders. These regulations prohibit, without authorization, a user to: "[c]ause a fire, other than a campfire, or the industrial flaring of gas, to be ignited by any source; [b]urn, timber, trees, slash, brush, tundra or grass except as used in campfires; [l]eave a fire without extinguishing it; [or] [r]esist or interfere with the efforts of firefighter(s) to extinguish a fire." *Id.* § 9212.1(a), (c), (d), (f).

FLPMA also directs BLM to develop and maintain comprehensive Resource Management Plans ("RMPs") that govern all aspects of public land management, including grazing administration. 43 U.S.C. § 1712. Grazing permits must be consistent with RMPs. 43 U.S.C. § 1732(a); 43 C.F.R. § 4100.0-8. RMPs constrain grazing permits by determining where grazing will or will not be allowed and by setting environmental standards that grazing permits must meet. *See* 43 U.S.C. § 1732(a) (requiring management "in accordance with the [RMPs]"); *id.* § 1752(c)(1) (conditioning renewal of grazing permits on lands remaining available for grazing in accordance with RMPs).

The land use plans covering the four allotments at issue in this case are the Steens Mountain Cooperative Management and Protection Area ("CMPA") Resource RMP and the Andrews Management Unit RMP, both approved in July 2005. In 2015, both of these RMPs were amended by the Oregon GSG-ARMPA. The GSG-ARMPA defines various categories of

important sage-grouse habitat requiring special protection and consideration, including Priority

Habitat Management Areas ("PHMAs"), General Habitat Management Areas ("GHMAs"), and

Sagebrush Focal Areas ("SFAs"), which are a subset of PHMAs. PHMAs are "BLM-

administered lands identified as having the highest value to maintaining sustainable [greater

sage-grouse] populations." GHMAs are "BLM-administered lands where some special

management will apply to sustain [greater sage-grouse populations; areas of occupied seasonal or

year-round habitat outside of PHMA[s]." SFAs are areas that "represent recognized strongholds

for [greater sage-grouse]."

The 2015 GSG-ARMPA also specifies certain "Management Decisions." One of these

requires that any "NEPA analysis for renewals . . . of livestock grazing permits/leases that

include lands within SFA and PHMA will include specific management thresholds based on

[greater sage-grouse] Habitat Objectives . . . Land Health Standards . . . and ecological site

potential, and one or more defined responses that will allow the authorizing officer to make

adjustments to livestock grazing that have already been subjected to NEPA analysis."

**D.  Administrative Procedures Act**

Neither NEPA nor the FLPMA provide a separate standard of review. Thus, claims under

these Acts are reviewed under the standards of the APA. *See Jewell*, 747 F.3d at 601 (NEPA);

*Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 994 (9th Cir. 2013) (FLPMA). Under the

APA, "an agency action must be upheld on review unless it is 'arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law.'" *Jewell*, 747 F.3d at 601 (quoting 5 U.S.C.

§ 706(2)(A)). A reviewing court "must consider whether the decision was based on a

consideration of the relevant factors and whether there has been a clear error of judgment." *Id.*

(quotation marks and citation omitted). The reviewing court's inquiry must be "thorough," but

"the standard of review is highly deferential; the agency's decision is entitled to a presumption of

PAGE 9 – OPINION AND ORDER

regularity, and [the court] may not substitute [its] judgment for that of the agency." *Id.* (quotation marks and citation omitted).

Although a court's review is deferential, the court "must engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it." *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2007). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see also Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001) ("The presumption of agency expertise can be rebutted when its decisions, while relying on scientific expertise, are not reasoned."). The reasoned-decisionmaking requirement, the Supreme Court has often observed, includes a duty to explain any "departure from prior norms." *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973); *see also Int'l Union, UAW v. NLRB*, 802 F.2d 969, 973-74 (7th Cir. 1986) ("[A]n administrative agency is not allowed to change direction without some explanation of what it is doing and why."). A court also "must not 'rubber-stamp' . . . administrative decisions that [it] deem[s] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 858 (9th Cir. 2005) (first alteration in original, remaining alterations added).

## FINDINGS OF FACT

Based on the evidence presented by the parties, the Court finds the following facts are more likely true than not:

**Background of HRI's Permit**

1.       HRI is a family-owned Oregon ranching corporation. Its shareholders are Steven

Dwight Hammond, his wife Earlyna Hammond, and his parents Dwight Lincoln Hammond and

Susan Hammond, through their Trust. Steven Hammond is the President of HRI, Dwight

Hammond is the Vice President, and Earlyna Hammond is the Secretary.

2.       HRI began grazing on public BLM lands in 1964. Before the Permit at issue in

this case, the most recent permit granted to HRI was Permit No. 3602564, which had a term from

March 1, 2004 to February 28, 2014. This permit authorized, for each year: 68 cattle and 471

AUMs on Hammond, from April 1 to October 30; 32 cattle and 32 AUMs on Hammond FFR,

from April 1 to April 30; 390 cattle and 590 AUMs on Mud Creek, from May 16 to June 30;

and 408 cattle and 407 AUMs on Hardie Summer, from July 1 to September 30.

3.       On February 14, 2014, BLM denied HRI's Application for Permit Renewal. BLM

explained that under its regulations permit holders and their "affiliates" must be in compliance

with the rules and regulations issued by the Secretary of the Department of the Interior and the

terms and conditions in the permit. BLM found that Steven Hammond and Dwight Hammond

were affiliates of HRI. BLM also found that their criminal convictions for intentionally setting

fires on public lands violated the regulations prohibiting cutting, burning spraying, destroying, or

removing vegetation without authorization and damaging or removing U.S. property without

authorization. 43 C.F.R. § 4140.1. BLM further concluded that the Hammonds' conduct

violated 43 C.F.R. § 9212.1(a), (c), (d), and (f).

4.       BLM summarized in detail the witness testimony at the criminal trial, and

characterized this testimony as demonstrating "how the Hammonds violated BLM grazing

regulations and the terms of [HRI's] grazing permit, endangered the lives of numerous

individuals, including firefighters, and altered ecological conditions on public lands." BLM

described testimony of the Hammonds lighting multiple fires.

5.    Steven Hammond was convicted of two counts, one relating to a 2001 fire and

one relating to a 2006 fire. Dwight Hammond was convicted of one count, relating to a 2006 fire.

The jury acquitted the Hammonds of several charges. The jury could not reach a verdict on

several charges and the judge instructed the jury to continue deliberations on those charges.

While the jury was deliberating, the prosecution and defense reached an agreement and the trial

ended.

6.    In reaching its final decision in 2014 denying HRI's application to renew Permit

No. 3602564, BLM accepted the sworn testimony at trial and, after a "thorough[] review[],"

rejected the protest filed by HRI that the sworn testimony was inaccurate or incomplete.

7.    BLM concluded that HRI and its affiliates had an unsatisfactory record of

performance. BLM stated: "The Hammond fire-setting maliciously and knowingly placed public

recreationists, firefighters, and BLM range staff at high risk just to further [HRI's] grazing

interests." BLM also noted that the "Hammonds set the fires because they disagreed with how

BLM managed the land. The Hammonds acted in the interest of improving the rangeland forage

for their cattle, but not necessarily for other resources like wildlife habitat."

8.    BLM concluded that each criminal conviction, standing alone or in combination,

constitutes an unsatisfactory record of performance. BLM explained:

> The Hammonds' malicious disregard for human life and public
> property shows contempt for BLM regulation of public land. The
> Hammonds' interference with firefighting efforts is antithetical to
> orderly use of resources. The Hammonds' disregard for orderly
> and planned prescribed burning that accounts for ecological
> objectives and human safety is incompatible with the orderly use
> and improvement of resources. The BLM carefully plans and
> conducts prescribed burns to meet ecological objectives, such as

> retaining sagebrush and bitterbrush habitat. By taking matters into
> their own hands and burning public lands outside of the official
> BLM process, the Hammonds altered the Burns District's
> prescribed fire management strategy for years to come. Good
> stewardship is more than just producing grass for livestock—it
> requires orderly conduct that protects the multiple objectives of
> public lands and the lives of those who work and recreate on public
> lands.

9.      BLM also concluded that the Hammonds' "additional fire-setting described in the criminal trial," outside of their criminal convictions, constituted an unsatisfactory record of performance. BLM found that "the testimony shows a pattern of intentional fire-setting by Dwight and Steven Hammond—beyond the fires for which they were convicted—demonstrating their callous disregard for human life and BLM multiple use objectives for the land."

10.     HRI appealed BLM's decision and sought a stay of the decision. On April 28, 2014, the Office of Hearings and Appeals ("OHA") denied the Hammonds' motion for a stay and BLM's decision went into effect. OHA found that the criminal convictions were sufficient to establish violations of governing regulations. OHA also found that BLM correctly relied on other evidence of "multiple instances of the Hammonds setting fires to eliminate juniper for the purpose of increasing forage for their cattle" and held that their "pattern of starting fires that damage vegetation on public lands and endangers lives is sufficiently serious to warrant permit non-renewal."

11.     HRI appealed the stay denial to the Interior Board of Land Appeals, and it affirmed the denial of the stay. Meanwhile, in the appeal the OHA was considering, the assigned judge was evaluating whether to have the case proceed to summary judgment or directly to a hearing. Industry trade organizations began lobbying then-Secretary of the Interior Zinke and President Donald J. Trump. Between May and November 2018, briefs were filed before the assigned OHA judge.

PAGE 13 – OPINION AND ORDER

12.     On July 10, 2018, President Trump issued Executive Grants of Clemency,
pardoning Steve and Dwight Hammond for their crimes and commuting their sentences. Steve
Hammond had served three years of his five-year sentence and Dwight Hammond had served
four years of his five-year sentence.

13.     On December 28, 2018, Secretary Zinke exercised his authority to assume
jurisdiction over the appeal the OHA was considering. On January 2, 2019, his last day in office,
Secretary Zinke issued his decision. He set out the factual and procedural history of the case in
slightly more than one page, the applicable law in slightly more than one page, and his analysis
in one paragraph. Secretary Zinke's analysis, in its entirety, states:

> I find that the pardons constitute unique and important changed
> circumstances since the BLM made its decision. In light of the
> Grants of Executive Clemency, the years of imprisonment, and
> civil damages paid by the Hammonds, I find that it is consistent
> with the intent of the pardons—and in particular their reflection of
> the President's judgment as to the seriousness of the Hammonds'
> offenses—to renew the Hammonds' permit for the duration of the
> term that would have commenced in 2014. The Hammonds'
> continuance of grazing will depend on compliance with BLM's
> grazing regulations. I do not find fault with BLM's assessment of
> the law and facts in its 2014 Decision and I reiterate BLM' s
> concern for human safety on public lands. The safety of our
> Nation's firefighters and others working and recreating on public
> lands remains paramount. I will ask BLM to keep the Office of the
> Secretary apprised of any permit compliance and human safety
> issues.

14.     Secretary Zinke concluded his decision by remanding "the matter to BLM with
instructions to renew, within 30 days of the date of this decision, the permit under the same terms
and conditions for the balance of the renewal period."

15.     On February 5, 2019, BLM Rangeland Management Specialist Jamie McCormack
circulated a memorandum to Burns District Manager Jeffrey Rose. This memorandum noted that
Secretary Zinke had directed BLM to renew the Permit under the same terms and conditions as

the previous permit. The memorandum stated that BLM had conducted standards and guidelines assessments and evaluations in 2018 on the four allotments, standards were being achieved except the standard relating to species, the failure of that standard was not caused by grazing, and thus the Permit qualified for a CX under the FLPMA, which constitutes compliance with NEPA. Mr. Rose concurred with this conclusion.

16.     The CX was dated February 1, 2019, but signed on February 4 and 5, 2019. It concluded that "the proposed action did not trigger any of the extraordinary circumstances described in 43 C.F.R. § 46.215." The CX also concluded that the Permit was "in conformance with the [land use plans], qualifies as a categorical exclusion, and does not require further NEPA analysis."

17.     On February 13, 2019, Jeffrey Rose of BLM and Steve Hammond of HRI signed the Permit, with an effective date of February 1, 2019 through February 28, 2024.

18.     BLM did not complete an EIS or environmental assessment ("EA") analyzing the Permit's proposed grazing on the allotments, or any alternatives. There is no evidence in the record that BLM previously conducted an EA or an EIS with respect to any earlier permits.

**Plaintiffs' Receipt of Permit and CX**

19.     On January 29, 2019, counsel for Plaintiff Western Watersheds Project ("Western Watersheds") noted the media coverage of Secretary Zinke's decision and asked the Department of the Interior and BLM for a copy of that decision. Both agencies provided a copy that same day. BLM noted, however, that they had just received the decision and "the details of how we will implement this decision have not been finalized."

20.     Plaintiffs requested copies of documents relating to the decision, including a copy of the Permit, and submitted a request under the Freedom of Information Act ("FOIA"). On

March 25, 2019, Plaintiffs again requested a copy of the Permit, noting that Western Watersheds had not yet received a copy. BLM responded that because Western Watersheds had submitted a FOIA request, the information would be provided under that request.

21.     On April 1, 2019, counsel for Western Watersheds responded to BLM, noting that the statutory deadline under FOIA had expired without a response, BLM had indicated it would not provide any response to the FOIA request until May 22, 2019, Western Watersheds believed it had a right to the information as an "interested party" under BLM regulations, and it would be a simple matter to email a copy. BLM provided a copy of the Permit and CX to Western Watersheds on April 1, 2019.

22.     Although the Permit authorized grazing to begin on April 1, HRI began grazing on March 25, 2019. No application for different use than is authorized by the Permit, which is required by the Permit before such changed use can begin, was provided to the Court.

23.     The Permit authorized 68 cattle and 471 AUMs on the Hammond allotment.[11] BLM "orally" authorized an increase of up to 490 cattle. No application for different use than is authorized by the Permit, which is required by the Permit before such changed use can begin, was provided to the Court. BLM later realized they had "miscalculated" that this number of cattle would comply with the Permit's limitation of 471 AUMs, and thus noted that HRI's total AUMs were in excess of the Permit.

24.     BLM issued letters to HRI adjusting the time frame and number of cattle that could be grazed on the Mud Creek and Hardie Summer allotments, in part due to this litigation.

---

[11] The Hammond allotment is authorized for grazing for seven months and is designated as 99 percent active. Thus, the total AUMs are calculated at 68 (cows) times 7 (months) times .99 equals 471.

**Characteristics of the Allotments**

25.      The Mud Creek allotment is approximately 8,200 acres, all of which is publicly-owned. It contains streams, including Dry Creek and Mud Creek.

26.      The Hardie Summer allotment is approximately 9,800 acres, of which approximately 39 percent is owned by HRI and 61 percent (6,000 acres) is publicly-owned. The allotment is subdivided into five pastures on which the cattle rotate during grazing. The Bridge Creek pasture is publicly-owned, the Cabin pasture is nearly equally owned between BLM and HRI, and the North, Fir Creek, and Sylvies pastures are predominantly owned by HRI.

27.      The Hardie Summer allotment also contains five streams, consisting of 3.3 miles of publicly-owned streams with riparian habitat. These streams are: Big Fir Creek, Little Fir Creek, Fish Creek, Lake Creek, and Big Bridge Creek. Big Fir Creek and Little Fir Creek are perennial streams with a significant portion (about half) on public land. Fish Creek is on private land and about 90 percent of Lake Creek is on private land. Big Bridge Creek is an intermittent stream that is mostly on private land. These streams are home to redband trout.

28.      The two allotments lie within the Steens Mountain CMPA. This area was designated by Congress with the purpose "to conserve, protect, and manage the long-term ecological integrity of Steens Mountain for future and present generations." 16 U.S.C. § 460nnn-12(a). Objectives of this designation include to promote grazing, recreation, historic, and other uses that are sustainable, and to ensure the conservation, protection, and improved management of the ecological, social, and economic environment of the CMPA, including geological, biological, wildlife, riparian, and scenic resources. *Id.* § 460nnn-12(b)(2), (4).

29.     To assess the effects of this grazing, BLM developed a set of standards to measure the status of the soil, vegetation, riparian areas, and wildlife on the range. The standards are known as the Standards for Rangeland Health.

30.     BLM completed evaluations of Standards for Rangeland Health on the Mud Creek and Hardie Summer allotments in 2007 and 2018. These assessments were performed by an interdisciplinary team consisting of multiple agency specialists. The 2007 evaluation was based on data gathered by interdisciplinary teams in 2006, before the fires that had been set by the Hammonds in August 2006 burned much of the allotments and thus changed their rangeland characteristics.

31.     For the Mud Creek allotment, the 2007 evaluation concluded that the allotment was not meeting two of the five standards, Standard 5 that relates to native species, species listed under the Endangered Species Act ("ESA"), or locally important species, and Standard 3 that relates to ecological processes. The 2018 evaluation concluded that the allotment was not meeting Standard 5. The assessment further noted that an Assessment, Inventory, and Monitoring project was initiated in 2016 but sage-grouse habitat determinations could not be completed until the data collection is finished in 2020. Based on available information, BLM found that sage-grouse habitat overall was rated as "marginal" because of the lack of sagebrush cover and continuity due to recent fires and juniper encroachment, and the presence of invasive annual grasses. The evaluation found that sage-grouse habitat exists on the allotment and where it does, it is suitable for winter, leking,[12] nesting, and early spring brood rearing.

32.     For the Hardie Summer allotment, the 2007 evaluation found that all five standards were being met. The 2018 evaluation found that the allotment did not meet Standard 5.

_____

[12] A "lek" is a sage-grouse breeding ground. "Leking" means breeding.

PAGE 18 – OPINION AND ORDER

The Hardie Summer allotment failed this standard because species composition and diversity had been altered. The assessment noted this alteration was likely caused by juniper encroachment and fire. The assessment also noted that although there were no known sage-grouse leks on the allotment, "year-round habitat for sage-grouse does occur where sagebrush is present." ECF 39-2 at 3. The assessment further noted that an Assessment, Inventory, and Monitoring project was initiated in 2016 but sage-grouse habitat determinations could not be completed until the data collection is finished in 2020. Based on available information, BLM concluded that the allotment offers "suitable year-round conditions for sage-grouse habitat." This habitat was rated "marginal" due to the juniper encroachment and the "infestations of invasive annual grasses within large fire scars adjacent to the allotment." *Id.* To meet this Standard, BLM recommended reducing juniper, reducing habitat loss, and treating invasive grasses. BLM concluded that grazing was not a causal factor for current habitat conditions.

33.     The allotments include Greater Sage-Grouse habitats designated in 2015 as PHMAs and GHMAs. The Mud Creek allotment also includes a sage-grouse breeding ground ("lek"), known as the South Bridge Creek lek. Two more leks, known as North Bridge Creek Nos. 1 and 2, lie less than two miles from the Mud Creek, Hammond, and Hammond FFR allotments and within three miles of the Hardie Summer allotment.

34.     The Hardie Summer allotment provides year-round habitat for sage-grouse, which are present at least from June to September.

35.     The 2006 fire more likely than not set by the Hammonds burned significant portions of the Mud Creek and Hardie Summer allotments. The Hammonds set the fire to burn brush and shrubs to increase the area for grass to grow for grazing. Because of the 2006 fire, the

remaining areas of sagebrush on the Hardie Summer and Mud Creek allotments are of critical importance to sage-grouse.

36.     Without active intervention such as planting seedlings, it will take from 50 to 100 years for sagebrush to naturally reestablish in the allotments.

37.     Grazing reduces the likelihood that sagebrush will reestablish.

38.     The riparian vegetation on the Hardie Summer allotment is showing signs of recovery after five years without grazing. Willows are regrowing and regaining their natural shape rather than a high browse line from grazing. Willows provide bank stability and overhang hiding cover for fish, are a source of nutrient and insect input critical for trout survival, provide shade necessary to keep stream temperatures low, and are a nesting and insect source for birds. They are, however, palatable to cattle later in the grazing season.

39.     Riparian areas take approximately 20 years to recover from overgrazing and poor management practices.

40.     Cattle that graze later in the season, like in the Hardie Summer allotment, are grazing when many grasses have desiccated and it is hot and thus they are drawn to the cooler, greener, riparian areas. Mr. Matthew Obradovich, a BLM employee and one of Defendants' experts who has regularly visited the Hardie Summer allotment, testified that generally by August 1st the grasses and forbs on the allotment are drying and less attractive to cattle and other wildlife.

41.     A single, poorly managed grazing season on Hardie Summer is likely to eliminate the recovery of the vegetation that has grown during the past five years.

**Sage-Grouse**

42.    The Greater Sage-Grouse is a bird that requires large expanses to meet its seasonal habitat requirements. The loss of habitat from fragmentation decreases the connectivity between seasonal habitats, potentially resulting in the loss of population.

43.    BLM has designated the Greater Sage-Grouse as a "sensitive" species. This requires that the "species be afforded, at a minimum, the same protections as candidate species for listing under the ESA; and provides that BLM Field Office managers are responsible for implementing the policy, including by [e]nsuring actions are evaluated to determine if special status species objectives are being met." *W. Watersheds Project v. Dyer*, 2009 WL 484438, at *8 (D. Idaho Feb. 26, 2009) (quotation marks omitted) (alteration in original).

44.    The Greater Sage-Grouse requires sagebrush for every part of its life cycle. In spring, nesting and brood-rearing sage-grouse use sagebrush for cover and forage. In summer, sagebrush is used for cover and forage as the birds move from nesting and brood-rearing sites to wetter areas. In the fall and winter, sage-grouse use sagebrush is for food.

45.    Sage-grouse also require tall grasses for cover and forbs for food in spring and during nesting and brood-rearing. Forbs also attract insects that are vital to young chicks. Sage-grouse also rely on the edges of riparian habitats near meadows and stream areas.

46.    Non-sagebrush habitat, including tall grasses, can provide Sage-grouse nesting habitat, particularly from April to August.

47.    BLM personnel have seen male and female sage-grouse in the lek on Mud Creek.

48.    BLM personnel noted in June 2018 evaluations of the Bridge Creek and Cabin pastures on the Hardie Summer allotment that sage-grouse use those pastures.

49.     Livestock grazing is known to be detrimental for sage-grouse because it reduces the height and density of grasses and forbs. Livestock grazing also increases susceptibility of Wyoming big sagebrush ecosystems to cheatgrass invasion as livestock trample biological soil crusts, suppress native bunchgrasses, and shorten fire-return. Domestic livestock disperse exotic seeds at about two orders of magnitude greater than do native ungulates, further increasing cheatgrass spread. Cheatgrass is highly flammable and suppresses sagebrush initiation and growth.

50.     The areas containing the South Bridge Creek and North Bridge Creek leks burned in the 2006 fire that was more likely than not set by the Hammonds. The number of birds attending the South Bridge Creek lek rebounded after the fire but has again declined. The North Bridge Creek No. 1 lek is no longer active. The North Bridge Creek No. 2 lek has varied in its use, generally around the low teens, with 2019 showing nine males using the lek.

**Redband Trout**

51.     BLM has designated redband trout as a "sensitive species."

52.     Redband trout spawn primarily in spring (March-June) and remain in place until they migrate in fall. They spawn exclusively in flowing waters. Water temperature and stream flow affect migration timing. Juveniles migrate downstream to their ancestral lake or river after one-to-three years in natal areas.

53.     Redband trout do best in areas with undercut banks, large woody debris, and overhanging vegetation. A study of redband trout in sagebrush desert basin streams found that abundance increased as habitat criteria such as stream shading, bank cover and stability, fine sediment, and cover for adults increased. The study also found that stream shade in the uppermost 50 meters of a stream would result in the greatest increase in fish density.

54.     Although redband trout are more tolerant of higher stream temperatures than other salmonids, they are still sensitive to water temperature. Their ultimate upper incipient lethal temperature ("UUILT") is 26-27℃. Their ideal growth temperature is 13℃. Their optimum temperature is 18℃. They also rely on macroinvertebrate species that are very sensitive to temperature change.

55.     Redband trout suffer sublethal problems at temperatures below the UUILT, including increased prevalence of disease, inability to feed, swim, or avoid predators, impaired growth rates, inability to smolt, alteration of smolt timing, and altered balance of competition with other species.

56.     Water temperatures in Bridge Creek can reach 24℃ on a hot summer day.

57.     Livestock grazing is a major source of degradation in the quantity and quality of riparian habitat and habitat for salmonids. Grazing causes streambank damage, removal of riparian vegetation, loss of large woody debris, fine sediment delivery, loss of overhanging banks, increased water temperature, channel widening, shallowing of flow depth, loss of pools, loss of fish cover structures, degradation of spawning habitat, alteration of food base, trampling of redds (spawning beds), and reduced dissolved oxygen in redds.

**Additional Problems Caused by Grazing**

58.     Grazing late in the season on Hardie Summer occurs when cheatgrass is mostly dried and less palatable to cattle. Exotic crested wheat grass is also less palatable to cattle. Cattle generally find native bunchgrasses more palatable.

59.     Grazing to reduce fire intensity requires a reduction in exotic and invasive grasses, but that would require that first the native bunchgrasses and forbs be overgrazed, which is harmful.

60.     When too much grazing is allowed after fire damage, cattle will destroy native vegetation and spread cheatgrass, whereas sagebrush steppe in the absence of grazing is more fire resistant.

61.     Livestock grazing has been linked to juniper expansion. Juniper expansion is one of the reasons the allotments failed Standard 5.

62.     Properly managed grazing, including grazing at a utilization standard that is appropriate for the particular allotment and grazing with consideration to the varying palatability of different forage and the sensitivity and importance, if any, of the riparian zones of a particular allotment, may reduce the harmful effects from grazing.

63.     The permitted grazing on Mud Creek and Hardie Summer is likely to cause harm to Greater Sage-Brush habitat and status by: (1) reducing tall grasses and forbs during breeding and nesting season in the allotments; (2) reducing cover for nesting hens and chicks to avoid predation; (3) increasing the spread of cheatgrass; (4) reducing the chances of sagebrush recovery and increasing the chances of juniper expansion; (5) reducing the forage available to nesting hens and chicks; (6) creating habitat fragmentation, including with the SFA south of Steens Mountain; and (7) degrading the riparian areas and wet meadows of the Hardie Summer allotment. Because of the importance of nesting in the months of June through August, some of this harm is likely to be immediate. Additionally, because of the fragile state of the lek on Mud Creek, its connectivity to the surrounding leks, and sensitive status of the Greater Sage-Grouse, harm to the Mud Creek lek is likely to cause irreparable harm to neighboring leks.

64.     The permitted grazing is likely to cause harm to redband trout habitat and status by: (1) increasing water temperature; (2) decreasing willows and other shade-providing cover; (3)  trampling of redds; (4) causing streambank damage; (5) removing riparian vegetation; and

(6) causing loss of large woody debris. Because the permitted grazing in the Hardie Summer allotment is late in the season and cattle will be drawn to riparian areas, this harm will be immediate.

65.    Defendants' proposed revised grazing plan that authorizes: (1) no AUMs on the Mud Creek allotment and allows only expeditious trailing through that allotment; (2) resting the Fir Creek pasture on the Hardie Summer allotment; and (3) grazing the remaining Hardie Summer pastures at 30 percent utilization, mitigates the immediate irreparable harm found by the Court arising from the grazing authorized by the Permit. Although Defendants did not quantify what 30 percent utilization equates to in terms of number of cattle, if 50 percent utilization across five pastures allows for 408 cattle, then presumably 30 percent utilization across four pastures would allow for significantly fewer cattle. The Court accepts Defense counsel's representation at the hearing that the proposed "alternative strategy for grazing in the upcoming season . . . would allow for some grazing to go forward in 2019 on Hardie Summer, but much less than what the Plaintiffs are seeking to enjoin." When Defense counsel made this representation, he specifically acknowledged that Plaintiffs were only seeking to enjoin grazing on the Mud Creek and Hardie Summer allotments, noting that Plaintiffs "have now indicated they only seek to have this preliminary injunction address two allotments instead of four, which was the original motion." The amended grazing plan therefore mitigates harm to sage-grouse by eliminating nearly all grazing on the Mud Creek allotment and significantly reducing the grazing on the Hardie Summer allotment. It also mitigates the irreparable harm to redband trout by eliminating grazing on a large portion of the Little Fir Creek, and significantly reducing grazing on the remaining pastures. The Court finds persuasive the expert testimony from both Plaintiffs' and Defendants'

experts that a 30 percent utilization standard for the four pastures of the Hardie Summer

allotment for a single season would not cause irreparable harm to sage-grouse or redband trout.

## CONCLUSIONS OF LAW

### A.  Likelihood of Success on the Merits

Plaintiffs carry the burden at the preliminary injunction stage for the same elements that

they must prove at trial, and Defendants carry the burden for the elements and affirmative

defenses that they must prove at trial. *Gonzales v. O Centro Espirita Beneficente UNIAO do*

*Vegetal*, 546 U.S. 418, 429 (2006) ("The point remains that the burdens at the preliminary

injunction stage track the burdens at trial."). The Court discussed the likelihood of success on the

merits in its Opinion and Order granting Plaintiffs' TRO ("TRO Opinion"), and will not repeat

that discussion here, other than to address the arguments raised by Defendants.

### 1.  Secretary Zinke's Decision and the FLPMA and Regulations

Defendants first argue that Plaintiffs are not likely to succeed on their challenge to

Secretary Zinke's decision because it was appropriate for Secretary Zinke to find that HRI had

the requisite satisfactory record of performance in light of the 2018 grants of Executive

Clemency by President Trump. The first problem with this argument is that Secretary Zinke did

not find that HRI and its affiliates had a satisfactory record of compliance. To the contrary,

Secretary Zinke expressly stated that he found no fault with BLM's 2014 legal and factual

findings, which were that HRI and its affiliates did not have a satisfactory record of compliance

and thus did not qualify for renewal of the permit.

The second problem with this argument is that a Presidential pardon does not overturn a

judgment of conviction, does not clear a person of the underlying conduct of conviction,

constitutes a confession of guilt, and does not preclude a government agency from considering

the underlying conduct in evaluating permit applications. *See Nixon v. United States*, 506

U.S. 224, 232 (1993) ("But the granting of a pardon is in no sense an overturning of a judgment of conviction by some other tribunal; it is "[a]n executive action that mitigates or sets aside *punishment* for a crime." (emphasis in original) (quoting Black's Law Dictionary 1113 (6th ed. 1990)); *United States v. Schaffer*, 240 F.3d 35, 38 (D.C. Cir. 2001) ("In fact, acceptance of a pardon may imply a confession of guilt."); *Bjerkan v. United States*, 529 F.2d 125 (7th Cir. 1975) ("A pardon does not 'blot out guilt' nor does it restore the offender to a state of innocence in the eye of the law . . . .").

As explained by the Seventh Circuit, if a necessary qualification involves character or other qualifications that are affected by the underlying conduct regardless of conviction, the pardon has little effect, whereas when the qualifications are based on the fact of conviction, the pardon removes disqualification:

> The pardon removes all legal punishment for the offense. Therefore if the mere conviction involves certain disqualifications which would not follow from the commission of the crime without conviction, the pardon removes such disqualifications. On the other hand, if character is a necessary qualification and the commission of a crime would disqualify even though there had been no criminal prosecution for the crime, the fact that the criminal has been convicted and pardoned does not make him any more eligible.

*Yasak v. Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago*, 357 F.3d 677, 683 n.5 (7th Cir. 2004) (quoting *Bjerkan v. United States*, 529 F.2d 125, 128 n.2 (7th Cir. 1975)) (noting that "the effects of the *commission of the offense* linger after a pardon, the effects of the *conviction* are all but wiped out") (emphasis added). BLM's 2014 conclusions, left undisturbed by Zinke, were based on the conduct and character of the Hammonds in committing the offense, not the mere fact of the conviction (including conduct for which there was no conviction). Thus, Plaintiffs are likely to succeed in arguing that the pardons "do[] not make [HRI] more eligible." *Id.*

Defendants also argue that Zinke appropriately expressed an awareness that he was disagreeing with the decision of a subordinate official (the 2014 BLM denial) and set forth the basis of that disagreement. Zinke, however, did not disagree with anything in the 2014 BLM denial. He specifically stated that he found "no fault" with that opinion. The only thing different in Zinke's opinion was the conclusion to grant the permit renewal, and the only explanation for that decision was the Presidential pardons, the Hammonds' (abbreviated) time spent in prison, and the civil damages paid. Zinke did not: (1) find that the Hammonds were in compliance with the terms of the permit and the governing rules and regulations; (2) explain why, if he now found that the Hammonds were in compliance, his finding was different than BLM's 2014 finding; (3) explain how, if the Presidential pardons were the basis of any new finding of compliance, they formed the basis of that finding; (4) address BLM's 2014 findings relating to conduct other than the conduct that supported the criminal convictions; or (5) explain how or why the Permit could issue if he was not finding that Hammonds were in compliance.

Defendants further argue that it is wholly within the discretion of the Secretary to determine whether a permittee has a "satisfactory record of performance" under 43 C.F.R. §§ 4110.1(b) and 4130.1-1(b)(1). Congress, however, has established the requirement that a permittee be "in compliance with the rules and regulations issued and the terms and conditions in the permit" before the Secretary can renew a permit. 43 U.S.C. § 1752(c); 43 U.S.C. § 315(b); *see also Hage*, 810 F.3d at 717. This requirement mandated by Congress "curtailed and qualified" the discretion of the Secretary. *Cf. Grimaud*, 220 U.S. at 521.

The agency has established that whether a permittee is in "substantial compliance" is to be determined by considering both "the number of prior incidents of noncompliance," and "the nature and seriousness of any noncompliances," recognizing that the ultimate aim of a BLM

decision regarding renewal is to use the record of performance "to confirm the ability" of a permittee "to be a [good] steward of the public land," and thus "to ensure that permittees . . . are good stewards of the land," thereby "protect[ing] [the land] from destruction or unnecessary injury and provid[ing] for orderly use, improvement, and development of resources." *Grazing Administration—Exclusive of Alaska (Final Rule)*, 60 Fed. Reg. 9894, 9925 (Feb. 22, 1995) (alterations added). The Secretary may not disregard governing statutes and agency regulations in making discretionary determinations. *See, e.g.*, *Erie Boulevard Hydropower, LP v. Fed. Energy Regulatory Comm'n*, 878 F.3d 258, 269 (D.C. Cir. 2017) ("It is axiomatic that an agency is bound by its own regulations. Therefore, if an agency action fails to comply with its regulations, that action may be set aside as arbitrary and capricious." (alteration, quotation marks, and citation omitted); *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841, 852 (9th Cir. 2003) (upholding challenge under the APA and finding that "[h]aving chosen to promulgate the [ ] policy, the [agency] must follow that policy"); *Friends of Richards-Gebaur Airport v. F.A.A.*, 251 F.3d 1178, 1195 (8th Cir. 2001) ("[A]n agency implementing a statute may not ignore . . . a standard articulated in the statute.").

The Department of Interior and the Secretary is obligated to follow statutory requirements and agency rules and regulations when making grazing determinations. *See Grimaud*, 220 U.S. at 521. Zinke did not perform an analysis of the Hammonds' number of prior incidents of noncompliance, the nature and seriousness of the incidents of noncompliance (particularly the incidents outside of the convictions), evaluate whether the Hammonds would be good stewards of the land, make a finding of whether the Hammonds were in compliance with the rules and regulations or terms of the 2004-2014 permit, or otherwise follow the directives of the governing statutes and regulations. Defendants' arguments that such findings were made or

were made "implicitly" are improper *post hoc* rationalizations. *Motor Vehicle Mfrs.*, 463 U.S. at

50 (noting that "courts may not accept appellate counsel's post hoc rationalizations for agency

action" and that "[i]t is well-established that an agency's action must be upheld, if at all, on the

basis articulated by the agency itself"). Accordingly, Plaintiffs have shown a likelihood of

success on their claim that Secretary Zinke's decision was arbitrary and capricious and otherwise

not in conformance with the law.

###    2.  Agency Decisions and the GSG-ARMPA

Plaintiffs allege that Zinke and BLM's decision violated NEPA, including the particular

NEPA analysis required by the 2015 GSG-ARMPA. Defendants argue that the 2015 GSG-

ARMPA is not applicable to the Permit decision and that if it is, it was sufficiently complied

with.

Defendants' first argument is that because the Hammond's original permit expired in

2014 and was renewed in 2019 based on changed circumstances that arose in 2018, the 2015

GSG-ARMPA amendment should not apply because it was not in effect in 2014 when the

original permit expired. This argument is legally incorrect. *Ziffrin, Inc. v. United States*, 318

U.S. 73, 78 (1943) ("[A] change of law pending an administrative hearing must be followed in

relation to permits for future acts. Otherwise the administrative body would issue orders contrary

to the existing legislation."); *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 848

(1990), Scalia, J., concurring (noting that *Ziffrin* required the administrative agency "to apply

current law (rather than the law in effect at the time of filing of the permit application) in

determining whether the applicant was qualified to obtain a permit for future operations"); 

*Pentheny, Ltd. v. Gov't of Virgin Islands*, 360 F.2d 786, 790 (3d Cir. 1966) ("[An administrative]

agency is required to act under the law as it stands when its order is entered."). This makes

particular sense in the context of environmental assessments under NEPA and the GSG-

ARMPA. These are directed at agency *action* and are designed to help agency decisionmakers make fully informed decisions and determine the best course of action, and thus the relevant statutes and regulations under these laws would be those as of the time the decision (the relevant action) was made.

Defendants' argument not to apply the changed circumstance of the 2015 GSG-ARMPA also is contrary to their assertion that the agency could review and consider as benefit to the Hammonds the changed circumstances after 2014 (the pardons, the prison time, the civil penalties paid). Defendants must be consistent. If the Court and the agency are to consider the facts as they exist in 2019 when the agency decision was made, that would include the fact that the GSG-ARMPA was passed in 2015.

Defendants argue that the 2015 GSG-ARMPA was properly applied because it merely requires that the NEPA analysis include certain thresholds, and the agency did not need to prepare a NEPA analysis for the Permit. This issue is discussed below.

### 3. Agency Decisions and NEPA

Plaintiffs challenge Zinke's and BLM's actions as violating NEPA. Defendants argue that the agency was authorized to forego a NEPA analysis under laws allowing for a "NEPA exclusion" and that BLM complied with NEPA by issuing the CX.

### a. Whether the agency could forego a NEPA analysis

Defendants contend that under the FLPMA, no NEPA analysis was required to be prepared before the Permit was renewed. Defendants then characterize this as a "NEPA exclusion." The FLPMA was amended on December 19, 2014, establishing that:

> (2) Continuation of terms under new permit or lease
>
> The terms and conditions in a grazing permit or lease that has expired . . . shall be continued under a new permit or lease until the date on which the Secretary concerned completes any

environmental analysis and documentation for the permit or lease
required under [NEPA] and other applicable laws.

(3) Completion of processing

As of the date on which the Secretary concerned completes the
processing of a grazing permit or lease in accordance with
paragraph (2), the permit or lease may be canceled, suspended, or
modified, in whole or in part.

43 U.S.C. § 1752(c)(2)-(3) (emphasis omitted).[13]

Defendants are correct that under the FLPMA, a NEPA analysis is not required to be
completed *before* a permit is renewed. This is not, however, an exemption or exclusion from the
requirements of NEPA or other applicable laws. This provision merely allows for a "limited
grace period" for the agency to conduct the required environmental analysis. *See WWP v.
BLM*, 629 F. Supp. 2d 951, 970 (D. Ariz. 2009) (analyzing the nearly identical text of
Section 325); *see also W. Watersheds Project v. Zinke*, 347 F. Supp. 3d 554, 558 (D. Idaho 2018)
("Thus, there is no repeal of environmental laws—the BLM is still required to meet the demands
of NEPA, FLPMA, and the FRH regulations, but just not prior to the renewal of those permits.")
(analyzing Section 325). After the required environmental review is completed, permits may then
be canceled, suspended, or modified. Defendants' argument that they were subject to a "NEPA
exclusion" is incorrect. Because Defendants do not argue, and the record does not support, that
Defendants intend to conduct a NEPA analysis in the future, reliance on § 1752(c) does not
refute Plaintiffs' likelihood of success on the merits of this claim.

---

[13] Before this amendment, a similar provision was contained in the terms of an
appropriations rider, Sec. 325 of Pub. L. No. 108-108 (2003) ("Section 325"), which was in
effect through 2014 through operation of Sec. 415 of Pub. L. No. 112-74 (2011), as amended and
extended by Sec. 411 of Pub. L. No. 113-76 (2014).

### b.   Categorical exclusion

Plaintiffs allege that Zinke and BLM did not perform the proper NEPA analysis. As noted above, there is no evidence or argument that Defendants will conduct a NEPA analysis at a reasonable time in the future as authorized by § 1752(c)(2). Indeed, BLM issued the CX, which concluded that no further NEPA analysis was required. Thus, the question is whether Plaintiffs are likely to succeed on their claim that the CX violated NEPA and the GSG-ARMPA.

A CX is "a category of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4. The FLPMA authorizes the use of a CX for a grazing permit if "the issued permit or lease continues the *current* grazing management of the allotment." 43 U.S.C. § 1752(h)(1)(A) (emphasis added). The Secretary also must have found that the allotment meets all the Rangeland Health Evaluation standards, or if not, that it failed standards "due to factors other than *existing* livestock grazing." *Id.* § 1752(h)(1)(B)(ii)(1)(bb) (emphasis added). Finally, even if both of those two criteria are met, the Secretary may not use a CX if there are "extraordinary circumstances in which a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4. Such circumstances include when an action may cause "significant impacts on . . . ecologically significant or critical areas," or when an action may "[c]ontribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species." 43 C.F.R. § 46.215(b), (l).

BLM found that the Permit qualified for a CX and that no extraordinary circumstances were present. Defendants simply state that the Court should defer to BLM's findings in the CX, without providing further argument, evidence, or authority. At the time that the CX was issued, however, the four allotments had not been grazed in at least five years. Thus the "current" grazing management was no grazing and the "existing" grazing was none. BLM did not explain in the CX how the Permit met the requirements of § 1752(h)(1)(A) when there was no "current"

grazing that the Permit maintained, or of § 1752(g)(1)(B)(ii)(1)(bb) when at the time of the most

recent Rangeland Health Evaluation finding that grazing had not caused the failure of the

standards there had not been grazing for years.

 *Amicus* Oregon Farm Bureau Federation ("OFBF") cites *Wildearth Guardians v. U.S.

Forest Service* to support the argument that BLM's finding that the Permit continues current

grazing practices is likely to be upheld on review on the merits. 668 F. Supp. 2d 1314 (D.N.M.

2009). The court in *Wildearth*, however, noted that the relevant agency regional office had

defined "current grazing management" as management implemented over the last three to five

years. *Id.* at 1327. Where no current management plan is in place, then only the "implementation

or modification of minor management practices, facilities, and improvements may be

categorically excluded." *Id.* The court further recognized that the agency could implement

"adaptive management flexibility that has been responsive to needed adjustments in permitted

actions" based on changed circumstances. *Id.* at 1328. The management over the last three to five

years of the Mud Creek and Hardie Summer allotments was no grazing. Allowing grazing from

no grazing is not a "minor" management plan and is not indicative of "adaptive management

flexibility" that is responsive to new circumstances.

 OFBF also argues that allowing the CX is consistent with the legislative history of the

appropriations riders and subsequent amendment to the FLPMA that allows for such exclusions.

OFBF notes that permitting a CX in permit renewals was intended to make the environmental

review process more efficient for allotments where the level of complexity of environmental

issues is "negligible" and that applies in to this CX. This conclusion, however, puts the cart

before the horse. The problem with BLM not having conducted an EA or EIS on the allotments,

particularly after the 2015 GSG-ARMPA was passed, is that is unknown whether the level of

complexity of environmental issues in negligible on these allotments. To the contrary, they have

a history of failing at least Standard 5, which indicates that there are environmental concerns.

In analyzing whether extraordinary circumstances exist, BLM provided brief, conclusory

rationale. Regarding the effect on migratory birds and on ecologically significant or critical

areas, BLM stated: "The proposed action to continue livestock grazing as it currently exists

would not alter any of the available landscape; there would be no effect to migratory birds or

their habitat." ECF 7-4 at 3. Regarding the spread of noxious weeds or non-native invasive

species, BLM stated: "Noxious weeds are known to be present in and in close proximity to these

allotments. Treatments are on-going. The weeds are currently not present in sufficient quantity to

be considered a significant impact in these allotments." *Id.* at 5. BLM did not, however, analyze

how or whether grazing would affect the treatment of these noxious weeds or the spread of these

"known" weeds. BLM also did not address invasive grasses,[14] even though the 2018 Rangeland

Health Evaluations specifically found that the allotments failed Standard 5 in part because of

annual invasive grasses. ECF 21-2 at 3; ECF 39-2 at 3; ECF 39-3 at 4; *see also* ECF 22 at 10

(Ms. McCormack stating in her first declaration that the assessed allotments were found in 2018

to fail Standard 5 because of "western juniper presence, lack of sagebrush, and annual invasive

grass contributing to risk of future wildfire as it relates to Greater sage-grouse"); ECF 23 at 7

(Mr. Matthew Obradovich stating in his first declaration that the assessed allotments were found

in 2018 to fail Standard 5 "due to the persistence of juniper, the increase in invasive annual

---

[14] It is unclear whether BLM considered the invasive grasses to be "noxious weeds." It does not appear so, because the noxious weeds were noted not to have a substantial impact and the invasive grasses were found to be a reason the allotments failed Standard 5. Even if the invasive grasses and noxious weeds were considered the same thing, as discussed, BLM did not sufficiently analyze this category.

grasses and the continued lack of sagebrush where it had been eliminated in the 2006 Granddad Fire").

Contrary to Defendants' argument, the Court gives only limited deference to an agency's conclusory opinion that is unsupported by meaningful analysis. *See Garcia v. Holder*, 659 F.3d 1261, 1267 (9th Cir. 2011) ("Where the [the agency's] decision does not give thorough reasoning, but instead is conclusory or lacks meaningful analysis, we give that decision only limited deference."); *Guevara v. Holder*, 649 F.3d 1086, 1091 (9th Cir. 2011) (giving only "some deference" to an agency opinion that "lacks a thorough and meaningful analysis"). Plaintiffs have shown a likelihood of success on the merits on their claim that BLM's issuance of the CX violated NEPA.

**B. Likelihood of Irreparable Harm**

Plaintiffs allege that they are likely to suffer irreparable harm before this case is resolved on the merits if grazing is not enjoined from harm to sage-grouse and redband trout, harm from the procedural violation of Defendants' failure to comply with NEPA, and harm to Plaintiffs' personal interests in the use and enjoyment of the allotments in their ungrazed state. Defendants and OFBF argue that Plaintiffs fail to demonstrate with sufficient likelihood that they will suffer irreparable harm based on the following: (1) the Rangeland Health Evaluations BLM conducted on the allotments; (2) the evidence from Defendants' experts; (3) the history of grazing on the allotments; and (4) the fact that the land can recover from grazing and thus harm is not irreparable. The Court first addresses Defendants' evidence and then considers the harm alleged by Plaintiffs.

1. **Defendants' Evidence**

   a. **Rangeland Health Evaluations**

BLM's 2018 Rangeland Health Evaluation on the Mud Creek and Hardie Summer

allotments concluded that neither met Standard 5 relating to species. According to BLM, these

allotments failed the standard because of fire damage, juniper encroachment, and invasive

grasses. BLM found that Mud Creek was suitable for sage-grouse leking and brood rearing and

that Hardie Summer was had suitable year-round conditions for sage-grouse habitat. The sage-

grouse habitat was rated as "marginal."

The Rangeland Health Evaluation, however, is not an analysis of harm to species or

habitat by the proposed action. Nor is it a comprehensive analysis of the type required by NEPA.

The Mud Creek analysis involved a review of only three of the 8,200 acres (0.00036 percent) and

the Hardie Summer analysis involved a review of only three of the 6,000 public acres (0.001

percent). The 2018 Hardie Summer and Mud Creek evaluations specifically acknowledged that

an Assessment, Inventory, and Monitoring project was ongoing and that the analysis relating to

sage-grouse and its habitat required the completion of the collection of data, expected by 2020.

The Rangeland Health Evaluations also do not analyze the effects of the grazing authorized in

the Permit on redband trout or sage-grouse or their habitat. Rangeland Health Evaluations are not

an evaluation of a proposed action, but "are expressions of the physical and biological condition

or degree of function necessary to sustain healthy rangeland ecosystems." *Standards for

Rangeland Health and Guidelines for Livestock Grazing Management for Public Lands

Administered by the Bureau of Land Management in the States of Oregon and Washington*, at 3

(August 12, 1997).

Additionally, the Rangeland Health Evaluations did not consider the cumulative impacts

of grazing on the four allotments but instead assessed each allotment individually. A NEPA

analysis of these allotments likely would require consideration of cumulative impacts, which might reveal environmental effects that an individual analysis does not. *See Watersheds Project v. Bennett*, 392 F. Supp. 2d 1217, 1223-24 (D. Idaho 2005), *modified in part sub nom. W. Watersheds Project v. Ellis*, 803 F. Supp. 2d 1175 (D. Idaho 2011) (rejecting a cursory analysis in an EA involving grazing allotments that did not include a detailed cumulative impact analysis); *W. Watersheds Project v. Rosenkrance*, 2011 WL 39651, at \*12 (D. Idaho Jan. 5, 2011) ("BLM's rangeland health assessment process may complement NEPA; it does not displace NEPA's requirement that BLM take a 'hard look' at the cumulative impacts of a proposed action."). They also not evaluate factors such as connectivity to neighboring leks. Simply put, "BLM's rangeland health assessments are not NEPA documents." *Rosenkrance*, 2011 WL 39651, at \*12.

Defendants did not perform an EIS or even an EA on the allotments. Defendants' reliance on the Rangeland Health Evaluations as evidence that the proposed grazing will not cause harm to species or habitat is misplaced because those evaluations serve a different purpose and perform a different analysis.

### b. Evidence from Defendants' experts

Defendants' expert Mr. Obradovich relies on the Rangeland Health Evaluations as providing "a sound basis" for concluding that the grazing allowed from 2004-2014 was not excessive or improper. As discussed above, these evaluations are not a sufficient basis to conclude that the proposed grazing will not now cause irreparable harm. Mr. Obradovich also opines that because the number of sage-grouse males increased on the leks on Mud Creek between 1995 and 2005, grazing must not be causing harm that led to the reduction in sage-grouse after 2006. This, however, does not take into account the cumulative effect of the harm from the fire in 2006 plus grazing on the allotment after the fire. Mr. Obradovich did not discuss,

as Plaintiffs' experts do, how an ecological system that could handle a certain level of grazing

before a fire cannot handle that same level of grazing after a fire. *See, e.g.*, *Dyer*, 2009

WL 484438, at *27 (ordering, when sensitive species including sage-grouse were involved, that

after a fire "BLM must abandon the grazing-as-usual model used in the 2008 authorizations, and

modify grazing levels and seasons-of-use in the unburned areas"). Additionally, as

Mr. Obradovich notes, climate change and other ecological factors affect sage-grouse. BLM did

not evaluate the proposed grazing in combination with those other factors.

Ms. McCormack also relies on the Rangeland Health Evaluations as "demonstrate[ing]

livestock have been grazing properly over time." ECF 22 at 13; *see also* ECF 40 at 14. She

concludes that continuing grazing at the same levels means continuing land management "that

has helped facilitate and allowed for improved riparian areas in these allotments between at

least 1980 and 2014." ECF 22 at 14; *see also* ECF 40 at 17. She emphasizes improvements to the

riparian areas of the Hammond and Mud Creek allotments, because cattle do not have much

access to those areas (unlike in the Hardie Summer riparian areas).

In their declarations, both of these experts also generally discuss the benefits of "properly

managed" grazing, but neither analyze what properly managed grazing would be on these

particular allotments given their current states—post-fire, with current vegetation levels, with the

current status of sage-grouse and redband trout and their habitat, with current climate conditions,

and in light of other ecological factors. Defendants' experts discuss the recent historical grazing

practice as if that necessarily is a model of what is "proper" grazing. Determining proper

grazing, however, is what a NEPA analysis is for. It allows BLM to analyze the environmental

effects of a proposed action and to consider alternatives to that action. At this point, BLM does

not know the environmental effects of the proposed grazing on the allotments as they stand today

or alternative levels of grazing because that analysis was not performed.

Ms. Lindsay Davies relies on Proper Functioning Conditioning ("PFC") assessments

from 1999 and 2006 when grazing was active as supporting that grazing will not harm riparian

conditions. Those evaluations, like Rangeland Health Evaluations, are not comprehensive.

Indeed, BLM has specifically explained in describing the function of a PFC that it is not intended

to evaluate fish habitat. The PFC Technical Reference guide states:

> A PFC assessment provides fundamental information regarding the
> physical function and condition of the riparian area; however,
> additional information is often needed to obtain a comprehensive
> assessment of riparian condition. Fish or wildlife habitat and water
> quality assessments are examples of additional resource
> assessments that may be needed to characterize overall riparian
> condition in preparation for subsequent activities. Often these
> assessments can be done simultaneously with the PFC assessment.

ECF 42-2 at 16.

Additionally, the 1999 and 2006 PFCs do not include current conditions such as the

effects of climate change and fire. In other words, if the ecological condition of the riparian

areas, including stream temperatures, are stressed by factors such as climate change and higher

temperatures in recent years, or neighboring areas that have been and have not yet recovered,

then adding grazing may cause harm that was not previously present when the earlier

assessments were completed. Courts also have questioned the weight that PFC assessments and

experts relying on them or their methodology should be given when assessing the status of

riparian areas. *See, e.g.*, *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 2004 WL 1293909, at *7

(D. Or. June 10, 2004) ("[T]he PFC method is a *qualitative* method. Rhodes cites to numerous

sources which question the usefulness of the methodology because it is considered highly

subjective." (emphasis in original)); *Oregon Nat. Desert Ass'n v. Singleton*, 47 F. Supp. 2d 1182,

1190 (D. Or. 1998) (noting that a PFC "does not reveal how 'properly functioning riparian areas' or 'at risk' areas correspond to the requirements of the [Wild and Scenic Rivers Act]," which is to protect and enhance the river's "outstandingly remarkable values").

Ms. Davies also relies on the Oregon Department of Fish and Wildlife's 2018 Draft Malheur Lakes Redband Conservation Plan ("Draft Redband Conservation Plan"), which included a population risk assessment of the population that includes the redband trout in the allotments as being at "low risk" of extinction. This Draft Redband Conservation Plan, however, described the headwater streams as "close to pristine and capable of supporting a healthy population of redband trout." Ms. Davies does not discuss whether grazing on the allotments would affect the "close to pristine" streams and if so whether it would affect population of redband trout on the allotments. Additionally, the fact that a population is "robust" does not mean that grazing will not negatively affect the population's habitat. Moreover, the draft document discussed the entire population in the relevant region, not the specific population on the streams in the allotments or whether affecting those populations would have a cumulative effect on the populations in the region.

### c. Past grazing

The fact that there was grazing in the past does not mean that Plaintiffs cannot demonstrate likely irreparable harm. This is so for several reasons. First, there is nothing in the record to indicate that BLM has ever performed an EA or EIS on the proposed grazing, and thus the previous grazing may have been causing irreparable harm to sage-grouse and redband trout without BLM's knowledge. Second, circumstances have changed since the previous grazing, including both climate change causing increased temperatures and the passage of the GSG-ARMPA requiring additional protection for sage-grouse.

### d.  Ability of the allotments eventually to recover

OFBF argues that because the allotments will eventually recover, including the recovery

Plaintiffs argue has been made during the last five years, any harm from grazing is not

irreparable. OFBF misinterprets "irreparable" harm. Harm is "irreparable" when it cannot "be

adequately remedied by money damages and is often permanent or at least of long duration."

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Although sagebrush may recover

within 50 to 100 years and riparian areas take 20 years to recover, that does not mean that harm

to this habitat is not irreparable. Trees can be replanted and will grow and yet logging is

regularly found to be irreparable harm. *See, e.g.*, *Connaughton*, 752 F.3d at 764 ("Neither the

planting of new seedlings nor the paying of money damages can normally remedy such damage.

The harm here, as with many instances of this kind of harm, is irreparable for the purposes of the

preliminary injunction analysis."). Moreover, harm to the redband trout and sage-grouse

themselves may also be irreparable harm.

### 2.  Likely Harm to Sage-Grouse

Livestock grazing is likely to cause destruction of sage-grouse habitat. *Dyer*, 2009 WL

484438, at *11, *13. "Livestock can also trample or disturb [sage-grouse] nests and cause

nesting females to flush from the nest, revealing the eggs to nest predators such as ravens." ECF

41 at 7 (Obradovich Second Declaration). Sage-grouse have been reported by BLM employees

on both Mud Creek and Hardie Summer allotments. Both of these allotments failed Standard 5

relating to species.

The South Bridge Creek lek on the Mud Creek allotment has declined to only two males

and the North Bridge Creek leks also have been declining, and one is now unoccupied. Plaintiffs

have shown that it is likely that these already fragile populations are exposed to greater risk if

grazing is recommenced. Plaintiffs' expert opines that grazing on the Mud Creek allotment will

likely lead sage-grouse to abandon the South Bridge Creek lek and it may affect the North

Bridge Creek leks as well. Defendants' expert agrees that there is connectivity between the Mud

Creek allotment and the surrounding allotment. Thus, harm to this lek is likely to affect

neighboring leks.

The U.S. Fish & Wildlife Service recognizes that high grass cover is "critical for

reproductive success" in sage-grouse and that "the average nest success for sage-grouse in

habitats where sagebrush has not been disturbed is higher than for sage-grouse in disturbed

habitats." U.S. Fish & Wildlife has recognized that high grasses, in and of themselves, can serve

as nesting habitat for sage-grouse. Grasses are more important from April through August during

a critical nesting time period.

The Mud Creek and Hardie Summer allotments suffer from cheatgrass invasions after the

fire. "Livestock grazing is one vector by which cheatgrass and other invasive weeds are spread

into and then displace native vegetation." *Dyer*, 2009 WL 484438, at *11; *see also Blue

Mountains Biodiversity Project v. U.S. Forest Serv.*, 229 F. Supp. 2d 1140, 1148 (D. Or. 2002)

(noting that the "increasing spread of noxious weeds[,] especially by cattle" needed to be

considered in a new EIS). Cheatgrass also reduces the likelihood of sagebrush recovery and

increases the risk of fire. *Dyer*, 2009 WL 484438, at *7, 10-11.

Plaintiffs' expert Dr. Clait E. Braun opines that the added stressor of grazing on the

allotments could extirpate the local sage-grouse population, harming connectivity with adjacent,

larger sage-grouse populations. Plaintiffs' expert also discusses the importance of the lek located

on the Mud Creek allotment, the danger to hens and chicks in June-August that are likely

nesting, and the importance of high grasses and forbs to hens and chicks.

Defendants' expert Mr. Obradovich states that he has seen females coming to breed in the lek on the Mud Creek allotment. Defendants' expert notes generally that sage-grouse avoid areas with greater than four percent juniper, although he does not state that any particular area of the Mud Creek allotment has greater than four percent juniper. He also states generally that the nearest "suitable" sagebrush for nesting is three miles from the Mud Creek lek. He does not, however, state that he has not observed any nesting on the Mud Creek allotment. High grasses can also provide habitat for nesting.

When Plaintiffs' expert Dr. Braun visited the Hardie Summer allotment, he saw two sage-grouse. BLM employees also reported in June 2018 that sage-grouse use that allotment. The Hardie Summer allotment is of particular importance because it has the "best" sage-grouse habitat after the 2006 fire set by the Hammonds. The months of July and August are an important period for rearing sage-grouse young, and livestock disturbance during these months can cause irreparable harm to nests, hens, and chicks.

The Court considers the known damage caused by livestock, risk to nests, hens, and chicks in the next few months, fragile state of the Mud Creek lek, importance of the remaining sage-grouse habitat on the Hardie Summer allotment after the 2006 fire, fact that the allotments contain areas designated as PHMAs and GHMAs, and fact that a single grazing season with too much grazing is likely to eliminate the ecological gains of the last five years on the Hardie Summer allotment. In light of these factors, Plaintiffs have shown likely irreparable harm to sage-grouse and their habitat from the grazing authorized in the Permit.[15]

---

[15] The Court disagrees with OFBF's argument that even if the Mud Creek lek is extinguished and the sage-grouse on these allotments perish it is insufficient to demonstrate irreparable harm because Plaintiffs do not demonstrate harm to the entire species. First, Plaintiffs have shown that extinguishment of the Mud Creek lek will affect neighboring leks. Second, Plaintiffs do not need to show irreparable harm at the species level. "Irreparable harm should be

Plaintiffs fail to meet their burden, however, of showing irreparable harm from a single grazing season under Defendants' amended grazing proposal of a 30 percent utilization standard on the Hardie Summer pastures other than the Fir Creek pasture, which would be rested. Plaintiffs' expert Dr. Braun testified that 30 percent utilization on the Hardie Summer allotment would be "proper" and would not cause irreparable harm. All of Defendants' experts who testified at the evidentiary hearing opined that 30 percent utilization (and higher) would not cause irreparable harm.

The only expert to testify that the proposed 30 percent utilization on the Hardie Summer allotment would cause irreparable harm was Plaintiffs' expert Dr. J. Boone Kauffman. After considering all of the testimony and evidence submitted by the parties, the Court finds the evidence more persuasive that one season of 30 percent utilization on the Hardie Summer allotment other than the Fir Creek pasture is not likely to cause irreparable harm to sage-grouse. This is because of the current good condition of much of the allotment, the presence of sagebrush habitat on the allotment that is available to sage-grouse and is not likely to be where the cattle will graze, the reduced level of utilization likely allows for sufficient grasses and forbs for both cattle and sage-grouse, and the reduced level of utilization is less likely to increase the spread of cheatgrass.

---

determined by reference to the purposes of the statute being enforced." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018). One purpose of the FLPMA is to protect ecological resources such as species, the purpose of the GSG-ARMPA to conserve the sage-grouse, and one purpose of the Steens Mountain CMPA is the conservation of species. When protection of species is a purpose, this may be done in incremental steps. *Id.*; *see also Nat'l Wildlife Fed. v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994) (discussing with approval a case in which only three to nine grizzly bears would have been killed as sufficient to support an injunction under the ESA).

### 3.   Likely Harm to Redband Trout

Livestock grazing is known to cause harm to riparian habitat. *Oregon Wild, v. Constance Cummins*, 239 F. Supp. 3d 1247, 1277 (D. Or. 2017); *Oregon Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 991 (D. Or. 2010). The riparian areas in Hardie Summer are accessible to livestock.

Defendants' expert Dr. Tamzen K. Stringham and Plaintiffs' expert Dr. Kauffman both discuss how willow trees in the riparian area currently show a normal growth instead of the "mushroom shape" caused by grazing. They disagree over whether the willows were previously affected by grazing and previously had a "mushroom shape." The Court finds the evidence persuasive that the willows were previously affected by grazing. Ms. Stringham relies on the previous PFCs to generally conclude that reintroducing grazing would not negatively affect the ecosystem function gains of the last five years. She does not address the changed circumstances or the fact that PFCs do not analyze fish habitat. As discussed above, the Court does not give much weight to the PFCs because they do not analyze fish habitat or effects on fish species in the same manner as does a NEPA analysis.

The Court is persuaded by the testimony of Plaintiffs' experts that the riparian areas of the Hardie Summer allotment are likely to face irreparable harm if the permitted grazing is allowed to commence. As discussed above, the assessments conducted by BLM and relied on by Defendants' experts did not address the same issues. In light of the significant harm to riparian habitat that cattle can cause, the sensitive status of redband trout, and the current status of the Hardie Summer allotment's recovery, Plaintiffs have demonstrated a likely irreparable harm to redband trout and their habitat with the permitted grazing.

Plaintiffs have not, however, demonstrated a likely irreparable harm to redband trout and their habitat with the proposed reduced grazing plan. As discussed in the section relating to harm

to sage-grouse, the amended grazing plan rests the Fir Creek pasture, which contains a large portion of Little Fir Creek. The remaining four pastures will be grazed at 30 percent utilization, which most of the experts opined will not cause irreparable harm given the current amount of available vegetation on the Hardie Summer allotment. The evidence shows that there is sufficient vegetation to support cattle and not place the riparian zones in jeopardy at the reduced level of grazing.

The Court has some concern, however, with the fact that the grasses and forbs will be dying during the proposed grazing and the riparian areas will become more attractive to cattle. The Court also is concerned with HRI's history of noncompliance, including apparently grazing beyond authorized AUMs, and BLM's recent history of lax enforcement of permit terms with this permittee and changing permit terms on the fly, without proper documentation and without following required procedures, such as what occurred at the beginning of this grazing season on the Hammond allotment. Accordingly, the Court will require BLM to monitor at least once per month of the grazing season (July, August, and September) the actual usage on the Hardie Summer allotment and the condition of a sample of the grazed riparian areas, and to file with the Court within two weeks after the close of the permitted season on the Hardie Summer allotment a report of the findings. Defendants will also be required to file the Actual Grazing Use Reports completed by HRI for the Mud Creek and Hardie Summer allotments.

### 4. Likely Harm to Plaintiffs' Members' Personal Use and Enjoyment

Plaintiffs allege that their members will suffer irreparable harm in the loss of their personal use and enjoyment of the allotments in their ungrazed state. Defendants do not respond to this allegation. OFBF argues that this harm is *de minimus* and insufficient to support an injunction because the allotments constitute a small part (39 square miles) of the surrounding 5,125 miles. OFBF does not specify whether that surrounding 5,125 miles is public

PAGE 47 – OPINION AND ORDER

or private land, and thus whether it would be accessible to Plaintiffs for to view, experience, use, and enjoy.

The Ninth Circuit has held that loss of the ability to view, experience, and use a forested area in its undisturbed state, even though there were significant other forested areas available, sufficed to allege irreparable harm for a preliminary injunction. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). *Cottrell* involved the harvesting of 1,652 acres of forest, and the Ninth Circuit concluded the ability to view, experience, and utilize that amount of acreage was not *de minimus*. *Id.* The allotments here total 15,800 acres, and the loss of the ability to enjoy them if they are irreparably harmed is not *de minimus*.[16] Because the Court has found grazing at the permitted level is likely to cause irreparable harm to the allotments, Plaintiffs have shown a likely irreparable harm from the loss of their ability to view, experience, use, and enjoy the allotments if grazing is allowed at the level in the Permit. Because the Court has found grazing at the proposed reduced level is not likely to cause irreparable harm to the allotments, Plaintiffs have not shown a likely irreparable harm in their ability to view, experience, use, and enjoy the allotments if grazing is allowed at the reduced level.

### 5.   Likely Harm from NEPA Violation

Plaintiffs argue that they have shown a likelihood of irreparable injury from Defendants' alleged violation of NEPA. When a court finds a likelihood of success on the merits of a NEPA claim coupled with likely environmental harm (as the Court finds in this case with grazing at the permitted level), the NEPA violation generally is found to rise to the level of irreparable harm

---

[16] Because short-term grazing is different than harvesting trees in a forest, the Court finds that the loss of use and enjoyment analysis turns on whether the grazing would itself harm the allotment. Otherwise, a plaintiff's subjective statement that he or she desires to use and enjoy an ungrazed parcel of land would suffice for a finding of irreparable harm.

supporting preliminary injunctive relief. *See, e.g.*, *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24 (D.D.C. 2009) ("When a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury.") (citing cases); *cf. Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989); *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 40-41 (D.D.C. 2013). This is because

> [t]he NEPA duty is more than a technicality; it is an extremely important statutory requirement to serve the public and the agency *before* major federal actions occur. If plaintiffs succeed on the merits, then the lack of an adequate environmental consideration looms as a serious, immediate, and irreparable injury. Although the *balancing* of this harm against other factors is necessarily particularized, the injury itself is clear.

*Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985) (emphasis in original) (citations omitted).

The First Circuit made a similar point in *Marsh*:

> NEPA is not designed to prevent all possible harm to the environment; it foresees that decisionmakers may choose to inflict such harm, for perfectly good reasons. Rather, NEPA is designed to influence the decisionmaking process; its aim is to make government officials notice environmental considerations and take them into account. Thus, *when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered*. . . . Moreover, to set aside the agency's action at a later date will not necessarily undo the harm. The agency as well as private parties may well have become committed to the previously chosen course of action, and new information—a new EIS—may bring about a *new* decision, but it is that much less likely to bring about a *different* one. It is far easier to influence an initial choice than to change a mind already made up.
>
> It is appropriate for the courts to recognize this type of injury in a NEPA case, for it reflects the very theory upon which NEPA is based—a theory aimed at presenting governmental decision-makers with relevant environmental data *before* they commit themselves to a course of action. This is not to say that a likely

> NEPA violation automatically calls for an injunction; the *balance* of harms may point the other way. It is simply to say that a plaintiff seeking an injunction cannot be stopped at the *threshold* by pointing to additional steps between the governmental decision and environmental harm."

*Marsh*, 872 F.2d at 500 (emphasis in original).

Because the Court has found likely irreparable environmental harm with grazing at the level authorized in the Permit, Plaintiffs have shown likely irreparable harm from Defendants' alleged NEPA violations. Because, however, Plaintiffs have not shown likely irreparable environmental or aesthetic harm at Defendants' proposed alternative reduced grazing level, in considering grazing at that level, Plaintiffs have not shown likely irreparable harm from Defendants' alleged NEPA violations.

## C. Balancing the Equities

In weighing equities, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). When the government is the defendant, generally the balancing of the equities and the public interest factors merge. *See, e.g.*, *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). Because there are interests of a third party (HRI) and *amici*, however, the Court finds it appropriate to consider these factors separately. *Id.* (considering the factors separately in light of the intervenors' interests).

Defendants present the same arguments, in almost the identical format, that they presented in opposing Plaintiffs' motion for a temporary restraining order. The Court rejects those arguments for the same reasons the Court discussed in its TRO Opinion. *W. Watersheds Project v. Bernhardt*, 2019 WL 2372595, at *14-16 (D. Or. June 5, 2019). The Court adds that

the fact that vegetation can "grow back" does not change the balance of equities. The irreparable

harm alleged by Plaintiffs is not the short-term loss of vegetation eaten by cattle.

Defendants also raise a new argument that there is an additional equitable consideration

relating to the fire danger that will be created if cattle are not permitted to graze in the

allotments. This argument is more appropriately considered in the public interest factor. *See*

*Connaughton*, 752 F.3d at 766. The Court finds that the balance of the equities tips in favor of

Plaintiffs.

**D.  Public Interest**

When determining the public interest, a court "primarily addresses impact on non-parties

rather than parties." *League of Wilderness Defs./Blue Mountains Biodiversity Project v.*

*Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (quoting *Sammartano v. First Judicial Dist.*

*Court*, 303 F.3d 959, 947 (9th Cir. 2002). When the alleged action by the government violates

federal law, the public interest factor generally weighs in favor of the plaintiff. *See Valle del*

*Sol*, 732 F.3d at 1029; *see also Inland Empire-Immigrant Youth Collective v. Nielsen*, 2018

WL 1061408, at *21 (C.D. Cal. Feb. 26, 2018) ("In addition, the Court again notes the public

interest that exists in ensuring that the government complies with its obligations under the law

and follows its own procedures." (quotation marks omitted)); *Coyotl v. Kelly*, 261 F. Supp. 3d

1328, 1344 (N.D. Ga. 2017) ("[T]he public has an interest in government agencies being

required to comply with their own written guidelines instead of engaging in arbitrary decision

making.").

Defendants argue that because the underlying statutes governing the use of Steens

Mountain and public resources support "grazing," as well as other uses, Plaintiffs fail to show

that the public interest favors a preliminary injunction. The statutes also, however, support

conservation. Thus, considering the purposes of those statutes is not particularly helpful in

evaluating the public interest factor. Because NEPA's purpose has not been met, however, considering statutory goals and purposes tips slightly in favor of granting a preliminary injunction.

Defendants also argue that a preliminary injunction will cause an increased fire danger, which is contrary to the public interest. Defendants' experts Ms. McCormack and Mr. Obradovic submitted declarations that briefly address this issue. Defendants also submitted the declaration of lay witnesses Fred I. Otley, a neighboring ranch owner and President of the Steens Mountain Landowners Group ("SMLG"), and Ruth E. Danielsen, a neighboring property owner, the Steens Mountain Private Property Landowner Representative on the Steens Mountain Advisory Council, and a member of SMLG. *Amicus* Harney County submitted the declaration of lay witness Mark Owens, County Commissioner for Harney County.

A claim of increased fire danger is given great weight when the claimed danger is "imminent or the danger has begun." *Connaughton*, 752 F.3d at 766. "Without evidence of an imminent threat . . . the inability to mitigate such risks for a temporary period" generally does not outweigh other public interests. *Id.*; *Accord Bark v. United States Forest Serv.*, 2019 WL 2344771, at *3 (D. Or. June 3, 2019) (distinguishing *Connaughton* because the parcels at issue "are assigned a high wildfire risk rating, and have a moderate to high risk of stand replacing wildfire" (quotation marks omitted)).

Defendants' expert declarations and testimony at the hearing do not support a finding that there is an imminent risk of increased fire danger, particularly on the Hardie Summer allotment where the proposed grazing would predominately occur. Ms. McCormack does not state that a lack of grazing by HRI in any of the allotments during the time period of a preliminary injunction would increase fire danger. She merely discusses generally that grazing, when

"properly prescribed" can have beneficial effects and discusses general research indicating that "[p]roperly managed livestock grazing can decrease risk, size, and severity of wildfires and decrease the risk of post-fire exotic annual grass invasion." ECF 40 at 15 (citation omitted). Mr. Obradovich states that "the *potential* exists in the absence of grazing for fine fuels such as grasses, both native and invasive annuals, *to accumulate over several years* of growth to the point where the accumulation *becomes* a hazard that would readily carry a more intense fire." ECF 41 at 8 (emphasis added). Mr. Obradovich's declaration is speculative and describes a risk that might occur in the future, not a risk that is currently present or imminent. At the hearing, Mr. Obradovich's testimony was similarly general in nature and did not describe a currently present or imminent fire danger. Dr. Tamzen Stringham testified that she did not see any cheatgrass on the Hardie Summer allotment and that there is low risk that cheatgrass can become dominate on that allotment based on its ecological characteristics. She expressed no concern about fire danger on that allotment. She testified generally regarding fine fuels and fire risk but not specifically with respect to the Mud Creek (or Hardie Summer) allotment. Her concern regarding the Mud Creek allotment was that without grazing cheatgrass would "maintain control" of the allotment.

Defendants' and Harney County's lay witnesses describe general concerns regarding increased fuels from lack of grazing and that this causes an increase in the risk of a "catastrophic" fire.[17]  Plaintiffs, however, provide expert testimony that grazing increases the risk of fire by exacerbating the spread of cheatgrass. ECF 29 at 5; ECF 59 at 20-21; *see also* *Dyer*, 2009 WL 484438, at *7, *11 (finding that "[t]he increased flammability of cheatgrass

---

[17] Mr. Otley and Ms. Danielsen's declarations also include improper legal conclusions and expert opinions, which the Court disregards.

causes increased fire intensity and frequency," "[t]he proliferation of annual invasive grasses (notably cheatgrass) is one of the leading causes of the heightened fire danger," and "[l]ivestock grazing is one vector by which cheatgrass and other invasive weeds are spread into and then displace native vegetation"). Defendants' expert Mr. Obradovich also testified at the hearing that grazing is a vector by which cheatgrass can be spread. Additionally, the significant fire in 2006 (more likely than not set by the Hammonds), occurred after decades of grazing.

Further, BLM specifically found that by denying the permit renewal to HRI, "the Hammonds will no longer have the economic incentive to burn public land allotments without authorization and endanger people." ECF 7-2 at 17. Thus, BLM concluded that not renewing the permit reduced the danger that the Hammonds would set more fires. In any event, the evidence does not show that the claimed increase risk of fire danger is imminent.

Defendants also argue that considering the harm to non-party HRI should result in the Court finding that the public interest factor does not support issuing a preliminary injunction. The Court discussed the harm to HRI in the TRO Opinion. *W. Watersheds*, 2019 WL 2372595, at *15-16. Defendants offer no new argument or evidence that persuades the Court to change that analysis.[18] Defendants simply argue that the harm to HRI is greater with a preliminary injunction than with a TRO. At the TRO stage, however, the Court had analyzed HRI's harm considering the cost of replacement grazing from June 1 through October 30, not the cost of replacing four weeks of grazing (the term of the TRO). The harm to HRI is now *less*, because HRI has grazed cattle for more than three months at a much higher level of AUMs than authorized in the Permit,

---

[18] The Court disagrees with Defendants that the requested injunction is mandatory versus permissive. The requested injunction would *preclude* grazing from *commencing* on the Mud Creek or Hardie Summer allotments this year. The injunction would not require the round up and removal of cattle from any allotment. The cattle simply would not be allowed to be moved onto the Mud Creek or Hardie Summer allotments.

due to BLM's "calculation error." Furthermore, limiting the injunction to only grazing above Defendants' alternative proposed grazing plan reduces the potential harm to HRI, because some grazing will be allowed on the Hardie Summer allotment. Moreover, during the previous years when HRI could not graze on federal land, the U.S. Department of Agriculture paid HRI a significant increase in subsidies, indicating that such subsidies may be available to counter the economic harm caused by a reduced ability to graze on federal land. ECF 57-6. For example, from 2010-2013, the last four years of the previous grazing permit, HRI received a total of $84,065 in subsidies. From 2014-2017, the first four years in which the permit was denied, HRI received a total of $587,590 in subsidies, an increase of more than $500,000. *Id.*

Harney County expresses concern about the potential public impact on other grazing permittees arising from the legal precedent of enjoining in the "middle" of the grazing "season." As the Court discussed in its TRO Opinion, the facts here are unique. *W. Watersheds*, 2019 WL 2372595, at *15. Despite repeated requests, Defendants refused to provide Plaintiffs with the Permit and CX until *after grazing began*. These documents were necessary for Plaintiffs to file a motion for preliminary injunctive relief, particularly given the evidentiary burden on Plaintiffs to obtain such relief. Thus, Plaintiffs were unable to file their motion before the grazing season began due to Defendants' behavior. Denying the motion on the grounds that it was filed after grazing began would reward Defendants for their behavior and may encourage Defendants to repeat this behavior as a strategy to prevail against future motions for preliminary injunctive relief. Additionally, grazing has not yet begun on the Mud Creek and Hardie Summer allotments, and thus grazing is not ongoing (or "in the middle") on those allotments.

Harney County also expresses concern that an injunction would exacerbate tensions in the local community regarding federal land management. Harney County notes that these

tensions have been heightened by the situation with Hammonds and with "outsiders" using that situation in the standoff at the Malheur National Wildlife Refuge. Harney County requests that the grazing be allowed to continue so that the community can "move on." Although Harney County's desire to move on from a difficult period is understandable, as noted above courts have long held that there is a strong public interest in having the government comply with governing statutes and regulations. Additionally, if the community is sensitive to federal management of public lands, ensuring that the federal government comply with the governing statutes and regulations is of particular public importance.

Harney County further argues that the economic effect on the community must be considered. The only economic harm asserted, however, is the cost to HRI of finding alternative grazing during the time period of the injunction and moving the cattle from the Hammond and Hammond FFR allotments to that alternative location (instead of moving the cattle to the Mud Creek and Hardie Summer allotments). There are no lost jobs or other community economic harms asserted.[19]

Some of Defendants' witnesses and *amici* express concern about the Court permanently enjoining all grazing on the allotments. Such an injunction is not before the Court. The Court is considering a preliminary injunction of limited scope and limited duration, based on likely irreparable harm that has been shown particularly because BLM did not perform the required environmental assessment. The Court expresses no opinion regarding whether if BLM performs the required environmental assessment and follows the applicable statutes and regulations in reviewing and issuing a permit to HRI or any other person to graze cattle on the allotments such

---

[19] The Court does not accept the conclusory assertion that because Harney County is a "tight-knit community" enjoining HRI's grazing would negatively affect the entire Harney County agricultural economy for this year and into the future.

grazing could or would be enjoined. Weighing all of the public interest considerations, the Court finds that issuing a preliminary injunction is in the public interest.

## E.  Conclusion

All four *Winter* factors weigh in favor of granting a preliminary injunction when considering grazing at the level authorized in the Permit. Plaintiffs have met their burden to demonstrate a need for preliminary injunctive relief until the Court decides the merits of this case.

## F.  Bond

For the reasons previously stated in the TRO Opinion, no bond is required.

## PRELIMINARY INJUNCTION

Plaintiffs' Motion for  a Preliminary Injunction is **GRANTED IN PART**. Until the Court resolves this case on the merits or orders otherwise, or until such time as the parties agree in writing to amend, supersede, or terminate this Preliminary Injunction, **IT IS ORDERED**:

1.      Defendants are enjoined from allowing turnout and grazing of livestock by Hammond Ranches, Inc. on the Mud Creek allotment, except for when cattle quickly and methodically trail through the allotment to reach the Hardie Summer allotment and, if needed, return from the Hardie Summer allotment. Total time trailing through the Mud Creek allotment may not exceed 14 days.

2.      Defendants are enjoined from allowing turnout and grazing of livestock by Hammond Ranches, Inc. on the BLM-controlled portion of the Hardie Summer allotment's Fir Creek pasture.

3.      Defendants are enjoined from allowing turnout and grazing of livestock by Hammond Ranches, Inc. on the BLM-controlled portions of the Hardie Summer allotment's remaining four pastures above a 30 percent utilization standard.

4.      Defendants shall monitor the actual use on the Hardie Summer allotment at least once per month during the permitted grazing season on the allotment (July, August, and September) and shall also review the condition of a sample of the riparian areas being grazed on the allotment. On or before October 14, 2019, two weeks after the expiration of the permitted grazing season on the Hardie Summer allotment (September 30, 2019), Defendants shall file with the Court in this case a report of their findings from the monitoring. Defendants shall also file with the Court in this case the Actual Grazing Use Report forms submitted by HRI on the Mud Creek and Hardie Summer allotments within two weeks of receiving these forms from HRI.

**CONCLUSION**

Plaintiffs' Motion for a Preliminary Injunction (ECF 7) is granted in part.

**IT IS SO ORDERED**.

DATED this 16th day of July, 2019.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge