# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **WESTERN WATERSHEDS PROJECT, CENTER FOR BIOLOGICAL DIVERSITY,** and **WILDEARTH GUARDIANS**, | Case No. 2:19-cv-0750-SI<br><br>**OPINION AND ORDER** |
| Plaintiffs, | |
| v. | |
| **DAVID BERNHARDT**, Secretary of the Interior, **JEFFREY ROSE,** District Manager Burns District Bureau of Land Management, and **BUREAU OF LAND MANAGEMENT**, | |
| Defendants. | |

David H. Becker, LAW OFFICE OF DAVID H. BECKER, LLC, 4110 SE Hawthorne Blvd. No. 168, Portland, OR 97214; Talasi B. Brooks, WESTERN WATERSHEDS PROJECT, INC., PO Box 2863, Boise, ID 83701; Paul David Ruprecht, WESTERN WATERSHEDS PROJECT, INC., PO Box 12356, Reno, NV 89510. Of Attorneys for Plaintiffs.

Luther Langdon Hajek, UNITED STATES DEPARTMENT OF JUSTICE, Environment and Natural Resources Division, 999 18th Street, South Terrace Suite 370, Denver, CO 80202. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

In this case, the Court is asked to determine, among other things, whether the then-

Secretary of the Interior, on his last day in office, failed to comply with governing statutes and

regulations, acknowledge his departure from established agency policies and practices, and

provide a reasoned explanation for that departure when ordering that a specific grazing permit be renewed. The Court also is asked to decide, among other things, whether vacatur of that agency action is the appropriate remedy, if those alleged serious errors have been found to occur.

Plaintiffs bring this action challenging Defendants' grant of a Grazing Permit (the "Permit") to Hammond Ranches, Inc. ("HRI") on four allotments—Mud Creek, Hammond, Hammond FFR, and Hardie Summer. Plaintiffs argue that then-Secretary of the Interior Ryan Zinke[1] and Defendant Bureau of Land Management ("BLM") acted arbitrarily and capriciously in violation of the Administrative Procedure Act ("APA")[2] by failing to follow the requirements of the Federal Land Policy and Management Act of 1976 ("FLPMA"),[3] the National Environmental Policy Act of 1969 ("NEPA"),[4] and applicable BLM regulations. Plaintiffs contend that Defendants violated these statutes and regulations when Secretary Zinke ordered that HRI's previously-issued grazing permit be renewed without conducting the analyses required by the FLPMA, BLM regulations, NEPA, and the 2015 Oregon Greater Sage-Grouse Approved RMP Amendment. Plaintiffs also argue that Defendants violated these statutes and regulations when BLM issued a categorical exclusion environmental review and approval ("CX") and the approved the Permit without performing the required analyses.

Plaintiffs filed a motion for temporary restraining order ("TRO") to enjoin grazing on the four allotments. On June 4, 2019, the Court granted Plaintiffs' motion for a TRO and enjoined grazing on the Mud Creek and Hardie Summer allotments through July 2, 2019. By stipulation of

---

[1] Defendant David Bernhardt is the current Secretary of the Interior.

[2] 5 U.S.C. §§ 701 *et seq.*

[3] 43 U.S.C. §§ 1701 *et seq.*

[4] 42 U.S.C. §§ 4321 *et seq.*

the parties, the Court extended the TRO through July 17, 2019. On July 16, 2019, the Court granted in part Plaintiffs' amended motion for preliminary injunction, adopting a revised grazing plan proposed by Defendants. For the 2019 grazing season, the Court enjoined Defendants from allowing turnout and grazing of livestock on the Mud Creek allotment and the government-controlled portion of the Fir Creek pasture on the Hardie Summer allotment, and also enjoined turnout and grazing of livestock on the remainder of the government-controlled portions of the Hardie Summer allotment at greater than 30 percent utilization.

Now pending before the Court are cross-motions for summary judgment filed by the parties. Plaintiffs also move to supplement the administrative record. Defendants agree to supplement the administrative record with the maps and actual records of use submitted by Plaintiffs, but object to supplementing the record with the declarations of Plaintiffs' experts and certain exhibits attached to those declarations.

For the reasons that follow, Plaintiffs' motion for summary judgment is granted and Defendants' motion is denied on Plaintiffs' claim that Secretary Zinke violated the APA. Resolving this claim results in the vacatur of the Permit and remand to the agency. Thus, the Court need not resolve the pending motions relating to Plaintiffs' claims that Secretary Zinke and BLM violated NEPA and that BLM violated the APA. Whether there are additional violations that also would require vacatur need not be determined to resolve this dispute. Further, any potential future permit issued after remand would likely involve a different and more comprehensive NEPA analysis, particularly given the unique factual circumstances of the Permit issued in this case. Secretary Zinke allowed BLM 30 days to issue the Permit, but because of the government shutdown, BLM only had a few days to perform an expedited NEPA analysis and issue the Permit to comply with the Secretary's order. This makes any evaluation by the Court of

BLM's current NEPA analysis likely irrelevant. The Court also need not resolve the disputed portion of Plaintiffs' motion to supplement the administrative record, because the disputed evidence relates to the portions of the cross-motions for summary judgment that the Court is not reaching at this time.

## STANDARDS

### A. Taylor Grazing Act

Grazing on federal lands is governed by, among other statutes and regulations, the Taylor Grazing Act of 1934[5] ("Taylor Grazing Act") and the FLPMA. The Taylor Grazing Act requires persons seeking to graze livestock on public lands to obtain a permit from the Department of the Interior. The Taylor Grazing Act provides for the "orderly use, improvement, and development of the range" on public lands. 43 U.S.C. § 315a. "The Taylor Grazing Act authorized the Secretary of the Interior 'to issue or cause to be issued permits to graze livestock' pursuant to 'his rules and regulations.'" *United States v. Estate of Hage*, 810 F.3d 712, 717 (9th Cir. 2016) (quoting 43 U.S.C. § 315b). "[T]he implied license under which the United States has suffered its public domain to be used as a pasture for sheep and cattle . . . was curtailed and qualified by Congress, to the extent that such privilege should not be exercised in contravention of the rules and regulations." *United States v. Grimaud*, 220 U.S. 506, 521 (1911) (citation omitted).

The goals of the Taylor Grazing Act "are to 'stop injury' to the lands from 'overgrazing and soil deterioration,' to "provide for their use, improvement and development," and 'to stabilize the livestock industry dependent on the public range.'" *Pub. Lands Council v. Babbitt*, 529 U.S. 728, 733 (2000) (quoting 48 Stat. 1269). "As grazing allocations were determined, the Department would issue a permit measuring grazing privileges in terms of

---

[5] 43 U.S.C. § 315 *et seq*.

'animal unit months' (AUMs), *i.e.*, the right to obtain the forage needed to sustain one cow (or five sheep) for one month." *Id.* at 735; *see also* 43 C.F.R. § 4100.0-5 (defining AUM).

## B.  Federal Land Policy and Management Act

The FLPMA provides additional direction for the management of public lands. "In enacting FLPMA, 'Congress declared that it is the policy of the United States to manage the public lands in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air, and atmospheric, water resource, and archeological values.'" *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 498-99 (9th Cir. 2011) (quoting *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 581 F.3d 1063, 1075 (9th Cir. 2009)). The FLPMA instructs that permits for grazing on public lands ordinarily shall be issued for a 10-year term, subject to such terms and conditions as BLM deems appropriate and consistent with governing law. 43 U.S.C. § 1752(a). The FLPMA also establishes that a permittee holding an expiring grazing permit will be given first priority for renewal if the permittee "is in compliance with the rules and regulations issued [by the Secretary] and the terms and conditions of the permit." 43 U.S.C. § 1752(c).

## C.  Relevant BLM Regulations

BLM has issued regulations implementing the Taylor Grazing Act and the FLPMA. 43 C.F.R. §§ 4100-4190.1 (2005).[6] BLM's regulations specify "mandatory qualifications" for an applicant for a permit for grazing on public lands. 43 C.F.R. § 4110.1. These include the requirement that any applicant (and its affiliates) for renewal of a grazing permit "*must be*

---

[6] Although BLM issued amended regulations in 2006, those regulations have been enjoined by the U.S. District Court for the District of Idaho, *see W. Watersheds Project v. Kraayenbrink*, 538 F. Supp. 2d 1302 (D. Idaho 2008), and are not in effect for the relevant BLM field office.

determined by the authorized officer to have a satisfactory record of performance." *Id.*

§ 4110.1(b) (emphasis added). An applicant is "deemed" to have a satisfactory record "if the

authorized officer determines the applicant and affiliates to be in substantial compliance with the

terms and conditions of the existing Federal grazing permit or lease for which renewal is sought,

and with the rules and regulations applicable to the permit or lease." *Id.* § 4110.1-1(b)(1)(i). "The

authorized officer may take into consideration circumstances beyond the control of the applicant

or affiliate in determining whether the applicant and affiliates are in substantial compliance with

permit or lease terms and conditions and applicable rules and regulations." *Id.* § 4110.1-

1(b)(1)(ii).

BLM regulations applicable to a grazing permit prohibit, among other things:

"(3) Cutting, burning, spraying, destroying, or removing vegetation without authorization"; and

"(4) Damaging or removing U.S. property without authorization." *Id.* § 4140.l(b). BLM also has

regulations applicable to preventing wildfires, which apply to users of public lands, including

grazing permit holders. These regulations prohibit, without authorization, a user to, among other

things: "[c]ause a fire, other than a campfire, or the industrial flaring of gas, to be ignited by any

source; [b]urn, timber, trees, slash, brush, tundra or grass except as used in campfires; [l]eave a

fire without extinguishing it; [or] [r]esist or interfere with the efforts of firefighter(s) to

extinguish a fire." *Id.* § 9212.1(a), (c), (d), (f).

**D.  Administrative Procedure Act**

Claims under the FLPMA are reviewed under the standards of the APA. *See Mont.*

*Wilderness Ass'n v. Connell*, 725 F.3d 988, 994 (9th Cir. 2013); *W. Watersheds Project v.*

*Abbey*, 719 F.3d 1035, 1041 (9th Cir. 2013); *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468

F.3d 549, 554 (9th Cir. 2006). Under the APA, a court must "hold unlawful and set aside agency

action . . . found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2).

"An agency must 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Gill v. United States Dep't of Justice*, 913 F.3d 1179, 1187 (9th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*, 463 U.S. at 43; *see also Gill*, 913 F.3d at 1187. The basis for the agency's decision must come from the record. *Gill*, 913 F.3d at 1187.

A reviewing court's inquiry must be "thorough," but "the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (quotation marks and citation omitted). Although a court's review is deferential, the court "must engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it." *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2008); *see also Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001) ("The presumption of agency expertise can be rebutted when its decisions, while relying on scientific expertise, are not reasoned."). A court "must not 'rubber-stamp' . . . administrative decisions that [it] deem[s] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005) (first alteration in

original, remaining alterations added). A court, however, may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Gill*, 913 F.3d at 1187-88 (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

The reasoned-decisionmaking requirement, the Supreme Court has often observed, includes a duty to explain any "departure from prior norms." *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973); *see also Int'l Union, UAW v. NLRB*, 802 F.2d 969, 973-74 (7th Cir. 1986) ("[A]n administrative agency is not allowed to change direction without some explanation of what it is doing and why."). "Unexplained inconsistency" between agency actions is "a reason for holding an interpretation to be an arbitrary and capricious change." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

When an agency's action represents a policy change, such action requires "a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Mfrs.*, 463 U.S. at 42. A policy change will comply with the APA if the agency: "(1) displays 'awareness that it is changing position,' (2) shows that 'the new policy is permissible under the statute,' (3) 'believes' the new policy is better, and (4) provides 'good reasons' for the new policy, which, if the 'new policy rests upon factual findings that contradict those which underlay its prior policy,' must include 'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy.'" *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (alteration in original) (quoting *F.C.C v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)). If, however, the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so, the policy change violates the APA. *Fox*, 556 U.S. at 537.

### E. Motion for Summary Judgment in APA Cases

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In an action reviewing the merits under the APA, however, the Court does not ask whether there is a genuine dispute as to any material fact. Rather, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985). In an APA-review case, "summary judgment is the appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Id.*

## BACKGROUND

### A. Background of HRI's Permit, Subsequent Denial, and Appeal

HRI is a family-owned Oregon ranching corporation. Its shareholders are Steven Dwight Hammond, his wife Earlyna Hammond, and his parents Dwight Lincoln Hammond and Susan Hammond, through their Trust. Steven Hammond currently is the President of HRI and Dwight Hammond is the Vice President.[7] HRI began grazing on public BLM lands in 1964. Before the Permit at issue in this case, the most recent permit granted to HRI was Permit No. 3602564, which had a term from March 1, 2004 to February 28, 2014. AR 1270-72. This permit authorized, for each year: 68 cattle and 471 AUMs on the Hammond allotment, from April 1 to

---

[7] During the time of the 2004-2014 Permit, Dwight was the President of HRI and Steven was the Vice President. AR 3005.

October 30;[8] 32 cattle and 32 AUMs on Hammond FFR, from April 1 to April 30; 390 cattle
and 590 AUMs on the Mud Creek allotment, from May 16 to June 30;[9] and 408 cattle and 407
AUMs on the Hardie Summer allotment, from July 1 to September 30.[10]

Steven and Dwight Hammond were indicted and tried on various criminal charges
stemming from allegations that they intentionally set fire to public lands. At their criminal trial in
June 2012, Steven Hammond was convicted on two counts, one relating to a 2001 fire and one
relating to a 2006 fire. AR 3006. Dwight Hammond was convicted on one count, relating to
a 2006 fire. *Id.* The jury acquitted the Hammonds on several charges and did not reach a verdict
on several other charges. *Id.* On October 30, 2012, the Hammonds were sentenced by U.S.
District Court Judge Michael Hogan. Steven Hammond was sentenced to twelve months and one
day of imprisonment and three years of supervised release. AR 1506-08. Dwight Hammond was
sentenced to three months of imprisonment and three years of supervised release. AR 1512-14.
On February 7, 2014, the Ninth Circuit vacated these sentences on appeal and instructed the
district court to resentence the Hammonds to the mandatory statutory minimum of five years. *See*
*United States v. Hammond*, 742 F.3d 880, 884-85 (9th Cir. 2014). The district court resentenced
the Hammonds on October 7, 2015, and ordered them to self-surrender on January 4, 2016, to

---

[8] The Hammond allotment is authorized for grazing for seven months and is designated
as 99 percent active. Thus, the total AUMs are calculated at 68 (cows) times seven (months)
times .99, which equals 471.

[9] The Mud Creek allotment is authorized for grazing for 1.51 months and is designated
at 100 percent active. Thus, the total AUMs are calculated at 390 (cows) times 1.51 (months)
times 1.0, which equals 590.

[10] The Hardie Summer allotment is authorized for grazing for three months and is
designated at 1/3 (33.33 percent) active. Thus, the total AUMs are calculated at 408 (cows) times
three (months) times .3333 percent, which equals 407.

begin serving their sentences. *United States v. Hammond*, Case No. 6:10-cr-60066-AA, ECF 234, 236[11]; *see also* AR 943.

On July 7, 2011, the United States filed a civil suit against HRI and Dwight and Steven Hammond in Case No. 11-cv-0823-SU (D. Or). AR 1518-30. The United States sought damages for several fires it alleged were set by the Hammonds, including: (1) two Fir Creek area fires in 2005; (2) Krumbo Butte fire in 2006; (3) Lower Bridge Creek fire in 2006; and (4) Granddad fire in 2006. *Id.* On August 26, 2014, the parties to the civil suit met with a mediator and reached a settlement agreement. On December 4, 2014, U.S. Magistrate Judge Patricia Sullivan entered the Consent Judgment as the parties agreed. *United States v. Hammond Ranches, Inc.*, Case No. 11-cv-0823-SU, ECF 76.[12] This judgment required HRI and the Hammonds to pay the United States $200,000 before December 31, 2015. *Id.* As part of the settlement, the Hammonds also were to pay $200,000 on or about December 1, 2014, for a total settlement payment of $400,000. *See id.*, ECF 75-1 (Settlement Agreement).

---

[11] The amended sentences are discussed in the administrative record, but the judgments imposing the amended sentences are not included as part of the administrative record (unlike the original judgments, which are part of the administrative record). Secretary Zinke, however, specifically cites the five years of imprisonment imposed by the court and that the Hammonds began serving their sentences in January 2016. Accordingly, the Court cites these publicly filed court documents, because Secretary Zinke relied on this information in his decision. *See Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (stating that a court may "admit extra-record evidence: (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith" (quotation marks omitted)).

[12] The Consent Judgment and settlement agreement in the civil case is not in the administrative record. Secretary Zinke, however, specifically relies on the "civil fines" paid by the Hammonds in settlement of this lawsuit in Secretary Zinke's decision. Thus, the Court considers these documents filed in the civil case docket because Secretary Zinke relied on this information in his decision, and to determine whether Secretary Zinke considered all relevant factors and sufficiently explained his decision. *See Lands Council*, 395 F.3d at 1030.

On February 14, 2014, BLM denied HRI's Application for Permit Renewal and declared that HRI's grazing preference will no longer be effective and that HRI will no longer hold a superior or priority position against others for the purpose of receiving a grazing permit for the subject allotments.[13] AR 1110-30. BLM explained that under its regulations permit holders and their "affiliates" must be in compliance with the rules and regulations issued by the Secretary of the Department of the Interior and the terms and conditions in the permit. BLM found that Steven Hammond and Dwight Hammond were affiliates of HRI. BLM also found that the Hammonds' criminal convictions for intentionally setting fires on public lands violated the regulations prohibiting cutting, burning spraying, destroying, or removing vegetation without authorization and damaging or removing U.S. property without authorization. 43 C.F.R. § 4140.1. BLM further concluded that the Hammonds' conduct violated 43 C.F.R. § 9212.1(a), (c), (d), and (f).

BLM summarized in detail the witness testimony received at the criminal trial. AR 1114-1124. BLM characterized this testimony as demonstrating "how the Hammonds violated BLM grazing regulations and the terms of [HRI's] grazing permit, endangered the lives of numerous individuals, including firefighters, and altered ecological conditions on public lands." AR 1114. BLM described the testimony as showing that the Hammonds intentionally set multiple fires, which included fires in addition to the fires leading to the criminal convictions. In reaching its final decision in 2014 denying HRI's application to renew Permit No. 3602564, BLM accepted

---

[13] The Office of Hearings and Appeals ("OHA") clarified that the statement that HRI's "grazing preference . . . will no longer be effective" equates to, and has no meaning separate from, "the language that HRI 'will no longer hold a . . . priority position against others for the purpose of receiving a grazing permit for these allotments.'"

the sworn testimony at trial and, after a "thorough[] review[]," rejected the protest filed by HRI that the sworn testimony was inaccurate or incomplete. AR 1125.

BLM concluded that HRI and its affiliates had an unsatisfactory record of performance. BLM stated: "The Hammond fire-setting maliciously and knowingly placed public recreationists, firefighters, and BLM range staff at high risk just to further [HRI's] grazing interests." AR 1126. BLM also noted that the "Hammonds set the fires because they disagreed with how BLM managed the land. The Hammonds acted in the interest of improving the rangeland forage for their cattle, but not necessarily for other resources like wildlife habitat." *Id.* BLM noted that "With the non-renewal of this permit, the Hammonds will no longer have the same economic incentive to burn public land allotments without authorization and endanger people." *Id.*

BLM concluded that each criminal conviction, whether standing alone or in combination, constitutes an unsatisfactory record of performance. BLM explained:

> The Hammonds' malicious disregard for human life and public property shows contempt for BLM regulation of public land. The Hammonds' interference with firefighting efforts is antithetical to orderly use of resources. The Hammonds' disregard for orderly and planned prescribed burning that accounts for ecological objectives and human safety is incompatible with the orderly use and improvement of resources. The BLM carefully plans and conducts prescribed burns to meet ecological objectives, such as retaining sagebrush and bitterbrush habitat. By taking matters into their own hands and burning public lands outside of the official BLM process, the Hammonds altered the Burns District's prescribed fire management strategy for years to come. Good stewardship is more than just producing grass for livestock—it requires orderly conduct that protects the multiple objectives of public lands and the lives of those who work and recreate on public lands.

*Id.*

BLM also concluded that the Hammonds' "additional fire-setting described in the criminal trial," outside of their criminal convictions, constituted an unsatisfactory record of

performance. AR 1127. BLM found that "the testimony shows a pattern of intentional fire-setting by Dwight and Steven Hammond—beyond the fires for which they were convicted—demonstrating their callous disregard for human life and BLM multiple use objectives for the land." *Id.*

HRI appealed BLM's decision and sought a stay of the decision. On April 28, 2014, the Office of Hearings and Appeals ("OHA") denied the Hammonds' motion for a stay and BLM's decision went into effect. AR 3004-13. OHA found that the criminal convictions were enough to establish violations of governing regulations. OHA also found that BLM correctly relied on other evidence of "multiple instances of the Hammonds setting fires to eliminate juniper for the purpose of increasing forage for their cattle," AR 3006, and found that in addition to the acts for which the Hammonds were found guilty, there was "also substantial evidence of other instances of the Hammonds setting fires which resulted in violations of 43 C.F.R. § 4140.1(b)(3)." AR 3010. OHA noted that the Hammonds did not dispute these other instances of starting fires, but instead merely argued that they were not convicted of such conduct. OHA determined that the other fires could be considered because "the standard of proof in a criminal case is much higher than the simple preponderance of the evidence standard applicable to the case on the merits in this proceeding." AR 3011.

OHA evaluated HRI's substantial compliance, using a test set forth in the 1995 final rule and later articulated by the Interior Board of Land Appeals ("IBLA"), which the Court will refer to for ease of reference as the "IBLA Test." The IBLA Test instructs the adjudicator to consider: (1) the number of prior incidents of noncompliance; (2) the nature and seriousness of any noncompliance; and (3) the ultimate aim of BLM in permit renewal—*to wit*, to use the record of performance to confirm the ability of the permittee to be a good steward of the public land and

thus protect the land from destruction or unnecessary injury and provide for orderly use, improvement, and development of resources. AR 3011. OHA concluded that the Hammonds' "pattern of starting fires that damage vegetation on public lands and endangers lives is sufficiently serious to warrant permit non-renewal. . . . It is also sufficiently serious to eliminate HRI's right to first priority for a new permit pursuant to 43 C.F.R. § 4130.2(e)(2)." AR 3012. OHA determined that HRI did not have a sufficient likelihood of success on appeal, considering whether HRI "raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." AR 3008. OHA denied HRI's request for a stay.

HRI appealed the stay denial to the IBLA. On November 23, 2016, the IBLA affirmed the denial of the stay. AR 2990-96. The IBLA held that the OHA correctly relied on the conduct for which the Hammonds were convicted in the criminal trial to conclude that HRI had not substantially complied with the terms of the 2004 permit and the underlying regulations. AR 2994. HRI also challenged OHA's reliance on the other instances of setting fires, for which the Hammonds were not convicted, and OHA's reliance on that conduct based on a preponderance of the evidence standard. The IBLA concluded: "We see no error in law or fact in Judge Sweitzer's determination. We are not persuaded that the Hammonds' acquittal with respect to some of the felony charges for arson demonstrates that Judge Sweitzer erred in finding that appellants are not substantially likely to prevail in their appeal of BLM's decision." AR 2995.

Although HRI's request for a stay was denied, OHA later stayed HRI's appeal pending the Department of the Interior's review of the Supreme Court's decision in *Lucia v. Securities and Exchange Commission*, 138 S. Ct. 2044 (2018). *See* AR 3245. After that stay was lifted, in

considering the appeal on the merits, the OHA's assigned judge was evaluating whether to have the case proceed to summary judgment or directly to a hearing. Between May and November 2018, briefs were filed before the assigned OHA judge on that issue. *See* AR 3295-96 (scheduling order). Before that, the parties attempted mediation, which failed. AR 2955-57, 2962-67.

On July 10, 2018, President Trump issued Executive Grants of Clemency, pardoning Steven and Dwight Hammond for their crimes and commuting their sentences. AR 966-67. Including time served before their resentencing, Steven Hammond had served about four years of his five-year sentence and Dwight Hammond had served about three years of his five-year sentence.

## B. Secretary Zinke's Decision

On December 26, 2018, Secretary Zinke exercised his authority under 43 C.F.R. § 4.5 to assume jurisdiction over HRI's appeal that the OHA was considering. AR 962. On January 2, 2019, Secretary Zinke's last day in office, the Acting Associate Solicitor, Division of General Law provided a Decision Memorandum to Secretary Zinke titled "Options Regarding *Hammond Ranches, Inc. v. BLM*, OR-020-14-10." AR 957-961 ("Decision Memo"). This Decision Memo briefly described the Hammonds' convictions and pardons, BLM's denial of HRI's permit renewal, HRI's appeal to date, the applicable law, and the effect of a pardon. The Decision Memo noted that "[a]mong other things, BLM's Final Decision notes that the Hammonds' fire-starting conduct underlying the convictions constitutes an unsatisfactory record of performance." AR 958. The Decision Memo stated that a pardon "eliminates punishment . . . but does not erase the conviction, including the facts underlying that conviction. . . . Thus, government agencies have permissibly considered conduct underlying an individual's pardoned conviction if the conduct is relevant to an assessment of the individual's qualifications for a license or

certification." AR 959. The Decision Memo concluded that although the Hammonds' pardons removed the "punitive consequences" of their crimes, "[t]o conclude that the Final Decision is a punitive consequence of the conviction does not follow because both the grazing regulations themselves and the articulated bases for the Final Decision are explicitly aimed at making a determination of regulatory compliance, to support a determination of proper stewardship in the context of BLM's land management duties." AR 959-60.

The Decision Memo suggested four options for Secretary Zinke's consideration. The first option was that the Secretary could rely on "changed circumstances since 2014, such as the pardon, the years of imprisonment, civil penalties paid, and lack of violations by Hammond Ranches, Inc. since 2014 in undertaking grazing on private land owned by the Hammonds . . . to determine that the Hammonds are in substantial compliance with the regulations." AR 960. The Decision Memo stated that in applying the IBLA Test to consider the number of prior incidents of noncompliance and the nature and seriousness of the noncompliance, "the pardons reflect the judgement [sic] of the executive that, in fact, the Hammonds' conduct did not constitute so serious a violation that the permit may not be renewed." *Id.* The Decision Memo was silent with regard to the remaining aspects of the IBLA Test, or the other conduct on which BLM based its denial that was not the subject of the convictions and pardons.

The second option proposed in the Decision Memo was to remand the case to the Assistant Secretary of Land and Minerals Management to resolve the case. The third option was to direct BLM to "expeditiously process" a new permit application if one was submitted by HRI. The fourth option was to allow the case to continue on the litigation path, through OHA and possibly further appeals. The first option was the option selected by Secretary Zinke.

The same day the Decision Memo issued, January 2, 2019, his last day in office,

Secretary Zinke issued his decision. AR 942-45. He set out the factual and procedural history of

the case in slightly more than one page, the applicable law in slightly more than one page, and

his analysis in one paragraph. Secretary Zinke's analysis, in its entirety, states:

> I find that the pardons constitute unique and important changed
> circumstances since the BLM made its decision. In light of the
> Grants of Executive Clemency, the years of imprisonment, and
> civil damages paid by the Hammonds, I find that it is consistent
> with the intent of the pardons—and in particular their reflection of
> the President's judgment as to the seriousness of the Hammonds'
> offenses—to renew the Hammonds' permit for the duration of the
> term that would have commenced in 2014. The Hammonds'
> continuance of grazing will depend on compliance with BLM's
> grazing regulations. I do not find fault with BLM's assessment of
> the law and facts in its 2014 Decision and I reiterate BLM' s
> concern for human safety on public lands. The safety of our
> Nation's firefighters and others working and recreating on public
> lands remains paramount. I will ask BLM to keep the Office of the
> Secretary apprised of any permit compliance and human safety
> issues.

AR 945. Secretary Zinke concluded his decision by remanding "the matter to BLM with

instructions to renew, within 30 days of the date of this decision, the permit under the same terms

and conditions for the balance of the renewal period." *Id.*

## C. BLM's Issuance of the Permit and CX

Secretary Zinke's decision was issued during the government shutdown. When the

government reopened on January 25, 2019, BLM had a very limited timeframe to comply with

Secretary Zinke's instruction to renew HRI's permit within 30 days of January 2, 2019.

Beginning January 29, 2019, BLM staff in Oregon began email communications to implement

Secretary Zinke's decision, including discussing NEPA compliance requirements and drafting

the CX. *See, e.g.*, AR 857-905.

On February 5, 2019, BLM Rangeland Management Specialist Jamie McCormack circulated a memorandum to Burns District Manager Jeffrey Rose. AR 911-13. This memorandum noted that Secretary Zinke had directed BLM to renew the Permit under the same terms and conditions as the previous permit. The memorandum stated that BLM had conducted standards and guidelines assessments and evaluations in 2018 on the four allotments, standards were being achieved except the standard relating to species, the failure of that standard was not caused by grazing, and thus the Permit qualified for a CX under the FLPMA, which constitutes compliance with NEPA. Mr. Rose concurred with this conclusion.

The CX was dated February 1, 2019, but signed on February 4 and 5, 2019. AR 926-33. It concluded that "the proposed action did not trigger any of the extraordinary circumstances described in 43 C.F.R. § 46.215." AR 928. The CX also concluded that the Permit was "in conformance with the [land use plans], qualifies as a categorical exclusion, and does not require further NEPA analysis." AR 931.

On February 13, 2019, Defendant Jeffrey Rose of BLM and Steven Hammond of HRI signed the Permit, with an effective date of February 1, 2019 through February 28, 2024. AR 934-41.[14] The Permit authorized 68 cattle and 471 AUMs on the Hammond allotment from April 1st through October 30th. It authorizes 32 cattle and 32 AUMs on the Hammond FFR allotment from April 1st through April 30th. It authorizes 390 cattle and 590 AUMs from May 16th through June 30th on the Mud Creek allotment, and 408 cattle and 407 AUMs from July 1st to September 30th on the Hardie Summer allotment.

---

[14] The copies of the Permit in the administrative record are unsigned copies. AR 934-41. A signed copy of the Permit, however, is in the record before the Court. *See* ECF 7-3.

## ANALYSIS

Plaintiffs argue that Secretary Zinke's decision violated the FLPMA and the regulations governing issuance of grazing permits because the decision did not include the required finding that HRI had a satisfactory record of performance, including a finding that HRI was in substantial compliance with the terms and conditions of its existing federal grazing permit (the 2004-2014 permit). Plaintiffs also argue that any such finding would be arbitrary and capricious. Defendants respond that Secretary Zinke "implicitly" found that HRI had a satisfactory record of performance, such a finding does not require a finding that HRI was in substantial compliance with the terms and conditions of its existing permit, and such a finding was appropriate based on "changed circumstances," particularly the Presidential pardons, the civil fines paid by the Hammonds, and their years of imprisonment.

### A.  Standard Applied by Secretary Zinke

Defendants argue not only that Secretary Zinke "implicitly" found that HRI had a satisfactory record of performance, but also that Secretary Zinke properly based that implicit finding on something other than the fact that HRI was in substantial compliance with the terms of its 2004 permit or with the governing regulations. Defendants argue that Secretary Zinke could and did find HRI's satisfactory performance based on any factor not specifically excluded by the statute and regulations, and that Secretary Zinke did not have to apply the substantial factor standard. This argument, however, ignores that Secretary Zinke, and the Decision Memo, expressly set forth the standard that Secretary Zinke purported to apply in reviewing the appeal of HRI's permit renewal.

The Decision Memo set forth the governing law and standards and Secretary Zinke quoted the relevant portions verbatim in his decision. The Decision Memo and Secretary Zinke's decision state that "[f]ederal law and regulations require a satisfactory record of performance for

renewal of a grazing permit." AR 943, 958. The Decision Memo and Secretary Zinke also state: "The Taylor Grazing Act of 1934 . . . conditions renewal of a grazing permit on compliance with rules and regulations." *Id.* They further state: "The BLM regulations require that the authorized officer find that an applicant have a satisfactory record before renewing a permit." AR 943-44, 958. They explain: "A satisfactory record means the applicant is in 'substantial compliance with' regulations applicable to the permit." AR 944, 958. Thus, Secretary Zinke explicitly provided the standard he purportedly applied for what constituted a satisfactory record of performance in his review of HRI's permit renewal. Defendants' Counsels' *post hoc* argument that Secretary Zinke applied a different standard is rejected. *Motor Vehicle Mfrs.*, 463 U.S. at 50 (noting that "courts may not accept appellate counsel's post hoc rationalizations for agency action" and that "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself"). The Secretary expressly stated that his review was based on an understanding that a satisfactory record of performance means that the applicant is in substantial compliance with the governing regulations.

Moreover, to the extent Secretary Zinke implicitly applied a different standard for what a satisfactory record of performance means, it fails under the APA. As the Decision Memo, Secretary Zinke's decision, HRI's appellate documents before the agency, and the governing regulations show, the agency's practice has been to evaluate a satisfactory record of performance for a permit renewal based on the substantial compliance test. Departure from agency practice may be permissible under the APA, but only if such departure is recognized by the agency and adequately explained. *See, e.g.*, *Fox*, 556 U.S. at 515-16; *Brand X*, 545 U.S. at 981; *Motor Vehicle Mfrs.*, 463 U.S. at 42; *Kake*, 795 F.3d at 966. No such recognition or explanation was

provided in this case. To the contrary, Secretary Zinke expressly cited only the substantial compliance test.

**B. Whether Secretary Zinke's Decision Contains a Finding of a Satisfactory Record of Performance**

Defendants argue that Secretary Zinke's decision "implicitly" contains a finding that HRI had a satisfactory record of performance. Defendants concede that there is no articulated finding by Secretary Zinke that HRI had a satisfactory record of performance. Defendants argue that such a finding can be ascertained from the Secretary's decision to grant a permit, the Secretary's reliance on the "changed circumstances," and the analysis in the contemporaneous Decision Memo. The Court disagrees.

Secretary Zinke expressly stated that he did not find fault with BLM's assessment of the law and facts in its 2014 decision denying HRI's permit. That 2014 decision found numerous instances of conduct by the Hammonds that resulted in a finding that the Hammonds did not have a satisfactory record of performance. This conduct included the conduct underlying the criminal convictions as well as additional conduct. The Secretary accepted all of these findings.

Secretary Zinke ordered that the Permit be issued solely based on three "changed circumstances"—the 2018 pardons of the Hammonds, the December 2014 and the 2015 settlement payments made by the Hammonds to the United States, and the terms of imprisonment served by the Hammonds beginning January 2016. None of these three factors, however, go to HRI's record of performance during the term of its previous permit. They all occurred after the expiration of that permit.

Indeed, Secretary Zinke appears to have carefully avoided making a finding that HRI was in substantial compliance or had a satisfactory record of performance. Considering his decision in conjunction with the Decision Memo illustrates this fact. The Decision Memo includes in its

proposal relating to "Option 1" that the Secretary could rely on certain changed circumstances "to determine that the Hammonds are in substantial compliance with the regulations." AR 960. The Decision Memo discusses applying the IBLA Test and suggests relying on "changed circumstances since 2014, such as the pardon, the years of imprisonment, civil penalties paid, and lack of violations by Hammond Ranches, Inc. since 2014 in undertaking grazing on private land owned by the Hammonds . . . ." *Id.* The Decision Memo also proposes that the pardons, in particular, "reflect the judgement [sic] of the executive that, in fact, the Hammonds' conduct did not constitute so serious a violation that the permit may not be renewed." *Id.*

Secretary Zinke selected Option 1 and specifically chose what text to adopt from that proposed option (and elsewhere in the Decision Memo) in drafting his decision and what not to adopt. For example, Secretary Zinke relied on the changed circumstances of the pardon, the years of imprisonment, and the civil penalties paid, but rejected relying on the lack of "violations" by HRI since 2014 in grazing on its own private land.[15] Secretary Zinke included from the proposed option certain acceptable suggested text—the changed circumstances he accepted and the suggestion about the pardon reflecting the executive's views on the seriousness of the Hammonds' conduct. Then, however, rather than accept the Decision Memo's proposed conclusion "that the Hammonds are in substantial compliance with the regulations," Secretary Zinke concluded that "I find it is consistent with the intent of the pardons . . . to renew the Hammonds' permit for the duration of the term that would have commenced in 2014." AR 945. There are other examples of Secretary Zinke's particular choices in selecting text from the Decision Memo, such as when Secretary Zinke stated in his decision that the 2014 BLM decision

---

[15] Indeed, it is not clear how HRI even could violate federal regulations governing grazing on publicly owned land while exclusively grazing on its own, privately owned land, or other leased privately owned land.

was based on the conduct underlying the criminal convictions, while the Decision Memo stated that "[a]mong other things," BLM's decision was based on the conduct underlying the criminal convictions.

A careful comparison of the Decision Memo and Secretary Zinke's decision is notable for when the Secretary chose not to incorporate the proposed text of the Decision Memo. As discussed in Section A above, Secretary Zinke directly quotes from the Decision Memo the legal standard that federal law and regulations require the finding of a satisfactory record of performance and that a satisfactory record of performance means that the applicant is in substantial compliance with regulations applicable to the permit. Yet one of the Decision Memo's proposals that was not incorporated into Secretary's decision was the proposed finding that the HRI (and its affiliates, the Hammonds) were in substantial compliance with the regulations. Secretary Zinke did not make any such finding. Nor did Secretary Zinke make any finding that HRI could somehow otherwise have a satisfactory record of performance without HRI being in substantial compliance with the regulations applicable to the 2004 permit, even if Secretary Zinke were applying a different standard for satisfactory record of performance. The Court rejects Defendants' argument that Secretary Zinke "implicitly" made any finding regarding HRI's satisfactory record of performance. After reciting the governing law that HRI must be found to have satisfactory record of compliance in order receive a renewed permit, meaning that HRI and its affiliates must be in substantial compliance with the regulations governing the 2004 permit, Secretary Zinke simply avoided the issue altogether. Under federal law and agency regulations, he may not do this.

Secretary Zinke's decision recited the IBLA Test for evaluating substantial compliance. AR 944. The Secretary noted under this test whether a permittee is in "substantial compliance" is

to be determined by considering both "the number of prior incidents of noncompliance," and "the nature and seriousness of any noncompliances," recognizing that the ultimate aim of a BLM decision about renewal is to use the record of performance "to confirm the ability" of a permittee "to be a [good] steward of the public land," and thus to "protect [the land] from destruction or unnecessary injury and provide for orderly use, improvement, and development of resources." AR 944 (alterations in original) (quoting *Hanley Ranch P'ship, et al.*, 183 IBLA 184, 199 (2013)); *see also Grazing Administration—Exclusive of Alaska (Final Rule)*, 60 Fed. Reg. 9894, 9925 (Feb. 22, 1995).

The Department of Interior and the Secretary are obligated to follow statutory requirements and agency rules and regulations when making grazing determinations. *See Grimaud*, 220 U.S. at 521. The Secretary also may not disregard governing statutes and agency regulations in making discretionary determinations. *See, e.g., Erie Boulevard Hydropower, LP v. Fed. Energy Regulatory Comm'n*, 878 F.3d 258, 269 (D.C. Cir. 2017) ("It is axiomatic that an agency is bound by its own regulations. Therefore, if an agency action fails to comply with its regulations, that action may be set aside as arbitrary and capricious." (alteration, quotation marks, and citation omitted); *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003) (upholding challenge under the APA and finding that "[h]aving chosen to promulgate the [ ] policy, the [agency] must follow that policy"); *Friends of Richards-Gebaur Airport v. F.A.A.*, 251 F.3d 1178, 1195 (8th Cir. 2001) ("[A]n agency implementing a statute may not ignore . . . a standard articulated in the statute."). Secretary Zinke did not perform analyze the Hammonds' number of prior incidents of noncompliance or the nature and seriousness of the incidents of noncompliance (particularly the incidents outside of the convictions), evaluate whether the Hammonds would be good stewards of the land, make a finding of whether the

Hammonds were in compliance with the rules and regulations or terms of the 2004 permit, or otherwise follow the directives of the governing statutes and regulations. The Secretary did not make a finding of substantial compliance or a finding that HRI had a satisfactory record of performance, either explicitly or implicitly.

Secretary Zinke's decision to issue the Permit without making the required finding that HRI had a satisfactory record of performance violates the APA. It was arbitrary and capricious, an abuse of discretion, not rationally connected to the facts before the agency, inconsistent with the governing statutes and regulations, and an unexplained change in agency practice and procedure.

## C. The Effect of the Post-Permit Conduct

Even assuming that Secretary Zinke's decision could be construed as "implicitly" finding that HRI had a satisfactory record of performance based on post-permit conduct, such a finding also would violate the APA for several reasons. First, as explained above, the three "changed circumstances" all occurred after the expiration of the 2004 permit. Defendants offer no authority or examples of when the agency relied on post-permit conduct to evaluate the permittee's record of performance. Indeed, the regulations contemplate that post-permit conduct will not be considered. The regulations establish that the "substantial compliance" requirement means "substantial compliance with the terms and conditions of the *existing* Federal grazing permit or lease *for which renewal is sought*, and with the rules and regulations applicable to the permit or lease." 43 C.F.R. § 4110.1(b)(1)(i) (emphasis added); *see also Grazing Administration— Exclusive of Alaska (Final Rule)*, 60 Fed. Reg. 9894, 9926 (Feb. 22, 1995) ("The concepts of 'permit violations,' 'satisfactory record of performance' and 'substantial compliance' are defined in general terms by the text of this final rule. Application on a case-by-case basis will be done by the authorized officer, within the framework established by this final rule, based upon review of

the record. For renewals, it will extend only to review of the permittee's record on the permit or lease for which renewal is sought. . . . Consistency in application of the qualification requirements is of concern to the Department. . . . Determining compliance with the terms and conditions and rules and regulations at the time of permit renewal stems from a statutory provision (43 U.S.C. 1752(c))."). The Secretary must comply with agency regulations, which allow for review of the record on the permit for which renewal is sought.

Defendants argue that because BLM relied on one instance of pre-2004 permit conduct (along with many instances of conduct during the 2004-2014 timeframe), it must necessarily mean that post-permit conduct may also be relied on. This argument is rejected. Considering a violation that occurred under the same permit during a previous term, which was not discovered until the current permit term, is not the same as considering post-permit conduct. OHA rejected HRI's argument that BLM's consideration of Steven Hammond's 2001 fire-starting conduct in denying the permit was erroneous. OHA found that BLM could consider a violation that occurred during a previous term of the same permit, "especially when BLM did not discover the permittee's culpability until during the current term of the permit." AR 3011. This is unlike considering the *later* fact that the Hammonds paid civil damages and went to prison for the conduct that constituted the underlying regulatory violations, and then received pardons while serving their sentences.

Next, the specific "changed circumstances" relied on by the Secretary fail under the APA. Each is discussed in turn.

### 1. Civil and Criminal Penalties

Secretary Zinke relied on the fact that the Hammonds paid civil damages and served criminal sentences as "changed circumstances" that supported granting the Permit. There are several problems with this reasoning. First, the civil damages and criminal sentences were not

"changed" circumstances from the 2014 BLM decision. BLM knew at the time of its decision that the government had filed a civil suit requesting significant civil damages. That case had been litigated for three years when BLM issued its decision. BLM also knew that the Hammonds had been criminally convicted (two years earlier in 2012) and that their sentences had been amended to the five-year statutory mandatory minimum. The Ninth Circuit issued its mandate one week before BLM's decision. BLM's 2014 permit nonrenewal for the same conduct was not done *instead of* civil and criminal penalties, but *in addition to* them.

Second, the regulations expressly include that permittees are prohibited from engaging in certain conduct (which could lead to a finding of substantial noncompliance) and that the permittee may *also* be subject to civil and criminal penalties if the permittee engages in that conduct. *See, e.g.*, 43 C.F.R. §§ 4140.1; 4170.1; 4170.2. This prohibited conduct includes burning, destroying, or removing vegetation and interfering with lawful uses and users. In response to violations, the agency may withhold issuance of a permit or cancel or suspend a permit. *Id.* § 4170.1-1(a). The agency also may charge monetary damages for certain violations. *See, e.g.*, § 4170.1-1(d). The regulations provide that failing to comply with the regulations is grounds for a finding of noncompliance, include as a potential repercussion for engaging in prohibited conduct the withholding of the issuance of a permit as a civil "penalty," and include other civil and criminal penalties. That the regulations expressly provide for nonrenewal of permits, withholding of permits, criminal penalties, and civil monetary penalties, shows that a permittee being subject to criminal and civil penalties along with the withholding of a permit or nonrenewal of a permit is part of the regulatory scheme and is not separate conduct that mitigates the violation.

Third, logic dictates that serving one's civil and criminal penalties for the violation that also is a basis for nonrenewal of a permit is not separate conduct that mitigates that violation. To find otherwise renders the enforcement provisions of the statutory and regulatory scheme meaningless. In addition to the regulations specific to grazing that allow for civil and criminal penalties, other regulations prohibit violative conduct and establish penalties. For example, agency regulations provide that injury or removal of vegetative resources is a trespass subject to monetary damages.[16] *See* 43 C.F.R. § 9239.0-7; 9239.0-8.

Fourth, Defendants offer no authority or previous example of the agency considering post-permit conduct for evaluating a record of performance, or considering payment of civil fines or service of criminal penalties to mitigate the underlying violations. Secretary Zinke's decision provided no recognition that his consideration of post-permit conduct was a deviation from established norms, and provided no explanation for such deviation. Nor did Secretary Zinke explain how the fact that a permittee's affiliates served criminal penalties and the permittee paid civil damages for the conduct that constituted the underlying violations that rendered the permittee to be in noncompliance could be considered mitigating conduct that rendered those underlying violations non-violative.

Fifth, it does not appear that Secretary Zinke considered all the relevant factors when focusing on the $400,000 "civil damages" that HRI paid to the government. The Secretary does not appear to have considered the fact that at the same time HRI was required to pay $400,000,

---

[16] This is not to say, however, that if HRI were to apply for a new grazing permit, the fact that the Hammonds have served their time and received a pardon would not be factors that could be considered. Persons who pay their debt to society should be able to start anew. The permit *renewal* regulations, however, are viewed from the timeframe of the existing permit. This also is not to say that the agency could not provide a reasoned explanation for considering post-permit conduct in considering permit renewal. Such an explanation, however, was not provided in this case.

its federal subsidies increased dramatically. From 2010-2013, HRI received a total of $84,065 in subsidies. *See* ECF 57-6.[17] HRI and the government reached a settlement agreement in 2014, in which HRI was required to pay a total of $400,00 by 2015. From 2014-2017, HRI received a total of $587,590 in subsidies, an increase of more than $500,000 from the previous three years' subsidies. This more than offsets that $400,000 total settlement payment. Secretary Zinke does not appear to have considered whether this dramatic increase in subsidies was related to offsetting the cost of private grazing due to BLM's denial of the grazing permit, offsetting the settlement damages that HRI had to pay, offsetting both of those expenses, or unrelated to either and the amount HRI would have received in any event.

To the extent Secretary Zinke found the fact that the Hammonds and HRI also paid monetary civil penalties and that the Hammonds served a criminal sentence to somehow render their conduct during the time of HRI's permit non-violative and thus showing a satisfactory record of performance, that finding violated the APA. Any such finding was arbitrary and capricious, an abuse of discretion, not rationally connected to the facts before the agency, inconsistent with the governing regulations, and an unexplained change in agency practice and procedure.

### 2. Presidential Pardons

Secretary Zinke also relied on the Presidential pardons as post-permit "changed circumstances" that somehow rendered HRI's permit renewal appropriate. Secretary Zinke, however, conceded in his decision that a Presidential pardon does not overturn a judgment of conviction, does not clear a person of the underlying conduct of conviction, constitutes a

---

[17] Although this evidence is not in the administrative record, the Court may consider it because Secretary Zinke specifically cites the "civil damages" paid by HRI as a factor in Secretary Zinke's decision. *See Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).

confession of guilt, and does not preclude a government agency from considering the underlying conduct in evaluating permit applications. AR 944; *see also Nixon v. United States*, 506 U.S. 224, 232 (1993) ("But the granting of a pardon is in no sense an overturning of a judgment of conviction by some other tribunal; it is "[a]n executive action that mitigates or sets aside *punishment* for a crime." (emphasis in original) (quoting Black's Law Dictionary 1113 (6th ed. 1990)); *Burdick v. United States*, 236 U.S. 79, 94-95 (1915) ("[A pardon] carries an imputation of guilt; acceptance a confession of it. . . . [It] remits punishment."); *United States v. Schaffer*, 240 F.3d 35, 38 (D.C. Cir. 2001) ("In fact, acceptance of a pardon may imply a confession of guilt."); *Bjerkan v. United States*, 529 F.2d 125, 128 n.2 (7th Cir. 1975) ("A pardon does not 'blot out guilt' nor does it restore the offender to a state of innocence in the eye of the law . . . .").

As explained by the Seventh Circuit, if a necessary qualification involves character or other qualifications that are affected by the underlying conduct regardless of conviction, the pardon has little effect, whereas when the qualifications are based on the fact of conviction, the pardon removes disqualification:

> The pardon removes all legal punishment for the offense. Therefore if the mere conviction involves certain disqualifications which would not follow from the commission of the crime without conviction, the pardon removes such disqualifications. On the other hand, if character is a necessary qualification and the commission of a crime would disqualify even though there had been no criminal prosecution for the crime, the fact that the criminal has been convicted and pardoned does not make him any more eligible.

*Yasak v. Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago*, 357 F.3d 677, 683 n.5 (7th Cir. 2004) (quoting *Bjerkan v. United States*, 529 F.2d 125, 128 n.2 (7th Cir. 1975)) (noting that "the effects of the *commission of the offense* linger after a pardon, the effects of the *conviction* are all but wiped out" (emphasis added)). BLM's 2014 conclusions, left undisturbed by Zinke,

were based on the conduct and character of the Hammonds in committing the offense, not the mere fact of the conviction (including conduct for which there was no conviction).

Defendants, and Secretary Zinke in his decision, cite *S.E.C. v. Lewis*, 423 F. Supp. 2d 337 (S.D.N.Y. 2006), to support that Secretary Zinke had the discretion to consider the pardon as changed circumstances that affected the analysis of renewing the permit. Mr. Lewis was a partner of a securities firm who was discouraged at the market manipulation that occurred just before a public offering, and so in 1986 he engaged in "market vigilantism," with no personal financial gain, to stop it from happening in one particular public offering. *Id.* at 338-39. He eventually pleaded guilty to three criminal counts and was sentenced to a fine and probation because of the uniqueness of the circumstances of the crime and the fact that he "devoted his life to the selfless service of others." *Id.* at 339. In 1990, in a civil suit, he agreed through a consent decree to a permanent injunction from violating certain securities laws. *Id.* In 2001 he was pardoned. *Id.* In 2006, the district court considered, under its equitable powers under Rule 60(b) of the Federal Rules of Civil Procedure, whether to modify the injunction. *Id.* at 340. The court reviewed the petition for modification under the standard established by the Supreme Court— whether "changed factual conditions" make compliance more onerous. *Id.* Under this standard, the court found that the pardon was a "changed factual condition." *Id.* at 341. The court also found that continuing the injunction was continued punishment for the conduct, 20 years earlier, underlying the pardon. *Id.* The court noted that such punishment is not appropriate when someone has been pardoned, because a pardon precludes continued punishment. *Id.*

*Lewis* is distinguishable. That decision involved a review under Rule 60(b), which specifically requires a court to consider, among other things, "changed factual circumstances." There is no comparable standard here, that considering a permit renewal may involve changed

factual circumstances after the expiration of the permit. Indeed, as discussed above, the regulations and agency practice show that post-permit changed factual circumstances are not part of the permit renewal analysis. Additionally, the court in *Lewis* found that maintaining the injunction constituted ongoing punishment for conviction. Secretary Zinke made no such finding. The Decision Memo found the opposite, that the permit non-renewal could not be considered a punitive consequence of conviction, because the grazing regulations established prohibited conduct and that permit non-renewal could result from engaging in such conduct, and BLM's 2014 decision was clear that it was based on regulatory non-compliance. *Lewis* does not support Secretary Zinke's reliance on the pardons to renew the Permit.

Secretary Zinke also stated that the pardons "reflect[ed] the President's judgment as to the seriousness of the Hammonds' offenses." AR 945. Secretary Zinke provides no basis for this assumption about the President's beliefs about the pardons, reasoning for the pardons, or beliefs about the seriousness of the underlying offenses. Secretary Zinke's assumption appears solely to be taken from the Decision Memo, which includes this conclusory suggestion. AR 960. The Decision Memo also did not provide any basis for this conclusion.

An agency's conclusion must have a rational connection to the facts before it. *Gill*, 913 F.3d at 1187. The pardons could have resulted from many different factors. They could have been, as Plaintiffs argue, the result of lobbying by powerful interest groups and friends of the President. They could have been, as Defendants assert and Secretary Zinke posited, the President's conclusion that setting fire to public lands, destroying public natural resources, and endangering the lives of the public and firefighters is not a very serious crime. They also could have been that the President believed, like the original sentencing judge believed, that the five-year mandatory minimum sentence was an inequitable sentence. The President may have

believed that the shorter sentences originally imposed of three months for Dwight Hammond and one year and one day for Steven Hammond were more equitable. Such a belief would not show that the underlying crimes were not serious or did not support permit nonrenewal, but merely that they did not support five years of confinement in a federal prison. Basing an agency decision on speculation regarding what the President may or may not have believed about the seriousness of the underlying crimes when granting executive clemency is inherently speculative and problematic.

If such speculation were to be a supportable basis on which to make an agency decision, there would need to be some evidence in the record supporting the conclusion drawn by the agency. The only possible evidence in the administrative record that could be considered to provide any insight into what the President believed and his motivation for granting the pardons is the Statement from the Press Secretary issued at the time of the pardons. The Statement provides:

> Today, President Donald J. Trump signed Executive Grants of Clemency (Full Pardons) for Dwight Lincoln Hammond, Jr., and his son, Steven Hammond. The Hammonds are multi-generation cattle ranchers in Oregon imprisoned in connection with a fire that leaked onto a small portion of neighboring public grazing land. The evidence at trial regarding the Hammonds' responsibility for the fire was conflicting, and the jury acquitted them on most of the charges.
>
> At the Hammonds' original sentencing, the judge noted that they are respected in the community and that imposing the mandatory minimum, 5-year prison sentence would "shock the conscience" and be "grossly disproportionate to the severity" of their conduct. As a result, the judge imposed significantly lesser sentences. The previous administration, however, filed an overzealous appeal that resulted in the Hammonds being sentenced to five years in prison. This was unjust.
>
> Dwight Hammond is now 76 years old and has served approximately three years in prison. Steven Hammond is 49 and has served approximately four years in prison. . . . Justice is

overdue for Dwight and Steven Hammond, both of whom are
entirely deserving of these Grants of Executive Clemency.

AR 968.

To the extent the statement could be considered providing evidence of the President's
motivations regarding the pardons, the press statement supports that the President was focused
on the unjustness of the length of the Hammonds' sentences and the terms of the sentences
already served by the Hammonds. It does not support the conclusion that the President was
focused on a belief that the crimes of conviction were not serious. Substantial evidence thus does
not support the agency's finding that the President held any particular belief about the
seriousness of the Hammonds' underlying crimes and whether they supported permit renewal or
nonrenewal.

Additionally, as discussed above, it is Secretary Zinke's statutory obligation to make a
finding of substantial compliance and a satisfactory record of performance, not the President's.
Whatever the President's belief about the seriousness of the underlying crimes, that alone does
not constitute a finding of substantial compliance or of a satisfactory record of performance,
even under the IBLA Test. The seriousness of the offense is merely one factor of the multi-factor
IBLA Test. Even if it could be construed that the President did not believe the Hammonds'
underlying criminal offenses were serious, that alone does not meet Secretary Zinke's obligation
to make a finding that HRI had a satisfactory record of performance.

Secretary Zinke was required to evaluate HRI's record of performance and failed to do
so. Secretary Zinke also provided no explanation for relying on the post-permit fact of the
pardons, which is a departure from agency norms. Further, Secretary Zinke expressly stated that
he found no fault with BLM's 2014 decision's findings of fact, which found that the Hammonds
engaged in significant violative conduct. Because the pardons had no effect on that underlying

conduct (both conduct that resulted in the underlying convictions, and conduct that did not result

in any conviction), even if Secretary Zinke had explained why relying on the post-permit

conduct of the pardons was permissible in this case, he did not provide any reasoned analysis

that had a rational basis in facts in the record for granting the Permit. Secretary Zinke's reliance

on the pardons, therefore, violated the APA because it was arbitrary and capricious, an abuse of

discretion, not rationally connected to the facts before the agency, inconsistent with the

governing statutes and regulations, and an unexplained change in agency practice and procedure.

### 3. Conduct Outside of the Convictions

The 2014 BLM decision also based its denial of the permit renewal on conduct in

addition to the conduct underlying the Hammonds' criminal convictions. In denying the stay, the

OHA found that reliance on this conduct was appropriate because BLM's review was governed

by a preponderance of the evidence standard versus the standard at the criminal trial of beyond a

reasonable doubt. The Decision Memo recognized that BLM relied on conduct outside of the

underlying convictions. Secretary Zinke, however, ignored this additional conduct relied on by

BLM. Because of Secretary Zinke's focus on the pardons as "important" changed circumstances,

he portrayed BLM's decision as solely based on the criminal convictions. Yet at the same time,

Secretary Zinke effectively adopted BLM's 2014 factual findings, which included all of BLM's

findings related to the Hammonds' conduct outside of the criminal convictions. Secretary Zinke

may not simply disregard without explanation the facts in the record that do not support his

chosen outcome. *Fox*, 556 U.S. at 537 ("An agency cannot simply disregard contrary or

inconvenient factual determinations that it made in the past, any more than it can ignore

inconvenient facts when it writes on a blank slate."). Because Secretary Zinke "entirely failed to

consider an important aspect of the problem, offered an explanation for [his] decision that runs

counter to the evidence before the agency, *Motor Vehicle Mfrs.*, 463 U.S. at 43, and simply

disregarded "contrary or inconvenient factual determinations" BLM had made in the past, *Fox,* 556 U.S. at 537, the Secretary's disregard of the Hammonds' conduct outside of the underlying criminal convictions also violated the APA.

## D.  Remedy

When a court determines that an agency's decision is unlawful under the APA, vacatur is the typical or usual remedy. *See* 5 U.S.C. § 706(2)(A) ("The reviewing court *shall ... set aside* agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" (emphasis added)); *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) ("We order remand without vacatur only in limited circumstances." (quotation marks omitted)); *accord Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (relief for APA error "normally will be a vacatur of the agency's order"). In the context of agency regulation, the Ninth Circuit has explained that "'when equity demands, the regulation can be left in place while the agency follows the necessary procedures' to correct its action." *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995)). Under these circumstances, "[w]hether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Id.* ((quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

Defendants argue that the Court should leave the Permit active during remand. The "limited circumstances" in which courts decline to vacate agency action generally involves agency rulemaking when merely technical violations have occurred, the violations clearly will be cured on remand, and significant disruptive consequences will occur with vacatur. *See, e.g.*, *Cal. Cmtys.*, 688 F.3d at 993-94 (EPA conceded errors with implementing final rule and requested

remand and court found vacatur during remand would delay implementation of critical power plant, be "economically disastrous" and likely create blackouts); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995) (delay to final rule could have wiped out a species of snail); *W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980) (vacatur would have thwarted "the operation of the Clean Air Act in the State of California during the time the deliberative process [was] reenacted"). The situation in this case does not meet this limited exception to vacatur.

The Secretary's failure to comply with the governing statutes and regulations, acknowledge his departure from agency policy and practices, and provide a reasoned explanation for that departure are all serious errors. Although it is possible that these errors can be cured on remand, it is also possible that the agency will find that HRI did not have a satisfactory record of performance. Thus, it is far from certain that a renewal permit will be issued after remand. Under such circumstances, the permit denial would not be "interim." This supports vacatur. *See Pollinator*, 806 F.3d at 532 (noting that in considering vacatur, the court has "looked at whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand" and vacating, in part, because "on remand, a different result may be reached").

Further, the disruptive consequences to Defendants resulting from vacatur, the loss of a few thousand dollars in grazing revenue, are not significant. The disruptive consequences to HRI resulting from vacatur also are not "economically disastrous" or otherwise so significant as to warrant deviation from the typical or standard remedy. HRI was able to maintain its ranching operation and obtain private grazing for the previous five years when it had no federal grazing

permit and, presumably, during this past year when it was allowed only reduced grazing. Moreover, HRI received significant government subsidies that more than offset the cost of private grazing. Additionally, many cattle grazing operations manage without the privilege of public grazing.

In their reply brief, Defendants stated with respect to disruptive consequences: "Individuals from the community have expressed concern about wildfire, which could pose a risk due to absence of grazing to reduce fine fuels accumulation." Defendants cited evidence submitted during the preliminary injunction phase of the case. At oral argument, Defendants reiterated the community members' concerns about wildfire risk as a potential disruptive consequence. Defendants, however, provided no additional evidence relating to wildfire danger. The evidence submitted at preliminary injunction does not show that significant disruptive consequences are likely to occur with vacatur.

As the Court discussed in its Opinion and Order granting in part the preliminary junction, the evidence regarding wildfire danger was general in nature and did not support any specific or imminent wildfire concern on the allotments. *W. Watersheds Project v. Bernhardt*, 392 F. Supp. 3d 1225, 1260-61 (D. Or. 2019). Further, it was contradicted by other evidence connecting grazing to *increased* risk of wildfire. *Id.* at 1261. Finally, the evidence relating to wildfire danger on the allotments was submitted before the 2019 grazing occurred. Such grazing reduced the presence of fine fuels. Defendants did not address the state of the allotments post-2019 grazing, including the admitted *overgrazing* of the Hammond allotment, and the allotments' current potential fire danger.

The Court has considered the seriousness of the Secretary's errors and the potential consequences of vacatur. The Court finds that the standard remedy of vacatur is appropriate in this case.[18]

## CONCLUSION

Plaintiffs' Motion for Summary Judgment (ECF 80) is GRANTED IN PART. Plaintiffs' motion is granted with respect to their claim that Secretary Zinke's conduct violated the APA. Defendants' Cross-Motion for Summary Judgment (ECF 86) on this claim is DENIED. The Court declines to reach the cross-motions for summary judgment on Plaintiffs' remaining claims. Plaintiffs' Motion to Consider Evidence Outside the Administrative Record (ECF 81) is GRANTED IN PART and DENIED AS MOOT IN PART. The Court grants the portion of the motion to which Defendants do not object and denies as moot the portion of the motion that is disputed. Plaintiffs' Partially Unopposed Motion to Take Judicial Notice of Documents Outside the Administrative Record (ECF 103) is GRANTED IN PART and DENIED AS MOOT IN PART. The grants the portion of the motion to which Defendants do not object and denies as moot the portion of the motion that is disputed. The parties shall confer and within 14 days of the date of this Opinion and Order jointly submit a proposed remand order and final judgment. If the

---

[18] Plaintiffs move that the Court consider evidence outside the record in considering whether to vacate on remand. Defendants object to some of the evidence offered by Plaintiffs. Defendants, however, also argue that when considering remand, the Court is not limited to the administrative record, and Defendants cite to evidence outside the administrative record. Regardless, the Court denies the disputed portion of Plaintiffs' motion as moot, because the Court did not consider that evidence in making its decision to remand with vacatur.

parties cannot agree on the form of order, they may submit separate forms, with a brief explanation of why the Court should enter their respective proposed forms.

**IT IS SO ORDERED**.

DATED this 20th day of December, 2019.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge